UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. _____ - Civ.

MAINSAIL PARENT, LLC
d/b/a ASPIRION, a Delaware limited
liability company, and
SPECIALIZED HEALTHCARE
PARTNERS, LLC, a Florida limited
liability company,

       Plaintiffs,

v.

DAVID JEWELL, an individual,
MICHAEL CAMERON, an individual,
ALISHA MAYS, an individual,
MEGAN KELLY, an individual, and
TERNIUM LLC, a Delaware
limited liability company.

       Defendants.

_____/

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs, Specialized Healthcare Partners, LLC and Mainsail Parent, LLC d/b/a Aspirion (collectively "Plaintiffs," "Aspirion" or "Company") sue Defendants, David Jewell ("Jewell"), Michael Cameron ("Cameron"), Megan Kelly ("Kelly"), Alisha Mays ("Mays"), and Ternium LLC ("Ternium") (collectively, "Defendants"), and allege as follows:

## NATURE OF THE ACTION

1.     This case of unfair competition arises between two revenue cycle management ("RCM") companies and involves four disloyal former employees who are actively executing an illegal scheme to divert clients and employees from Aspirion to Ternium. Two of those former employees, Jewell and Cameron, entered valid and straightforward restrictive covenants with

1

Aspirion, yet flagrantly breached those covenants by soliciting or inducing Aspirion's employees to resign from the Company and by soliciting or servicing Aspirion's clients and prospective clients. All four former employees – Jewell, Cameron, Mays, and Kelly (collectively, "Former Employee Defendants") – conspired and tortiously interfered with Aspirion's business relationships by poaching Aspirion's workforce and stealing Aspirion's clients for Ternium's benefit, and for their own benefit.

2.      Defendants' unlawful conduct is particularly harmful to Aspirion given that competition within the RCM industry is aggressive and highly sensitive to price and level of service provided. Aspirion fiercely competes with other RCM vendors throughout the United States. To succeed in this industry, Aspirion has devoted a significant amount of time, money, and effort since its inception in establishing and maintaining active, ongoing, and substantial accounts with some of the country's leading healthcare providers through developing and nurturing close-working relationships with specific clients. Once an account with a client is established, the Company expends substantial resources to provide RCM services to the client, customized to the client's specific needs, generating relationships with clients that repeatedly return to Aspirion seeking its assistance with RCM work.

3.      Aspirion has recently uncovered damning information revealing that Defendants have been covertly siphoning Aspirion's business for years—both before and after the Former Employee Defendants tendered their resignations to the Company. Defendants' blatant misconduct – in clear violation of employment contracts, the Company's policies, and applicable law – is actively eroding Aspirion's business and thus continues to cause, and threatens to cause, Aspirion serious and irreparable harm.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiffs' claims brought pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)-(c), and 28 U.S.C. § 1331.

5.      This Court has pendant jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

6.      Subject matter jurisdiction also exists by virtue of diversity of citizenship, 28 U.S.C. § 1332. The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of attorneys' fees, interest and costs, and there is complete diversity of citizenship.

7.      Plaintiff Specialized Healthcare Partners, LLC is a limited liability company organized and existing under the laws of the state of Florida, with its principal place of business located in Del Ray Beach, Palm Beach County, Florida. Specialized Healthcare Partners, LLC's lone member is a citizen of the state of Delaware. Specialized Healthcare Partners, LLC is in the business of providing RCM services and operates under the Aspirion brand as a wholly owned subsidiary of Mainsail Parent, LLC d/b/a Aspirion Health Resources ("Aspirion"). As further explained in the following paragraph, Aspirion is a citizen of Delaware.

8.      Plaintiff Mainsail Parent, LLC d/b/a Aspirion Health Resources ("Aspirion") is a limited liability company organized and existing under the laws of the state of Delaware, with its principal place of business located in Columbus, Georgia. Mainsail Parent, LLC's lone member, Mainsail Midco, LLC, is a citizen of the state of Delaware. Mainsail Midco, LLC's sole member is Mainsail Holdco LLC. Mainsail Holdco's sole members are four Delaware corporations with

their principal place of business in Wilmington, Delaware. Thus, for purposes of diversity of citizenship, Aspirion is a citizen of Delaware.

9.     Defendant Jewell was employed as a Managing Attorney and Executive Director of Client Success at the Company until his resignation in September 2023. Upon information and belief, Jewell is currently a resident of the state of North Carolina.

10.    Defendant Cameron was employed as a Vice President of Sales at the Company until his resignation in January 2024. Upon information and belief, Cameron is currently a resident of the state of Texas.

11.    Defendant Kelly was employed as a Managing Attorney and Executive Director of Client Success at the Company until her resignation in October 2023. Upon information and belief, Kelly is currently a resident of the state of Texas.

12.    Defendant Mays was employed as a Managing Attorney and Executive Director of Client Success at the Company until her resignation in November 2023. Upon information and belief, Kelly is currently a resident of the state of Florida.

13.    Defendant Ternium, LLC is a limited liability company organized under the laws of Delaware.  The information uncovered by Aspirion to date shows that Ternium is in the business of providing RCM services similar to those offered by Aspirion. Plaintiffs have made a reasonable effort to discover and allege Ternium's citizenship. Based on these efforts, Plaintiffs are informed and believe that Ternium is owned by four members – Defendants David Jewell, Michael Cameron, Megan Kelly and Alisha Mays. Jewell is a resident of North Carolina, Cameron and Kelly are residents of Texas, and Mays is a resident of Florida. Thus, for purposes of diversity of citizenship, Ternium is, therefore, a citizen of North Carolina, Texas, and Florida.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because (a) at least one defendant resides in the Southern District of Florida, (b) the Defendants conduct business in this District, and (c) a substantial part of the events giving rise to the claim occurred in this District.

15.     Venue is also proper in this Court pursuant to the forum selection clause in the Jewll Agreement (as defined below), § 24, and the Cameron Agreement (as defined below), § 24.

## FACTUAL BACKGROUND

### A.  The RCM Industry

16.     RCM vendors, such as Aspirion, focus on supporting hospitals and healthcare systems (also referred to as "healthcare providers") by providing services to more efficiently manage the healthcare provider's revenue cycles.

17.     The revenue cycle in healthcare is inherently complex. The fee healthcare providers are paid for a medical service is often a fraction of the fee billed for that service. The fee paid to a healthcare provider varies based on the type of medical care provided; medical necessity; provider and facility credentialing; the patient's medical insurance coverage, the terms of the healthcare provider's contract with a medical insurance company, laws and regulations governing potential payers, and compliance with medical coding, billing, documentation and submission standards. The complexity of the healthcare revenue cycle, the limited access to skilled staff, and the subject matter expertise required to maximize collections lead the majority of hospitals and health systems to partner with RCM vendors to help optimize reimbursements, identify and correct billing errors, pursue complex claims, assist with overturning denials, and collect fairly owed accounts receivables.

18.     The goal for RCM companies is to provide services that maximize healthcare provider revenue while decreasing the time spent on administrative and clinical functions and

accelerating the time to payment. This, in turn, supports the financial viability of healthcare providers and allows healthcare providers to devote more to patient care and treatment.

**B. Aspirion**

19.     Aspirion is a technology-enabled RCM vendor that supports hospitals and healthcare systems. Aspirion has over 170 clients nationwide. For over two decades, Aspirion has helped healthcare providers manage and improve their claims processing, payment, collection, and revenue generation functions and processes.

20.     Aspirion invests significant resources to develop and maintain goodwill with its customers and clients, workforce, and referral services. The Company's assembled workforce, in which it invests substantial time, money and resources, is comprised of more than 1,400 employees, including more than 170 attorneys and legal staff, over 60 clinicians, nine (9) sales representatives, and a team of other healthcare professionals. These roles vary from non-management level employees to executive level employees.

21.     The revenue cycle in healthcare is complex.  The fee paid to a provider varies based upon the type of medical care provided, medical necessity, provider and facility credentialing, the patient's medical insurance coverage, the terms of the provider's contract with a medical insurance company, laws and regulations governing potential payers, and compliance with medical coding, billing, documentation and submission standards. The complexity, limited access to skilled staff, and the subject matter expertise required to optimize collections, lead the majority of hospitals and health systems to partner with RCM vendors to help optimize reimbursements, identify and correct billing errors, pursue complex claims, assist with overturning denials, and collect fairly owed accounts receivables. RCM vendors in healthcare are focused on supporting hospitals and health systems by providing these services.

22.     Aspirion's service offerings are highly specialized and distinct from most other healthcare RCM vendors. Aspirion's core and most profitable line of business is Denials Management, with special emphasis on high-balance clinical denials. This type of work requires specialized expertise and training. As a qualification for their roles, three of the four Former Employee Defendants – Jewell, Kelly, and Mays – held juris doctorate degrees (J.D.s) and were trained by the Company to become subject matter experts regarding denied medical insurance claims. Achieving subject matter expertise requires years of health insurance denial resolution experience and mastering knowledge related to regulation, contracts, payer policy, and clinical care guidelines. Aspirion invests heavily in training and developing team members who can operate as subject matter experts in the healthcare revenue cycle marketplace. This expertise is not only core to Aspirion's performance outcomes but serves as a key differentiator in the healthcare revenue cycle marketplace.  The Former Employee Defendants' value in the marketplace is largely derived from the years of professional development and experience gained at Aspirion.

### C.  The Former Employee Defendants

#### Defendant David Jewell

23.     David Jewell was formerly employed by Specialized Healthcare Partners, LLC. Following Aspirion's acquisition of Specialized Healthcare Partners, LLC in July 2019, Jewell retained the role of Managing Attorney and was subsequently promoted to Managing Attorney & Executive Director of Client Success within the Company's Client Success Department ("Executive Director").

24.     In his role of Executive Director, Jewell oversaw approximately 25% of the Company's clients and was responsible for leading the team of legal and business professionals directly supporting those clients. Jewell was also tasked with business development and asked to identify opportunities for expansion and to cross-sell within his client base.

25.     Jewell was assigned to and served as the primary client-facing contact for numerous Company clients including Children's Hospital of Orange County, Cedars Sinai, and Piedmont Healthcare, among others. As Executive Director, he was responsible for client satisfaction, client retention, and client expansion. He was also responsible for ensuring the operations team's performance met the client's needs.

26.     In March 2018, Jewell entered into an employment agreement with the Company ("Jewell Agreement"). A true and correct copy of the Jewell Agreement is attached as **Exhibit 1.**

27.     The Jewell Agreement contains a Florida choice of law provision. Ex. 1, Jewell Agreement, § 17.

28.     Jewell agreed that he "shall devote his best efforts and his full business time and attention … to the business and affairs of the Company and its Subsidiaries and Affiliates." *Id*. § 2(b).

29.     Jewell further agreed that he would "perform his duties, responsibilities and functions to the Company and its Subsidiaries and Affiliates hereunder to the best of his abilities in a diligent, trustworthy, professional and efficient manner[.]" *Id.*

30.     As a condition of his employment, Jewell agreed to abide by certain restrictive covenants set forth in Section 10 of his employment agreement. Specifically, the Jewell Agreement includes a one-year post-separation prohibition on Jewell soliciting any of the Company's (or its affiliates or subsidiaries) employees who were employed by the Company (or its affiliates or subsidiaries) in the previous twelve (12) months:

> Employee agrees that, during the Employment Period and for twelve (12) months thereafter (the "Non-Solicitation Period") he shall not directly or indirectly either alone or in association with others (i) solicit, or facilitate any organization with which the Employee is associated in soliciting, any employee of the Company or any of its Subsidiaries or any of its Affiliates to leave the employ of the Company or any of its Subsidiaries or any of its Affiliates; [or] (ii) solicit for employment,

> hire or engage as an independent contractor, or facilitate any organization with which the Employee is associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed by the Company or any of its Subsidiaries or any of its Affiliates at any time during the term of the Employee's employment with the Company of any of its Subsidiaries or any of its Affiliates (provided, that this clause (ii) shall not apply to any individual whose employment with the Company or any of its Subsidiaries of any of its Affiliates has been terminated for a period of one year or longer)[.]

*Id.* § 10(a).

31.     Jewell also agreed that he would not interfere with Aspirion's (or its affiliates' or subsidiaries') relationships with their employees or induce or attempt to induce the Company's employees (or the employees of its affiliates or subsidiaries) to leave the Company during his employment:

> In addition, during the Employment Period, Employee shall not directly or indirectly through another person or entity (i) induce or attempt to induce any employee of the Company or any Subsidiary or any Affiliate to leave the employ of the Company or such Subsidiary or Affiliate, or in any way interfere with the relationship between the Company or any Subsidiary or any Affiliate and any employee thereof [or] (ii) hire any person who was an employee of the Company or any Subsidiary or any Affiliate at any time during the Employment Period[.]

*Id.* § 10(b).

32.     The Jewell Agreement also includes a one-year post-separation prohibition on Jewell soliciting, servicing, or interfering with any of the Company's clients (or the clients of the Company's affiliates or subsidiaries):

> Employee agrees that, during the Employment Period and for twelve (12) months thereafter (the "Non-Solicitation Period") he shall not directly or indirectly either alone or in association with others […] (iii) solicit business from or perform services for any customer, supplier, licensee or business relation of the Company or any of its Subsidiaries or any of its Affiliates, induce or attempt to induce, any such entity to cease doing business with the Company or any of its Subsidiaries or any of its Affiliates; or in any way interfere with the relationship between any such entity and the Company any of its Subsidiaries or any of its Affiliates.

*Id.* § 10(a).

33.     Jewell also agreed that he would not interfere with Aspirion's (or its affiliates' or subsidiaries') relationships with their clients or induce or attempt to induce the Company's clients (or the clients of its affiliates or subsidiaries) to cease doing business with the Company or its affiliates/subsidiaries during his employment:

> In addition, during the Employment Period, Employee shall not directly or indirectly through another person or entity (iii) induce or attempt to induce any customer, supplier, licenses, licensor, franchisee or other business relation of the Company or any Subsidiary or any Affiliate to cease doing business with the Company or such Subsidiary or such Affiliate, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary or any Affiliate (including, without limitation, making any negative or disparaging statements or communications regarding the Company or its Subsidiaries or its Affiliates).

*Id.* § 10(b).

34.     By signing his employment agreement, Jewell agreed that he would not solicit Aspirion's employees or clients and he would not solicit employees or clients of any of the Company's affiliates and subsidiaries.

35.     Jewell agreed these restrictive covenants were reasonable given his role with the Company and he expressly acknowledged that in his role he would (i) have access to and "become familiar with the Company's and its Subsidiaries' and its Affiliates' trade secrets and with other Confidential Information concerning the Company and its Subsidiaries and its Affiliates" and (ii) his services to the Company were "of special, unique and extraordinary value to the Company and its Subsidiaries and its Affiliates." *Id.* § 10(a).

36.     Jewell further agreed that any violation of the restrictive covenants constitute irreparable harm to the Company such that an appropriate remedy would be an injunction or similar equitable relief:

> (d) In the event of the breach or threatened breach by Employee of any of the provisions of this Paragraph 10, the Company and its Subsidiaries and its Affiliates would suffer irreparable harm, and in additional and supplementary to

other rights and remedies existing in its favor, the Company and its Subsidiaries and its Affiliates shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

*Id.* § 10(d); *see also id.* § 13.

37.     In addition to his non-solicitation covenants, Jewell agreed not to use or divulge the

Company's confidential information and to return all such information upon his separation from

the Company:

> 8.  Confidentiality. Employee acknowledges that this Agreement and the information, observations and data (including trade secrets) obtained by him while employed by the Company or its Subsidiaries or its Affiliates concerning the business or affairs of the Company or its Subsidiaries or its Affiliates ("Confidential Information") are the property of the Company or such Subsidiary or such Affiliate. Therefore, Employee agrees that he shall not disclose to any person or entity or use for his own purposes any Confidential Information or any confidential or proprietary information of other persons or entities in the possession • of the Company or its Subsidiaries or its Affiliates ("Third Party Information"), without the prior written consent of the Company's Managing Partners, unless and to the extent that the Confidential Information or Third Party Information becomes generally known to and available for use by the public other than as a result of Employee's acts or omissions. Employee shall deliver to the Company at the termination or expiration of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer files, disks and tapes, printouts and software and other documents and data (and copies thereof) embodying or relating to Third Party Information, Confidential Information, Work Product (as defined below) or the business of the Company or its Subsidiaries or its Affiliates which he may then possess or have under his control.

*Id.* § 8.

38.     Jewell further agreed not to pursue for his own benefit any business, commercial or

investment opportunities or offers that he receives or learns of during his employment with the

Company:

> 26.  Corporate Opportunity. Employee shall submit to the Company's Managing Partners all business, commercial and investment opportunities, or offers presented to Employee or of which Employee becomes aware at any time during the Employment Period which relate to the business currently or then conducted by the Company ("Corporate Opportunities"). Unless approved by the Company's

Managing Partners, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf.

*Id.* § 26.

39.     The Jewell Agreement is designed and intended to preserve and protect the Company's legitimate and protectable business interests within the meaning of Section 542.335(1)(b), Florida Statutes, including but not limited to, its substantial relationships (both existing and prospective) with Aspirion's workforce, customers and clients, and referral sources, and the substantial goodwill Aspirion has developed in connection with the foregoing relationships.

40.     In September 2023, Jewell called Aspirion's President and General Manager, Jeff Podraza, to provide notice of his resignation. During that conversation, Podraza reminded Jewell that his March 2018 employment agreement remained in effect, including the restrictive covenant confidentiality obligations.

41.     Effective September 27, 2023, Jewell resigned from his position with the Company.

42.     Upon information and belief, Jewell is a shareholder and member of Ternium.

**Defendant Michael Cameron**

43.     Michael Cameron was the former Chief Client Officer of the Company prior to Aspirion's acquisition of Specialized Healthcare Partners, LLC in July 2019. Following the acquisition, Cameron held the position of Senior Vice President of Sales at the Company.

44.     Cameron entered into an Employment Agreement with Aspirion, effective July 20, 2016 ("Cameron Agreement"). A true and correct copy of the Cameron Agreement is attached as **Exhibit 2.**

45.     The Cameron Agreement contains a Florida choice of law provision. *See* Ex. 2, Cameron Agreement, § 17.

46.     Cameron agreed to "devote his best efforts and his full business time and attention … to the business and affairs of the Company." *Id.* § 2(b). Cameron further agreed to perform his "duties and functions to the Company hereunder to the best of his abilities in a diligent, trustworthy, professional and efficient manner and [to] comply with the Company's policies and procedures in all material respects." *Id.*

47.     As a condition of his employment, Cameron agreed to abide by certain restrictive covenants set forth in Section 10 of his employment agreement. Specifically, the Cameron Agreement included a one-year post-separation prohibition on Cameron soliciting any of Aspirion's employees who were employed by the Company within the previous twelve (12) months:

> Employee agrees that, during the Employment Period and for twelve (12) months thereafter (the "Non- Solicitation Period"), he shall not directly or indirectly either alone or in association with others (i) solicit, or facilitate any organization with which the Employee is associated in soliciting, any employee of the Company to leave the employ of the Company; [or] (ii) solicit for employment, hire or engage as an independent contractor, or facilitate any organization with which the Employee is associated in soliciting for employment, hire or engagement as an independent contractor, any person who was employed by the Company at any time during the term of the Employee's employment with the Company (provided, that this clause (ii) shall not apply to any individual whose employment with the Company has been terminated for a period of one year or longer)[.]

*Id.* § 10(a).

48.     Cameron also agreed that he would not interfere with the Company's relationships with its employees or induce or attempt to induce any of the Company's employees to leave the Company while he was employed at the Company and for twelve months following termination of employment:

> Employee agrees that, during the Employment Period and for twelve (12) months thereafter (the "Non- Solicitation Period"), he shall not directly or indirectly either alone or in association with others (i) induce or attempt to induce any employee of the Company to leave the employ of the Company, or in any way interfere with the

relationship between the Company and any employee thereof, (ii) hire any person who was an employee of the Company at any time during the Employment Period[.]

*Id.* § 10(b).

49.     His employment agreement also included a one-year post-separation prohibition on

Cameron soliciting or servicing any of the Company's clients:

> Employee agrees that, during the Employment Period and for twelve (12) months thereafter (the "Non- Solicitation Period"), he shall not directly or indirectly either alone or in association with others […] (iii) solicit business from or perform services for any customer, supplier, licensee or business relation of the Company or any of its subsidiaries, induce or attempt to induce, any such entity to cease doing business with the Company or in any way interfere with the relationship between any such entity and the Company[.]

*Id.* § 10(a).

50.     Cameron also agreed to not solicit Aspirion's clients while employed at the

Company:

> [D]uring the Employment Period, Employee shall not directly or indirectly through another person or entity […] (iii) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company to cease doing business with the Company, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company (including, without limitation, making any negative or disparaging statements or communications regarding the Company).

*Id.* § 10(b).

51.     Cameron agreed that any breach (or threatened breach) of the restrictive covenants

constitutes irreparable harm to the Company such that an appropriate remedy is injunctive or

similar equitable relief:

> (d) In the event of the breach or a threatened breach by Employee of any of the provisions of this Paragraph 10, the Company would suffer irreparable harm, and in addition and supplementary to other rights and remedies existing in its favor, the Company shall he entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof (without posting a bond or other security).

*Id.* § 10(d).

52.     Given his role with the Company, Cameron acknowledged that he would have access to and "become familiar with the Company's trade secrets and with other Confidential Information concerning the Company" and agreed not to use or divulge Aspirion's Confidential Information:

> 8. <u>Confidentiality</u>. Employee acknowledges that this Agreement and the information, observations and data (including trade secrets) obtained by him while employed by the Company concerning the business or affairs of the Company ("Confidential Information") are the property of the Company. Therefore, Employee agrees that he shall not disclose to any person or entity or use for his own purposes any Confidential Information or any confidential or proprietary information of other persons or entities in the possession of the Company ("Third Party Information"), without the prior written consent of the Company's Managing Partners, unless and to the extent that the Confidential Information or Third Party Information becomes generally known to and available for use by the public other than as a result of Employee's acts or omissions. Employee shall deliver to the Company at the termination or expiration of the Employment Period, or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer files, disks and tapes, printouts and software and other documents and data (and copies thereof) embodying or relating to Third Party Information, Confidential Information, Work Product (as defined below) or the business of the Company which he may then possess or have under his control.

*Id.* § 8.

53.     Cameron further agreed not to pursue for his own benefit any business, commercial or investment opportunities, or offers that he learns of or receives during his employment with the Company:

> 26. <u>Corporate Opportunity</u>. Employee shall submit to the Company's Managing Partners all business, commercial and investment opportunities, or offers presented to Employee or of which Employee becomes aware at any time during the Employment Period which relate to the business currently or then conducted by the Company ("Corporate Opportunities"). Unless approved by the Company's Managing Partners, Employee shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Employee's own behalf.

*Id.* § 26.

54.     The Cameron Agreement is designed and intended to preserve and protect the Company's legitimate and protectable business interests within the meaning of Section 542.335(1)(b), Florida Statutes, including but not limited to, its substantial relationships (both existing and prospective) with Aspirion's workforce, customers and clients, and referral sources, and the substantial goodwill Aspirion has developed in connection with the foregoing relationships.

55.     Effective January 31, 2024, Cameron resigned from his position with the Company.

56.     Upon information and belief, Cameron is a shareholder and member of Ternium.

**Defendants Alisha Mays and Megan Kelly**

57.     Both Mays and Kelly held the title of Managing Attorney & Executive Director of Client Success and, therefore, had the same or similar responsibilities as Jewell.

58.     Prior to Mays's resignation from Aspirion in October 2023, she was the Managing Attorney & Executive Director at the Company who was responsible for 25% of client accounts, including the Banner Health account. In this role, Mays was the Company's primary client-facing representative on the account responsible for client satisfaction, client retention, client expansion, and ensuring the operations team was meeting Banner Health's needs.

59.     Mays also served as Aspirion's primary touchpoint for Evangelical Health while employed at the Company.

60.     Likewise, Kelly was entrusted with and responsible for leading Aspirion's relationship with another 25% of the Company's clients including Parkview Health and Centura Health, among others.

61.     Kelly resigned from Aspirion on October 13, 2023, which was just three weeks after Jewell left the company.

62.     Mays resigned from Aspirion on October 20, 2023, which was one week after Kelly resigned.

63.     On information and belief, Kelly and Mays are shareholders in Ternium.

**D.  Aspirion's Policies Protecting Its Confidential Information**

64.     Given their respective roles, all four Former Executive Defendants were intimately familiar with the Company's marketing strategies, confidential pricing information, and business development plans. They also had knowledge of and access to Aspirion's Confidential Information, which encompasses, among other things, its most sensitive trade-secret, confidential, competitively-sensitive, proprietary, and commercially valuable business information, including the Company's business accounts, financial information for every client, operational structure, proprietary algorithms, processes and methodologies, compensation plans, operational processes, workforce training materials, prospective and existing customers, vendor lists, personnel information, marketing and sales techniques, systems, reports, client specific analytics and business plans, among other confidential business information ("Confidential Information"). Aspirion's Confidential Information gives the Company competitive advantages over its competitors.

65.     Moreover, all four Former Employee Defendants had access to some of the Company's most secret and competitively sensitive information – including prospective customer lists and intelligence about evolving and pending sales opportunities. Aspirion's prospective customers are compiled in a cloud-based platform, SalesForce. The platform does not only include a list of the Company's identified prospects, but also identifies key decision-makers at each prospect, and contains notes on each opportunity, information related to negotiation and pricing strategies, and data on prospective client needs, preferences, and buying behaviors. The Company has dedicated and continues to dedicate significant investment (both time and money), research,

business intellect, client relationships and data collection efforts to compile the data captured in SalesForce. The information contained in Aspirion's SalesForce platform, compiled over the course of two decades, gives the Company a competitive advantage over its competitors.

66.     Aspirion protects the secrecy of its Confidential Information and its goodwill and client relationships from unfair competition by having its key employees, such as Jewell and Cameron, execute employment agreements containing non-solicitation covenants and confidentiality provisions.

67.     The Company also maintains robust policies and procedures to ensure employees protect its Confidential Information. As a condition of their continued employment with Aspirion, each of the four Former Employee Defendants annually reviewed and agreed to abide by the "Aspirion Acceptable Use Policy." The purpose of the Acceptable Use Policy "is to outline the acceptable use of Aspirion data, devices and equipment, Aspirion's information systems and Aspirion's client's information system." The agreement, at the outset, requires that "users maintain confidentiality indefinitely, even after the contract, work, employment, or any other aspect of involvement with Aspirion has ended." A true and correct copy of the Acceptable Use Policy is attached hereto as **Exhibit 3**.

68.     The Acceptable Use Policy contains the following three prohibitions concerning Plaintiff's Confidential Information:

- Employees will not disclose confidential information, such as internal policies, business correspondence, company announcements, without authorization and will not use confidential information to compromise the organization in any way.

- Employees should not save or store confidential information in unsecure areas on their computer such as in the "downloads" folder or on the user's desktop and should empty the computer's "trash" regularly.

18

- Employees must not disclose confidential information to non–employees, family members or organization outsiders without authorization from Aspirion Management.

Ex. 3, Acceptable Use Policy, Sec. XI(a)(i) (1), (3)-(4).

69. It also expressly provides that "[e]mployees' duty to protect confidential information will survive termination of employment and remain in effect until such information becomes public knowledge, or until Aspirion provides written notice releasing employee from the obligations set forth in this policy, whichever occurs first." *Id*. Sec. XI(a)(i)(2).

70. Each of the Former Employee Defendants expressly acknowledged that they understood and would comply with the required "Aspirion Acceptable Use Policy." *See* **Exhibit 4**, Acceptable Use Policy and Training Acknowledgement Forms for M. Cameron, D. Jewell, M. Kelly and A. Mays.

71. The Employee Code of Conduct within the Aspirion Employee Handbook further underscores the Company's commitment to protecting its Confidential Information. The "Employee Code of Conduct" specifically lists "[f]ailure to maintain confidentiality of information concerning other employees, customers, or the Company" as a violation of Company policy, punishable by termination. A true and correct copy of the Aspirion Employee Handbook is attached hereto as **Exhibit 5.**

### E. Aspirion Discovers Ternium and Its Connection to the Former Employee Defendants.

#### 1. Aspirion Notices "Ternium" In its Clients' Accounting Systems.

72. Aspirion's clients – hospitals and health systems – typically maintain online systems to track and manage RCM vendors assigned to resolve the healthcare provider's claim denials ("Accounting Systems"). In the normal course of business, Aspirion monitors placement notes (also referred to as "claim" or "referral" notes) found in Accounting Systems to ensure that

Aspirion is processing accounts efficiently and receiving a continuous assignment of claims, and to troubleshoot if a client decreases Aspirion's placements. *See* Declaration of T. Page, attached as **Exhibit 6**, at ¶ 15.

73.     Banner Health is one of Aspirion's clients that maintains an Accounting System. In February 2024, Aspirion's Vice President Legal Center of Excellence, Thomas Page, first noticed "Ternium" while reviewing placement notes on claims assigned to Aspirion in Banner Health's Accounting System. *Id.* ¶ 10.

74.     Page was also informed by certain managing attorneys in February 2024 that "Ternium Revenue Cycle Management" was listed as a vendor in an Accounting System maintained by a different Company client, Evangelical Health. *Id*.

75.     Given that Aspirion had yet to uncover information linking the Former Employee Defendants to Ternium, the listing of Ternium in Banner Health's and Evangelical Health's Accounting Systems did not trigger any concern from Page and others at that time. *Id*. Nonetheless, Ternium's listings provide evidence of Defendants' solicitation of Aspirion's clients.

### 2.     Aspirion Identifies Its Ex-Employees Listed on Behalf of "Ternium" In Its Clients' Accounting Systems.

76.     Months after references to Ternium were observed in Banner Health's and Evangelical Health's Accounting Systems, in May 2024, a separate supervising attorney reported to Page that a former employee, Liaran Aleman, had left a note on a denial assigned to Aspirion in the Children's Hospital of Orange County ("CHOC") Accounting System. *Id.* ¶ 11. The note, which was discovered on or about May 17, 2024, was entered by "Aleman, Liaran" on April 24, 2024 and indicated that she had entered the note on behalf of an entity listed as "TRCM." *Id*.

77.   The CHOC Accounting System also indicated that former employee Monica Duenas was assigned and actively working denials on behalf of an entity referred to as "Ternium RCM." *Id.* ¶ 13.

78.   At the time, Aspirion still did not know that Jewell and Cameron were behind Ternium, or that Duenas had any involvement with Ternium other than servicing clients on its behalf. *Id*. ¶ 14.

### 3.   Aspirion Becomes Aware that Jewell is Working on Behalf of Ternium and Immediately Sends a Cease-and-Desist Letter and Initiates an Investigation.

79.   On June 20, 2024, about a month following the discovery of Aleman's and Duenas's presence in CHOC's Accounting System, Page was again monitoring notes in Banner Health's Accounting System during the normal course of his work. *Id.* ¶ 16. During his review, Page saw the names of former Company employees listed as "users" in the Banner Health Accounting System. *Id*. This included the name of David Jewell, who was listed with an "@terniumrcm.com" email address. *Id*. Page also saw Mays, Kelly, and two other former Aspirion employees listed in the Banner Health Accounting System with "@terniumrcm.com" email addresses. *Id*.

80.   Jewell taking business from a Company client on behalf of himself or a competitor is the very reason Aspirion required Jewell to agree to a non-solicit covenant. For that reason— and because of the considerable number of ex-Company employees who had apparently join Jewell at Ternium—the discovery of Ternium personnel in Banner Health's Accounting System was deeply concerning to Aspirion. In response, Aspirion immediately retained outside counsel and transmitted a cease-and-desist letter to Jewell on June 26, 2024. *See* Declaration of A. Amick, attached as **Exhibit 7**, at ¶ 33.

81.   This incident also prompted the Company to immediately initiate an internal IT investigation to determine the extent of Ternium's involvement with the Company's employees

and clients. Ex. 7, A. Amick Decl. ¶ 36. Aspirion also notified certain employees to be on the lookout for signs of Ternium activity they may come across during their usual course of work.

### F. Aspirion's Investigation Uncovers That Defendants Formed and Operated Ternium Long Before They Resigned From The Company.

82.     Jewell's involvement in Ternium prompted the Company to initiate an internal IT investigation to determine the full extent of Defendants' business activities. Ex. 7, A. Amick Decl. ¶ 36.

83.     Aspirion was shocked by the information that resulted from the investigation. *Id.*

#### 1. The Former Employee Defendants Formed Ternium While Employed by Aspirion.

84.     Aspirion uncovered information revealing that the Former Employee Defendants began making plans to form a new RCM company while still employed at the Company. Moreover, Defendants' efforts began as early as August 2022—more than a year before any of the Former Employee Defendants separated from the Company. *Id.* ¶ 37.

85.     Plaintiff's internal IT investigation uncovered emails between the Former Employee Defendants from August and September 2022, in which they refer to each other as the "Dream Team," schedule a meeting with a prospective financial backer, and discuss or otherwise reference their plans to form a new RCM company. *Id.* at ¶ 37(a).

86.     On August 26, 2022, Cameron exchanged emails with a law firm seeking legal advice related to "starting a new company" and drafting "fair partnership agreements." *Id.* ¶ 37(b).

87.     The Former Employee Defendants did not merely explore a potential business venture in 2022, but actually formed the competing company and began soliciting and potentially servicing Aspirion's clients more than a year before Jewell resigned.

88.     On September 28, 2022, the Former Employee Defendants filed articles of organization for Ternium with the Delaware Secretary of State.

89.     Then on March 22, 2023, on information and belief, Defendants registered for the web domain "TerniumRCM.com" on goDaddy.com. Again, this occurred many months before any of the Former Employee Defendants separated from the Company.

90.     Between April 15 and April 17, 2024, all four Former Employee Defendants each filed articles of organization to form limited liability companies. On April 15, 2024, Cameron filed articles of organization for Dallas Mike and Associations, LLC and Kelly filed articles of organization for Willjack Holdings, LLC with the Texas Secretary of State's Officer; a day later, on April 16, 2024, Mays filed articles of organization with the Florida Secretary of States for Grand Champion Enterprises, LLC; and Jewell filed articles of organization with the North Carolina Secretary of State for CaraBlu Capital, LLC on April 17, 2024.

### 2. The Former Employee Defendants Solicited Aspirion's Clients While Employed by Aspirion.

91.     The Company's internal IT investigation and instruction for employees to look out for signs of Ternium uncovered additional information demonstrating that Defendants solicited Aspirion's clients while the Former Employee Defendants were employed at the Company.

92.     Aspirion team members identified information in the Banner Health Accounting System during the usual course of business indicating that Ternium had successfully solicited business from and contracted with Aspirion client Banner Health and potentially as early as October 2022. Ex. 6, T. Page Decl., ¶ 18. This includes a referral note dated October 2022 on a denied claim that had been assigned to Aspirion for resolution. *Id.*

93.     Page also personally discovered a system-generated note in the Banner Health system which indicated that a different denied claim that was also assigned to Aspirion had been previously assigned to or otherwise logged as "Ternium Placement – Clinical". This system-generated note was dated April 2023. *Id.* ¶ 19.

94.     Defendants' solicitation of Banner Health is further corroborated from an email that surfaced from the IT investigation which leads Aspirion to believe that Jewell and Cameron had commenced contract negotiations with Banner Health prior to September 2023, at a time when all four Former Employee Defendants were employed by the Company. Ex. 7, A. Amick Decl. ¶ 38(b).

95.     On February 1, 2024, mere days after an employee named Liaran Aleman resigned from the Company, Banner Health sent an email to Aleman's Aspirion email account confirming an update to her employer, credentials and related information in their system to reflect that she "no longer worked for [Aspirion]" and was now at Ternium. *Id*.

96.     Furthermore, based on emails discovered during Aspirion's internal IT investigation, Jewell and Cameron were negotiating contracts between Ternium and another Company client as early as April 2023 while both were still employed at the Company.

97.     Aspirion's investigation also uncovered evidence that Defendants also solicited business from Aspirion client Children's Hospital of Orange County ("CHOC"). *Id*. ¶ 38(a).

98.     CHOC has been an Aspirion client since September 2021. Mike Cameron was the sales representative assigned to CHOC, Dave Jewell was the assigned Client Success Executive Director, Monica Duenas was the Client Success Manager, and Liaran Aleman was an Associate Attorney assigned to work their accounts. Ex. 6, T. Page Decl. ¶ 12.

99.     In June 2023, Cameron emailed leadership at CHOC to inquire about the status of Ternium's prospective contract, a contract Defendants initially submitted for approval in April 2023, while all four Former Employees were still employed at Aspirion. Ex. 7, A. Amick Decl., ¶ 38(a).

100.     Based on the foregoing evidence documented through emails and activity recorded in the Banner Health Account System, it is clear that Ternium was soliciting, and potentially performing services for, at least two different Company clients as early as October 2022.

### 3.  The Former Employee Defendants Pursued Aspirion's Corporate Opportunities for Their Benefit and While Employed by Aspirion.

101.     Evidence also shows that Cameron and/or Jewell pursued work from one of Aspirion's prospective clients, using the Company's compilation of prospects and related data in its SalesForce database, on behalf of Ternium and while still employed by the Company.

102.     The investigation yielded emails from summer 2023 in which Cameron requested a copy of the bid package Aspirion submitted in response to the University of New Mexico ("UNM") Health's request for proposal. Ex. 7, A. Amick Decl. ¶ 39(b). Cameron was sent a complete set of bid documents, including drafts of the bid itself, pitch materials, and master services agreement, in advance of UNM's October 2023 supplemental RFP deadline. *Id*.; *see also* Declaration of G. Shorten, attached as **Exhibit 8**, at ¶¶ 22-23.

103.     On February 7, 2024,  Aspirion received formal notice that it had lost the UNM bid. The formal notice also provided the list of all bidders which included Ternium, confirming that Ternium also submitted a bid for the project. Ex. 8, Shorten Decl. ¶ 24; Ex. 7, Amick Decl. ¶ 39(b).

104.     Upon information and belief, Cameron and/or Jewell were pursuing the UNM bid on behalf of Ternium while Cameron was simultaneously leading the bid process for Aspirion and Jewell was assigned as a subject matter expert supporting the Aspirion bid submission.

105.     The investigation also revealed that, in January 2023, more than a year before Cameron would resign, Cameron contacted one of Aspirion's identified prospective clients, Valleywise Health, based on "a note in our [Aspirion's] database". Ex. 7, A. Amick. Decl. ¶ 39(a).

106.    Cameron understood and acknowledged that the prospect was being pursued by a different Aspirion sales representative, Paul Morino. *Id*. Despite this, Cameron suggested to Valleywise Health that the hospital work with Cameron instead. *Id*.

107.    Upon information and belief, Cameron and/or Jewell used Aspirion's list of prospects in SalesForce to identify and pursue business at Valleywise on behalf of Ternium while still employed at Aspirion and even though Cameron and/or Jewell were aware that other Aspirion sales personnel were pursuing the same prospect for Aspirion.

108.    Louisiana Children's Medical Center ("LCMC") was another prospective client that was identified and pursued by Cameron and/or Jewell for Ternium.

109.    Aspirion's forensic IT investigation revealed evidence that Cameron identified and solicited business from LCMC for Ternium in August 2023, at a time when all four Former Defendants were still employed at Aspirion.

110.    Aspirion sales representative Paul Morino had logged LCMC in the Company's SalesForce database as a new opportunity in January 2023 and was having ongoing discussions with LCMC to explore a potential contract with Aspirion. Ex. 7, A. Amick. Decl. ¶ 39(c).

111.    During the investigation, Aspirion discovered a calendar invite from August 8, 2023, indicating that Mike Cameron met with leadership from  LCMC over dinner, while still employed at Aspirion. *Id*.

112.    Another email uncovered, dated May 11, 2024, from LCMC to Kelly's Aspirion email and cc'ing her "@terniumrcm.com" email, states that former Aspirion employee, Monica Duenas' LCMC account is set to expire unless renewed for an additional 180 days. *Id*.

113.    This confirms that Ternium pursued and obtained a contract with LCMC, likely in the fall of 2023 while all four Former Employee Defendants (but certainly Cameron) were still employed by Aspirion. *Id*.

114.    Upon information and belief, Cameron and/or Jewell used Aspirion's list of prospective clients and known opportunities to identify and pursue the LCMC opportunity on behalf of Ternium while other Aspirion sales personnel were pursuing the same prospective clients for Aspirion.

115.    Aspirion has not been awarded business at LCMC. *Id*.

### 4. The Former Employee Defendants Solicited Aspirion's Employees While Employed by Aspirion and Thereafter.

116.    In addition to soliciting clients, Aspirion's forensic IT investigation unearthed evidence demonstrating that Defendants solicited Aspirion's employees beginning immediately after Jewell's resignation in September 2023 if not earlier.

117.    Upon information and belief, Jewell and Cameron solicited and/or induced Defendants Mays and Kelly to resign from Aspirion and joint Ternium in clear violation of their restrictive covenants. Mays and Kelly did resign in October 2023 and, upon information and belief, joined Ternium shortly thereafter.

118.    Not long after Jewell, Kelly, and Mays resigned from the Company, three additional attorneys left the Company. On November 7, 2023, Monica Duenas resigned on November 7, 2023; Alexis Elkins resigned on November 17, 2023; and Liaran Aleman resigned on January 29, 2024. Ex. 6, T. Page Decl.¶ 8.

119.    In addition, Aspirion's forensic IT investigation revealed that Cameron prepared to covertly solicit individuals to join Ternium during and post his employment with Aspirion.

120.     On November 30, 2022, Cameron received an email from employment counsel attaching a draft non-disclosure agreement titled "Ternium NDA." Ex. 7, A. Amick Decl., ¶ 37(c). The prefatory language indicated that the purpose of the agreement is to allow parties "to discuss certain matters regarding potential business transactions[.]" *Id*. The draft NDA also contains a signature block listing "Ternium, LLC" as a party to the agreement and "Dave Jewell" as the individual signing on behalf of "Ternium, LLC." *Id*.

121.     Defendants used similar NDAs when soliciting Aspirion's employees. For example, Liaran Aleman informed her supervisor in early January 2024 that she had received an offer from another employer and was required to sign an NDA in order to discuss a potential employment opportunity with them. Ex. 6, T. Page Decl., ¶ 9. As part of its internal IT investigation, the Company discovered a January 11, 2024 email from Aleman's personal account to her Aspirion account attaching the NDA she was asked to sign, which bears the Ternium logo. Ex. 7, A. Amick Decl. ¶ 40(a).

122.     Of course, Aleman is the same ex-employee  whose employer, contact and related information in the Banner Health system required updating within days of leaving the Company, thus confirming that it was Ternium who solicited her. *Id.* ¶ 40(b).

**G. Even After Aspirion Sent the Cease-and-Desist Letter, Defendants Continue to Actively Solicit Aspirion's Clients and Employees.**

123.     Since transmitting its cease-and-desist letter on June 26, 2024, evidence has emerged demonstrating that Jewell and Cameron do not intend to cease their unlawful activities.

124.     Although counsel for Jewell has responded to Aspirion's cease-and-desist letter and claimed that the restrictive covenants in Jewell's employment agreement were unenforceable, counsel for Jewell did not deny that Jewell solicited Aspirion's employees and clients Ex. 7, A. Amick Decl., ¶ 33.

125.     The Company has since received multiple reports from different sources relaying that Cameron has openly boasted about his new company's successful efforts to poach or divert clients away from Aspirion and to Ternium.

126.     On July 1, 2024, Aspirion's Chief Experience Officer received a phone call from a friend who reported that Cameron was describing the new company he formed and how his new company was stealing Aspirion's clients. *See* Declaration of T. Eller, attached as **Exhibit 9**, at ¶¶ 6-8.

127.     On July 10, 2024, several Company employees received a meeting invite from Aspirion's new client, Baptist Medical Center Jacksonville ("Baptist Jacksonville"), related to a training presentation that was mandatory for all new vendors. Former Company employees, Mays and Katherine Drolet were also listed as recipients of the meeting invite with "@terniumrcm.com" email addresses. Ex. 6, T. Page Decl. at ¶ 25; Ex. 7, A. Amick Decl. ¶ 34.

128.     Drolet resigned from the Company on May 29, 2024, less than two months prior to her appearing on the July 10, 2024 meeting invite with a Ternium email address. Ex. 6, T. Page Decl. at ¶ 22.

129.     In the days immediately following the July 10, 2024 email, Baptist Jacksonville's Vice President of Revenue Cycle confirmed that Ternium had solicited business from Baptist Jacksonville and was selected as one of four vendors to perform work on the hospital's denied claims. Ex. 8, G. Shorten Decl. ¶ 15.

130.     Cameron was leading the Baptist Jacksonville opportunity for Aspirion before his resignation from the Company in January 2024.

131.     Furthermore, in the past week, Aspirion has been notified by both an existing client and a prospective client that they had recently been in contact with Jewell and/or Cameron. In a

July 18, 2024 meeting with Houston Methodist Hospital's ("Houston Methodist") Vice President of Revenue Cycle Operations, Aspirion learned that Cameron had recently reached out to Houston Methodist to discuss potentially partnering with his new company, Ternium. *See* Declaration of B. Webster, attached as **Exhibit 10**, at ¶¶ 11-12.

132.    The following day, on July 19, 2024, the Senior Director of Denial Prevention at Aspirion's existing client Children's Medical Center Dallas ("Dallas Children's"), similarly disclosed that Dallas Children's had recently met with Jewell and Cameron who were "trying to get some of [Dallas Children's] business." *Id.* ¶¶ 6-7.

133.    Also, on July 19, 2024, Aspirion learned that Cameron recently contacted the Chief Revenue Cycle Officer of long-term Aspirion client, UC San Diego, and offered to take him golfing. That golf outing was scheduled for July 26, 2024. *See* Declaration of B. Manderson, attached as **Exhibit 11**, at ¶ 6.

134.    Jewell and Cameron also continue to initiate contact with Aspirion's current employees. In fact, Cameron contacted one of Plaintiff's current employees on the Client Success Team, Lainey Johnson, as recently as July 15, 2024. Ex. 9, T. Eller Decl, at ¶ 9.

135.    All conditions precedent to filing this action have occurred, have been performed, have been waived, or are otherwise futile.

136.    Over the past 12 months Aspirion has seen an 83% reduction in the aggregate claims dollar value placed with Aspirion from Banner Health and an 89% reduction from CHOC, two Aspirion clients the Defendants have solicited and won business from. The business that was awarded to Defendants was business historically placed with Aspirion. Given that Aspirion is compensated on a contingency basis as a percentage of dollars ultimately collected on a denied

claim, this substantial reduction in the placement of claims at these two clients alone already has caused Aspirion significant economic harm. Ex. 7, A. Amick Decl., at ¶ 44.

137.    Aspirion estimates that as a result of Defendants' breaches and wrongful conduct, it has suffered money damages in the amount of at least $4 million from known lost client revenue and compensation paid to Defendants for which they are not entitled. This amount only takes into account lost business at the small number of clients Plaintiffs have been able to identify as Ternium clients through Aspirion's forensic IT investigation. Aspirion suspects Defendants have solicited and obtained business from additional Company clients and therefore expects the amount of actual damages suffered by Aspirion to be much greater.

138.    In addition, Defendants' ongoing breaches and misconduct poses the threat of further and irreparable harm to Aspirion in the form of lost client relationships, lost employees, lost goodwill, and the misuse of Aspirion's confidential and proprietary business information that Defendants had access to during their employment, as described above.

139.    Aspirion has retained the undersigned attorneys to represent it in this action and has agreed to pay them a reasonable fee for their services.

## COUNT I
## BREACH OF CONTRACT – RESTRICTIVE COVENANTS
## AGAINST DAVID JEWELL

140.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3,  and 16-139 above as though fully set forth herein.

141.    Jewell's employment agreement is a valid and enforceable contract that contains valid and enforceable restrictive covenants within the meaning of Fla. Stat. § 542.335.

142.    Plaintiffs are informed and believe that Jewell founded Ternium, together with the other Former Employee Defendants, in or around September 2022. Plaintiffs are informed and believe Jewell has been and continues to be employed by Ternium.

143.    Ternium is an RCM company that provides the same or similar services to those provided by Plaintiffs. Ternium has been retained to provide or is currently providing services to various Company clients including, but not limited to, CHOC, Banner Health, Baptist Jacksonville, and Evangelical Health, among others.

144.    Jewell has breached and is still in breach of the non-solicitation provisions of the Jewell Agreement by soliciting business from or servicing Plaintiffs' existing customers including, but not limited to, Children's Hospital of Orange County, Evangelical Health, Banner Health, Baptist Jacksonville, UC San Diego, and Dallas Children's.

145.    Jewell has breached and is still in breach of the non-solicitation provisions of the Jewell Agreement by inducing or attempting to induce Plaintiffs' clients, customers, licensees, suppliers and other business relations to cease doing business with Aspirion.

146.    Jewell has breached and is still in breach of the Corporate Opportunities provision of the Jewell Agreement by pursuing the Company's prospective customers on his own behalf and for his own benefit.

147.    Ternium currently employs eight individuals who were employed by Aspirion in the past twelve months, including the four Former Employee Defendants.

148.    Jewell has breached and continues to breach the non-solicitation provisions of his employment agreement by soliciting Plaintiffs' employees, including but not limited to, the other Former Employee Defendants in this action and additional four former Aspirion employees Elkins, Duenas, Aleman, and Drolet.

149.    Jewell's conduct is in violation of the express terms (as well as Plaintiffs' reasonable expectations)  of the restrictive covenant provisions in his employment agreement.

150.    As a direct and proximate result of Jewell's breach of his employment agreement, Plaintiffs have suffered and continue to suffer damages.

151.    Jewell's conduct, together with the other Former Employee Defendants and Ternium, constitutes a deliberate and material breach of his employment agreement, which has caused (and will continue to cause) damages and irreparable harm to Plaintiffs' business, customer relationships, and goodwill.

152.    Plaintiffs performed all of the obligations that the Jewell Agreement required Plaintiffs to perform.

153.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Jewell's breach of his obligations under the restrictive covenant provisions under his employment agreement.

154.    Plaintiffs have an inadequate, insufficient, and/or incomplete remedy at law and are entitled to injunctive relief enjoining Jewell from the conduct described herein.

155.    The material portions of the Jewell Agreement have been recited, referenced or incorporated in this Complaint and are attached hereto.

WHEREFORE, Plaintiffs demand judgment against Jewell for (1) preliminary and permanent injunctive relief to enjoin Jewell (and all others acting in concert with him) from continuing to violate Jewell's employment agreement and from engaging in the other conduct described herein; (2) award damages and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under §

542.335(1)(k); and (3) grant such other and further relief (including monetary damages and disgorgement of ill-gotten gains) as this Court deems just and proper under § 542.335(1)(k).

## COUNT II
### BREACH OF CONTRACT – RESTRICTIVE COVENANTS
### AGAINST MICHAEL CAMERON

156.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3, and 16-139 above as though fully set forth herein.

157.    Cameron's employment agreement is a valid and enforceable contract that contains valid and enforceable restrictive covenants within the meaning of Fla. Stat. § 542.335.

158.    Plaintiffs are informed and believe that Cameron founded Ternium, together with the other Former Employee Defendants, in September 2022. Plaintiffs are informed and believe Cameron has been and continues to be employed by Ternium.

159.    Ternium is a RCM company that provides the same or similar services to those provided by Plaintiffs. Ternium has been retained to provide or is currently providing services to various Company clients including, but not limited to, CHOC, Banner Health, Baptist Jacksonville, and Evangelical Health, among others.

160.    Ternium currently employs eight individuals who were employed by Aspirion in the past twelve months, including the four Former Employee Defendants.

161.    Cameron has breached and is still in breach of the non-solicitation provisions of the Cameron Agreement by soliciting the Company's current and former employees, to leave the Company and work at Ternium, including but not limited to, the other Former Employee Defendants in this action and four additional former Aspirion employees Duenas, Elkins, Aleman and Drolet.

162.    Cameron has breached and is still in breach of the non-solicitation provisions of Cameron's employment agreement by soliciting business from or servicing Plaintiffs' existing customers including, but not limited to, Children's Hospital of Orange County, Evangelical Health, Banner Health, Baptist Jacksonville, UC San Diego, and Dallas Children's.

163.    Cameron has breached and is still in breach of the non-solicitation provisions of the Jewell Agreement by inducing or attempting to induce Plaintiffs' clients, customers, licensees, suppliers and other business relations to cease doing business with Aspirion and/or to seek those RCM services provided by the Company from Ternium.

164.    Cameron has breached and is still in breach of the Corporate Opportunities provision of the Cameron's Agreement by pursuing the Company's prospective clients on his own behalf and for his own benefit.

165.    Plaintiffs are informed and believe that Cameron retains, has used, and threatens to continue to use, the Company's confidential and proprietary business information in the operation of Ternium, in breach of the confidentiality provisions of Cameron's employment agreement.

166.    Cameron's conduct is in violation of the express terms (as well as Plaintiffs' reasonable expectations) of the restrictive covenant provisions in his employment agreement.

167.    As a direct and proximate result of Cameron's breach of his employment agreement, Plaintiffs have suffered and continue to suffer damages.

168.    Cameron's conduct, together with the other Former Employee Defendants and Ternium, constitutes a deliberate and material breach of his employment agreement, which has caused (and will continue to cause) damages and irreparable harm to Aspirion's business, customer relationships, and goodwill.

169.    Plaintiffs performed all of the obligations that the Cameron Agreement required Plaintiffs to perform.

170.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Cameron's breach of his obligations under the restrictive covenant provisions under his employment agreement.

171.    Plaintiffs have an inadequate, insufficient, and/or incomplete remedy at law and are entitled to injunctive relief enjoining Cameron from the conduct described herein.

172.    The material portions of the Cameron Agreement have been recited, referenced or incorporated in this Complaint and are attached hereto.

WHEREFORE, Plaintiffs demand judgment against Cameron for (1) preliminary and permanent injunctive relief to enjoin Cameron (and all others acting in concert with him) from continuing to violate the Cameron's employment agreement and from engaging in the other conduct described herein; (2) award damages and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under § 542.335(1)(k); and (3) grant such other and further relief (including monetary damages and disgorgement of ill-gotten gains) as this Court deems just and proper under §542.335(1)(k).

**COUNT III**
**VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C.A. §§ 1831-1839)**
**AGAINST ALL DEFENDANTS**

173.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3 and 16-139 above as though fully set forth herein.

174.    The Defend Trade Secrets Act ("DTSA") provides a private civil action for the misappropriation of trade secrets that are related to product or services used in interstate commerce.

175.    The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" owned and kept secret by a company. 18 U.S.C. § 1839(3).

176.    Aspirion owns numerous trade secrets including, without limitation, its prospective client lists, pricing information, operational best practices, operations methodologies, customer-specific data, as well as other Confidential Information.

177.    Aspirion's trade secrets, including but not limited to Aspirion's client lists, prospective client lists, client pricing information, business and project forecasts, financial information, and all other confidential business information were at all times kept confidential by the Company.

178.    At all times material to this action, Aspirion is the "owner" of the Company's trade secrets, including Aspirion's prospective client list.

179.    Aspirion's trade secrets provide independent economic value as the Company uses the Confidential Information, including its prospective customer lists and related data compiled in its SalesForce database, to procure and maintain customers, through marketing strategies and competitive pricing.

180.    Aspirion's Confidential Information, including its prospective customer lists and related data compiled in its SalesForce database, is not generally known and is not readily ascertainable by proper means.

181.    The Former Employee Defendants were entrusted with this access to Aspirion's trade secrets and confidential business information during their employment at Aspirion. Specifically, the Former Employee Defendants, and through them, Ternium, had access to the

Company's prospective customer lists and related data compiled in its SalesForce database, which was a compilation of some of Aspirion's most confidential and competitively valuable information.

182.    The information compiled in Plaintiffs' SalesForce platform hosts the Company's list of prospective clients, notes about prospective clients, and any details concerning the status of any negotiations with prospective clients. This information is highly sensitive, confidential and competitively valuable and includes financial and bidding information which is critical in the healthcare RCM industry.

183.    Given the commercially sensitive nature of the information, Plaintiffs restrict access to its SalesForce database and requires certain key employees, such as Jewell and Cameron, to sign agreements containing confidentiality provisions and provisions prohibiting employees from using such information to pursue corporate opportunities on their own behalf and for their own benefit.

184.    The confidential information at issue was misappropriated by Defendants when Defendants accessed and used Aspirion's prospective client list to identify and pursue Aspirion prospective clients for the benefit of Ternium and siphon business away from Aspirion and to Ternium. This conduct is in direct breach of their ongoing duties to maintain the secrecy of Aspirion's trade secrets and confidential business information.

185.    As both a direct and proximate result of Defendants' misappropriation of Aspirion's trade secrets, Plaintiffs' business relationships with prospective clients continue to be damaged.

186.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' misappropriation of Aspirion trade secrets due to the numerous business opportunities the Former Employee Defendants have diverted and continue to divert from Aspirion.

187.     Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Jewell and Cameron from the misappropriation described herein.

188.     Pursuant to 18 U.S.C. § 1836(b)(3)(B), Aspirion is entitled to recover damages for its actual losses, and to prevent Defendants' unjust enrichment.

189.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), Aspirion seeks preliminary and permanent injunctive relief to enjoin Defendants from using and misappropriating Aspirion's Confidential Information including, but not limited to, the Company's prospective customer lists and related data.

WHEREFORE, Plaintiffs demand judgment for all damages under the law, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs, and for injunctive relief, the costs of bringing this action, and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under § 542.335(1)(k).

## COUNT IV
### VIOLATION OF FLORIDA UNIFORM TRADE SECRET ACT
### (Fla. Stat. § 688.001 et seq.)
### AGAINST ALL DEFENDANTS

190.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3 and 16-139 above as though fully set forth herein.

191.     The data compilations and records of Aspirion and the Confidential Information contained therein, and especially the lists of Aspirion's existing and prospective customers, lists of identified sales opportunities, and the opportunity-specific data compiled in the Company's SalesForce database, are trade secrets owned by Aspirion and subject to protection under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, et seq. *See* Fla. Stat. § 688.002.

192.     This information derives independent economic value by not being accessible, through proper means, to competitors such as Ternium, which can profit from its use or disclosure. This identifies Aspirion's existing and prospective clients and specific sales opportunities which are not readily available to the public or to the Company's competitors. The Company has dedicated and continues to dedicate significant investment (both time and money), research, business intellect, client relationships and data collection efforts to compile the extensive data on existing and prospective clients captured in the Company's SalesForce database. The information contained in Aspirion's SalesForce platform, compiled over the course of two decades, gives the Company a competitive advantage over its competitors.

193.     Aspirion has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including restricting access to the SalesForce database to only key individuals in its workforce, requiring key employees with access to review and acknowledge Company Acceptable Use policies, and having key employees, such as Jewell and Cameron, sign agreements which expressly prohibit the use or disclosure of Company confidential information and also prohibit employees from pursuing corporate opportunities for their own benefit. *See*, *e.g.*, Ex. 1 and 2.

194.     The Former Employee Defendants misappropriated and misused Aspirion's confidential, trade secret information in violation of the Florida Unifor Trade Secrets Act by using and/or disclosing Aspirion's existing and prospective customer information without the Company's consent and despite the fact that the Former Employee Defendants' knowledge of this information was obtained by the Defendants in the course of their employment with Aspirion, and thus under circumstances giving rise to a duty to maintain the information's secrecy and limit its use.

195.     As both a direct and proximate result of Defendants' misappropriation of Aspirion's trade secrets, Plaintiffs' business relationships with prospective clients continue to be damaged.

196.     Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' misappropriation of Aspirion trade secrets due to the numerous business opportunities the Defendants have diverted and continue to divert from Aspirion.

197.     Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendants from the misappropriation described herein.

WHEREFORE, Plaintiffs demand judgment for all damages under the law, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs, and for injunctive relief, the costs of bringing this action, and any other appropriate relief under § 542.335(1)(j), including Plaintiffs' attorneys' fees and costs incurred in bringing this action under § 542.335(1)(k).

### COUNT V
### BREACH OF DUTY OF LOYALTY
### AGAINST DEFENDANTS JEWELL, CAMERON, KELLY AND MAYS

198.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3 and 16-139 above as though fully set forth herein.

199.     The Former Employee Defendants each owed a duty of loyalty to their employer, Aspirion, under Florida law by virtue of them being employees of Aspirion.

200.     The Former Employee Defendants each had a duty of loyalty to Aspirion, as their employer, not to engage in disloyal acts in anticipation of future competition with the Company.

201.     The Former Employee Defendants breached their duty of loyalty by using Aspirion's Confidential Information acquired during the course of their employment for the benefit of Ternium.

202.     The Former Employee Defendants breached their duty of loyalty by soliciting Aspirion's customers, including without limitation CHOC, Banner Health, and Baptist Jacksonville, on behalf of or for the benefit of Ternium while still employed at Aspirion.

203.     The Former Employee Defendants breached their duty of loyalty by soliciting or otherwise inducing each other to leave Aspirion and join Ternium.

204.     The Former Employee Defendants breached their duty of loyalty by soliciting or otherwise inducing other employees, including without limitation Alexis Elkins, Monica Duenas, Liaran Aleman, and Katherine Drolet, to leave Aspirion and joint Ternium.

205.     The Former Employee Defendants breached their duty of loyalty by soliciting business from Aspirion's prospective clients, including without limitation University of New Mexico, Louisiana Children's Medical Center, and Valleywise Health, for their personal endeavor, while employed at Aspirion and under an obligation to pursue such business for Aspirion.

206.     The Former Employee Defendants breached their duty of loyalty by directly competing with Aspirion for customers, including without limitation the University of New Mexico, while employed at Aspirion.

207.     As both a direct and proximate result of the Former Employee Defendants' misconduct, Plaintiffs have suffered and continue to suffer damages.

208.     Plaintiffs have suffered and continue to suffer irreparable harm as a result of the Former Employee Defendants' breaches of their duty of loyalty not only by the loss of value of the diverted business, but also by the damage, which cannot be calculated, of lost relationships and goodwill enjoyed with the healthcare providers.

209.     Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendants from the conduct described herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for (1) preliminary and permanent injunctive relief; (2) all damages available under the law available against Defendants, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs; and (3) such further relief as this Court deems just and proper.

## COUNT VI
### TORTIOUS INTERFERENCE
### AGAINST ALL DEFENDANTS

210.    Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3 and 16-139 above as though fully set forth herein.

211.    Plaintiffs have business relationships with a number of healthcare providers, including Banner Health, Baptist Jacksonville, CHOC, and Evangelical Health that are the focus of this action. These business relationships are substantial and take years to develop by consistently providing high-quality revenue cycle services.

212.    Plaintiffs have prospective business relationships with a number of identified healthcare providers, such as LCMC, UNM Health, and Valleywise Health, among others identified in the Company's SalesForce database. These prospective business relationships are substantial, take time and resources to identify, and years to develop.

213.    At all times material to this action, Defendants had knowledge of the business relationships with Plaintiffs' existing and prospective clients solely from working at the Company. While working at the Company, Defendants had responsibility for these business relationships because they were assigned to these specific clients.

214.    Defendants also had knowledge of their own employment agreements and continuing confidentiality obligations and that Defendants' conduct, as described in this

43

Complaint, was in violation thereof. Ternium had knowledge of these business relationships from the Former Employee Defendants (as its principals) and can also be held liable for tortious interference.

215.    At all times material to this action, Defendants' conduct was deliberate, willful, and an intentional solicitation of Plaintiffs' clients to reduce business for Plaintiffs, interfere with Plaintiffs' relationships with its employees, and direct those clients and employees to Ternium.

216.    Defendants further intentionally interfered with the Company's employment contracts by aiding, abetting, encouraging, and facilitating Jewell's and Cameron's breaches of the restrictive covenants in those contracts, through the misconduct detailed in this Complaint.

217.    Defendants have taken these actions with wanton disregard and indifference with respect to the rights of the Company and its clients, motivated solely by greed and self-interest.

218.    Plaintiffs' business relationships are being undermined and damaged as a result of the Former Employee Defendants' and Ternium's intentional and unjustified interference with them and their respective contractual business relationships.

219.    As both a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered and continue to suffer damages.

220.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' tortious interference with business relationships not only by the loss of value of the diverted business, but also by the damage, which cannot be calculated, of lost relationships and goodwill enjoyed with the healthcare providers.

221.    Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendants from the conduct described herein.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for (1) preliminary and permanent injunctive relief; (2) all damages available under the law available against Defendants, including but not limited to, imposition of a constructive trust on all proceeds received by Ternium at the expense of Plaintiffs, attorneys' fees, and the costs of bringing this action; and (3) such further relief as this Court deems just and proper.

**COUNT VII**
**CIVIL CONSPIRACY**
**AGAINST ALL DEFENDANTS**

222.   Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-3, 16-139, and 210-221 above as though fully set forth herein.

223.   This is a civil conspiracy claim against the Former Employee Defendants and Ternium for having reached either an express or implied agreement to (1) conspire to create Ternium, (2) solicit employees away from the Company to join Ternium, (3) using Ternium to unlawfully steal the Company's existing and prospective clients and tortiously interfere with its business relationships and the substantial goodwill developed in connection with these relationships, and (4) misuse Plaintiffs' confidential and proprietary business information that the Former Employee Defendants possessed by virtue of their employment, in aid of Ternium's solicitation of Plaintiffs' existing and prospective clients and employees.

224.   On information and belief, the Former Employee Defendants and Ternium reached either an express or implied agreement on or around August 4, 2022.

225.   As set forth herein, Defendants conspired with each other (acting in concert) to such an extent that, but for their mutual agreement to take part in a conspiracy, it would have been impossible for them to divert clients and employees away from the Company and commence business relationships with Ternium.

226.    The underlying unlawful acts taken by Defendants to conspire to solicit business including (1) direct solicitation of Plaintiffs' employees and clientele through Ternium and (2) tortious interference of business relationships, and (3) misuse of Plaintiffs' confidential and proprietary business information, have damaged Aspirion.

227.    As both a direct and proximate result of Defendants' conspiratorial misconduct, Plaintiffs have suffered and continue to suffer damages.

228.    Plaintiffs have suffered and continue to suffer irreparable harm as a result of Defendants' conspiratorial misconduct not only by the loss of value of the diverted business, but also by the damage, which cannot be calculated, of lost relationships and loss of goodwill enjoyed with the healthcare providers.

229.    Plaintiffs have an inadequate, insufficient and incomplete remedy at law absent injunctive relief enjoining Defendants from the conduct described herein.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly and severally, for (1) preliminary and permanent injunctive relief; (2) all damages available under the law against Defendants, including both the actual loss and unjust enrichment caused by their conspiracy, disgorgement of profits earned by them, imposition of a constructive trust on all proceeds received by them at the expense of Plaintiffs, and prejudgment interest; and (3) such further relief as this Court deems just and proper.

[*REMAINDER OF PAGE LEFT BLANK*]

Dated: July 29, 2024

Respectfully submitted,

*/s/ Jorge D. Guttman, Esq.*
Jorge D. Guttman
Florida Bar No. 15319
Becky N. Saka
Florida Bar No. 1010315
Nicolaos Soulellis
Florida Bar No. 1031737
**GUNSTER**
600 Brickell Avenue
Brickell World Plaza
Miami, Florida 33131
jguttman@gunster.com
bsaka@gunster.com
nsoulellis@gunster.com


Robert B. Gilmore*
Kevin L. Attridge*
Samantha P. Christensen*
Jacqueline C. Lau*
**STEIN MITCHELL BEATO & MISSNER LLP**
2000 K Street NW, Suite 600
Washington, DC 20005
Tel: 202-737-7000
RGilmore@steinmitchell.com
KAttridge@steinmitchell.com
SChristensen@steinmitchell.com
JLau@steinmitchell.com

*Counsel for Plaintiffs*

* motion for *pro hac vice* forthcoming

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to Counsel of Record.

*/s/ Jorge D. Guttman*
JORGE GUTTMAN

47