# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. _____ - Civ.**

MAINSAIL PARENT, LLC
d/b/a ASPIRION HEALTHCARE
RESOURCES, and
SPECIALIZED HEALTHCARE
PARTNERS, LLC

        Plaintiffs,

v.

DAVID JEWELL,
MICHAEL CAMERON,
ALISHA MAYS,
MEGAN KELLY, and
TERNIUM, LLC

        Defendants.

_____/

## DECLARATION OF AMY AMICK

1.      My name is Amy Amick. I am a resident of Milton, Georgia. I am over the age of eighteen (18) and I make this Declaration based upon my personal knowledge of the facts stated herein. If called and sworn as a witness, I would testify competently and truthfully as to the facts stated in this Declaration. I am a full-time employee of Plaintiff Mainsail Parent, LLC. d/b/a Aspirion Health Resources ("Aspirion" or the "Company"). As the Company's Chief Executive Officer, I have authority to submit this Declaration.

2.      I submit this Declaration in support of Plaintiffs Aspirion's and Specialized Healthcare Partners, LLC's Complaint against Defendants Michael Cameron, David Jewell, Megan Kelly, Alisha Mays (the "Former Employee Defendants"), and Ternium, LLC ("Ternium").

3.     I have been employed by Aspirion since April 2023. In my role as CEO, I am responsible for the strategic direction of the company and managing overall operations and Company performance. Given my CEO role, I am also familiar with the Company's contracts with the Former Employee Defendants, including their restrictive covenants, as well as the Company's policies and procedures governing the use of Aspirion's commercially sensitive, confidential and proprietary business information ("Confidential Information").

4.     Aspirion is a technology-enabled revenue cycle management (RCM) services company, or "RCM vendor," that supports hospitals and health systems nationwide. Aspirion has more than 170 clients. Aspirion helps healthcare providers manage and improve their claims processing, denials management, accounts receivables collections, and revenue generation functions and processes. Through its proprietary software, algorithms, methodology, and processes and its dedicated team of healthcare, legal, and technical professionals, Aspirion helps hospitals and physicians recover otherwise lost claims revenue from denials, aged Accounts Receivables, and complex claims (*e.g.* motor vehicle accidents, workers compensation, Veterans' Affairs,  and claims from government programs such as TriCare and out-of-state Medicaid programs). While Aspirion offers our clients this breadth of service offerings, our largest and most prioritized service line is the Denials subsegment of the RCM market. In particular, the company specializes in supporting hospitals and health systems resolve aged, high-value, complex denials. Due to the nature of these denials, Aspirion utilizes employees with juris doctor degrees (JD) to triage, appeal and escalate denials with medical insurance companies. Aspirion's JD denial resolution model is one of its key differentiators in the market.

5.     It is estimated that 17% of all claims are denied by a medical insurance company. Moreover, according to the Kauffman Hall National Hospital Flash Report, the average operating

margin for hospitals in the United States in 2023 was 2.3 %. This means that hospitals rely on every last dollar of revenue and overturning denied claims is very important to the hospital. Providers partner with RCM vendors, such as Aspirion, to refute denials and to justify, and ultimately collect, payment for these denied claims.

6.      The revenue cycle in healthcare is complex.  The fees paid to a provider varies based upon the type of medical care provided, medical necessity, provider and facility credentialing, the patient's medical insurance coverage, the terms of the provider's contract with a medical insurance company, laws and regulations governing potential payers, and compliance with medical coding, billing, documentation and submission standards. The complexity, limited access to skilled staff, and the subject matter expertise required, leads the majority of hospitals and health systems to partner with RCM vendors to help optimize reimbursements, identify and correct billing errors, pursue complex claims, assist with overturning denials, and collect fairly owed accounts receivables. RCM vendors in healthcare are focused on supporting hospitals and health systems by providing these services.

7.      RCM vendors' overall goal of increasing provider revenue directly benefits the patient and increases patient satisfaction. It is an arduous process for a hospital or health system to ensure accurate and full payment.  Moreover, maximizing effectiveness in the revenue cycle is very important to hospitals and health systems:  ensuring providers receive fair payment for services rendered is critical to the overall revenue of the health system and accelerating time to payment also is important to providers' cash flow. RCM vendors also can reduce the time providers have to spend on administrative and clinical functions. This means providers can devote more time and attention to ensuring they are delivering high quality value-based care to patients.

8.      Aspirion invests significant resources to develop and maintain goodwill with its customers and clients, workforce, and referral sources. Aspirion's assembled workforce, in which Aspirion invests substantial time, money and resources, is comprised of more than 1,400 employees, including more than 170 attorneys and legal staff, over 60 clinicians, nine sales representatives, and a team of other healthcare professionals. These roles vary from non-management level employees to executive level employees.

9.      Until their respective resignations from Aspirion, three of the Former Employee Defendants held senior-level management positions within Aspirion and the fourth, Cameron served as the most senior sales executive. Each were prior employees of Specialized Healthcare Partners LLC ("SHP").  Cameron was the Chief Client Officer at SHP and Jewell, Mays, and Kelly each held the title of Managing Attorney and Client Manager at SHP.

10.     In July 2019, Aspirion acquired SHP. Almost all SHP employees continued their employment post-acquisition and became part of the Aspirion workforce, including the Former Employee Defendants.

11.     After the acquisition, Aspirion appointed Cameron as Senior Vice President of Sales. In this role, Cameron was responsible for identifying and pursuing prospective business opportunities for Aspirion, including identifying opportunities to expand an existing client relationship as well as identifying and signing potential new clients. Cameron served as the most senior sales representative in the Company and he had a broad national territory comprised of some of the largest hospitals and health systems within the United States.

12.     In 2020, David Jewell (Jewell) was promoted to Managing Attorney & Executive Director of Client Success within Aspirion's Client Success Department. In that role, Jewell had accountability for approximately 25% of Aspirion's clients and he was responsible for leading the

team of legal and business professionals directly supporting and managing those clients. He was the primary liaison between the client and Aspirion's Operations team who performed RCM services on the client's behalf. As part of this role, Jewell was also tasked with business development and asked to identify opportunities for expansion and to cross-sell within his client base. As an Executive Director, Jewel was responsible for client satisfaction, client retention, and client expansion and he was responsible for ensuring our operations team's performance met the client's needs. Given his role, Jewell was the primary client-facing contact for a number of Aspirion's largest and most important clients including, for instance, Children's Hospital of Orange County, Cedars Sinai, and Piedmont Healthcare, among others.

13.     Megan Kelly (Kelly) was also promoted to Managing Attorney & Executive Director of Client Success in 2020. Like Jewell, Kelly was entrusted with approximately 25% of Aspirion's clients, including Parkview Health and Centura Health, among others. As Executive Director, she led the team of legal and business professionals supporting her clients and she was responsible for client satisfaction, client retention, client expansion, and for ensuring our operations team's performance met her clients' needs. On the business development side, she identified opportunities for business expansion and made efforts to cross-sell within her client base.

14.     Alisha Mays (Mays) was also promoted to Managing Attorney & Executive Director of Client Success in 2020. Like Jewell and Kelly, she was responsible for approximately 25%  of Aspirion's clients including, for instance, Banner Health, Phoenix Children's and Evangelical Health.  Her primary responsibilities included leading the team of professionals supporting her clients and ensuring client satisfaction and client retention but, as part of her role, she also identified opportunities for expansion and made efforts to cross-sell within her client base.

15.     Aspirion's service offerings are highly specialized and distinct from most other healthcare RCM vendors.  As a qualification for their roles, three of the four Former Employee Defendants, Jewell, Kelly, and Mays, held juris doctorates and were subject matter experts regarding denied health insurance claims.  Achieving subject matter expertise requires years of health insurance denial resolution experience and mastering knowledge related to regulation, contracts, payer policy, and clinical care guidelines.  Aspirion invests heavily in training and developing team members who can operate as subject matter experts in the healthcare revenue cycle marketplace.  This expertise is not only core to Aspirion's performance outcomes but serves as a key differentiator in the healthcare revenue cycle marketplace.  The Defendants' value in the marketplace is largely derived from the years of professional development and experience gained at Aspirion.

16.     Moreover, in their respective roles – Senior Vice President of Sales and Managing Attorneys & Executive Directors of Client Success – all four of the Former Employee Defendants were very familiar with Aspirion's existing and prospective customers, marketing strategies, sales pipeline, confidential pricing structure, client health index, client strategies and performance results. The Former Employee Defendants also had knowledge of and access to Aspirion's Confidential Information, which encompasses, among other things, its most sensitive trade-secret, confidential, competitively-sensitive, proprietary, and commercially valuable business information, including the Company's business accounts, client contracts, financial information, proprietary algorithms, processes, and methodologies, operational structure, compensation plans, operational processes, workforce training materials, prospective and existing customers, sales pipeline, vendor lists, personnel information, marketing and sales techniques, systems, reports, and

business plans, among other confidential business information. Aspirion's Confidential Information gives Aspirion competitive advantages over its competitors.

17.     Specifically, all four Former Employee Defendants had access to some of the Company's most secret and competitively sensitive information - prospective customer lists and intelligence about evolving and pending sales opportunities. Aspirion's prospective customers are compiled in a cloud-based platform, SalesForce. The platform does not only include a list of the Company's identified prospects, but also identifies key decision-makers at each prospect, and contains notes on each opportunity, information related to negotiation and pricing strategies, and data on prospective client needs, preferences, and buying behaviors. The Company has dedicated and continues to dedicate significant investment (both time and money), research, business intellect, client relationships and data collection efforts to compile the data captured in SalesForce. The information contained in Aspirion's SalesForce platform, compiled over the course of two decades, gives the Company a competitive advantage over its competitors.

18.     Aspirion protects the secrecy of its Confidential Information and its goodwill and client relationships from unfair competition by having its key employees execute agreements with non-solicitation and no-hire covenants.

19.     Defendants Jewell and Cameron each signed employment agreements containing non-solicitation and no-hire covenants that extend for twelve (12) months following their separation from the Company. Their employment agreements also set forth their obligations with respect to the Company's Confidential Information and specifically prohibited them from pursuing Aspirion's corporate opportunities for their own benefit. True and correct copies of Jewell's and Cameron's employment agreements are attached to the Complaint as **Exhibits 1 and 2**.

20.     Aspirion also maintains robust policies and procedures to ensure employees protect its Confidential Information. As a condition of their employment with Aspirion, each of the four Former Employee Defendants reviewed and agreed to abide by the "Aspirion Acceptable Use Policy." The purpose of the Acceptable Use Policy "is to outline the acceptable use of Aspirion data, devices and equipment, Aspirion's information systems and Aspirion's client's information system." The policy requires that "users maintain confidentiality indefinitely, even after the contract, work, employment, or any other aspect of involvement with Aspirion has ended." A true and correct copy of the Acceptable Use Policy is attached to the Complaint as **Exhibit 3**.

21.     The Acceptable Use Policy contains the following three prohibitions concerning Aspirion's Confidential Information:

- Employees' will not disclose confidential information, such as internal policies, business correspondence, company announcements, without authorization and will not use confidential information to compromise the organization in any way.

- Employees should not save or store confidential information in unsecure areas on their computer such as in the "downloads" folder or on the user's desktop and should empty the computer's "trash" regularly.

- Employees must not disclose confidential information to non –employees, family members or organization outsiders without authorization from Aspirion Management.

Compl. Ex. 3, Acceptable Use Policy, Sec. XI(a)(i) (1), (3)-(4).

22.     It also expressly provides that "Employees' duty to protect confidential information will survive termination of employment and remain in effect until such information becomes public knowledge, or until Aspirion provides written notice releasing employee from the obligations set forth in this policy, whichever occurs first." Compl. Ex. 3, Acceptable Use Policy, Sec. XI(a)(i)(2).

23.     Each of the Former Employee Defendants indicated that they understood and would comply with the required "Aspirion Acceptable Use Policy." *See* Complaint **Exhibit 4**, Acceptable

Use Policy and Training Acknowledgement Forms for M. Cameron, D. Jewell, M. Kelly and A. Mays.

24.     The Employee Code of Conduct within the Aspirion Employee Handbook further underscores the Company's commitment to protecting its Confidential Information. The "Employee Code of Conduct" specifically lists "[f]ailure to maintain confidentiality of information concerning other employees, customers, or the Company" as a violation of Company policy, punishable by termination. A true and correct copy of the Aspirion Employee Handbook, effective March 1, 2020, is attached to Complaint as **Exhibit 5.**

25.     The Employee Code of Conduct likewise prohibits employees from obtaining "[o]ther employment that creates a conflict of interest or affects job performance". Such employment is also punishable by termination. *Id.*

26.     Between September 27, 2023 and January 30, 2024, all four Former Employee Defendants separated from Aspirion.

27.     Jewell resigned from his position as Managing Attorney and Executive Director of Client Success effective September 27, 2023.

28.     Kelly's employment with Aspirion terminated on October 13, 2023, less than three weeks after Jewell's.

29.     One week later, on October 20, 2023, Mays' resignation became effective.

30.     Finally, Cameron's employment with Aspirion terminated effective January 31, 2024.

31.     Beginning in late June 2024, I received several reports from various employees that at least six former Aspirion employees were observed as listed "users" in the databases and systems of certain Aspirion clients ("Accounting System"). I also learned that all of these former Aspirion

employees were listed with "@terniumrcm.com" email addresses or otherwise associated with the company named "Ternium RCM" or "TRCM."

32.     On or around June 20, 2024, Jeff Podraza, President and General Manager of Denials, informed me that the names of Former Employee Defendants Jewell, Mays, and Kelly had been observed as listed "users" in the Banner Health Accounting System. He also reported that two other former Aspirion employees, Alexis Elkins and Monica Duenas, had also been observed as listed "users" in the Banner Health Accounting System. I was told that all five of these individuals were listed as having "@terniumrcm.com" email addresses. I also learned from Jeff Podraza that, in the course of Aspirion team members working on claims assigned to Aspirion, our team members saw historical notes indicating that two claims currently assigned to Aspirion were previously assigned to Ternium in October 2022 and April 2023.

33.     In response, at my direction, Aspirion immediately retained outside counsel and transmitted a cease-and-desist letter to Jewell on June 26, 2024. On July 26, 2024, Aspirion received a response to this letter. Counsel for Jewell claimed that the restrictive covenants in Jewell's employment agreement were unenforceable, but did not deny that Jewell solicited Aspirion's employees and clients.

34.     On or around July 10, 2024, I received another report from Jeff Podraza indicating that Ternium had been retained to provide RCM services for a new Aspirion client, Baptist Medical Center of Jacksonville ("Baptist Jacksonville"). Specifically, I was informed that former Aspirion attorneys, Katherine Drolet and Alisha Mays, were listed as recipients on a training email sent by Baptist Jacksonville to all vendors. It is my understanding that Ms. Drolet and Ms. Mays were listed by their respective "@terniumrcm.com" email addresses on the meeting invite.

35.     These recent reports from June and July indicated to me that Defendants were targeting, soliciting, and hiring Aspirion employees. I also suspected that Defendants were targeting Aspirion clients.

36.     Based on the foregoing information and my concerns, on July 12, 2024, I directed Aspirion IT to conduct a forensic investigation of the Former Employee Defendants' Company email accounts and electronic files, to investigate the Former Employee Defendants' misconduct and whether and to what extent the Former Employee Defendants' activities had any connection to Ternium. The results of this investigation were shocking and are summarized in the paragraphs below.

37.     Aspirion's IT department uncovered evidence that the Former Employee Defendants began forming Ternium as early as 2022. Specifically, the forensic investigation uncovered the following:

a.   In an email dated August 4, 2022, the Former Employee Defendants refer to each other as "the Dream Team" and arranged to meet a prospective financial backer for their new business venture. The August 4, 2022 email is attached as **Exhibit A**.

b.   An email dated August 26, 2022, shows that Cameron engaged legal counsel because he was "starting a new company" and needed "fair partnership agreements." The August 26 email is attached as **Exhibit B.**

c.   In an email dated November 30, 2022, Cameron received a draft Non-Disclosure Agreement titled "Ternium NDA" from outside employment counsel. The draft agreement contains a signature block listing "Ternium, LLC" as a party and "Dave Jewell" as the individual signing on behalf of "Ternium, LLC." The November 2022 emails are attached as **Exhibit C.**

     d.   An October 2023 email thread forwarded from Cameron's wife to his Aspirion email account shows that Cameron was using a "@terniumrcm.com" email address while still employed at the Company. The October 2023 email is attached as **Exhibit D**.

38.    The investigation also uncovered evidence that the Former Employee Defendants were soliciting and signing Aspirion's clients while still employed at the Company. This evidence includes:

     a.   A June 2023 email exchange between leadership at Children's Hospital of Orange County ("CHOC") and Cameron showing that Jewell and Cameron had solicited business from and were negotiating a contract with CHOC on behalf of Ternium as early as April 2023 and while both were still employed at Aspirion. The June 2023 email exchange is attached as **Exhibit E.**

     b.   A February 1, 2024 email sent by Banner Health to former Aspirion employee Liaran Aleman confirming Ms. Aleman had changed employers and updating her credentials, lists the Ternium contract end date as September 7, 2027. This indicates that the contract start date was September 7, 2023 and suggests that contract negotiations began while all four Former Employee Defendants were still employed by the Company. The February 1, 2024 email is attached as **Exhibit F.**

     c.   The July 10, 2024 meeting invite from Baptist Jacksonville listing as recipients former Aspirion attorneys, Mays and Drolet at their "@terniumrcm.com" email addresses, confirms that Ternium solicited and was awarded business from Aspirion client, Baptist Jacksonville. The July 10, 2024 meeting invite is attached hereto as **Exhibit G.**

39.     Aspirion IT also discovered evidence that the Former Employee Defendants and Ternium were targeting and soliciting business from the prospects listed in Aspirion's SalesForce database and while still employed at Aspirion. For example, the following documents were uncovered:

a.   Emails from January 2023, more than a year before Cameron would resign, show Cameron (i) contacting one of Aspirion's identified prospective clients, Valleywise Health, based on "a note in our [Aspirion's] database," (ii) acknowledging that the prospective client was assigned to a different Aspirion sales representative, Paul Morino, and (iii) suggesting to the prospective client that it work with Cameron instead. When the prospective client responds stating a preference to work with Cameron rather than Mr. Morino, Cameron forwards the email to Kelly, Jewell and Mays "for [their] entertainment." The January 2023 Valleywise emails are attached as **Exhibit H.**

b.   Cameron was our sales executive assigned to University of New Mexico ("UNM"), a new client Aspirion was trying to win.  Cameron was responsible for Aspirion's Response for Proposal ("RFP") submission for a public selection process UNM conducted in 2023.  July and August 2023 emails show that Cameron requested a copy of Aspirion's bid submitted in response to this RFP as well as other discretionary denial bids  from Aspirion's Marketing department. Cameron received a complete set of bid documents, including a copy of the bid itself, pitch materials, and master services agreement, in advance of UNM's October 2023 supplemental RFP deadline. A February 7, 2024 letter from UNM notifies Aspirion that it was not awarded the UNM contract and lists Ternium as one of the other

bidding parties. Together, these communications indicate that the Defendants used Aspirion's bid to submit a competing bid on behalf of Ternium at a time when all four were still employed by Aspirion. The July and August 2023 Emails are attached as **Exhibit I**, and the February 2024 UNM letter is attached as **Exhibit J.**

c. Aspirion sales representative, Mr. Morino, opened a new sales opportunity to sell denials services to Louisiana Children's Medical Center ("LCMC") in January 2023. A calendar invite from August 8, 2023 indicates that Mike Cameron met with Bret Kelsey of LCMC over dinner, while still employed at Aspirion. A May 11, 2024 email sent from LCMC to Kelly's Aspirion email and cc'ing her "@terniumrcm.com" email, states that former Aspirion employee, Monica Duenas' LCMC account is set to expire unless renewed for an additional 180 days. This confirms that Ternium pursued and obtained a contract with LCMC, likely in the fall of 2023 while all four Former Employee Defendants (but certain Cameron) were still employed by Aspirion. Aspirion was not awarded business at LCMC. The August 8, 2023 Dinner Invite and May 11, 2024 Email are attached as **Exhibits K** and **L.**

40. Finally, Aspirion IT found evidence confirming the Former Employee Defendants, actively recruited and then hired Aspirion employees:

a. A January 11, 2024 email from former Aspirion employee Liaran Aleman's personal email account to her Aspirion email account attaching a Non-Disclosure Agreement with Ternium, LLC demonstrates the Former Employee Defendants were soliciting Ms. Aleman for employment. The January 2024 NDA email is attached as **Exhibit M.**

b.  A February 1, 2024 email from Banner Health, sent merely 3 days after Ms. Aleman's January 29 resignation, stating that Ms. Aleman "no longer worked for [Aspirion]" confirms that Ms. Aleman was hired to perform the same RCM services to Banner Health as an employee of Ternium that she was providing while employed at Aspirion just a few days prior. This suggests that Defendants specifically targeted, solicited and hired Aspirion employees who were performing the same work for certain clients that Ternium had contracted to perform and suggests that the Defendants were doing so to redirect work from Aspirion to Ternium. *See* Ex. G.

41.  In addition to the results from Aspirion IT's forensic  investigation, in the last week I received additional reports that Aspirion clients, Children's Medical Center Dallas and UC San Diego Health, have recently been contacted by Defendants.

42.  These reports, together with the results of this internal IT investigation, confirmed for me that Jewell and Cameron were behind Ternium and that they were soliciting Aspirion employees, customers and prospects in breach of their restrictive covenants and using Aspirion's Confidential Information for the benefit of Ternium. It is clear that Defendants' collective business activities have harmed Aspirion's business and continue to pose a real and continuing threat of harm to Aspirion's business.

43.  It was also clear to me that Ternium is directly competing against Aspirion. Aspirion's core and most profitable line of business is Denials Management, with special emphasis on high-balance clinical denials. This line of business is very material to the Aspirion brand and to the valuation of our company. Based on the evidence gathered to date, it is clear to me that Defendants are 100% focused on diverting high-balance clinical denials away from Aspirion and

to Ternium and have been actively working to divert such business away from Aspirion for more than a year.

44.     Over the past 12 months Aspirion has seen an 83% reduction in the aggregate claims dollar value placed with Aspirion from Banner Health and an 89% reduction from CHOC, two Aspirion clients the Defendants have solicited and won business from. The business that was awarded to Defendants was historically placed with Aspirion.  Given that Aspirion is compensated on a contingency basis as a percentage of dollars ultimately collected on a denied claim they manage, this substantial reduction in the placement of claims at these two clients alone already has caused Aspirion significant economic harm.

45.     Based on the evidence collected to date and described above, Aspirion determined that the Company's legitimate business interests were at stake including, but not limited to, its relationships with existing and prospective Aspirion clients, workforce, and referral sources and its goodwill.

46.     I initiated this lawsuit on behalf of Aspirion to protect Aspirion's legitimate business interests.

47.     There is an immediate and irreparable injury that will result to Aspirion that warrants the entry of a temporary restraining order to enjoin Defendants from (i) soliciting, interfering, inducing or attempting to cause any employee of Aspirion to leave his or her employment; (ii) soliciting, interfering, inducing or attempt to cause any client, customer, licensee, supplied or other business relation to terminate or reduce its business relationship with Aspirion; and (iii) disclosing or using any Aspirion trade secrets or other confidential or proprietary information acquired by the Former Employee Defendants during their employment with Aspirion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: July _____, 2024

Amy Amick, CEO

# EXHIBIT A

**From:** Kathy Cameron
**To:** Michael Cameron
**Subject:** Fwd: Introduction with Gary Busacca for Mike, Megan, and Alisha
**Date:** Thursday, August 4, 2022 5:07:31 PM

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
ENCRYPT all PHI, PII, and/or confidential information to outside sources.

---

Sent from my iPhone

Begin forwarded message:

> **From:** Dave Jewell <davemjewell@yahoo.com>
> **Date:** August 4, 2022 at 4:03:05 PM CDT
> **To:** Alisha Mays <alisha.m.mays@gmail.com>, msimoson09@gmail.com, Dave Jewell <davemjewell@yahoo.com>, kcameron327@gmail.com
> **Subject: Introduction with Gary Busacca for Mike, Megan, and Alisha**
>
>
> Hey Dream Team,
>
> Gary can meet with us tomorrow morning at 9:30am EST/8:30am CST. Feel free to use the below google link to attend.
>
> Looking forward to it!
> Dave
>
>
> https://meet.google.com/dri-avym-cfh

# EXHIBIT B

| | |
|---|---|
| **From:** | Michael Cameron |
| **To:** | Lindy Duffney |
| **Cc:** | Megan Fooshee |
| **Subject:** | RE: Referral/Intro |
| **Date:** | Friday, August 26, 2022 5:00:02 PM |

Hi Linda and Megan,

Nice to meet you both virtually.

Let's touch base in a couple of weeks when I have more info.    My cell is below and my personal email is mcameron0305@gmail.com

Thanks
Michael

**From:** Lindy Duffney <lindy@katzenfooshee.com>
**Sent:** Friday, August 26, 2022 3:18 PM
**To:** Michael Cameron <michael.cameron@aspirion.com>
**Cc:** Megan Fooshee <megan@katzenfooshee.com>
**Subject:** Re: Referral/Intro

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
ENCRYPT all PHI, PII, and/or confidential information to outside sources.

Hello Michael,

A new company? That is exciting! Megan can absolutely help with this. Are you available on Monday (8/29) for a quick call with Megan? She has time from 9 AM - 11 AM, and then again between 1 PM - 2:30 PM. If Tuesday (8/30) works better, she is available between 10 AM -3 PM.

Thank you,

**Lindy Duffney | Paralegal**
**Katzen Fooshée, PLLC**
**14800 Quorum Drive, Suite 450**
**Dallas, Texas 75254**
**lindy@katzenfooshee.com**


On Fri, Aug 26, 2022 at 3:10 PM Megan Fooshee <megan@katzenfooshee.com> wrote:

> Yes! @Lindy Duffney will help respond for me!
> Megan Fooshée
>
> Office: 214.932.6583

Find me on LinkedIn



On Thu, Aug 25, 2022 at 6:47 PM Scott Schwob <SSchwob@schwob.com> wrote:

Megan,
I would like to introduce you to Mike Cameron a neighbor and good friend,  Mike is starting a new company and could use your amazing knowledge, attitude and negotiating abilities to get fair partnership agreements in place.

Ill let you take it from here.

Hope all is well

I guessed at your new email address.  Let us know if that is the new email.

Thank You!

Scott

Scott Schwob
SCHWOB COMPANIES – New address!
1350 Lakeshore Drive, Suite 160
Coppell Texas 75019
P: 972-243-7674 • F: 972-243-7710
www.schwob.com

Genuine Relationships. Superior Services. Environmentally Aware.

 If you must print this email, please recycle.

EXHIBIT C

| | |
|---|---|
| **From:** | Lindy Duffney |
| **To:** | Michael Cameron |
| **Cc:** | Megan Fooshee |
| **Subject:** | Ternium NDA | Redlined Changes |
| **Date:** | Wednesday, November 30, 2022 3:31:03 PM |
| **Attachments:** | Ternium NDA 20221114 1v2 redline.docx |

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.
ENCRYPT all PHI, PII, and/or confidential information to outside sources.

---

Hi Mr. Cameron,

Attached is the Ternium NDA containing Megan's redlined edits. If you do not immediately see the red and blue lined content when you open the document, simply navigate the cursor to the toolbar at the top of the page and click on the "Review" tab. Then, enable the redline feature by clicking the "Track Changes" icons. If you need additional assistance viewing the redlined changes, please let me know and I will be happy to help.

The red, struck-through items have been deleted by Megan. The blue, underlined items have been added. Please let us know if you have any questions or concerns.

Thank you,

**Lindy Duffney | Paralegal**
**Katzen Fooshée, PLLC**
**14800 Quorum Drive, Suite 450**
**Dallas, Texas 75254**
**lindy@katzenfooshee.com**



## MUTUAL NON-CIRCUMVENTION, NON-DISCLOSURE, AND CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT is entered into effective November 14, 2022 (the "Effective Date") by and between Ternium, LLC its successors, and assigns and _____ (collectively the "Parties").

**WHEREAS**, the Parties desire to discuss certain matters regarding potential business transactions between them and/or other third parties (the "Potential Transaction"); and

**WHEREAS**, in connection with these discussions, certain confidential and proprietary information regarding each party, as well as other third party businesses, may be disclosed to the other to assist in the evaluation of the potential business transactions; and

**WHEREAS**, the parties desire to establish the terms under which they will disclose certain confidential and proprietary information.

**NOW THEREFORE**, in consideration for the mutual promises contained herein, and other good and valuable consideration, receipt of which is expressly acknowledged, the parties hereby agree and covenant as follows:

**Section 1. Confidential Information.** Confidential Information shall mean:

**(a)** any data or information that is competitively sensitive material, and not generally known to the public, including, but not limited to, products planning information, marketing strategies, plans, finance, operations, customer relationships, customer profiles, sales estimates, business plans, and internal performance results relating to the past, present or future business activities of the parties, their parent corporations if applicable, their subsidiaries and affiliated companies and the customers, clients and suppliers of any of the foregoing; and

**(b)** any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords the applicable party a competitive advantage over its competitors; and

**(c)** all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, information, know-how, show-how and trade secrets, whether or not patentable or copyrightable regardless of whether such information is a Party's property or the property of a third-party supplier (such as a software licensor), and regardless of whether such information is specifically marked or identified as confidential.

Confidential Information includes without limitation, all of the Parties' documents, strategies, marketing, processes, protocols, policies, technical specifications, algorithms,  inventions, equipment, prototypes and models, and any other tangible manifestation of the foregoing, whether now existing or arising in the future.



Confidential Information also includes conversations about the purchase or sale of any or all assets of other third-party businesses as well as any documentation, materials, and/or information disclosed on behalf of said third parties.

Neither Ternium, nor any of their employees, affiliates, or representatives make any representation or warranty as to the accuracy or completeness of Confidential Information from any such third party business, and each party expressly disclaims any and all liability based on such information or an omission there from.

**Section 2. Confidentiality Obligations.** Except as expressly authorized by prior written consent of the supplying party, the receiving party shall:

**(a)** limit access to any Confidential Information received by it to its employees or third parties who have a need-to-know in connection with the evaluation of ~~the potential business transaction, and only for use in connection therewith~~the Potential Transaction; and

**(b)** Advise its employees or third parties having access to the Confidential Information of the proprietary nature thereof and of the obligations set forth in the Confidentiality Agreement; and

**(c)** take appropriate action by instruction or agreement with its employees or other parties having access to the Confidential Information to fulfill its obligations under this Confidentiality Agreement; and

**(d)** safeguard all Confidential Information received by it using a reasonable degree of care, but not less than that degree of care used by the receiving party in safeguarding its own similar information or material; and

**(e)** use all Confidential Information received by it solely for purposes of evaluating the potential business transactions with the supplying party and for no other purpose whatsoever; and

**(f)** not disclose any Confidential Information received by it to third parties without prior written consent by supplying party; and

**(g)** not disclose the existence of the discussions to any third party; and

**(h)** be responsible for any breach of the terms hereunder by the receiving party or any person who receives any Confidential Information from the receiving party.

The receiving party shall be responsible for, and shall not be excused or relieved from the foregoing obligations by reason of any improper, unlawful, illegal, fraudulent or criminal conduct by any of its employees or any other third party with access to the receiving party's facilities. The receiving party shall give the supplying party immediate notice of any unauthorized use or disclosure of any Confidential Information.

Except as prohibited by law, regulation or Exchange rule binding upon the receiving party, upon the request of the supplying party, the receiving party shall (i) surrender to the supplying party



all memoranda, notes, records, drawings, manuals and other documents or materials (and all copies of same) pertaining to or including the Confidential Information and (ii) destroy all memoranda, notes, records, drawings, manuals, records, and other documents or materials (and all copies of same) prepared by receiving party or any person who received any Confidential Information from the receiving party based on any information in the Confidential Information. Upon the return or destruction of such materials, the receiving party agrees to certify, in writing, that all of the foregoing materials have been surrendered to the supplying party.

**Section 3. Exceptions to Confidentiality.** The obligations of confidentiality and restriction on use in Section 2 shall not apply to any information that the receiving party proves:

**(a)** Was in the public domain prior to the date of this Agreement or subsequently came into the public domain through no fault of the receiving party, or

**(b)** Was lawfully received by the receiving party from a third party free of any obligation of confidence to such third party; or

**(c)** Was already in the possession of the receiving party prior to receipt thereof, directly or indirectly, from the supplying party; or

**(d)** Is required to be disclosed to any governmental agency pursuant to applicable laws or regulations, or is required to be disclosed in a judicial or administrative proceeding after all reasonable legal remedies for maintaining such information in confidence have been exhausted, at the supplying party's expense, including, but not limited to, (and except where such notice is prohibited by law, regulation or Exchange rule binding upon the receiving party) giving the supplying party as much advance notice of the possibility of such disclosure as practical so the supplying party may attempt to obtain a protective order at supplying party's expense concerning such disclosure, or take such other actions as necessary to stop such disclosure or to assure confidential handling of such Confidential Information at supplying party's expense; or

**(e)** Is subsequently and independently developed by employees, consultants or agents of the receiving party without reference to the Confidential Information disclosed under this Agreement, such burden of proof to be on the party claiming this exclusion.

**Section 4. Rights in Confidential Information.** Except as specifically provided for herein, this Agreement does not confer any right, license, interest or title in, to or under the Confidential Information to the receiving party. Except as specifically provided for herein, no license is hereby granted to the receiving party, by estoppel or otherwise under any patent, trademark, copyright, trade secret or other proprietary rights of the supplying party. Title to the Confidential Information shall remain solely in the supplying party, even if suggestions, comments, ideas or other improvements made by the receiving party are incorporated into the Confidential Information or related materials, unless otherwise agreed to in writing by the parties.

**Section 5. Indemnity by the Receiving Party.** The receiving party agrees to indemnify and hold harmless the supplying party from and against any and all losses, claims, damages and expenses



(including, but not limited to, attorneys' and experts' fees, costs of investigation and costs of settlement) which result from the receiving party's breach of this Agreement or unauthorized use or disclosure of the Confidential Information. The receiving party's indemnification obligations pursuant to the immediately preceding sentence shall include any obligation to indemnify and hold harmless the supplying party from and against any and all losses, claims, damages and expenses asserted by anyone claiming by, through or under the supplying party.

**Section 6. Equitable Relief.** The Parties agree that money damages would not be a sufficient remedy for breach of the confidentiality and other obligations of this Agreement. Accordingly, in addition to all other remedies that either party may have, the supplying party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any breach of the confidentiality and other obligations of this Agreement. The receiving party agrees to waive any requirement for a bond a connection with any such injunctive or other equitable relief.

**Section 7. Other Agreements.** This Confidentiality Agreement is in addition to and not in lieu of whatever other agreements may exist between the parties; provided, however, that unless any other such agreement is more protective of the supplying party, in the event of inconsistency between this Agreement and the other agreement, this Agreement shall control.

Supplying party has no obligation under this Agreement to (a) disclose any Confidential Information or (b) negotiate for, enter into or otherwise pursue the Purpose. Supplying party provides all Confidential Information without any representation or warranty, expressed or implied, as to the accuracy or completeness thereof, and supplying party will have no liability to receiving party or any other person relating to receiving party's use of any of the Confidential Information or any errors therein or omissions therefrom.

**Section 8. Term and Survival.** The rights and obligations of the parties under this Agreement expire three (3) years after the Effective Date; provided that with respect to Confidential Information that constitutes a trade secret under the laws of any jurisdiction, such rights and obligations will survive such expiration until, if ever, such Confidential Information loses its trade secret protection other than due to an act or omission of receiving party, or its representatives. ~~The receiving party's obligations hereunder shall survive two years from the termination of any related contract or other relationship between the parties.~~ [1]

[1] **Section 9. Miscellaneous.** This Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement may not be amended or modified except in a writing making express reference hereto, signed by both parties. Agreement shall be governed and construed under the internal laws of the State of North Carolina. Any disputes arising pursuant to this Agreement will be resolved exclusively within Orange County, North Carolina. Why is this in NC? Can we move it to Texas?  If so, replace with the following "This Agreement and all matters relating hereto are governed by, and construed in accordance with, the laws of the State of Texas, without regard to the conflict of laws provisions of such State. Any legal suit, action or proceeding relating to this Agreement must be instituted in the federal or state courts located in Dallas, County,

---

[1] The term is too vague as to when it ends. Any new contracts should have their own confidentiality governing them.



Texas. Each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**First Party: Ternium, LLC**
Signature: D Jewell
Printed Name: Dave Jewell
Date: November 14, 2022

**Second Party:** _____
Signature: _____
Printed Name: _____
Date

# EXHIBIT D

| From: | Kathy Cameron |
|---|---|
| To: | Michael Cameron |
| Subject: | Fwd: Document shared with you: "Essay" |
| Date: | Friday, October 6, 2023 6:34:48 PM |

---

**CAUTION: Message is from External Sender**

Do **NOT** click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.

---

Sent from my iPhone

Begin forwarded message:

> **From:** Kathy Cameron <kcameron327@gmail.com>
> **Date:** October 6, 2023 at 5:25:18 PM CDT
> **To:** Michael Cameron <Michael.Cameron@terniumrcm.com>
> **Subject: Fwd: Document shared with you: "Essay"**
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** "Arissa Fricano (via Google Docs)" <drive-shares-dm-noreply@google.com>
>> **Date:** October 6, 2023 at 5:09:49 PM CDT
>> **To:** kcameron327@gmail.com
>> **Subject: Document shared with you: "Essay"**
>> **Reply-To:** Arissa Fricano <arissarose5706@gmail.com>

# Arissa Fricano shared a document

 Arissa Fricano

(arissarose5706@gmail.com) has invited you to edit the following document:



Essay

**Open**

If you don't want to receive files from this person, block the sender from Drive

Google LLC, 1600 Amphitheatre Parkway,
Mountain View, CA 94043, USA
You have received this email because
arissarose5706@gmail.com shared a
document with you from Google Docs.



EXHIBIT E



From:
To:
Subject: FW: RCMSA-09.01.2023-UPDATED #2
Date: Friday, September 8, 2023 4:59:41 PM
Attachments: image001.png
image003.png
image005.png

---

**CAUTION: Message is from External Sender**
Do NOT click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

ENCRYPT all PHI, PII, and/or confidential information to outside sources.

Mike,

These are the notes in the system that Maggie got for me.  Scroll down to the end.  You are welcome to share this with Dave, but don't share this back with Maggie or Barb as I should not be sharing.  The contract won't go to legal until ARC signs off on it.

….Notes after 06/21:

06/21/2023- Recvd email from Stacey in ARC:  Good morning team,
We just wanted to follow up with you regarding the contract review for Ternium.  Yesterday we had our assessment call with Ternium.  At this point, we are waiting for Ternium to share security reports with us.  We will send another update soon.
Thank you,
Stace

06/26/2023-Received email from Michael Cameron advising that security documents sent to ARC
07/06/2023-Received email from Michael Cameron asking status of security documents with ARC.Responded to Michael- No update yet.
07/12/2023- Sent email to Stace in ARC asking for status.
07/12/2023- Stace from ARC responded-Good morning team,
We just wanted to follow up with you regarding the contract review for Ternium.  Yesterday we had our assessment call with Ternium.  At this point, we are waiting for Ternium to share security reports with us.  We will send another update soon.
Thank you,
Stace
07/12/2023- Received email from Dace re: aws certification that he sent to ARC. Also sent it to me for reference. Frowarded to Stacey in ARC to make sure she got it.
07/13/2023- Received emil from Stacey in ARC:  Hello Barbara,
I hope you are doing well.   Thank you for the attachment. We did receive that doc but I believe we are waiting for another report for our Security team to review.
@Ray, I am on PTO tomorrow.  If you happen to get an update while I'm out, will you please update Barbara and Terry on this thread?
Stace

07/17/2023-Received email from Dave asking status of ARC.
07/17/2023-  Sent back message to Dave- no updates yet.
07/17/2023-Received email from Michael at Ternium:  Ok sounds good.  I think the next step when we are approved by ARC is we are put into your legal department for approval if that is correct?   So, maybe we are already in legal but let us know what you think.
Thanks
Michael
7/17/2023- Responded back to Michael- yes- those are the steps.

07/21/2023- Received email from Ray in ARC:  Barbara,
When we met with the vendor and the workflow was discovered to deal with CHOC patient data, it was revealed that their security documentation was limited.  When additional documentation was provided to CHOC, it was generic information from their hosting service; however, ISO always asks for specific security documentation (audits, penetration tests, HIPAA certification, HITRUST certification, etc) regarding the vendor's application and environment.
If Ternium is unable to provide this, our Infosec team may have to conduct a manual audit of their environment which would be the next step.  Please let us know if you would like any more information.
Sincerely,
-Ray

07/21/2023-Sent response above to Michael and Dave at Ternium.
07/21/2023- Responded to Ray in ARC- Asking if he sent this required info needed to Ternium.
07/26/2023-Email from Ray in ARC-  Good morning Barbara, I apologize for the delay in my response.  The follow-up items were a direct inquiry from our Infosec team so I do not have any additional info for you to relay.  We will check today for an update on this.
-Ray.
07/26/2023- Sent response to Ray in ARC:  Hi Ray- I've been in communication with vendor.  Please see below and advise:

From Ternium
Barbara,
I hope all is well.
Just to provide you an update, we should have all the security documents/policies in the next week or so.   Dave may have more to add but it is a priority for us and we should have very soon.  We would submit these back to you or someone at the ARC team?  Not sure about the audit route as an option but we'll need the security documents in the future regardless.
Thanks
Michael

07/26/2023- Email to Ternium:  Hi Michael,
You should send to InfoSec and ARC team.  CC me if you want to.
Have a great day!

07/29/2023- From Ternium- Hi Barbara,
We understand our documentation was a little short, but we have engaged with a compliance firm to conduct our system and security audits and assist in building out the policies and documentation.  I should have an update for you Friday afternoon or early next week.  This is our number one priority so we will move this along as quickly as possible.
Thanks!
Dave

08/02/2023- From Ray in ARC-Good morning Barbara,
I checked our third-party security portal just now to see if any additional artifacts, audit reports, or security certifications had been provided by Ternium for review; however, it appears this is still in progress.  I have also cc'd Daniel & Melissa, who have performed the original assessment with Ternium and can resend the upload link to David Jewell just as a courtesy.
08/02/2023-Forwarded above into to Ternium.
08/09/2023- Received email from ARC advising us that they received an email from Ternium:  Hi Daniel,
I'm still working on getting you a more specific certificate for our account system.  However, I just sent over all of our compliance and security policies to assist with additional reviews.
Also, I wanted to let you know that we are going through a third-party security and compliance assessment right now as part of our corporate initiative to pursue HiTrust certification in the next 12 months.  So the policies I provided are as of today, but are also subject to change as we supplement and improve our policies over the next 30 days.
More than happy to discuss or provide any additional information you may need.  Please let me know if you have any questions.
Hope everyone has a great weekend!
Dave

08/14/2023-Recvd email from Ternium with cc to ARC:  Daniel and CHOC team,
Happy Monday and hope all is well.
Dave and I just wanted to follow up on the documents sent over about 10 days ago to see if you have any questions or maybe we are in the clear now from a security perspective.
Thanks
Michael

08/14/2023- From ARC/Security team to Ternium:  Hi Michael,
I don't see anything else in the folder link you provided except the AWS SOC 2.
08/14/2023-From Ternium to ARC security team:  Hi Michael,
I'm not sure what happened there, but I've just placed additional files in the link you provided below.  Please take a look and we can connect with any questions or clarifications.
Also, we are currently undergoing a HIPAA compliance assessment from a third party, so we should have a report on that in the next few weeks.  It is our intent to pursue HITRUST certification within the next year so we are working towards the highest levels of security compliance available.
Thanks,
Dave

08/14/2023-From Daniel in Security to Ternium:  Hey Dave,
Good deal. I got the notification and will place those files in the assessment in Censinet. I hope your assessments go well.
Thank you!
Daniel Hudgins
Service Lead, Third-Party Risk Management
Fortified Health Security
C: 931-994-9147
dhudgins@fortifiedhealthsecurity.com- STILL IN ARC

08/18/2023- Received email from Vendor to ARC:  Good afternoon Daniel,
I just obtained some additional security documentation for our Simplicity system.  If you can provide another link I can drop those new documents in there pretty quickly.
Thanks and have a great weekend!
Dave

08/24/2023-Daniel Hudgins sent email to Dave and Michael:  Hey Dave and Michael,
Here is a link to upload any additional documents: https://fortifiedhealthsecurity.egnyte.com/ul/h26I4WMAhu
Michael,
Per Ray's message, CHOC was wanting a SOC2 Type 2 of your application, not just an AWS SOC2.

" On Jun 28, 2023, at 10:17 PM, Ray De La Cruz <RDeLaCruz@choc.org> wrote:
Dave,
Upon review of the provided SOC2TYPE2, this is for AWS not for your application.  Our Infosec team is requesting the SOC2TYPE2 for your Ternium application, if this is available.  Please let us know if this can be uploaded."
Thanks,
Daniel
Daniel Hudgins
Service Lead, Third-Party Risk Management
Fortified Health Security
C: 931-994-9147
dhudgins@fortifiedhealthsecurity.com

08/24/2023- Dave to Daniel: Subject: RE: CHOC System Assessment Call: #899 Ternium, LLC (Contract Review)
Hi Daniel,
Just sent over some additional supporting compliance/security documentation for our account work flow system.  Just to be clear, we do not have an application that we are leveraging to support CHOC or something that will directly interface with CHOC's network or systems.  The documents I just sent over are related to our account work flow system, that we use internally to support our services.  It is that system that is through AWS.  I hope the documentation and that clarifies things a little bit in case there was any confusion.  Appreciate all your efforts and always more than happy to connect to discuss our security parameters.  We are currently going through a full HIPAA compliance assessment and will be able to share those results sometime in September.
Thanks and I hope everyone has a great weekend!

Dave

6/27/2023-Michael Cameron sent email to ARC and Daniel. Daniel,

If possible, let us know if this last document Dave sent satisfies the security requirements and process for CHOC since we don't interface directly with CHOC's systems in the next week or less.   We'd be happy to discuss on a quick call if that helps as well.

Thanks so much

Michael

08/31/23-Email from Daniel from ARC third party (fortified health security)-Hey Michael,

Those are definitely helpful. What is that ISO certificate for – "Ontario Systems dba Finvi Katabat"?

Also, once you've got your HIPAA assessment completed, that would be good to send to CHOC.

Daniel

09/01/2023-Email from Dave from Ternium to Daniel:  Good afternoon Daniel,

The documents recently submitted for Ontario Systems dba Finvi Katabat are related to our account work-flow management system – Ontario Systems is the parent company.   When I went back to them for additional documentation on their security and compliance set up they provided a package and I forwarded along everything they sent me.  I wanted to make sure you have all information that I receive for full transparency and to ensure that you have everything you have.

We have our HIPAA assessment landing meeting on next Thursday to review initial analysis.  Most likely won't have a final report for you by then, as there may be some additional things we need to do on our end, but I'll certainly pass along the final assessment (or even a preliminary assessment) as so as we have it in-hand.

Thank you for your continued support and I hope everyone has a fantastic holiday weekend!

Dave

I also checked MediTract and it appears that Ternium Contract is still in REJECTION Phase until the Final ARC Documentation is submitted:



Kindest Regards,
Maggie

*Maggie Murphy Bornn*

Executive Secretary to Ken Baxter

Vice President, Revenue Cycle

T: (714) 509 1617

E: Margaret.murphy.bornn@choc.org

1201 W. La Veta Avenue  |  Orange, CA 92868





---

**From:** ████████ @choc.org>
**Sent:** Friday, September 8, 2023 12:11 PM
**To:** Maggie Murphy Bornn <Margaret.Murphy.Bornn@choc.org>
**Cc:** Barbara Greene <barbara.greene@choc.org>
**Subject:** FW: ROMSA-09.01.2023-UPDATED #2

Can you confirm for me that the Ternium has been moved to legal review, please.  The last note here from June 21 is from Stace and that they passed ARC.  We should have an update from legal by now.

Please advise. Vendor is wanting to know what the hold up is. I need to get that contract finalized.

Thanks,

████

---

**From:** Barbara Greene <Barbara.Greene@choc.org>
**Sent:** Friday, September 1, 2023 12:53 PM
**To:** ████████ @choc.org>
**Cc:** Maggie Murphy Bornn <Margaret.Murphy.Bornn@choc.org>
**Subject:** ROMSA-09.01.2023-UPDATED #2

Ternium communication to ARC updated

*Barbara Greene*

Administrative Assistant, Revenue Cycle

T: (949)285-4925

E: Barbara.Greene@choc.org

1201 W. La Veta Avenue  |  Orange, CA 92868

CHOC Commerce Tower, 6th Floor Annex Suite, 505 S. Main St., Orange, CA 92868





---

This email message and any files transmitted are sent with confidentiality in mind and contain privileged or copyright information. You must not present this message to another party without gaining permission from the sender. If you are not the intended recipient you must not copy, distribute or use this email or the information contained in it for any purpose other than to notify Children's Hospital of Orange County. Any views expressed in this message are those of the sender, except where the sender specifically states them to be the views of Children's Hospital of Orange County. If you have received this message in error, please notify the sender immediately, and delete this email from your system. We do not guarantee that this material is free from viruses or any other defects although due care has been taken to minimize the risk.

# EXHIBIT F

| | |
|---|---|
| **From:** | Service Hub |
| **To:** | Liaran Aleman; Chuck.Galloway@bannerhealth.com |
| **Subject:** | RITM1436598 has been fulfilled - We have a vendor user who has left that vednot to work for another one. Can we have this person"s Contract and Email updated to |
| **Date:** | Thursday, February 1, 2024 12:31:33 PM |
| **Attachments:** | image.png |
| | image.png |

---

**CAUTION: Message is from External Sender**

Do NOT click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.



## Notification

# Your request item has been fulfilled

Please review your request item to confirm if completed. If you have any questions, please contact Ritesh Yadav within 10 business days.

## Summary of Details

**Requested for:** Aleman Liaran

**Opened by:** Charles Galloway

**Preferred contact number:** 561 486 7939

**Location:** Banner Corporate Center Mesa

**Urgency:** Low

**Brief description:** We have a vendor user who has left that vednot to work for another one. Can we have this person's Contract and Email updated to the new vendor? User's BHS IS venLiaran and was with Aspirion but has moved to Ternium LMS# 0101-08-188365 Contract end date 09/07/2027. New email is liaran.aleman@terniumrcm.com and new phone # is 786-493-3321

**Close Notes:** Updated Aleman Liaran Email and Phone number to liaran.aleman@terniumrcm.com and new phone # is 786-493-3321.

Click here to login: Service Hub Login Link

Customers:  Click on the "Requests / Incidents" link located in the right hand corner and select the request to view the details.

IT Users:  Search for the RITM in the top right hand corner Search box to view the details.



Ref:MSG52218294

EXHIBIT G

| | |
|---|---|
| **From:** | Hoverter, Jennifer |
| **To:** | Drolet, Katherine; Alisha Mays; Katherine Drolet; Loren Tock; teamsvisitor:492f9d55a02f40f38bcfe918aafb7168; Wanda Graham; Katelyn Lifton; Hoverter, Jennifer; Nicholas Malaby; Mikie McBride; Tiffany Leffler; Heather Jackson |
| **Subject:** | Meeting (ScheduledMeeting)/Thread Id: 19:meeting_YTM5NzliYmYtMTM5MC00MzQ4LWFiZGMtYmE0MjIwNjA3NzVh@thread.v2/Communication Id: f5df9879-6b64-482b-9d0b-33d46df33d2e/Drolet, Katherine,Alisha Mays,Katherine Drolet,Loren Tock,teamsvisitor:492f9d55a02f40f38b... |
| **Date:** | Wednesday, July 10, 2024 11:36:54 PM |

Start Time (UTC): 7/10/2024 4:54:28 PM
End Time (UTC): 7/10/2024 8:04:51 PM
Duration: 03:10:22.7572225

[7/10/2024 4:54:28 PM (UTC)] Katherine.Drolet@bmcjax.com joined.
[7/10/2024 5:00:38 PM (UTC)] Katherine.Drolet@bmcjax.com left.
[7/10/2024 4:59:51 PM (UTC)] alisha.mays@terniumrcm.com joined.
[7/10/2024 4:59:53 PM (UTC)] alisha.mays@terniumrcm.com left.
[7/10/2024 5:03:05 PM (UTC)] Katherine.Drolet@bmcjax.com joined.
[7/10/2024 5:04:29 PM (UTC)] Katherine.Drolet@bmcjax.com left.
[7/10/2024 5:09:05 PM (UTC)] Katie.Drolet@terniumrcm.com joined.
[7/10/2024 5:15:43 PM (UTC)] Katie.Drolet@terniumrcm.com left.
[7/10/2024 4:58:25 PM (UTC)] Loren.Tock@terniumrcm.com joined.
[7/10/2024 8:02:19 PM (UTC)] Loren.Tock@terniumrcm.com left.
[7/10/2024 5:00:08 PM (UTC)] teamsvisitor:492f9d55a02f40f38bcfe918aafb7168 joined.
[7/10/2024 8:04:49 PM (UTC)] teamsvisitor:492f9d55a02f40f38bcfe918aafb7168 left.
[7/10/2024 4:55:48 PM (UTC)] wanda.graham@aspirion.com joined.
[7/10/2024 8:04:36 PM (UTC)] wanda.graham@aspirion.com left.
[7/10/2024 5:17:23 PM (UTC)] Katie.Drolet@terniumrcm.com joined.
[7/10/2024 8:01:12 PM (UTC)] Katie.Drolet@terniumrcm.com left.
[7/10/2024 4:58:26 PM (UTC)] katelyn.lifton@aspirion.com joined.
[7/10/2024 8:02:23 PM (UTC)] katelyn.lifton@aspirion.com left.
[7/10/2024 4:56:37 PM (UTC)] Jennifer.Hoverter@bmcjax.com joined.
[7/10/2024 8:04:51 PM (UTC)] Jennifer.Hoverter@bmcjax.com left.
[7/10/2024 5:00:51 PM (UTC)] nicholas.malaby@aspirion.com joined.
[7/10/2024 8:01:55 PM (UTC)] nicholas.malaby@aspirion.com left.
[7/10/2024 5:00:49 PM (UTC)] mikie.mcbride@aspirion.com joined.
[7/10/2024 8:04:16 PM (UTC)] mikie.mcbride@aspirion.com left.
[7/10/2024 4:55:09 PM (UTC)] Tiffany.Leffler@terniumrcm.com joined.
[7/10/2024 8:03:54 PM (UTC)] Tiffany.Leffler@terniumrcm.com left.
[7/10/2024 4:57:28 PM (UTC)] hjackson98@r1rcm.com joined.
[7/10/2024 8:04:13 PM (UTC)] hjackson98@r1rcm.com left.

EXHIBIT H

**From:** Dave Jewell
**To:** Michael Cameron; Alisha Mays
**Subject:** RE: Vegas and Phoenix
**Date:** Tuesday, January 17, 2023 1:53:50 PM
**Attachments:** image001.png
image002.png
image003.png
image004.png

---

Oh that's hilarious.

---

**From:** Michael Cameron <michael.cameron@aspirion.com>
**Sent:** Tuesday, January 17, 2023 12:51 PM
**To:** Dave Jewell <dave.jewell@aspirion.com>; Alisha Mays <alisha.mays@aspirion.com>
**Subject:** FW: Vegas and Phoenix

FYI for your entertainment…

 **Michael Cameron** • Senior Vice President of Sales
Direct: (972) 489-1995 • Fax: (561) 701-9455
michael.cameron@aspirion.com • www.aspirion.com          

---

NOTICE:  This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, distribution, dissemination,  copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

**From:** Michael Cameron
**Sent:** Tuesday, January 17, 2023 10:40 AM
**To:** Megan Kelly <megan.kelly@aspirion.com>
**Subject:** FW: Vegas and Phoenix

FYI

**From:** Amanda De Los Reyes <Amanda.DeLosReyes@valleywisehealth.org>
**Sent:** Tuesday, January 17, 2023 9:52 AM
**To:** Michael Cameron <michael.cameron@aspirion.com>
**Subject:** RE: Vegas and Phoenix

**CAUTION: Message is from External Sender**
Do NOT click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.

Hi Michael-

I think my admin may have thought you were both working together, as I did as well.

I would prefer to work with you as we already have a relationship.

Is there a way we can have this changed?

Thanks!

**From:** Michael Cameron <michael.cameron@aspirion.com>
**Sent:** Tuesday, January 17, 2023 8:49 AM
**To:** Amanda De Los Reyes <Amanda.DeLosReyes@valleywisehealth.org>

**Subject:** RE: Vegas and Phoenix

CAUTION: **External Email.** This Email originated **outside** of Valleywise Health. THINK BEFORE YOU CLICK. It could be a **phishing email.**

Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Amanda,

Ok, maybe I'll see you in Vegas.

As a prospective client, you have a choice of who you work with at Aspirion but it sounds like Paul already has you covered.    Best of luck and let me know if there is anything I can ever do to help.

Michael

   **Michael Cameron** • Senior Vice President of Sales
Direct: (972) 489-1995 • Fax: (561) 701-9455
michael.cameron@aspirion.com • www.aspirion.com   

NOTICE:  This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, distribution, dissemination,  copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

**From:** Amanda De Los Reyes <Amanda.DeLosReyes@valleywisehealth.org>
**Sent:** Tuesday, January 17, 2023 9:18 AM
**To:** Michael Cameron <michael.cameron@aspirion.com>
**Subject:** RE: Vegas and Phoenix

**CAUTION: Message is from External Sender**
Do NOT click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.

Hi Michael-

Nice to hear from you!

I will try to swing by Monday night, I am committed to dinners Sunday through Tuesday. If I can't swing by Monday night, perhaps we can get together when you are in Phoenix.

I do have a meeting with Paul today at 11am MST.

Thanks!



**Amanda De Los Reyes, MBA, CRCR**
VP Revenue Cycle
Pronouns: She/Her/Hers

**Valleywise Health - Tempe Diablo, Bldg A**
2900 South Diablo Way, Suite A102
Tempe, AZ 85282

Phone: 602-344-2863
Cell: 503-320-5939

Valleywisehealth.org

**From:** Michael Cameron <michael.cameron@aspirion.com>
**Sent:** Monday, January 16, 2023 2:36 PM
**To:** Amanda De Los Reyes <Amanda.DeLosReyes@valleywisehealth.org>
**Subject:** Vegas and Phoenix

CAUTION: **External Email.** This Email originated **_outside_** of **Valleywise Health**. THINK BEFORE YOU CLICK. It could be a **phishing email.**

Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Amanda,

Thanks for sending the email and congrats again on the new career change.   Should be nice right now in Phoenix if you have moved there.

I'll be at Western Region in Vegas so let me know if you want to get a drink or dinner while out there.   We have our event that Monday night if you can make it.   The week of the 30th, I'll be in Phoenix for company meeting if you have some availability that week as well.

Also, do you have meeting with Paul Morino from my company later this week?     I see a note in our database but not sure it is real or updated.

Thanks
Michael

**Michael Cameron** • Senior Vice President of Sales
Direct: (972) 489-1995 • Fax: (561) 701-9455
michael.cameron@aspirion.com • www.aspirion.com



NOTICE:  This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, distribution, dissemination,  copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

This message and any attachments are for the designated recipient only and may contain privileged, proprietary, or otherwise confidential information. If you have received this communication in error, please notify the sender immediately and delete the original. Any other use of the email by you, including copying, distributing, or disseminating the contents or attachments, is prohibited.
This message and any attachments are for the designated recipient only and may contain privileged, proprietary, or otherwise confidential information. If you have received this communication in error, please notify the sender immediately and delete the original. Any other use of the email by you, including copying, distributing, or disseminating the contents or attachments, is prohibited.

# EXHIBIT I

**From:**        Erin Haynie <erin.haynie@aspirion.com>
**Sent:**        Wednesday, July 19, 2023 11:28 AM
**To:**          Michael Cameron
**Subject:**     RE: Discretionary Denials RFP
**Attachments:** UNM RFP Response_Clinical Denial Appeals and Payment Variance Services.docx

Hi Michael,

I'm sorry for the delay, my head is officially underwater with work. 

Are there other RFP specific to discretionary denials that you can think of?

Thanks,
Erin

 **Erin Haynie, Sales** • Vice President of Marketing
Direct: 706-256-5203 • Fax: 706-324-3291
erin.haynie@aspirion.com • www.aspirion.com      

NOTICE: This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If y not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and th review, distribution, dissemination, copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If yo received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

**From:** Michael Cameron <michael.cameron@aspirion.com>
**Sent:** Tuesday, July 18, 2023 9:13 AM
**To:** Erin Haynie <erin.haynie@aspirion.com>
**Subject:** Discretionary Denials RFP

Hi Erin,

Can you send over the final version of the Univ of New Mexico RFP for denials?    I'll take others (discretionary denials) as well but another prospective client is asking.

Thanks
Michael

 **Michael Cameron** • Senior Vice President of Sales
Direct: (972) 489-1995 • Fax: (561) 701-9455
michael.cameron@aspirion.com • www.aspirion.com      

NOTICE:  This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and t review, distribution, dissemination,  copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If yo received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

| | |
|---|---|
| **From:** | Erin Haynie <erin.haynie@aspirion.com> |
| **Sent:** | Saturday, August 12, 2023 10:00 AM |
| **To:** | Michael Cameron |
| **Subject:** | UNM RFP Response |
| **Attachments:** | UNM Exhibits.zip; UNM RFP Response_Clinical Denial Appeals and Payment Variance Services.docx |

# EXHIBIT J

| | |
|---|---|
| **From:** | Angela A Eckhardt |
| **To:** | "michael.cameron@aspirion.com" |
| **Subject:** | RFP 485-23 Clinical Denial Appeals and Payment Variance Services |
| **Date:** | Wednesday, February 7, 2024 6:23:20 PM |
| **Attachments:** | image001.png |
| | Aspirion.pdf |

CAUTION: Message is from External Sender
Do NOT click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the Phish-Alert button in Outlook.

ENCRYPT all PHI, PII, and/or confidential information to outside sources.

Michael,

Good afternoon.  Please see attached letter.  If you have any questions feel free to reach out.


Thank you,




Angela A. Eckhardt

Procurement Specialist

UNM Hospital Purchasing Department

aaeckhardt@salud.unm.edu <mailto:aaeckhardt@salud.unm.edu>



Purchasing Department
933 Bradbury Dr. SE, Suite 3165
Albuquerque, NM 87106

February 7, 2024

Michael Cameron SVP Sales
michael.cameron@aspirion.com
Aspirion Health Resources, LLC
1506 6th Avenue, Suite 3
Columbus, GA 31901

**RE: Notice of Award UNMH RFP 485-23, Clinical Denial Appeals and Payment Varience Services**

The following suppliers submitted responses to the above solicitation:

| Vendor | Points |
|---|---|
| Aspirion | 57.50 |
| Bottom Line Systems, LLC | 46.75 |
| Cognizant | 50.50 |
| Engage Health Solutions, LLC | 36.00 |
| Managed Resources, Inc. | 63.50 |
| Med Metrix | 43.25 |
| Optum | 34.00 |
| Savista | 71.00 |
| Ternium LLC | 52.75 |

Responses were evaluated according to the criteria stated in the solicitation. We announce award to: **Savista**

We would like to thank each supplier for your time and efforts in preparing a response to this solicitation. We invite you to contact us if you would like additional information or have any questions about the evaluation process. We appreciate your interest in doing business with The University of New Mexico Hospital.

Sincerely,

*Angela A. Eckhardt*

Angela A. Eckhardt
Procurement Specialist
UNM Hospitals
Purchasing Department aaeckhardt@salud.unm.edu

EXHIBIT K

**From:**             Bret Kelsey <bret.kelsey@lcmchealth.org>
**Sent:**              Saturday, July 22, 2023 8:34 AM
**To:**                Michael Cameron
**Subject:**         Accepted: Gerrit, Megan and Mike Dinner

# EXHIBIT L

| | |
|---|---|
| **From:** | LCMC Provisioning Requests |
| **To:** | Megan Kelly |
| **Cc:** | megan.kelly@terniumrcm.com |
| **Subject:** | Expiring LCMC User Account – Needs Attention |
| **Date:** | Thursday, April 11, 2024 2:54:58 PM |
| **Importance:** | High |

---

**CAUTION: Message is from External Sender**

Do <u>NOT</u> click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.

This message was sent securely using Zix®

You are identified as an LCMC sponsor for the affiliate(s) account that are set to expire and become disabled:

| imf_legal_first_name | imf_legal_last_name | contract_end_date | external_company | manager_email_address |
|---|---|---|---|---|
| Alexis | Elkin | 5/11/2024 | Ternium | megan.kelly@aspirion.com |

Please review these accounts. If you wish to extend the expiration of specific accounts, go to MyIT Service portal https://lcmchealth.service-now.com/sp – select I need something – User Access and Provisioning -Add/Modify Access and request the Extend affiliate (non-employee) access. Requested accounts will be extended 180 days. If the extension should be less than 180 days, please provide the end date.

<u>**IMPORTANT:**</u> If there is no response each account will expire and become disabled on the date indicated above.

Please do not reply to this email!

Thank you,

This message was secured by Zix®.

EXHIBIT M

| | |
|---|---|
| **From:** | Liaran Aleman |
| **To:** | Liaran Aleman |
| **Subject:** | Re: documento que necesito |
| **Date:** | Thursday, January 11, 2024 10:05:52 AM |
| **Attachments:** | RSImage-12945613.png |
| | RSImage-12939853.png |
| | RSImage-12363545.png |
| | Ternium NDA.pdf |

---

**CAUTION: Message is from External Sender**

Do <u>NOT</u> click links or open attachments from an unknown or unexpected sender. Report suspicious e-mails using the **Phish-Alert button** in Outlook.

**ENCRYPT** all PHI, PII, and/or confidential information to outside sources.

Sincerely,

Liaran Aleman

On Jan 11, 2024, at 9:28 AM, Liaran Aleman <liaran.aleman@aspirion.com> wrote:

<u><RSImage-12363545.png></u>

Liaran Aleman, JD • Associate Attorney, Licensed in FL
Direct: (561) 486-7939 • Fax: (561) 264-8920
Liaran.Aleman@Aspirion.com • www.aspirion.com

<RSImage-12945613.png>

---

NOTICE:  This message and accompanying documents are covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and contain information intended for the specific individual (s) only. This information is confidential. This email message and all attachments transmitted with it are intended solely for the use of the addressee. If you are not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, distribution, dissemination,  copying, or taking of any action based on the contents of this information, message or its attachments is strictly prohibited. If you have received this communication in error, please notify the sender immediately by returning this email to the sender and delete the original message and attachments.

<RSImage-12939853.png>

This message and any attachments are for the designated recipient only and may contain privileged, proprietary, or otherwise confidential information. If you have received this communication in error, please notify the sender immediately and delete the original. Any other use of the email by you, including copying, distributing, or disseminating the contents or attachments, is prohibited.
<Liaran Aleman.pdf>



## MUTUAL NON-CIRCUMVENTION, NON-DISCLOSURE, AND CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT is entered into effective _____, 2024 by and between Ternium, LLC its successors, and assigns and _____ (collectively the "Parties").

**WHEREAS**, the Parties desire to discuss certain matters regarding potential business transactions between them and/or other third parties; and

**WHEREAS**, in connection with these discussions, certain confidential and proprietary information regarding each party, as well as other third party businesses, may be disclosed to the other to assist in the evaluation of the potential business transactions; and

**WHEREAS**, the parties desire to establish the terms under which they will disclose certain confidential and proprietary information.

**NOW THEREFORE**, in consideration for the mutual promises contained herein, and other good and valuable consideration, receipt of which is expressly acknowledged, the parties hereby agree and covenant as follows:

**Section 1. Confidential Information.** Confidential Information shall mean:

**(a)** any data or information that is competitively sensitive material, and not generally known to the public, including, but not limited to, products planning information, marketing strategies, plans, finance, operations, leadership, customer relationships, customer profiles, sales estimates, business plans, and internal performance results relating to the past, present or future business activities of the parties, their parent corporations if applicable, their subsidiaries and affiliated companies and the customers, clients and suppliers of any of the foregoing; and

**(b)** any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords the applicable party a competitive advantage over its competitors; and

**(c)** all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, information, know-how, show-how and trade secrets, whether or not patentable or copyrightable and regardless of whether such information is a Party's property or the property of a third-party supplier (such as a software licensor), and regardless of whether such information is specifically marked or identified as confidential.

Confidential Information includes without limitation, all of the Parties' documents, strategies, marketing, processes, protocols, policies, technical specifications, algorithms,  inventions,

equipment, prototypes and models, and any other tangible manifestation of the foregoing, whether now existing or arising in the future.

Confidential Information also includes conversations about the purchase or sale of any or all assets of other third-party businesses as well as any documentation, materials, and/or information disclosed on behalf of said third parties.

Neither Ternium, nor any of their employees, affiliates, or representatives make any representation or warranty as to the accuracy or completeness of Confidential Information from any such third party business, and each party expressly disclaims any and all liability based on such information or an omission there from.

**Section 2. Confidentiality Obligations.** Except as expressly authorized by prior written consent of the supplying party, the receiving party shall:

**(a)** limit access to any Confidential Information received by it to its employees or third parties who have a need-to-know in connection with the evaluation of the potential business transaction, and only for use in connection therewith; and

**(b)** Advise its employees or third parties having access to the Confidential Information of the proprietary nature thereof and of the obligations set forth in the Confidentiality Agreement; and

**(c)** take appropriate action by instruction or agreement with its employees or other parties having access to the Confidential Information to fulfill its obligations under this Confidentiality Agreement; and

**(d)** safeguard all Confidential Information received by it using a reasonable degree of care, but not less than that degree of care used by the receiving party in safeguarding its own similar information or material; and

**(e)** use all Confidential Information received by it solely for purposes of evaluating the potential business transactions with the supplying party and for no other purpose whatsoever; and

**(f)** not disclose any Confidential Information received by it to third parties without prior written consent by supplying party; and

**(g)** not disclose the existence of the discussions to any third party; and

**(h)** be responsible for any breach of the terms hereunder by the receiving party or any person who receives any Confidential Information from the receiving party.

The receiving party shall be responsible for, and shall not be excused or relieved from the foregoing obligations by reason of any improper, unlawful, illegal, fraudulent or criminal conduct by any of its employees or any other third party with access to the receiving party's facilities. The receiving party shall give the supplying party immediate notice of any unauthorized use or disclosure of any Confidential Information.

Except as prohibited by law, regulation or Exchange rule binding upon the receiving party, upon the request of the supplying party, the receiving party shall (i) surrender to the supplying party all memoranda, notes, records, drawings, manuals and other documents or materials (and all copies of same) pertaining to or including the Confidential Information and (ii) destroy all memoranda, notes, records, drawings, manuals, records, and other documents or materials (and all copies of same) prepared by receiving party or any person who received any Confidential Information from the receiving party based on any information in the Confidential Information. Upon the return or destruction of such materials, the receiving party agrees to certify, in writing, that all of the foregoing materials have been surrendered to the supplying party.

**Section 3. Exceptions to Confidentiality.** The obligations of confidentiality and restriction on use in Section 2 shall not apply to any information that the receiving party proves:

**(a)** Was in the public domain prior to the date of this Agreement or subsequently came into the public domain through no fault of the receiving party, or

**(b)** Was lawfully received by the receiving party from a third party free of any obligation of confidence to such third party; or

**(c)** Was already in the possession of the receiving party prior to receipt thereof, directly or indirectly, from the supplying party; or

**(d)** Is required to be disclosed to any governmental agency pursuant to applicable laws or regulations, or is required to be disclosed in a judicial or administrative proceeding after all reasonable legal remedies for maintaining such information in confidence have been exhausted including, but not limited to, (and except where such notice is prohibited by law, regulation or Exchange rule binding upon the receiving party) giving the supplying party as much advance notice of the possibility of such disclosure as practical so the supplying party may attempt to obtain a protective order concerning such disclosure, or take such other actions as necessary to stop such disclosure or to assure confidential handling of such Confidential Information; or

**(e)** Is subsequently and independently developed by employees, consultants or agents of the receiving party without reference to the Confidential Information disclosed under this Agreement.

**Section4. Rights in Confidential Information.** Except as specifically provided for herein, this Agreement does not confer any right, license, interest or title in, to or under the Confidential Information to the receiving party. Except as specifically provided for herein, no license is hereby granted to the receiving party, by estoppel or otherwise under any patent, trademark, copyright, trade secret or other proprietary rights of the supplying party. Title to the Confidential Information shall remain solely in the supplying party, even if suggestions, comments, ideas or other improvements made by the receiving party are incorporated into the Confidential Information or related materials, unless otherwise agreed to in writing by the parties.

**Section 5. Indemnity by the Receiving Party.** The receiving party agrees to indemnify and hold harmless the supplying party from and against any and all losses, claims, damages and expenses (including, but not limited to, attorneys' and experts' fees, costs of investigation and costs of settlement) which result from the receiving party's breach of this Agreement or unauthorized use or disclosure of the Confidential Information. The receiving party's indemnification obligations pursuant to the immediately preceding sentence shall include any obligation to indemnify and hold harmless the supplying party from and against any and all losses, claims, damages and expenses asserted by anyone claiming by, through or under the supplying party.

**Section 6. Equitable Relief.** The Parties agree that money damages would not be a sufficient remedy for breach of the confidentiality and other obligations of this Agreement. Accordingly, in addition to all other remedies that either party may have, the supplying party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any breach of the confidentiality and other obligations of this Agreement. The receiving party agrees to waive any requirement for a bond a connection with any such injunctive or other equitable relief.

**Section 7. Other Agreements.** This Confidentiality Agreement is in addition to and not in lieu of whatever other agreements may exist between the parties; provided, however, that unless any other such agreement is more protective of the supplying party, in the event of inconsistency between this Agreement and the other agreement, this Agreement shall control.

**Section 8. Survival.** The receiving party's obligations hereunder shall survive two years from the termination of any related contract or other relationship between the parties.

**Section 9. Miscellaneous.** This Agreement shall be binding upon the parties hereto and their respective successors and assigns. This Agreement may not be amended or modified except in a writing making express reference hereto, signed by both parties. Agreement shall be governed and construed under the internal laws of the State of North Carolina. Any disputes arising pursuant to this Agreement will be resolved exclusively within Orange County, North Carolina.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**First Party: Ternium, LLC**
Signature:
Printed Name:
Date:


**Second Party: _____**
Signature: _____
Printed Name: _____
Date: _____