**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 1-24-cv-22875-CMA**

MAINSAIL PARENT, LLC
d/b/a ASPIRION,
a Delaware limited liability company, and
SPECIALIZED HEALTHCARE
PARTNERS, LLC,
a Florida limited liability company

       Plaintiffs,

v.

DAVID JEWELL, an individual,
MICHAEL CAMERON, an individual,
ALISHA MAYS, an individual,
MEGAN KELLY, an individual, and
TERNIUM LLC,
a Delaware limited liability company.

       Defendants.

_____/

**PLAINTIFFS' MOTION FOR ENTRY OF**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**
**AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 2

    A.   The Highly Specialized Nature of RCM Services Require Aspirion to Safeguard Its Employees and Client Relationships. ........................................................................ 2

    B.   Jewell and Cameron's Restrictive Covenants Expressly Prohibit Soliciting Aspirion's Employees and Soliciting or Serving Its Clients. ...................................... 3

    C.   Aspirion's Recent Internal Investigation Reveals Defendants' Unlawful Plan to Steal the Company's Business, Including Clients and Employees............................... 3

    D.   New Information Reveals that Aspirion is Under Imminent Threat of Losing More Business to Defendants' Unlawful Scheme. ...................................................... 4

LEGAL STANDARD ............................................................................................................ 5

ARGUMENT ......................................................................................................................... 6

I.   All Four Factors Weigh In Favor Of Granting Aspirion Injunctive Relief. ...................... 6

    A.   Aspirion Is Likely To Succeed On The Merits Of Its Claims. .................................... 6

        1.   Aspirion Will Likely Prevail on its Breach of Contract Claims against Jewell and Cameron. ............................................................................ 7

        2.   Aspirion Will Likely Prevail on its Trade Secrets Claims Against the Former Employee Defendants ......................................................... 11

        3.   Aspirion Will Likely Prevail on its Tortious Interference Claim Against All Defendants. ........................................................................ 12

        4.   Aspirion Will Likely Prevail on its Breach of a Duty of Loyalty Claim Against the Former Employee Defendants ............................... 13

        5.   Aspirion Will Likely Prevail on its Civil Conspiracy Claim Against All Defendants. ........................................................................ 14

    B.   Aspirion Will Suffer Immediate and Irreparable Injury Absent Injunctive Relief.... 14

    C.   Aspirion's Injury Outweighs Any Possible Harm To Defendants. .......................... 16

    D.   The Public Interest Favors Granting This Interim Temporary Injunction................ 17

II.   No Bond Should Be Required For The Temporary Restraining Order. ............................ 18

CONCLUSION ...................................................................................................................... 18

## **TABLE OF AUTHORITIES**

### **Cases**

*ACR Electronics, Inc. v. DME Corporation*,
  2012 WL 13005955 (S.D. Fla. Oct. 31, 2012) .......................................................... 15

*All Leisure Holidays Ltd. v. Novello*,
  2012 WL 5932364 (S.D. Fla. Nov. 27, 2012) ....................................................... 15, 17

*All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*,
  2022 WL 2340997 (S.D. Fla. Apr. 8, 2022) ................................................... 8, 10, 17

*Am. Builders & Contractors Supply Co. Inc v. McPherson*,
  2023 WL 11760715 (N.D. Fla. Sept. 12, 2023) ....................................................... 18

*AmeriGas Propane, Inc. v. Sanchez*,
  335 So. 3d 1253 (Fla. 3d DCA 2021) ...................................................................... 15

*Anago Franchising, Inc. v. C.H.M.I., Inc.*,
  2009 WL 5176548 (S.D. Fla. Dec. 21, 2009) .......................................................... 14

*Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency*, LLC,
  2023 WL 3564942 (N.D. Fla. Apr. 14, 2023) ................................................ 14, 15, 16

*AutoNation, Inc. v. O'Brien*,
  347 F. Supp. 2d 1299 (S.D. Fla. 2004) ................................................................... 7, 8

*BellSouth Telecom., Inc. v. MCIMetro Access Transmission Servs., LLC*,
  425 F.3d 964 (11th Cir. 2005) ................................................................................ 18

*Caliber Home Loans, Inc. v. Bales*,
  2016 WL 4810287 (M.D. Fla. Sept. 14, 2016) ...................................................... 9, 15

*Charles Schwab & Co. v. Aviles*,
  2007 WL 9702744 (S.D. Fla. Aug. 23, 2007) ................................................. 6, 7, 8, 17

*Charles Schwab & Co. v. McMurry*,
  2008 WL 5381922 (M.D. Fla. Dec. 23, 2008) ......................................................... 13

*Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*,
  561 Fed.Appx. 882 (11th Cir. 2014) ....................................................................... 14

*Corp. Ins. Advisors, LLC v. Addeo*,
  2021 WL 6622154 (S.D. Fla. Dec. 8, 2021) .................................................... 8, 10, 11, 16, 17

*East v. Aqua Gaming, Inc.*,
  805 So.2d 932 (Fla. 2d DCA 2001) ......................................................................... 17

*Env't Servs., Inc. v. Carter*,
   9 So. 3d 1258 (Fla. 5th DCA 2009) ........................................................................ 7

*Estetique Inc. USA v. Xpamed LLC*,
   2011 WL 4102340 (S.D. Fla. Sept. 15, 2011) ......................................................... 9

*Ferrero v. Associated Materials Inc.*,
   923 F.2d 1441 (11th Cir. 1991) .............................................................................. 15

*Future Metals LLC v. Ruggiero*,
   2021 WL 5853896 (S.D. Fla. Oct. 26, 2021) .......................................................... 6

*GFA Int'l, Inc. v. Trillas*,
   327 So. 3d 872 (Fla. 3d DCA 2021) ........................................................... 7, 14, 15

*HRB Res. LLC v. Osborne*,
   2022 WL 4552449 (M.D. Fla. Mar. 29, 2022) ................................................. 10, 15

*I.C. Sys., Inc. v. Oliff*,
   824 So.2d 286 (Fla. 4th DCA 2002) ...................................................................... 15

*JetSmarter Inc. v. Benson*,
   2018 WL 2709864 (S.D. Fla. Apr. 6, 2018) ..................................................... 15, 17

*Joseph Spine, P.A. v. Moulton*,
   346 So. 3d 154 (Fla. 2d DCA 2022) ...................................................................... 14

*JTH Tax, LLC v. Gilbert*, 2022 WL 1619594 (M.D. Fla. May 12, 2022) .................................. 18

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*,
   51 F.3d 982 (11th Cir. 1995) .................................................................................. 6

*Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*,
   939 So. 2d 268 (Fla. 4th DCA 2006) ..................................................................... 15

*Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide*, LLC,
   2011 WL 6754058 (S.D. Fla. Dec. 22, 2011) ........................................................ 15

*Martin v. Partsbase, Inc.*,
   2020 WL 7495536 (S.D. Fla. Dec. 4, 2020) .......................................................... 13

*Merrill Lynch v. Hagerty*,
   808 F.Supp. 1555 (S.D. Fla. 1992) .............................................................. 8, 10, 17

*Morgan Stanley Smith Barney, LLC v. Abel*,
   2018 WL 515348 (M.D. Fla. Jan. 23, 2018) ................................................. 7, 10, 16

*Nat'l Ins. Consulting Grp., LLC v. Kandel*,
   2020 WL 13389742 (S.D. Fla. Jan. 15, 2020) ....................................................... 13

*Regions Bank v. Raymond James & Assocs., Inc.*,
  2020 WL 7419650 (M.D. Fla. Apr. 20, 2020) ......................................................... 8, 9, 11, 12

*Schiavo v. Schiavo*,
  357 F.Supp.2d 1378 (M.D. Fla. 2005) ........................................................................ 7

*Schiavo v. Schiavo*,
  403 F.3d 1223 (11th Cir.2005) ................................................................................... 6

*Talk Fusion, Inc. v. Ulrich*,
  2011 WL 2681677 (M.D. Fla. June 21, 2011) ......................................................... 6, 9

*Textron Fin. Corp. v. Unique Marine, Inc.*,
  2008 WL 4716965 (S.D. Fla. Oct. 22, 2008) ........................................................... 6

*TracFone Wireless, Inc. v. Washington*,
  978 F. Supp. 2d 1225 (M.D. Fla. 2013) ................................................................... 18

*XN Fin. Servs., Inc. v. Conroy*,
  2012 WL 12873512 (S.D. Fla. Mar. 5, 2012) .......................................................... 13

## **Statutes**

18 U.S.C. § 1836 ............................................................................................................ 11

18 U.S.C. § 1839 ............................................................................................................ 11, 12

Fla. Stat. § 542.335 .......................................................................................... 7, 8, 14, 17, 18

Fla. Stat. § 688.002 ...................................................................................................... 11, 12

Fla. Stat. § 688.003 ....................................................................................................... 11

Plaintiffs, Specialized Healthcare Partners, LLC and Mainsail Parent, LLC d/b/a Aspirion (collectively "Plaintiffs," "Aspirion" or the "Company"), submits for entry of a temporary restraining order ("TRO"), and upon expiration of the TRO, a preliminary injunction, against Defendants, David Jewell, Michael Cameron, Alisha Mays, Megan Kelly, and Ternium LLC ("Ternium") (together, "Defendants"), pursuant to Federal Rule of Civil Procedure 65. In support, Aspirion submits the following memorandum of law and incorporates herein by reference the Complaint and exhibits filed as though set forth in their entirety.

## INTRODUCTION

Aspirion filed this action after learning that its former employees—Jewell, Cameron, Mays, and Kelly (together, the "Former Employee Defendants")—are actively diverting the Company's clients, prospects and employees to their new company, Ternium LLC. Defendants' brazen operation is unlawful given that (1) its masterminds, Jewell and Cameron, entered valid and straightforward restrictive covenants with Aspirion prohibiting this exact conduct, and (2) all the Former Employee Defendants have evidently misused Aspirion's confidential business information, violated their duties of loyalty to Aspirion, and tortiously interfered with the Company's clients, prospects and employees.

The evidence of Defendants' misconduct adduced already, even before discovery, is damning:

- the Former Executive Defendants formed Ternium and began siphoning Aspirion's business long before they resigned from the Company;

- Cameron prepared "Ternium" non-disclosure agreements while still employed at Aspirion and used them to covertly solicit the Company's employees;

- Cameron requested and acquired Aspirion project bid documents while Ternium secretly was submitting a competing bid on the same project;

- in multiple instances, employees left Aspirion and shortly thereafter appeared with Ternium email addresses in the vendor management systems of Aspirion's clients; and

- numerous clients and prospective clients have informed Aspirion that Jewell and Cameron have recently contacted them to discuss doing business with Ternium.

These and other facts confirm that Aspirion has suffered and continues to face the threat of significant harm to its business, its confidential information, and its client and employee relationships. The Court should therefore issue a TRO and preliminary injunction stopping Defendants from their ongoing misconduct.

## FACTUAL BACKGROUND[1]

### A.  The Highly Specialized Nature of RCM Services Require Aspirion to Safeguard Its Employees and Client Relationships.

Revenue cycle management ("RCM") vendors, including Aspirion, focus on supporting hospitals and healthcare systems by providing services to more efficiently manage their clients' revenue cycles. Compl. Ex. 7, Amick Decl. ¶ 4. Aspirion employs more than 170 attorneys and legal staff to manage and serve clients. *Id.* ¶ 8. Aspirion's core solution area is in the Denials subsegment. In particular, the company specializes in supporting hospitals and health systems resolve aged, high-value, complex denials. Aspirion utilizes employees with juris doctor degrees (JD) to triage, appeal and escalate denials with medical insurance companies—one of its key differentiators in the market. *Id.* ¶ 4. Aspirion must invest in years of training for an employee to gain specialized industry skills that add value. *Id.* ¶ 15. The RCM industry, at the same time, is highly sensitive to price and level of service provided. *Id.* ¶ 7. Safeguarding both its talent and trade secrets is paramount for Aspirion: the company uses restrictive covenants, as well as confidentiality provisions and policies, to preserve its client relationships and prevent its competitors from receiving an unfair advantage. *Id.* ¶ 18.

---

[1] Aspirion is submitting declarations in support of its Complaint from six of its employees with relevant knowledge: Thomas Page (Vice President, Legal Center of Excellence) (Exhibit 6), Amy Amick (Chief Executive Officer) (Exhibit 7), Greg Shorten (Chief Client Officer) (Exhibit 8), Tina Eller (Chief Experience Officer) (Exhibit 9), Brent Webster (Senior Vice President of Sales) (Exhibit 10), and Bray Manderson (Senior Vice President of Sales) (Exhibit 11). Instead of re-filing the declarations with this motion, Aspirion cites directly to the declarations submitted with its Complaint.

### B. Jewell and Cameron's Restrictive Covenants Expressly Prohibit Soliciting Aspirion's Employees and Soliciting or Serving Its Clients.

The restrictive covenants in Jewell and Cameron's employment agreements (Employment Agreements") prohibit those two individuals, for the duration of their employment and for one year after their separation from Aspirion,[2] from soliciting the Company's employees (who have worked for the Company in the past year) and from soliciting and serving Aspirion clients. Compl. Exs. 1 and 2, § 10(a)-(b). The Employment Agreements also (1) prohibit Jewell and Cameron from using or divulging the Company's confidential business information (the "Confidential Information") (in perpetuity) and (2) require them to return all such information upon their separation from the Company. *Id.* § 8. Moreover, Jewell and Cameron expressly agreed the covenants were reasonable and their breach (or even threat thereof) warrants injunctive relief. *Id.* §§ 10(c), 13. Finally, Jewell and Cameron agreed not to pursue any corporate opportunities they learned while working at Aspirion for their own benefit. *Id.* § 26.

### C. Aspirion's Recent Internal Investigation Reveals Defendants' Unlawful Plan to Steal the Company's Business, Including Clients and Employees.

Earlier this year, Aspirion saw "Ternium" appear as a vendor in the RCM account management systems ("Accounting Systems") of its clients Banner Health, Evangelical Health, and Children's Hospital of Orange County ("CHOC"). Compl. Ex. 6, Page Decl. ¶¶ 10, 11.[3] It was not until June 20, 2024, when a Company employee saw Jewell's name in Banner Health's Accounting System with a Ternium email address, along with Mays, Kelly, and two other ex-Aspirion employees, that Aspirion was able to connect that Jewell was performing the same services within Aspirion's clients with other ex-employees on behalf of a competing entity, and therefore was in blatant violation of his restrictive covenants forbidding him from soliciting and serving Aspirion's clients and soliciting its employees. *Id.* ¶ 16.

Discovering that Jewell—who formerly oversaw 25% of Aspirion's clients—was connected to Ternium immediately prompted Aspirion to initiate an internal investigation of its ex-employees' involvement with its new competitor ("Investigation"). Amick Decl. ¶¶ 12, 31-32.

---

[2] Because both Jewell and Cameron have resigned from Aspirion within the past year, they are still within the one-year non-solicitation period. Amick Decl. ¶ 27 (Jewell resigned September 27, 2023); *Id*. ¶ 30 (Cameron resigned on January 31, 2024).

[3] Accounting Systems are online portals maintained by Aspirion's clients to manage their RCM vendors. Amick Decl. ¶ 31.

Aspirion also immediately sent Jewell a cease-and-desist letter. *Id.* ¶ 33. The Investigation revealed that in addition to Jewell, Mays, and Kelly, the operation also included Cameron. All four had unfettered access to Aspirion's deal pipeline database. Compl. Ex. 8, Shorten Decl. ¶¶ 5-7. And Aspirion was shocked when it discovered that the Former Employee Defendants began forming the competing company over a year before any of them resigned from Aspirion, referring to themselves as the "Dream Team" while discussing financial backing for a new RCM company. Amick Decl. ¶ 37(a). The Investigation also uncovered that Defendants solicited and serviced an Aspirion client, Banner Health, through Ternium beginning in October 2022. Page Decl. ¶¶ 19-20. The Investigation further revealed that in summer 2023 Cameron requested (and received) the draft bid package Aspirion submitted in response to the University of New Mexico Health's ("UNM") request for proposal while Ternium was submitting a competing bid. Amick Decl. ¶ 39(b).[4]

At least seven other Aspirion employees followed Jewell to Ternium since his departure from the Company in October 2023. These employees include Defendants Mays and Kelly, who worked closely with Jewell and resigned from Aspirion to join Ternium within one month of Jewell leaving Aspirion. *Id.* ¶¶ 27-29. The Investigation also revealed that Cameron prepared and used non-disclosure agreements to covertly hire Company employees away from Aspirion. *Id.* ¶ 37(c). Defendants' solicitation of Aspirion employees is also evidenced by the timing of employee resignations. Moreover, in addition to Mays and Kelly resigning from the Company within weeks of Jewell in Fall 2023, two additional Company employees left within a month of Mays and Kelly. Page Decl. ¶ 8. Cameron left the Company in January 2024 as did another employee. Yet another employee left in May 2024, and shortly thereafter Aspirion learned she was employed by Ternium through seeing her name associated with a Ternium email address within a client system which she previously supported for Aspirion. *Id.* ¶¶ 22-25.

### D. New Information Reveals that Aspirion is Under Imminent Threat of Losing More Business to Defendants' Unlawful Scheme.

Jewell (through an attorney) responded to the cease-and-desist letter by (incorrectly) denying that the nonsolicitation covenant could be enforced against him—but not denying that he

---

[4] Cameron was sent a complete set of bid documents, including drafts of the bid itself, pitch materials, and master services agreement, in advance of UNM's October 2023 supplemental RFP deadline. *Id.*; Shorten Decl. ¶ 22. Upon formal notice that Aspirion lost the UNM bid, Aspirion received the list of bidders which included Ternium, confirming that it also submitted a bid for the project. Shorten Decl. ¶ 23.

in fact already had solicited Aspirion clients and employees, or committing that he would refrain from doing so. Amick Decl. ¶ 33. Jewell's lack of a substantive response is unsurprising given the evidence that has emerged in the past few weeks demonstrating that Jewell and Cameron have no intention of ceasing their unlawful solicitation. As one example, Aspirion has heard that Cameron recently openly boasted about his new company's successful efforts to poach or divert clients away from Aspirion. Shorten Decl. ¶ 19. As another example, one of Aspirion's new clients, Baptist Medical Center Jacksonville ("Baptist Jacksonville"), confirmed it had hired Ternium in response to an Aspirion inquiry where Aspirion employees received an email from the healthcare provider that listed Mays and another ex-employee with Ternium email addresses. Amick Decl. ¶ 34. Cameron was leading the Baptist Jacksonville opportunity for Aspirion before his resignation from the Company in January 2024. Shorten Decl. ¶ 9.

Information has been collected in roughly the past week alone that shows Aspirion's business is under immediate threat of losing additional business and client goodwill. Cameron has not only continued to contact Company employees, Compl. Ex. 9, Eller Decl. ¶ 9, but Aspirion has also been notified by both an existing client and a prospective client that they had recently been in contact with Jewell and Cameron. Compl. Ex. 10, Webster Decl. ¶¶ 5-12. In a July 18, 2024 meeting with Aspirion prospective client Houston Methodist Hospital, Aspirion learned that Cameron had recently reached out to discuss Houston Methodist Hospital partnering with his new company, Ternium. Cameron engaged in this solicitation even though Aspirion, and Cameron specifically, had actively pursued work from Houston Methodist Hospital throughout 2023 . *Id.* ¶¶ 11-12. The following day, on July 19, 2024, Aspirion client Children's Medical Center Dallas ("Dallas Children's'"), an account Cameron was assigned to as the sales representative, similarly disclosed that Dallas Children's had recently met with Jewell and Cameron who were "trying to get some of [Dallas Children's] business." *Id.* ¶ 7. On July 19, 2024, Aspirion learned from one of its employees that Cameron recently contacted him and his client contact at UC San Diego Health, again a former client where Cameron was the sales executive, to schedule a round of golf on July 26, 2024. Compl. Ex. 11, Manderson Decl. ¶ 6.

\

## **LEGAL STANDARD**

"The same four factors apply to the determination of whether to grant a temporary restraining order or preliminary injunction: '(1) a substantial likelihood of success on the merits;

(2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.'" *Textron Fin. Corp. v. Unique Marine, Inc.*, No. 08-10082-CIV, 2008 WL 4716965, at *5 (S.D. Fla. Oct. 22, 2008) (quoting *Schiavo v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir.2005)). "The primary difference between the entry of a temporary restraining order and a preliminary injunction is that a temporary restraining order may be entered before the defendant has an adequate opportunity to respond, even if notice has been provided." *Id.* "No particular quantum of proof is required for each of these criteria for issuance of a preliminary injunction." *Charles Schwab & Co. v. Aviles*, 07-21745-CIV, 2007, WL 9702744, at *3 (S.D. Fla. Aug. 23, 2007). "Rather, proof adduced for each of these criteria is balanced on a sliding scale analysis." *Id.* "When proof on one of the criteria is particularly strong, less proof is required for the remaining criteria. *Id.* (internal citations omitted).[5]

## ARGUMENT

### I.  All Four Factors Weigh In Favor Of Granting Aspirion Injunctive Relief.

#### A.  Aspirion Is Likely To Succeed On The Merits Of Its Claims.

To satisfy the first prong, the movant is only required to provide a showing of "*likely*, rather than *certain*, success." *Future Metals LLC v. Ruggiero*, 21-CIV-60114, 2021 WL 5853896, at *20 (S.D. Fla. Oct. 26, 2021) (emphasis added) (citations omitted). *See also Talk Fusion, Inc. v. Ulrich*, No. 8:11-CV-1134-T-33AEP, 2011 WL 2681677, at *4 (M.D. Fla. June 21, 2011) (citation omitted). Further, as here, "in cases where the 'balance of the equities weighs heavily in favor of granting the injunction,' the movant need only show a 'substantial case on the merits.'" *Talk Fusion, Inc.*, 2011 WL 2681677, at *4 (quoting *Schiavo v. Schiavo*, 357 F.Supp.2d 1378, 1383

---

[5] In considering a motion for preliminary injunctive relief, "a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citations and internal quotations omitted).

(M.D. Fla. 2005)). Although Aspirion only needs to show a substantial case for just one count,[6] Aspirion has evidence to establish a reasonable probability of succeeding on all of its claims.[7]

**1. Aspirion Will Likely Prevail on its Breach of Contract Claims against Jewell and Cameron.**

"In Florida, a breach of contract action requires the following three elements: a valid contract, material breach, and damages." *Morgan Stanley Smith Barney, LLC v. Abel*, 2018 WL 515348, at *2 (M.D. Fla. Jan. 23, 2018). Because damages resulting from the breach of restrictive covenants are irreparable and presumed under Florida law when seeking injunctive relief, discussed *infra* § II.B, Aspirion need only show that the covenants are valid and were breached.

**a. Jewell and Cameron Agreed to Enforceable Restrictive Covenants.**

It is indisputable that Jewell and Cameron signed the Employment Agreements which contain non-solicitation and confidentiality provisions. *See* Compl. Exs. 1 & 2. Restrictive employment covenants are governed by section 542.335 of the Florida statutes. *GFA Int'l, Inc. v. Trillas*, 327 So. 3d 872, 875 (Fla. 3d DCA 2021). "Section 542.335 … includes all contractual restrictions such as noncompetition/nonsolicitation agreements, confidentiality agreements, exclusive dealing agreements, and all other contractual restraints of trade." *Env't Servs., Inc. v. Carter*, 9 So. 3d 1258,1262 (Fla. 5th DCA 2009). A restrictive covenant will be enforced if the employer can prove "(1) the existence of one or more legitimate business interests justifying the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer." *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004). *See also* Fla. Stat. § 542.335(1)(b), (c).

**Legitimate Business Interests.** The alleged breaches of the Employment Agreements relate to Jewell's and Cameron's solicitation and service of Aspirion's clients, solicitation of employees, and the retention, use, or disclosure of Aspirion's Confidential Information. Section 542.335(1)(b) recognizes each of these safeguards as "legitimate business interests".[8] Moreover,

---

[6] *Aviles*, 2007 WL 9702744, at *6 (citing *Schiavo*, 357 F.Supp.2d at 1383).

[7] The Complaint alleges seven counts against Defendants: Breach of Contract (Counts I and II); Violation of Defend Trade Secrets Act (Count III); Violation of Florida Uniform Trade Secret Act (Count IV); Breach of Duty of Loyalty (Count V); Tortious Interference (Count VII); and Civil Conspiracy (Count VII).

[8] Section 542.335 lists, among other items, "substantial relationships with specific prospective or existing clients," "extraordinary or specialized training," and "trade secrets or valuable

"courts are statutorily required to construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." *O'Brien*, 347 F. Supp. 2d at 1304. Thus, courts have consistently applied section 542.335 in ruling that non-solicit (for both clients and employees), non-service, and confidentiality covenants constitute legitimate business interests. *See*, *e.g.*, *Merrill Lynch v. Hagerty*, 808 F.Supp. 1555, 1558 (S.D. Fla. 1992) *aff'd*, 2 F.3d 405 (11th Cir. 1993) (finding that relationships with current or prospective clients qualify as a legitimate business interest).[9] The Court should likewise find that the relevant covenants here aim to protect legitimate business interests under Florida law.

**Reasonably Necessary to Protect.** The tailored covenants are reasonable in time, area, and line of business to safeguard Aspirion's legitimate business interests at issue, which are requirements under Florida law. Fla. Stat. § 542.335(1)(a)–(c). In terms of time, the covenants are only one year in duration. Compl. Exs. 1 & 2 § 10(a). Because the duration for each is not more than two-years, they fall within the reasonable limit specified under Section 542.335(1)(d)(1)(a).*Regions Bank v. Raymond James & Assocs., Inc.*, 2020 WL 7419650, at *4 (M.D. Fla. Apr. 20, 2020) (finding one-year restriction reasonable under section 542.335). Next, the covenants are narrow[10] and are therefore reasonable in area even though they do restrict the prohibited conduct based on geography. *See id.* at *4; *see also All Star Recruiting Locums, LLC*, 2022 WL 2340997, at *14. The Court should also find that the covenants are reasonable in the same "line of business" because, again, by limiting prohibitions to the company's own information and soliciting its employees, they necessary only involve Aspirion's line of business, and "the solicitation of any customer whom the Former Employee Defendants serviced during their

---

confidential business or professional information that otherwise does not qualify as trade secrets." Fla. Stat. § 542.335(1)(b).

[9] *See also Corp. Ins. Advisors, LLC v. Addeo*, No. 21-CV-61769, 2021 WL 6622154 (S.D. Fla. Dec. 8, 2021) (same); *Aviles*, 2007 WL 9702744, at *6 (same); *Regions Bank v. Raymond James & Assocs., Inc.*, 2020 WL 7419650, at *4 (M.D. Fla. Apr. 20, 2020) (same); *All Star Recruiting Locums, LLC v. Ivy Staffing Sols., LLC*, 2022 WL 2340997, at *14 (S.D. Fla. Apr. 8, 2022) (protecting confidential business information and client relationships qualifies as legitimate business interests).

[10] Under the terms of the Employment Agreements, Jewell and Cameron are free to work for a direct competitor located in the same geographic area without any delay, and they are permitted to service their new employer's clients and to solicit the patronage of the public at large. The restraints Jewell and Cameron agreed to merely preclude them from soliciting and serving *Aspirion's* clients or prospects, soliciting *Aspirion's* employees, and from using, disclosing, or retaining *Aspirion's* Confidential Information. *See* Amick Decl. Exs. 1 and 2, §§ 10(a)-(b), 8.

employment with Plaintiff—that is, the exact same line of business." *Regions Bank*, 2020 WL 7419650, at *4. *See also supra* fn. 10.

The Court should accordingly find that Aspirion has made a showing of legitimate business interests justifying the restrictive covenants and a showing that the contractually specified restraints are reasonably necessary to protect its established interests.

### b.    Jewell and Cameron Breached their Enforceable Employment Agreements.

**Soliciting Employees.** The Employment Agreements prohibit Jewell and Cameron from soliciting individuals who have been employed by Aspirion within the past year. *See supra* Factual Background § B. Still within a year of leaving Aspirion, Jewell and Cameron have hired numerous individuals at Ternium who worked at Aspirion in the previous year, *see supra id.* § C, and therefore breached their covenants. *Estetique Inc. USA v. Xpamed LLC*, 2011 WL 4102340, at *9 (S.D. Fla. Sept. 15, 2011) (finding likelihood of breach for hiring plaintiff's terminated employee within a two-year period preceding defendant's termination). In addition to the circumstances of numerous ex-employees resigning on the heels of Jewell's departure, including Mays and Kelly who had a close-working relationship with Jewell and left within weeks of his departure, Aspirion has emails demonstrating Jewell's solicitation through his preparation and use of non-disclosure agreements for Aspirion employees. *See supra* Factual Background § C. The circumstances and documented evidence surrounding the defections to Ternium are more than enough evidence to form a likelihood of success on Aspirion's breach of contract claim. For example, in *Talk Fusion, Inc. v. Ulrich*, the court found that plaintiff showed a likelihood of success on its breach of non-solicit covenant claim by submitting a declaration from one of its current employees stating that the ex-employee defendant solicited him on the competing business. 2011 WL 2681677, at *4 (granting TRO).[11] Aspirion presents even stronger evidence than *Talk Fusion, Inc.*, and thus the Court should find that there is a substantial likelihood that Aspirion should prevail on its breach of non-solicit claim.

**Soliciting and Serving Clients.** The Employment Agreements prohibit Jewell and Cameron from soliciting or serving Aspirion's clients or prospect. Aspirion has already adduced ample evidence showing breach of this provision: (1) multiple Aspirion clients have informed the Company that they have been contacted by Jewell and Mays, (2) Cameron recently scheduled a

---

[11] *See also Caliber Home Loans, Inc. v. Bales*, 2016 WL 4810287, at *1 (M.D. Fla. Sept. 14, 2016) (granting TRO based in part on defendant's "improper solicitation of Caliber employees").

July golf outing with a Company employee and his client contact, and (3) multiple former Aspirion employees have appeared in client accounting systems on behalf of Ternium, reflecting that they are providing services for Aspirion's clients. *See supra id.* §§ C-D. This evidence is more than enough to show that Jewell and Cameron have solicited and served Aspirion's clients, and thus establishes a substantial likelihood of breach. *See Abel*, 2018 WL 515348, at *2 (finding breach and granting TRO where evidence showed defendant contacted at least five clients of his former employer and one client transferred); *HRB Res. LLC v. Osborne*, 2022 WL 4552449, at *1 (M.D. Fla. Mar. 29, 2022) (finding breach and granting TRO where evidence showed defendant was servicing plaintiff's clients in violation of non-serve provision).

      **Confidentiality.** The Employment Agreements prohibit Jewell and Cameron from divulging Aspirion's confidential information. Compl. Exs. 1 and 2, § 8. Defendants' immediate sourcing of the same clients and prospects as Aspirion's makes it highly likely that they used Aspirion's Confidential Information to target specific clients, and therefore supply the Court with ample evidence of Jewell's and Cameron's breaches. In *Merrill Lynch v. Hagerty*, this Court found (and the Eleventh Circuit affirmed) that defendant "unquestionably" breached his confidentiality and non-solicit covenants by retaining a home database of the names of plaintiff's clients and subsequently contacting those clients after joining his new firm. 808 F.Supp. 1555, 1557 (S.D. Fla. 1992).

      But even without direct evidence of Jewell and Cameron's use of Aspirion's Confidential Information, the Court should find that the immediate servicing of Aspirion's clients provides more than enough evidence to find a substantial likelihood of success on its breach of contract claims. Indeed, "[e]ven if there is no clear evidence that [defendants] divulged Plaintiff's confidential information, a reasonable inference can be made that they used some information they gained during their tenure with Plaintiff to get Clarinda's business for Craft and subsequently make placements at Clarinda." *All Star Recruiting Locums, LLC*, 2022 WL 2340997, at *15. Likewise, in *Corp. Ins. Advisors, LLC v. Addeo*, the defendant was subject to an agreement that prohibited her from "servicing" any of plaintiff's clients for two years after the end of her employment. 2021 WL 6622154, at *7 (S.D. Fla. Dec. 8, 2021). This Court found a likelihood of breach of a non-solicit covenant based on the chain of events that saw the defendant leaving the company, then immediately begin servicing the plaintiff's clients for a competing firm which caused plaintiff a

decline in business. *Id.* The same occurred here, and thus Jewell and Cameron breached their non-solicitation and confidentiality covenants.[12]

    **2. Aspirion Will Likely Prevail on its Trade Secrets Claims Against the Former Employee Defendants**

To prevail on either its DTSA or FUTSA claim, "Plaintiff must demonstrate that it possessed a trade secret that was misappropriated using improper means." *Regions Bank*, 2020 WL 7419650, at *3 (citing 18 U.S.C. § 1836(b)(3)(A)(i); Fla. Stat. § 688.003(1)). Threatened misappropriation is sufficient for injunctive relief. *Id.*

"FUTSA and DTSA similarly define a 'trade secret' as: (1) any type of information, (2) that derives economic value from being secret, and (3) that is kept secret." *Id.* (citing 18 U.S.C. § 1839(3); Fla. Stat. § 688.002(4)). While employed at Aspirion, the Former Employee Defendants had access to the Company's most sensitive information: full client account list and information, contracts, pricing models, methodologies, pipeline / prospect lists, solution offerings, and revenues. For example, each had access to the Company's pipeline deals through its Sales Force database. Amick Decl. ¶ 17. Cameron also acquired Aspirion's draft bid package for the University of New Mexico proposal request in advance of submitting a request on behalf of Ternium. *Id.* ¶ 39(b). Courts routinely consider customer and pricing information classic trade secrets. ("Generally, Florida law considers a business's customer lists and the information contained therein to be trade secrets subject to protection if that information is compiled from non-public information and is kept confidential by the business." (string citation omitted)); *see also Regions Bank*, 2020 WL 7419650, at *4 ("The Court believes that such information—specifically, Plaintiff's customer lists—constitutes trade secrets within the meaning of the FUTSA and DTSA.")

Aspirion also took reasonable steps to maintain secrecy of the Confidential Information. For example, Aspirion has multiple policies in place aimed at protecting its Confidential Information, including an Acceptable Use Policy and rules set forth in its Employee Handbook. Amick Decl. ¶¶ 20-24. Aspirion also required employees, including Jewell and Cameron, to agree in employment agreements not to divulge confidential information and to return any such data

---

[12] Similarly, in *Charles Schwab & Co. v. Aviles*, this Court found that the plaintiff company was likely to succeed on its breach of non-solicitation covenant claim despite ex-employee's contention he recalled client names from memory, not confidential information. 2007 WL 9702744, at *7.

upon separation. *Id*. ¶ 19.The confidential information at issue here therefore qualifies as trade secrets.

"Both Acts define 'misappropriation' as the acquisition of a trade secret of another by a person without consent and by improper means." *Regions Bank*, 2020 WL 7419650, at *4 (citing 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2)). "[T]he Acts define 'improper means' to include 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" *Regions Bank*, 2020 WL 7419650, at *4 (citing 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1)). Ternium's targeting of the exact same clients the Former Employee Defendants serviced while employed at Aspirion evinces that Defendants are using the Confidential Information. At no point did Aspirion consent to any of the Defendants taking the company's confidential information. Amick Decl. ¶¶ 20-22. Furthermore, Jewell and Cameron both acknowledged in their Employment Agreements that their positions required use of the Company's Confidential Information and agreed to not disclose such information to another person or entity without written consent, Compl. Ex. 1 (§ 8), Ex. 2 (§ 8), and yet, as set forth above, that appears to be exactly what happened. Therefore, Aspirion can show a substantial likelihood that it will prevail on the merits of its FUTSA and DTSA claims.

### 3. Aspirion Will Likely Prevail on its Tortious Interference Claim Against All Defendants.

Aspirion likewise already has sufficient evidence to satisfy all four elements necessary under Florida law to show that Defendants tortiously interfered with Aspirion's business relationships.[13] First, Aspirion has had contractual relationships with at least seven healthcare providers that Ternium has contacted. Shorten Decl. ¶¶ 13, 24, Page Decl. ¶¶ 10, 11, 16, 25, Webster Decl. ¶¶ 6-7, 11. These healthcare providers were some of Aspirion's most important clients; thus, Defendants certainly had knowledge of these contractual relationships by simply working at Aspirion. Page Decl. ¶ 7. But even more directly, the Former Employee Defendants acquired knowledge of these contractual relationships because they were assigned to these clients while employed at Aspirion. *Id.*  And even though Ternium itself obviously did not service these

---

[13] The elements of tortious interference include: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1177 (11th Cir. 1994).

clients for Aspirion, it certainly gleaned information from the Former Employee Defendants and can therefore also be held liable for tortious interference. *XN Fin. Servs., Inc. v. Conroy*, 2012 WL 12873512, at *9 (S.D. Fla. Mar. 5, 2012) (citation omitted).

Next, the facts are overwhelming that Defendants intentionally interfered with Aspirion's contractual relationships by diverting the business on those accounts to Ternium. Cameron even gloated about his excitement over all the business Ternium was taking from Aspirion. Shorten Decl. ¶ 19. It is indisputable that in many instances the same Defendant who was previously assigned to a particular client at Aspirion later appeared as the servicing agent for Ternium for that same client for the same scope of services provided by Aspirion. Shorten Decl. ¶¶ 18, 27, Page. Decl. ¶¶ 12-13, 16, 25. What is more, the Court can also rely on Aspirion's significant drop in business upon the Defendants' departures, Amick Decl. ¶ 44, as evidence that Defendants interfered with Aspirion's contractual relationships. *See XN Fin. Servs., Inc.*, 2012 WL 12873512, at *9 ("Anber testified that XN has seen a significant drop in business as a result of Conroy's departure. A fact-finder could find that this business had transferred to Agentis based on circumstantial evidence."). Finally, Aspirion was damaged not only by the loss of the value of the diverted business, but also by the damage, which cannot be calculated, to the relationship and goodwill enjoyed with its clients.

### 4.   Aspirion Will Likely Prevail on its Breach of a Duty of Loyalty Claim Against the Former Employee Defendants.

Aspirion can also show (1) the existence of a duty of loyalty, (2) a breach of that duty, and (3) damages proximately caused by the breach." *Martin v. Partsbase, Inc.*, 2020 WL 7495536, at *2 (S.D. Fla. Dec. 4, 2020) (citing cases). First, all Former Employee Defendants were employees of Aspirion and under Florida law employees have a duty of loyalty their employers. *Charles Schwab & Co. v. McMurry*, 2008 WL 5381922, at *1 (M.D. Fla. Dec. 23, 2008). Indeed, an employee owes a duty "not to 'engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during the course of his employment or soliciting customers and other employees prior to the end of his employment.'" *Nat'l Ins. Consulting Grp., LLC v. Kandel*, 2020 WL 13389742, at *3 (S.D. Fla. Jan. 15, 2020). Defendants' illegal operation of Ternium and competing for Aspirion clients and established opportunities at prospects while employed at Aspirion clearly gives Aspirion a substantial likelihood of success for its duty of loyalty claim.

**5.  Aspirion Will Likely Prevail on its Civil Conspiracy Claim Against All Defendants.**

Finally, given the relationships formed in order for Defendants to carry out their unlawful acts set forth above, Aspirion can provide evidence sufficient to show a substantial likelihood of success for its civil conspiracy claim.[14] The four Former Employee Defendants, were all involved in the early formation of Ternium and each have been linked to Aspirion's clients since their employment at the Company. Amick Decl. ¶¶ 37-39. Thus, the Former Employee Defendants conspired to create Ternium, and are using the company to unlawfully steal Aspirion's clients and employees and tortiously interfere with its business relationships and the substantial goodwill Aspirion developed. Aspirion, accordingly, has a substantial likelihood of prevailing on its civil conspiracy claim.

**B.  Aspirion Will Suffer Immediate and Irreparable Injury Absent Injunctive Relief.**

To demonstrate irreparable harm under Florida law, a movant must show "that the injury cannot be undone through monetary remedies." *Anago Franchising, Inc. v. C.H.M.I., Inc.*, 2009 WL 5176548, at *11 (S.D. Fla. Dec. 21, 2009). Jewell and Cameron's restrictive covenants create a presumption of irreparable harm by operation of Florida law. *See* Fla. Stat. § 542.335(1)(j). "Florida law presumes irreparable harm in cases involving violations of employment agreement provisions regarding trade secrets, customer lists, or direct solicitation of existing customers." *Anchor Title & Escrow, LLC v. Omega Nat'l Title Agency*, LLC, 2023 WL 3564942, at *2 (N.D. Fla. Apr. 14, 2023) (citing Fla. Stat. § 542.335(2)(a)). Therefore, "[a] party only needs to prove a violation of an enforceable restrictive covenant to be entitled to the presumption" and "need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined." *Trillas*, 327 So. 3d at 877 (internal citations and quotations omitted). *See also Joseph Spine, P.A. v. Moulton*, 346 So. 3d 154, 159 (Fla. 2d DCA 2022) ("In other words, if the trial court finds that the restrictive covenants are enforceable and have been violated, it is non-negotiable that the statutory presumption of irreparable injury be applied."). Critically, Jewell and Cameron have

---

[14] Under Florida law, a plaintiff must show "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Cordell Consultant, Inc. Money Purchase Plan & Trust v. Abbott*, 561 Fed.Appx. 882, 886 (11th Cir. 2014).

*agreed* that any breach (or threat of breach) of their covenants constitutes irreparable harm for which Aspirion is entitled to an injunction. Compl. Exs. 1 & 2 § 10(d).

Florida courts have repeatedly found that nothing short of an injunction is warranted to prevent the loss of goodwill and customer relationships. *Trillas*, 327 So. 3d at 878 ("Trillas's continued breach of the restrictive covenants in the employment agreement would continue to damage GFA's goodwill and relationships with its customers. Only an injunction would prevent this damage." (internal quotations and citations omitted)).[15] Injunctive relief is also the only solution to prevent harm caused by serving clients and soliciting employees of former employers. *See, e.g.*, *HRB Res. LLC*, 2022 WL 4552449, at *1 (granting TRO to prevent defendant from servicing plaintiff's clients in violation of non-serve provision); *Caliber Home Loans, Inc.*, 2016 WL 4810287, at *1 (granting TRO and finding the plaintiff would suffer irreparable harm if the defendants were "permitted to improperly solicit Caliber's employees and customers"). Defendants' theft of Aspirion's business warrant a presumption of irreparable harm, for which injunctive relief is the only adequate remedy.

Further, "as to the second factor—whether a TRO is necessary to prevent irreparable injury—courts have routinely held that a defendant's use of proprietary information to solicit customers and clients to a direct competitor of the plaintiff risks irreparable loss of customers and business, goodwill, and market position and competitiveness." *Anchor Title & Escrow, LLC*, 2023 WL 3564942, at *2 (citing cases).[16] Therefore, all harm at issue is presumed irreparable.

---

[15] *See also Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) ("The loss of customers and goodwill is an irreparable injury."); *JetSmarter Inc. v. Benson*, 2018 WL 2709864, at *8 (S.D. Fla. Apr. 6, 2018) (same, quoting *Ferrero*); *see also Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C.*, 939 So. 2d 268, 272 (Fla. 4th DCA 2006) ("[T]he mere fact that damages for current patients might be calculable does not address the investment made by the clinic in developing Dr. Litwinczuk's practice in Palm Beach County and thus the goodwill that was generated."); *AmeriGas Propane, Inc. v. Sanchez*, 335 So. 3d 1253, 1258 (Fla. 3d DCA 2021) ("[M]oney damages would not cure AmeriGas's injuries. Rather, only an injunction would prevent losses incurred with the dissemination of confidential information and lost customer relationships.").

[16] *See also ACR Electronics, Inc. v. DME Corporation*, No. 11-62591-CIV,2012 WL 13005955, at * 14 (S.D. Fla. Oct. 31, 2012) (same); *All Leisure Holidays Ltd. v. Novello*, 2012 WL 5932364, at *5 (S.D. Fla. Nov. 27, 2012) (same); *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide*, LLC, 11-60621-CIV, 2011 WL 6754058, at *9 (S.D. Fla. Dec. 22, 2011) (same); *I.C. Sys., Inc. v. Oliff*, 824 So.2d 286, 287 (Fla. 4th DCA 2002) (characterizing damages as irreparable where use of trade secrets and customer lists were at stake).

Finally, Aspirion is under the threat of imminent harm and therefore injunctive relief should be issued before Defendants have the opportunity to respond.  Since sending Jewell a cease-and-desist letter, new information has revealed that Ternium recently intensified its campaign to poach Aspirion's clients: in just the past week, Aspirion has been informed that both Jewell and Cameron have contacted at least two of Aspirion's clients to discuss partnering with Ternium, Webster Decl. ¶¶ 6-7, 11, which puts Aspirion under the very real and immediate threat of irreparably losing business before Defendants can be heard in opposition. *See Abel*, 2018 WL 515348, at *4. In *Morgan Stanley Smith Barney, LLC v. Abel*, the defendant left his position as a financial planner at Morgan Stanley for a new firm. *Id.* at *1. "Based on Morgan Stanley's allegations and supporting declarations," the court found that Morgan Stanley was under imminent harm because "it appears that Abel has solicited at least one customer from Morgan Stanley and to his new firm, and has contacted several others.").[17] Similar to *Abel*, Defendants' continued misconduct poses an immediate threat of irreparable harm and, accordingly, Aspirion has satisfied the second prong.

### C.  Aspirion's Injury Outweighs Any Possible Harm To Defendants.

"This factor 'requires that the movant prove that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant.'" *Addeo*, 2021 WL 6622154, at *12 (citation omitted). "Thus, the court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id*. Aspirion's loss of business from Defendants' poaching clients and employees decidedly outweighs any possible harm to Defendants' unlawful business advantage.

Aspirion is under immediate threat of continuing to lose its clients. *See, e.g.*, *Abel*, 2018 WL 515348, at *2. Competition within the claims industry is aggressive and highly sensitive to price and level of service provided. Amick Decl. ¶ 7. Defendants' use of Aspirion's compiled data concerning current and prospective customers (which includes revenues, business trends, contract terms, health of the relationship, key sales opportunities, and contacts) would place Aspirion at a severe competitive disadvantage, particularly where a competitor has poached the very Aspirion employees who had performed work for or pursued the current and potential clients in question.

---

[17] *See also Anchor Title*, 2023 WL 3564942, at *1 (granting TRO upon plaintiff's argument that it "will suffer and continue to suffer immediate and irreparable injury in the form of lost business from its customers and clients that it has spent years developing.").

Finally, Defendants' misappropriation of Aspirion's current and prospective customer information, and tortious interference with Aspirion's business relationships, will harm Aspirion's overall goodwill that Aspirion has devoted a significant amount of time, money, and effort in establishing and maintaining.

Defendants, on the other hand, would merely be required to comply with their legal obligations—by returning confidential information and ceasing violating the non-solicitation and confidentiality covenants. There is no basis for the Defendants to claim hardship merely by having to abide by their employment covenants, especially where, as here, Florida law mandates that the validity of those covenants shall not depend on "any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." Fla. Stat. 542.335(1)(g)(1). In the same vein, "Defendant[s] would suffer little, if any, harm by being ordered to comply with the Florida Uniform Trade Secrets Act and the [agreements] to which [they are] bound." *JetSmarter Inc.*, 2018 WL 2709864, at *8 Indeed, "[t]he temporary inconvenience that would result to Defendants by precluding their use of this information during the short duration of the TRO is outweighed by the threatened irreparable injury." *Novello*, 2012 WL 5932364, at *6. This factor, accordingly, also weighs heavily in favor of granting a TRO.

### D.  The Public Interest Favors Granting This Interim Temporary Injunction.

The public interest overwhelmingly favors granting the requested limited duration temporary injunction. "It is well-settled that public policy favors the enforcement of reasonable restrictive covenants." *Aviles*, 2007 WL 9702744, at *9 (citing Fla. Stat. § 542.335). "The Florida Legislature has determined that injunctions to protect trade secrets and restrictive covenants serve the public interest." *Addeo*, 2021 WL 6622154 at *13 (citing cases). Likewise, "Florida law […] makes plain that protecting trade secrets does not disserve, but rather promotes the public interest." *JetSmarter Inc.*, 2018 WL 2709864, at *8.[18] The public has a strong interest in ensuring that businesses can invest in their business, employees, and clients, while being certain that the businesses' information and strategic advantages are reasonably protected when employees leave

---

[18] *See also Novello*, 2012 WL 5932364, at *6 ("[E]ntry of a TRO to protect trade secrets serves the public interest."); *East v. Aqua Gaming, Inc.*, 805 So.2d 932, 934 (Fla. 2d DCA 2001) (same); *All Star Recruiting Locums*, 2022 WL 2340997, at *6 (same); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Silcox*, No. 01-8800-CIV, 2001 WL 1200656, *6 (S.D. Fla. Oct. 4, 2001) (same).

the company. Without these reasonable restraints businesses will be less inclined to innovate and expand.

To overcome the established public interest, Defendants would need to identify a public policy reason that would "substantially outweigh the need to protect the legitimate business interest or interests." Fla. Stat. § 542.335(1)(i). No such overwhelming public interest exists.

## II.   No Bond Should Be Required For The Temporary Restraining Order.

"The amount of bond to be required is left to the trial court's discretion, and "the court may elect to require no security at all." *BellSouth Telecom., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (internal quotation omitted). Here, no security should be required because the parties waived any bond requirement for the purposes of seeking injunctive relief in the Employment Agreements. Compl. Exs. 1 & 2 § 10(d). *Am. Builders & Contractors Supply Co. Inc v. McPherson*, 2023 WL 11760715, at *3 (N.D. Fla. Sept. 12, 2023); *JTH Tax, LLC v. Gilbert*, 2022 WL 1619594, at *17 (M.D. Fla. May 12, 2022). Furthermore, "[w]here the plaintiff has a high probability of success on the merits of its claim, and the defendant maintains no legitimate interest in continuing the prohibited conduct, a bond is unwarranted." *JTH Tax,* LLC, 2022 WL 1619594, at *17 (citing *TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013)). Accordingly, Aspirion should not be required to post a bond.

## CONCLUSION

Aspirion is facing the very real and imminent threat of the loss of additional longstanding goodwill and business as a result of Defendants' refusal to comply with their contracts and the law. This loss of business and market share has resulted, and continues to result, in irreparable harm to Aspirion, which can be remedied only through injunctive relief. Consequently, Aspirion respectfully requests this Court grant its Motion and enter a TRO as to Defendants in the form submitted as **Exhibit 1**, which includes enjoining Defendants from: providing services to Aspirion's clients; interfering with Aspirion's business relationships or contracts; soliciting Aspirion's employees, former employees, clients, or prospective clients; and disclosing Aspirion's Confidential Information. Aspirion also asks that the Court orders Defendants to return all of Aspirion's Confidential Information and property and provide a full accounting. Finally, Aspirion respectfully requests the Court to schedule a hearing on Aspirion's Motion for a Preliminary Injunction before the expiration of the TRO.

DATED: July 29, 2024          Respectfully submitted,

By: /s/ *Jorge D. Guttman*
Jorge D. Guttman
Florida Bar No. 15319
jguttman@gunster.com
Becky N. Saka
Florida Bar No. 1010315
bsaka@gunster.com
Nicolaos Soullelis
Florida Bar No. 1031737
nsoulellis@gunster.com
**GUNSTER, YOAKLEY & STEWART, P.A.**
600 Brickell Avenue, Suite 3500
Miami, FL 3313
Tel: 305-376-6000

Robert B. Gilmore (*pro hac vice* forthcoming)
Kevin L. Attridge (*pro hac vice* forthcoming)
Samantha P. Christensen (*pro hac vice* forthcoming)
Jacqueline C. Lau (*pro hac vice* forthcoming)
**STEIN MITCHELL BEATO & MISSNER LLP**
2000 K Street NW, Suite 600
Washington, DC 20005
Tel: 202-737-7000
RGilmore@steinmitchell.com
KAttridge@steinmitchell.com
SChristensen@steinmitchell.com
JLau@steinmitchell.com

*Counsel for Plaintiffs Specialized Healthcare*
*Partners, LLC and Mainsail Parent, LLC d/b/a*
*Aspirion*

19

**<u>CERTIFICATE OF EFFORT TO PROVIDE NOTICE TO DEFENDANTS</u>**

Pursuant to Federal Rule of Civil Procedure 65(b)(1), I HEREBY CERTIFY that on July 29, 2024, I emailed a copy of the complaint and motion for temporary restraining order (along with its exhibits) to the known Ternium email addresses of the Former Employee Defendants, as well as the outside counsel for Jewell who responded to Aspirion's cease and desist letter. I also served or am in the process of serving a copy of the complaint and motion for temporary restraining order on Defendants, including Ternium via its Registered Agent, UNITED STATES CORPORATION AGENTS, INC., 131 CONTINENTAL DRIVE SUITE 305, NEWARK, DE 19713.

Given Defendants' improper solicitation of Plaintiffs' employees and customers and misappropriation of Plaintiffs' confidential, sensitive, and proprietary trade secrets, there is a real and palpable risk that there will be further dissemination and improper use of Plaintiffs' trade secrets, and that further notice to the Defendants may cause Defendants to attempt to delete electronic evidence of their misappropriation and/or improper solicitation. Plaintiffs respectfully submit that the requested TRO should be entered as soon as possible to maintain the status quo pending a Preliminary Injunction hearing.

 /s/ *Jorge D. Guttman*  
JORGE GUTTMAN

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on July 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to Counsel of Record.

 /s/ *Jorge D. Guttman*  
JORGE GUTTMAN

20