```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
                    MIAMI DISTRICT

              CASE NO.:  1:24-CV-22875-CMA


MAINSAIL PARENT, LLC d/b/a ASPIRION;
and SPECIALIZED HEALTHCARE PARTNERS,
LLC,

              Plaintiffs,
vs.

DAVID JEWELL; MICHAEL CAMERON; ALISHA
MAYS; MEGAN KELLY; and TERNIUM, LLC,

              Defendants.
_____


                   DEPOSITION OF

                  DAVID M. DUFFUS


               APPEARING REMOTELY FROM

               PITTSBURGH, PENNSYLVANIA



               Friday, January 17, 2025
                 1:27 p.m. - 3:15 p.m.
```

Stenographically Reported Remotely By:
Joey Beauregard, Court Reporter
Notary Public, State of Florida
US Legal Support

David M. Duffus
January 17, 2025

```
 1    REMOTE  APPEARANCES:

 2
      On behalf of the Plaintiffs:
 3
      STEIN MITCHELL BEATO & MISSNER, LLP
 4    2000 K Street Northwest
      Suite 600
 5    Washington, DC 20007
      771.220.6210
 6    ROBERT B. GILMORE, ESQ.
      rgilmore@steinmitchell.com
 7

 8    On behalf of the Defendants:

 9    POLLARD PLLC
      401 East Las Olas Boulevard
10    SUITE 1400
      Fort Lauderdale, Florida 33301
11    954.332.2380
      JONATHAN POLLARD, ESQ.
12    jpollard@pollardllc.com
      CHRISTOPHER S. PRATER, ESQ.
13    cprater@pollardllc.com
      DEAKEN SHULER, ESQ.
14    dshuler@pollardllc.com

15
      ALSO PRESENT:
16
      Dave Jewell
17

18

19

20

21

22

23

24

25
```

David M. Duffus
January 17, 2025

1

2                         I N D E X

3

4

5    Examination                                  Page

6    DAVID M. DUFFUS
     Direct    By Mr. Pollard:                      4
7
     Certificate of Oath                           63
8    Certificate of Reporter                       64
     Read and Sign Letter to Witness              65
9    Errata Sheet (forwarded upon execution)      66

10

11

12                    NO EXHIBITS MARKED

13

14

15

16

17

18

19

20

21

22

23

24

25

David M. Duffus
January 17, 2025

```
 1              P R O C E E D I N G S

 2                      - - -

 3        Deposition taken before Joey Beauregard, Court

 4   Reporter and Notary Public in and for the State of

 5   Florida at Large, in the above cause.

 6                      - - -

 7   Thereupon:

 8                   DAVID M. DUFFUS,

 9   having been first duly sworn, was examined and

10   testified under oath as follows:

11               CONTINUED DIRECT EXAMINATION

12   BY MR. POLLARD:

13        Q.   So what we're getting at when we talk

14   about profits that the top line number there is

15   going to come from these fees?

16        A.   Well, the starting point will be the fee

17   calculation that's presented on Attachment 3A.

18        Q.   Okay.  And we were at, I think the second

19   chart down the page.  And so when we look at the

20   projected fee on the second chart, that's projecting

21   the impact of the Ternium defendant's conduct,

22   correct?

23        A.   It is what I would characterize as the

24   actual world that reflects a projection on the

25   placements.  And then as you step it all the way
```

```
 1    down through and that's placements on a monthly and
 2    annual basis.  And then as you step it down through,
 3    the fees that are expected to be generated given the
 4    conduct at issue.
 5         Q.   Okay.  And was there certain actual data
 6    that went into this in terms of what we actually
 7    know about fees experience generated for 24?
 8         A.   Yes.
 9         Q.   Okay.  And then the third chart down the
10    page vertically can you explain this to me?
11         A.   It is the difference between the first two
12    charts in terms of the historical monthly average.
13    And, again, this relates initially to placements.
14    Historically -- historical monthly average of
15    placements, the projected lost placements, the
16    projected loss collections and ultimately the
17    projected loss fees based on the prior two tables
18    that we just walked through.
19         Q.   Thank you.
20              So if I understand correctly to summarize
21    what we're looking at but for the Ternium
22    defendant's conduct, you would have projected
23    ▆▆▆▆▆▆▆▆   in fees from Banner, as a result of the
24    defendant's conduct you're projecting ▆▆▆▆▆▆▆ in
25    fees and you're calculating a ▆▆▆▆▆▆   shortfall
```

1    with respect to fees from Banner for the year 2024?

2        A.   Or at least based on the 2024 placements.

3        Q.   What do you mean at least based on the

4    2024 placements?

5        A.   Well, because, again, we've got a

6    projection for 2024 that starts up above as a walk

7    through, you know, that number's ██████████ in

8    placements.  As I mentioned, the calculation in the

9    second table, the ██████████, that's the historical

10   monthly average is based on the period May through

11   October 2024.  So playing that out, that projects

12   out the ████████████████████████████████ and

13   then the third table would be the difference based

14   on those two projections.

15       Q.   So this ██████████ that's lost fees from

16   Banner?

17       A.   Correct.  Projected lost fees from Banner.

18       Q.   And you maintain that this is accurate to

19   a reasonable degree of certainty?

20       A.   Yes, I do.

21       Q.   Okay.  Can we go to Chart 3B.

22            MR. POLLARD:  Hold on, I don't -- where is

23   Mr. Gilmore?

24            MR. GILMORE:  I'm here.

25            MR. POLLARD:  You're here.

David M. Duffus
January 17, 2025

```
1              Okay.  I'm sorry, Rob I was, like, oh, my

2         God, where is Gilmore?  Okay.  All right.

3         We're good.

4    BY MR. POLLARD:

5         Q.   Let's go to 3B, okay.  Mr. Duffus, can you

6    explain to me what we're looking at here?  Is this a

7    projection, or is this actual numbers?

8         A.   These are actual numbers.

9         Q.   Okay.  So on this chart when we go to the

10   fees column, this is the actual money that Aspirion

11   received in fees from Banner?

12        A.   That's correct.  Over this trailing --

13   what I call the trialing 12-month period, or it's

14   actually a little bit more than that because it's

15   June '23 through October '24.

16        Q.   Okay.  So you'd agree with me, as you just

17   testified, there's some of '23 in here and then

18   there is also some of '24 in here?

19        A.   That's correct.

20        Q.   Is it accurate to say that there are 10

21   months of '24 in here?

22        A.   There are.

23        Q.   So it would be possible for us to add up

24   the fees that Aspirion actually made from Banner for

25   the first 10 months of '24?
```

1       A.    You could.

2       Q.    Did you do that?

3       A.    At some point I probably did.

4       Q.    Okay.  Do you know what it totals for fees

5    if you add up the first 10 months of '24?

6       A.    I do not.

7             MR. POLLARD:  Okay.  Deaken, can we pull

8       up the date chart?

9    BY MR. POLLARD:

10      Q.    Okay.  There are -- if you could look at

11   this, Mr. Duffus.  The first -- make it a little

12   smaller so we can just see both charts.

13            This is 2024, okay.  And this is a chart

14   that our client has compiled.  It's based on the

15   data in your report, but just so that we can

16   compare.  If you look at January, the first line of

17   this spreadsheet where it says ███████.  You can

18   spot check that against January '24 in your report?

19   You agree that's the same number?

20      A.    It appears to be.

21      Q.    Okay.  Let's do the same thing for

22   February '24.  Let's go.  Do you see ██████?

23      A.    I do.

24      Q.    Okay.  Let's go back to the other one.  Do

25   you agree that's the same number?

1        A.   I do.

2        Q.   Okay.  Let's go back to the Dave chart

3   again.  ████.  Do you agree that's accurate?

4        A.   They're the same number.

5        Q.   Let's do the next one.  April ████?

6        A.   I'm sorry, you're going to have to show me

7   that other chart.  I assume you're asking me to

8   compare it?

9        Q.   Yeah, just compare it.  Make sure it's the

10  same number.

11       A.   It appears to be.

12       Q.   Okay.  The next we're going to go to May

13  ████.

14       A.   I see that.

15       Q.   Same number?

16       A.   It is.

17       Q.   June, ████?

18       A.   I see that.

19       Q.   July, ████?

20       A.   I see that.

21       Q.   August, ████?

22       A.   I see that.

23       Q.   September, ████?

24       A.   I see that.

25       Q.   October, ████?

1     A.   I see that.

2     Q.   Okay.

3          MR. POLLARD:  Pull up Dave's chart,

4     Deaken.

5   BY MR. POLLARD:

6     Q.   Now, when we add all this up for fees,

7   this is actual.  You agree with me?

8     A.   It's actual, sure.

9     Q.   Okay.  Aspirion received ██████████in

10  fees from Banner through October 2024.  Does that

11  look accurate to you?

12    A.   I haven't done the calculation, but that's

13  what your schedule presents.

14    Q.   If you look at those numbers, do you have

15  any reason to doubt that██████████ figure, do you

16  have any reason to doubt that's an accurate

17  calculation by adding those numbers up?

18    A.   I don't have an opinion one way or the

19  other because I haven't done it, or at lease if I

20  did it was some time ago and I don't recall the

21  results.

22    Q.   Okay.  So if these are actual fees for

23  '24, correct?

24    A.   That's correct.

25    Q.   For Banner, correct?

1  A. Correct.

2  Q. Paid to Aspirion, correct?

3  A. Correct.

4  Q. We could -- if we have 10 months here, we

5 could divide that by 10 and come up with a monthly

6 average, correct?

7  A. You could.

8  Q. And then if we plug that in, you see the

9 bottom we could project that out and we would get

10 █████████?

11  A. I'm sorry, say that again.

12  Q. Sure, sure.

13   So if we took that monthly average and we

14 used it to fill in for November and December, which

15 are the only ones where we're missing actual data,

16 we would get█████████ and change?

17  A. Presumably that's what it adds up to.

18  Q. Okay.  Now, do you have a calculator?

19  A. I do not.

20  Q. Let's go back to the first chart here on

21 this page, the one that has █████████.  You agree

22 with me that as a matter of math -- strike that.

23   If these numbers are accurate in this

24 column then it means that Aspirion generated

25 █████████ in fees from Banner for the first 10

1     months in 2024, correct?

2          A.    If they're accurate.

3          Q.    If those numbers are accurate --

4          A.    Or at least if the math is accurate.

5          Q.    Okay.  If the math is accurate.

6                Okay.  But you've already confirmed the

7     numbers are the same as the numbers in your report,

8     correct?

9          A.    Correct.

10         Q.    So we're not even talking about the

11    numbers being accurate.  Now we're just saying if

12    the math is accurate, then Aspirion received

13    ████████    in actual fees from Banner for the first

14    10 months of 2024, correct?

15         A.    Correct.

16         Q.    Okay.  Let's flip back to your report.

17               MR. POLLARD:  Let's flip back to the

18         chart, Deaken, the comparative chart.

19               No, no, I want the lost -- there we go.

20         There we go.

21    BY MR. POLLARD:

22         Q.    So, Mr. Duffus, I need you to explain this

23    to me.  Your second chart on this page you were

24    projecting Aspirion to make ██████ in fees from

25    Banner.  That's what you were projecting, correct?

1     A.    Correct.

2     Q.    And you said that was a $2,880,042

3  shortfall over the but for number, correct?

4     A.    Correct.

5     Q.    And that but for the conduct that the

6  Ternium defendants Aspirion would have made the top

7  chart number ███████████  in fees from Banner,

8  correct?

9     A.    Correct.

10    Q.    And you said that was to a reasonable

11 degree of certainty, correct?

12    A.    Correct.

13    Q.    Well, my question is --

14          MR. POLLARD:  Deaken, can we flip back to

15    Dave's chart?

16 BY MR. POLLARD:

17    Q.    It appears that through October Aspirion

18 made ██████████; isn't that what it appears?

19    A.    That's what the math adds up to, sure.

20    Q.    And if we project the only two months we

21 don't have for the year of 2024, that would come out

22 to ███████████, correct?

23    A.    Correct.

24    Q.    So it appears that Aspirion actually made

25 more money in fees from Banner for 2024 than your

```
 1   but for projection?
 2        A.   Well, I don't think you're
 3   understanding --
 4             MR. GILMORE:  Objection, form, foundation.
 5             THE WITNESS:  I don't think you're
 6        understanding my analysis or that you listened
 7        closely to my testimony earlier.  And as a
 8        result you've got kind of a false premise or a
 9        false result here.
10   BY MR. POLLARD:
11        Q.   What am I missing, Mr. Duffus?  Please
12   make it make sense.
13        A.   Well, I think I made it make sense, but
14   please go back to 3A and I'll reiterate what I said
15   earlier.  If we look at the middle table I testified
16   earlier that the historical monthly average of 3
17   million -- we're talking about Banner, ████████ is
18   based on the average over the months May through
19   October of 2024.  If I project that out on an annual
20   basis, 12 months that's ████████, apply the
21   collection rate against it and the fee rate and
22   given the run rate of May through October, the
23   projected fees are ████████.
24             MR. POLLARD:  Deaken, will you pull up the
25        dates chart?
```

1    BY MR. POLLARD:

2        Q.    You were projecting that Aspirion would

3    make ████████ and change in fees from Banner for

4    the year 2024, correct?  That was your projection?

5        A.    Based on the 2024 placements that I used

6    in my analysis.  And, again, I think you asked me a

7    question about it and I was very clear in my

8    testimony in terms of what I did to talk about 2024

9    placements for the period May through October of

10   2024.

11       Q.    But for 2024 based on actual revenue,

12   Aspirion through October already made ████████ in

13   fees.

14       A.    Yes, they did.

15       Q.    So through 10 months of 2024 they made

16   more than double what your projected fee amount is

17   in the second chart on that page.

18       A.    Well, because my calculation is forward

19   looking over a five-year damage period, and it's

20   premised on a run rate of May through October of

21   2024.

22       Q.    You testified earlier that these charts in

23   your report attachment 3A showed us projected fees

24   from Banner for the year and a projected shortfall

25   of more than ████████.

David M. Duffus
January 17, 2025

1      A.   That is correct.  It's a forward looking

2    projection.  Again, the top part of 3A projects a

3    one year figure or a starting one year figure based

4    on what historically occurred in 2022 and 2023

5    taking that average stepping it down through

6    collections, stepping it down through the fee rate.

7    It then compares it against a forward looking

8    projection of what's actually expected to happen

9    based on a run rate between May of 2024 and October

10   of 2024.

11          There's a six-month period run rate on

12   placements against step down through that gives a

13   projection going forward of what I'll call the year

14   one fees will be.

15      Q.   Okay.  I don't want to talk about

16   projections.  I want to talk about actual.  When we

17   look at the actual numbers, actual revenue that

18   Aspirion makes from Banner take it from your chart.

19   We're already confirmed the numbers.  There is no

20   actual shortfall for 2024.

21      A.   Well, but there is because, again, in my

22   lost profit model we're looking forward using 2024

23   placements both as -- well, in the actual and then

24   we've got an estimate above what would be expected.

25   What I have on 3A in my mind appropriately reflects

1    what the damages are.  I mean, you asked me if I put

2    it forward to a reasonable degree of certainty and I

3    believe I did.

4         Q.   Did Aspirion actually lose fee revenue

5    comparing 2024 over 2023 with respect to Banner?

6         A.   You'll have to go back and show me what

7    Banner's revenue was in 2023.  I believe they did

8    because there was something like ███████ -- and

9    we could look at 3A, but my recollection is, it's

10   something like ██████ in placements.  And then

11   if we step it all the way down through would result

12   in a reduction in the fee '23 versus '24.

13        Q.   Okay.  Let's take the historical average

14   that you're working with.  Did Aspirion actually

15   have a shortfall in terms of Banner looking

16   historically versus 2024?

17        A.   I don't even know what that means.  You

18   have to take me back to the table and we'll have to

19   see.

20        Q.   This is your historical projection, okay?

21   Banner, you're projecting ██████.  That's what

22   you're projecting.

23        A.   Based on the two-year average of 2022 and

24   2023 in terms of placements and then the historical

25   collection rate and the effective fee rate.

1      Q.   Okay.  That's -- so that is your projected

2  but for defendant's engaging in misconduct this is

3  what Aspirion would have made from Banner, correct?

4      A.   Based on the frame work that I've set out,

5  yes.

6      Q.   Okay.  Dave's chart.  This is what they

7  actually made through October ███████.  What is

8  that shortfall?

9      A.   Compared to what?

10      Q.   Compared to what you were projecting the

11  ████████ number.

12      A.   But you're mixing apples and oranges

13  because you're trying to -- you're trying to

14  characterize my analysis in a way that's

15  inconsistent with what I did and what my testimony

16  has been for the last 15 or 20 minutes that we've

17  been going through this.

18      Q.   No, I'm not asking you about that.  I'm

19  asking you a specific question.  What is the

20  difference between approximately ████████████

████████████?

22      A.   Mathematically?

23      Q.   Mathematically.

24      A.   Around ██████.

25      Q.   Okay.  And you agree that ████████

```
 1      figure doesn't account for two additional months of

 2      the year?

 3           A.   That's correct.

 4           Q.   So if we take that ████████, divide it

 5      by 10, what do we get?

 6           A.   ████████████████████████████████████

 ███████.

 8           Q.   ███████ a month, approximately, correct?

 9           A.   Correct.

10           Q.   Okay.  If we use that to fill in November

11      and December and we total that up, what does that

12      total approximately?

13           A.   It's going to add another ████████ or so

14      to the number --

15           Q.   ██████████████ --

16           A.   -- ████████████ --

17           Q.   ████████████.  Okay.  Keep that number in

18      your head.  ████████████ compared to ████████████

19      Is there a shortfall there between those numbers?

20           A.   Mathematically, no.  But I think it's a

21      false comparison.

22           Q.   Noted.

23           A.   I'm sorry?

24           Q.   Noted.

25           A.   Well, I'll beg to disagree with you.  Your
```

1    comparison is false.  I mean, there's so many

2    falsities in what you put forward that I just think

3    it's inappropriate to run the calculation in the way

4    that you have.

5          Q.    You think it's inappropriate to total up

6    actual fee revenue and compare it to what you

7    projected?

8          A.    Right.  Because it misconstrues the

9    analysis that I performed, which I've testified to

10   multiple times.

11         Q.    You'd agree with me that if you made

12   errors in your calculations for 2024, and then you

13   extrapolated forward to '25, '26, '27, '28, you

14   would compound those errors?

15         A.    You'd have to tell me what the errors are

16   and then I can decide whether it has an effect or

17   not.

18         Q.    Well, no, I think we can just from a

19   general premise standpoint we can say if you

20   projected lost revenue ███████████████████████

█████████████████████████████████████████████████████

22   for one year, you agree with me that if you

23   extrapolated that forward for several years you are

24   compounding errors?

25               MR. GILMORE:  Objection to form,

David M. Duffus
January 17, 2025

```
 1           foundation.

 2                   THE WITNESS:  Yeah.  I mean, are you

 3           asking me a hypothetical?  I'm unaware of any

 4           errors in my calculation that have any

 5           compounding effect.

 6                   If you want to point them to me we could

 7           evaluate them and perhaps I can answer your

 8           question.

 9   BY MR. POLLARD:

10           Q.   I already tried, sir.

11                   Can you tell me what other factors did you

12   account for that could have possibly changed the

13   volume of claims dollars placed with Aspirion by a

14   particular client?

15           A.   Well, I considered in my analysis -- well,

16   I considered a variety of things.  I mean, first of

17   all, I considered what was set forth in the

18   interrogatory answers as they related to the contact

19   that was made by -- I called them the former

20   employee defendants in my report -- the admitted

21   contact that they made with these clients, the time

22   period over which that contact occurred, the dates

23   on which certain contracts were entered, and that

24   certainly went into my analysis.  I looked at the

25   volume of claims placed by client, kind of in
```

David M. Duffus
January 17, 2025

```
 1    accordance, if you will, with what was disclosed in
 2    the interrogatory answers and considered the
 3    relationship that I saw in that volume versus what
 4    was disclosed.
 5            And there may be other things that I
 6    looked at that are discussed in my report that I
 7    don't recall as I sit here, but, you know, among
 8    other things I considered whether there may have
 9    been factors on the Aspirion side that contributed
10    to the departure or the reduction if you will in
11    placements.  And I've observed no evidence to
12    indicate that there was anything on the Aspirion
13    side.
14        Q.    Okay.  In terms of your calculations, did
15    you account for any other causal factors?
16            MR. GILMORE:  Objection, form, foundation.
17            THE WITNESS:  Well, I think I just
18        testified to what I considered.  If you want
19        to -- if you want to raise them with me or tell
20        me what you're thinking I'll be happy to see if
21        I have addressed them.
22    BY MR. POLLARD:
23        Q.    Okay.  Let's try to walk through this.
24            So you testified that Aspirion's fee
25    revenue decreased as a result of Ternium defendant's
```

David M. Duffus
January 17, 2025

```
 1    conduct, correct?
 2              MR. GILMORE:  Objection, form, foundation.
 3              THE WITNESS:  I think what I testified to
 4         is that there are disclosures in the
 5         interrogatory answers of activity.  I think
 6         there's information that was obtained via an
 7         IT -- would be capital I, capital T --
 8         investigation as to the conduct of the
 9         defendant that has a bearing on these
10         particular clients.  And I looked at the actual
11         numbers as it relates to placements and
12         particularly the trends in those numbers as it
13         lined up against that data for purposes of
14         evaluating whether it was reasonable for me to
15         assume that there was a causal linkage between
16         what was asserted and the damages that have
17         been claimed.
18    BY MR. POLLARD:
19         Q.   Mr. Duffus, I'm going to have to ask you
20    to please answer my question.
21              Did you, in your calculations account for
22    any other factors that may have led to a decrease in
23    fee revenue?
24         A.   And I'll go back to my --
25              MR. GILMORE:  Objection -- hold on.  Hold
```

David M. Duffus
January 17, 2025

1          on.  Objection to the lawyer colloquy.

2          Objection, form, foundation, and asked and

3          answered.

4               THE WITNESS:  And I'll go back to my

5          testimony previously about what I considered.

6     BY MR. POLLARD:

7          Q.   Did you consider market events?

8          A.   You'll have to be specific what you mean

9     in terms of market events.

10         Q.   Okay.  Are you familiar with the Change

11    Healthcare system hack?

12         A.   I am.

13         Q.   Okay.  Did you factor that into your

14    analysis in any way?

15         A.   That was certainly something that I

16    considered.

17         Q.   Did you factor it into your calculations?

18         A.   It really doesn't play into my actual

19    calculation because as I understand it, that hack

20    occurred in February of 2024.  And as I testified

21    earlier, the placement analysis that I performed

22    started in May of 2024.

23              So, you know, two or three months after

24    that hack -- and I think if you look at the volumes

25    of placed claims, you can see that while there may

David M. Duffus
January 17, 2025

 1    have been a dip there was some recovery months after

 2    that hack.

 3        Q.   Do you know if any of the clients at issue

 4    were specifically impacted by the Change Healthcare

 5    data breech?

 6        A.   I can't say specifically.

 7        Q.   Okay.  So if a specific client outright

 8    stopped placing claims for a period of time, could

 9    that have impacted the volume of claims placed with

10    Aspirion?

11            MR. GILMORE:  Objection, form, foundation.

12            THE WITNESS:  Well, I don't think what you

13        just said is supported by the data.

14    BY MR. POLLARD:

15        Q.   So none of the clients at issue here had a

16    stoppage or a slow down in terms of claims that they

17    placed with external vendors?

18        A.   I didn't say that.

19        Q.   So certain of the clients did have a

20    stoppage or slow down in terms of the claims placed

21    with external vendors?

22        A.   I can't speak for what those clients did

23    with all of their vendors.  What I'm speaking to

24    with respect to the data is, and I think your

25    question was, was there a stoppage in the placement

David M. Duffus
January 17, 2025

1    of claims.  And I don't think that's borne out by

2    the data because there is no month in the data where

3    the placed claims went to zero.

4        Q.   But you didn't account for the impact of

5    the Change Healthcare data system hack, did you?

6        A.   I did.  I think I just told you I

7    considered it.  And I also told you that my analysis

8    starts in May several months after that hack

9    occurred and carried through October of 2024.

10       Q.   Do you know when the hack occurred?

11       A.   I believe it was February or toward the

12   end of February 2024.

13       Q.   So is it your testimony that by May any

14   market consequences or fallout in this particular

15   segment of the market would have disappeared by May?

16       A.   I can't say that it totally disappeared,

17   but certainly based on my analysis of the data I can

18   see a dip in placements and then a recovery in the

19   months after.

20       Q.   Did you account for Aspirion's shift to

21   relying on artificial intelligence?

22            MR. GILMORE:  Objection, form, foundation.

23            THE WITNESS:  Yeah.  I'm not sure what

24       that even means.

25

David M. Duffus
January 17, 2025

```
1    BY MR. POLLARD:

2         Q.  Are you aware of Aspirion's efforts to or

3    heavily rely on artificial intelligence?

4         A.  Rely on it in what way?

5         Q.  In the context of this specific line of

6    its business.

7         A.  I don't recall.  I have a vague

8    recollection that maybe that came up, but I don't

9    recall that specifically.

10        Q.  So you definitely didn't factor that into

11   your calculation?

12        A.  I didn't say that.  I said I have a

13   recollection -- a vague recollection of that, that

14   that might have been an item of discussion.

15        Q.  Did you factor it into your calculations?

16        A.  Factor it in how?

17             MR. GILMORE:  Objection, form, foundation.

18   BY MR. POLLARD:

19        Q.  So you didn't factor it into your

20   calculations?

21        A.  I really appreciate how you testify for

22   me.  Again, I think if you specify for me how you're

23   asserting that AI has been used I can tell you

24   whether I included it or not.

25        Q.  Do you believe that the
```

David M. Duffus
January 17, 2025

1    individuals -- strike that.

2              When you look at a company like Aspirion,

3    okay.  You understand that these defendants were

4    involved in managing certain accounts, correct?

5         A.   That's my understanding.

6         Q.   Okay.  Could there be any change in

7    revenue or decrease in revenue that is attributable

8    to a less qualified replacement taking over those

9    accounts?

10             MR. GILMORE:  Objection, form, foundation.

11             THE WITNESS:  Yeah, I can't speak to that.

12   BY MR. POLLARD:

13        Q.   Do you know how long it was before

14   Aspirion replaced these individuals with the

15   specific accounts that they were servicing?

16        A.   I'm sorry, say that again.

17        Q.   Sure.  Do you know how long it was before

18   Aspirion replaced these four individuals with the

19   specific accounts that they were servicing?

20        A.   I don't.

21             MR. GILMORE:  Objection, form, foundation.

22   BY MR. POLLARD:

23        Q.   Do you know whether or not the folks who

24   eventually replaced the Ternium defendants at

25   Aspirion had the same credentials and experience?

David M. Duffus
January 17, 2025

```
 1        A.   No, I don't.
 2        Q.   Could that potentially impact the client
 3   relationship?
 4        A.   I don't know.
 5        Q.   Could that potentially impact the volume
 6   of claims placed?
 7        A.   I don't know.
 8        Q.   Could that potentially impact the volume
 9   or rather percentage of claims collected?
10        A.   I don't know.
11             I mean, again, I think you're giving me
12   hypotheticals about what occurred without any
13   specifics.  So it's hard for me to answer.
14        Q.   Did you account for any of these clients
15   taking a significant volume of these claims in-house
16   as opposed to outsourcing them to vendors?
17             MR. GILMORE:  Objection, form, foundation.
18             THE WITNESS:  I haven't seen enough data
19        at this point to be able to evaluate that.
20   BY MR. POLLARD:
21        Q.   Okay.  But let's do a little bit of a
22   hypothetical to try and understand.
23             Suppose a client has 100 claims.  Just to
24   use a round number.  Are you with me?
25        A.   I am.
```

David M. Duffus
January 17, 2025

1      Q.    Client has a hundred claims.  Suppose in

2   2023 the client places all 100 of those claims

3   externally with a vendor.  Are you with me?

4      A.    I am.

5      Q.    Now, suppose in 2024 the client keeps 50

6   of those claims in-house and then places 50 of those

7   claims with a vendor.  Are you with me?

8      A.    I am.

9      Q.    Okay.  There would be a reduction in

10   claims placed with a vendor, correct?

11      A.    I think in the static model that you're

12   suggesting where there is never a change in the

13   number of claims and there is only one vendor.  I

14   mean, mathematically that that is how it works.

15      Q.    Well, what I'm get at is this:  If a

16   client took a significant volume of its claims

17   in-house, that would conceivably effect the amount

18   of claims to be placed with vendors, correct?

19      A.    Vendors plural or a specific vendor?

20      Q.    All of them.  Any of them.

21      A.    Well, I mean, certainly if you're talking

22   about multiple vendors, it could.  It could effect

23   it, sure.

24      Q.    So are you privy to any data which

25   indicates volume of claims that these clients have

David M. Duffus
January 17, 2025

1   taken in-house?

2        A.   I have not seen any of that thus far.  I

3   mean, I understand that, you know, discovery is

4   still ongoing.  This case is a little bit

5   interesting in that respect.  So I've not observed

6   that data to date.

7        Q.   So if claims were removed from the market

8   and Aspirion experienced a reduction in claims, that

9   reduction wouldn't necessarily be attributable to

10  the defendant if they were taken in-house?

11       A.   I don't agree with that.

12       Q.   What is the base of your disagreement?

13       A.   Well, I mean, let's -- let's take -- let's

14  take your example that you gave a little bit earlier

15  of a hundred claims that are out in the marketplace.

16  But now let's assume that rather than one static

17  vendor there is two vendors or even three vendors --

18  well, we'll do two since it's easy.

19            One gets 50 claims, the other gets 50

20  claims.  If, in your example, the client takes 50 of

21  those claims in-house, if they took all 50 from one

22  vendor it would have no effect on the other vendor.

23       Q.   Can you tell me either numerically or

24  percentage wise what volume of Banner's claims they

25  have taken in-house over the past year and a half?

David M. Duffus
January 17, 2025

1          A.   I think I've testified that I've not seen

2     that data.  So I can't run that calculation.

3          Q.   Well, suppose -- let's go back to the

4     hundred claims hypothetical, okay?  Let's suppose

5     there are a hundred claims here, okay.  And Banner

6     puts a hundred of its claims, all hundred with

7     Aspirion.  You follow?

8          A.   I do.

9          Q.   Now, Banner takes 50 out of that hundred

10    and moves those back in-house.  There is 50 claims

11    remaining, correct?

12         A.   Correct.

13         Q.   So Aspirion would have just lost 50

14    claims, correct?

15         A.   In your simple hypothetical, sure.

16         Q.   Okay.  Is the loss of those 50 claims

17    attributable to the Ternium defendants in that

18    hypothetical?

19         A.   It could be.

20         Q.   How would the Ternium defendants be

21    responsible for Banner taking 50 of those hundred

22    claims in-house?

23         A.   Well, I mean, look, your simple

24    hypothetical fails to account for the fact that the

25    Ternium defendants or the former employee defendants

David M. Duffus
January 17, 2025

1    have already answered in interrogatories that they

2    solicited Banner while they were still employed by

3    Aspirion, that they signed an agreement with them.

4    I'd have to go back to my report and look at the

5    actual date.  And frankly it doesn't account for

6    what the effect, if you will, of that interference

7    might have on any decision that might be made by

8    Banner to bring those claims in-house or for that

9    matter, to give them to Ternium.

10            I mean, that's why you're leaving out of

11   the equation is what did Ternium get and how does

12   what Ternium got compare to what Aspirion lost.  I

13   mean, that's the real analysis, not some faux

14   hypothetical that tries to create a narrative.

15        Q.   Well, how does your model not a faux

16   hypothetical because your model is based on what

17   Aspirion got before and projecting that it would

18   have got the same thing?

19        A.   It's looking at what the placements were

20   historically and using that as a projection for what

21   would be expected going forward, but for what's been

22   alleged in this case and then comparing it against

23   action.

24        Q.   If there is a significant volume of claims

25   let's take Banner for instance.  If there is a

David M. Duffus
January 17, 2025

1    significant volume of Banner claims that no longer

2    go to Aspirion, but don't go to Ternium, are you

3    attributing those loses to Ternium?

4         A.    I may be.  I mean, I have to evaluate

5    information to understand, but it could very well be

6    a situation where, look, I mean, I'll acknowledge

7    that discovery is still ongoing and there is

8    information still being produced, but, I mean, I've

9    seen situations in the past where clients have said,

10   you know, effectively a pox on both of your houses,

11   you guys figure it out and deal with whatever

12   disputes you have, but we're taking our business

13   elsewhere.  And that could clearly be connected to

14   the conduct that's at issue in this case.

15             MR. POLLARD:  All right.  We're going to

16        take a 10-minute break.  We'll be back.

17             (A short break was taken.)

18   BY MR. POLLARD:

19        Q.    Mr. Duffus, did you account for -- strike

20   that.

21             Did you ask Aspirion if they ever turned

22   away business from these clients?

23        A.    I don't remember having that discussion.

24        Q.    Okay.  So if a client came to Aspirion

25   with a bucket of claims work and Aspirion simply

David M. Duffus
January 17, 2025

1    turned it away and said we can't handle that right

2    now or it doesn't fit with our business model.  Do

3    you agree with me that that bucket of claims, for

4    lack of a better word, that should be excluded from

5    any sort of calculation of lost profits?

6         A.    I think it depends on what the bucket is.

7         Q.    How does it depend?

8         A.    Well, because we're dealing with large

9    dollar denials.  I mean, if they're turning away, I

10   don't know, small dollar claims or some other, you

11   know, workers' compensation claims or, you know,

12   other types of claims that might come to them it

13   wouldn't have any impact on the damages because

14   we're dealing with the large dollar denials.

15        Q.    If we could identify hypothetically a

16   bucket of certain claims that a client brought to

17   Aspirion and Aspirion turned it away and said, we

18   don't want that.  And then Ternium secured that

19   business, would it be defensible to include the fees

20   from that business in any calculation of Aspirion's

21   damages?

22        A.    You're going to have to say that again.  I

23   didn't quite follow that.

24        Q.    Sure, sure.  Basically if a client brings

25   a bucket of claims to Aspirion and Aspirion turns it

David M. Duffus
January 17, 2025

1     away, do you follow?  Aspirion says no we can't take

2     that for whatever reason.  Either you don't want it

3     or we can't take it.  They turn it away.  And then

4     Ternium scoops up that business.  Should revenue

5     from that bucket that Aspirion turned away fairly be

6     included in any computation of lost profits or

7     damages?

8               MR. GILMORE:  Objection, form, foundation.

9               THE WITNESS:  I think it depends again

10         what that bucket is and why it was turned away.

11    BY MR. POLLARD:

12         Q.   But you didn't ask Aspirion about this or

13    probe into it?

14               MR. GILMORE:  Objection, form, foundation.

15               THE WITNESS:  Yeah.  I'm not sure -- asked

16         them about what?

17    BY MR. POLLARD:

18         Q.   About business they turned away.

19         A.   We may have had discussions about some

20    business that they turned away.  Non-high dollar

21    denials.  I think there may have been a discussion

22    about business in other categories that they've

23    turned away.

24         Q.   Your report at certain points gets into

25    disgorgement, correct?

David M. Duffus
January 17, 2025

1      A.   I'm sorry, say that -- I'm losing you here
2   periodically.
3      Q.   Sure.  Your report at some points gets
4   into what's called disgorgement, correct?
5      A.   It does.
6      Q.   Okay.  Would it be proper to seek
7   disgorgement of revenue derived from business that
8   Aspirion did not want?
9      A.   It may be.
10      Q.   In what circumstances would that be the
11   case?
12      A.   Well, I think, look, I'm not going to play
13   lawyer.  I'm speaking just purely as a damage
14   expert, but I think the role of the damage expert
15   particularly on the plaintiff's side is to identify
16   the universe of revenue that's potentially at issue.
17   The burden then shifts to the defendant to identify
18   which should be excluded or what we might call
19   apportionment.
20          So when I say it may be is I'd have to see
21   what apportionment analysis the defendant puts
22   forward and make my analysis or determination based
23   on that.
24      Q.   In terms of your report, what parts of
25   your report did you actually draft?

David M. Duffus
January 17, 2025

1      A.   Well, pretty close to a hundred percent if

2   not a hundred percent of it.

3      Q.   Did you create the tables that are in the

4   report?

5      A.   Probably my staff did the mechanical, you

6   know, construction and data entry under my direction

7   and review.

8           MR. POLLARD:  Deaken, let's go to the

9      Table 2 placed claims annual volume.

10  BY MR. POLLARD:

11     Q.   Do you recognize this chart?

12     A.   I do.

13     Q.   Can you tell me what this is?

14     A.   It's a table from my expert report.

15     Q.   What does this table show?

16     A.   It shows the annual volume of placed

17  claims for the clients that are at issue in this

18  case.

19     Q.   Okay.  Earlier you stated that you

20  reviewed the trends in terms of claims volume, the

21  trends.  Do you recall that?

22     A.   I do.

23     Q.   Can you tell me what Trends you see in

24  this chart?

25     A.   Well, I can see, for instance, when we

1    look at Banner that it's -- the placed volume in

2    2021 was about ████████████.  It went up to ████

     ████████████████████████ in 2023.  And then on an

4    annualized basis down to around █████████ in

5    2024.

6        Q.   Okay.  Is it fair --

7        A.   You could go client by client and do a

8    similar analysis.

9        Q.   Okay.  Is it fair to say that this ████

     ███████████ in 2023 was anomalous?

11       A.   I can't speak to that.

12            MR. GILMORE:  Objection, form, foundation.

13   BY MR. POLLARD:

14       Q.   Okay.  Do you see any other numbers on

15   this chart that are even in the same universe of

16   that 160 million?

17            MR. GILMORE:  Objection, form, foundation.

18            THE WITNESS:  No.  I mean it's by, you

19       know, it is the largest number on this table

20       the 160 million.

21   BY MR. POLLARD:

22       Q.   By more than ██████████, correct?

23       A.   Correct.

24       Q.   Okay.  Let's look at CHOC.  We have █

     ████████████████████████████████████████████

1   ████████████████████████████   Are you

2   seeing is there a trend here that you discern?

3        A.   Yes.   Increasing into 2023 and then

4   decreasing in 2024.

5        Q.   Okay.  Let's go to Evangelical.  Do you

6   see a trend here?

7        A.   I do.

8        Q.   What's the trend?

9        A.   Increasing into 2022 and then decreasing

10  in 2023.

11       Q.   Let's go to Parkview.  Do you see a trend

12  in Parkview?

13       A.   Increasing into 2023 and then decreasing

14  in 2024.

15       Q.   So in the difference between '23 and '24

16  column, are you attributing these significant

17  decreases to the conduct of the Ternium defendants?

18       A.   I think it's among the data I evaluated to

19  make a determination as to whether it's reasonable

20  to assume that there is a causal linkage between

21  what's been alleged and the damages that have been

22  asserted.

23       Q.   But I just want to walk through some of

24  these right?  So for Banner difference from '23 to

25  '24 down ██████████.  Are you attributing that to

1    the Ternium defendants?

2         A.    I think there is a reasonable basis based

3    on this to assume that there is a causal linkage

4    between what's been asserted and the damages that

5    have been sustained.

6         Q.    But are you attributing -- I'm asking you

7    this specific figure of down ████████ and change,

8    are you attributing that to the Ternium defendants,

9    yes or no?

10        A.    I think what I'm looking at on this is --

11   and I'll take a step back for a minute and go back

12   to something I think I testified to a little bit

13   earlier is there are interrogatory answers that have

14   been provided by the defendants about the conduct

15   specific to these particular clients.

16              I then took my analysis a step further and

17   said, okay.  Well, what was put forward in those

18   interrogatory answers and is that or is there

19   objective data that might be evaluated to measure

20   the potential effect of what's been admitted to, I

21   think by the defendants and their interrogatory

22   answers.

23              And when I look at the data broadly across

24   these seven or eight clients, we can see that there

25   is a decline in place volumes that puts me in a

David M. Duffus
January 17, 2025

```
 1   place where I believe it's reasonable to assume that

 2   there is a causal linkage between what's been

 3   asserted and the calculation of damages.

 4        Q.   So is your answer that you're attributing

 5   this $109 million drop in claims to the Ternium

 6   defendants?

 7        A.   I'm -- I believe it's reasonable to assume

 8   based on what I've evaluated that that drop in

 9   claims is due to the conduct that's been alleged in

10   this case.

11        Q.   Okay.  Same thing for CHOC, you're

12   attributing this $28 million decrease in claims to

13   the Ternium defendants?

14        A.   For the reasons I just mentioned.

15        Q.   Same thing for Evangelical?

16        A.   Yes.  For the same reasons I just

17   mentioned.

18        Q.   Same thing for Legacy?

19        A.   Yes.  For the reasons I just mentioned.

20        Q.   Same thing for Parkview?

21        A.   Yes.  For the reasons I mentioned.

22        Q.   When did Ternium start providing services

23   to Evangelical?

24        A.   I know there was a disclosure in the

25   interrogatory answers.  I believe a table that was
```

1    attached that disclosed that.  I'd have to look at

2    it to be certain.  I don't recall as I sit here.

3         Q.   Well, let's just look at this chart for

4    Evangelical.  So Evangelical was at ▮▮▮▮▮▮ and

5    change in 2022, and it dropped to ▮▮▮▮▮ in 2023.

6    So there was already a big decrease prior to the

7    Ternium defendants doing anything?

8         A.   I don't agree with that.

9         Q.   Well, why do you disagree?

10        A.   Well, bear with me and maybe I -- just for

11   what it's worth, I have a copy of my report.

12        Q.   Sure.

13        A.   Let me just take a look at it because I

14   think in my report I mention -- right.  So I'm

15   looking at page 6 of my expert report.  I'm sorry,

16   paragraph 20.  And what I've stated in the report is

17   that in September 2022 Mr. Jewell solicited

18   Evangelical Community Hospital on behalf of Ternium

19   and began contract negotiations in May of 2023 and

20   received the signed contract on September 29th of

21   2023 or within days of his resignation from

22   Aspirion.

23            So, I mean, based on what I see, out of

24   the information produced so far in the case, is that

25   there was activity even while Mr. Jewel was employed

David M. Duffus
January 17, 2025

1   at Aspirion whereby he was soliciting Evangelical

2   and certainly we see in 2023 the numbers drop off.

3   We see contract negotiations began in May of 2023,

4   and then an actual contract was signed and obviously

5   the volume as you showed me on the table before fell

6   off significantly in 2023.

7        Q.   But you agree with me there is significant

8   lead time on this business, correct?

9             MR. GILMORE:  Objection, form, foundation.

10            THE WITNESS:  Lead time in what way?

11  BY MR. POLLARD:

12        Q.   Lead time in terms of a contract has to be

13  signed, there is a lag before the claims are placed,

14  there is not going to be a shortfall immediately.

15  It's going to take awhile for that to play out.

16            MR. GILMORE:  Objection --

17            THE WITNESS:  I understand that it

18        takes --

19            MR. GILMORE:  Hold on.  Objection, form,

20        foundation.

21            THE WITNESS:  I understand generally that,

22        I mean, obviously there is time between when

23        a -- takes time to negotiate a contract and

24        then once a contract is signed there can be a

25        time line between that signature and when

David M. Duffus
January 17, 2025

1        claims are placed.

2   BY MR. POLLARD:

3        Q.   Okay.  Let's just keep moving down the

4   chart.  Let's go to Parkview.  There is a

5   $15,955,000 shortfall in terms of claims volume.

6   Are you attributing that to Aspirion?  I'm sorry,

7   Ternium rather.

8        A.   For the reasons that I previously

9   mentioned I believe it's reasonable to assume that

10   there is a linkage.

11       Q.   What if Ternium's never done any business

12   with Parkview?

13       A.   I'm sorry?  I'm not following.  What's the

14   question?

15       Q.   You've told me that you're attributing

16   this $16.9 million decrease in claims placed with

17   Aspirion by Parkview to Ternium.  I'm asking you,

18   would it change your opinion if I told you that

19   Ternium has never done any business with Parkview?

20       A.   No.

21       Q.   It wouldn't change your mind at all?

22       A.   Well, again, I'll go back to what I talked

23   about right before the break is, is, again, we can

24   look at the conduct.  We can look at what's been

25   asserted or alleged.  And there can be damages if

1    the volume's dropped off because a client, for

2    instance, makes a decision that they don't want to

3    do business or they're going to reduce the amount of

4    business because they just don't like being caught

5    in the middle on a dispute.

6        Q.   But you agree with me for 2024 Parkview is

7    still placing ███████ and change worth of claims

8    with Aspirion, correct?

9        A.   Yes.  On an annualized basis.

10       Q.   Okay.  Pretty significant volume, correct?

11       A.   I mean, it is what it is.

12       Q.   Okay.  And if Ternium doesn't do any

13   business with Parkview, how is Ternium responsible

14   for that $16.9 million shortfall?

15       A.   Well, because, again, I think there is

16   admitted conduct stating that Parkview was solicited

17   by the former employee defendants.  That could very

18   well have had an effect.

19            I mean, again, I've not seen all the

20   discovery in the case.  I'd have to ultimately

21   evaluate, if you will, everything one has produced,

22   but I could see a reasonable situation where volume

23   dropped off because of the alleged solicitation of

24   that particular client.

25       Q.   But do you agree with me there is a

David M. Duffus
January 17, 2025

```
 1    difference between stating something could be or is

 2    possible versus testifying to a reasonable degree of

 3    certainty?

 4         A.   Well, I mean, let me go back to what I

 5    testified to a little bit earlier.  This section in

 6    this table and this analysis is presented in the

 7    context of whether it's reasonable for me as an

 8    expert to assume that there is a causal linkage

 9    between what's been asserted in the damages that

10    have been claimed.  And that analysis isn't simply

11    looking at numbers, although the numbers are part of

12    the analysis, but it's also looking at things, like,

13    what's been admitted to in the interrogatory answers

14    as to the conduct of the former employee defendants.

15              And when I look at what's been admitted to

16    and match that up or marry it up with the change in

17    volume, I think it's reasonable to assume, based on

18    the data and information that I've examined to date,

19    that that reduction is linked to what's been

20    alleged.

21         Q.   Did you determine whether or not any of

22    the clients at issue were unhappy with Aspirion's

23    services or offerings?

24         A.   I asked that question.

25         Q.   And did you get an answer?
```

```
1         A.    I did.

2         Q.    What was the answer?

3         A.    The answer was that there were not service

4    issues that caused the reduction in volume.

5         Q.    On any of these clients?

6         A.    On any of these clients.

7              MR. POLLARD:  Deaken, let's go to 4,

8         attachment 4.

9    BY MR. POLLARD:

10        Q.    So is it fair to say that this is your

11   ultimate summary of the claimed lost profits?

12        A.    It is.

13        Q.    Okay.  And so if we look at this chart, if

14   I understand correctly, 2024 you submit, based on

15   this chart, that Aspirion lost more than ████

     ████████████ in revenue that would have otherwise been

17   distributable to Banner?

18        A.    I think certainly the number is ████████

     ███████████████████.  I think just to be clear and,

20   you know, as we look at this, you know, in hindsight

21   I think I probably would have preferred to label

22   each column as year one, year two, year three

23   because that's really what they are is the years in

24   a damage model or in the damage calculation.

25        Q.    Okay.  But that's not ████████ it's in
```

```
 1    the middle of the page, lost revenue existing
 2    clients Banner ██████████ --
 3         A.   I'm sorry, yes, that is correct.
 4         Q.   That's the lost revenue that otherwise
 5    would have come from Banner?
 6         A.   That is correct.  That is my estimate of
 7    lost revenue.
 8         Q.   And you agree with me your estimate for
 9    2024 turned out to be inaccurate?
10         A.   No, I don't agree with that.
11         Q.   So you still maintain that Aspirion
12    actually lost more than ████████████ in revenue that
13    would have come from Banner?
14         A.   Correct.
15         Q.   Even though the actual fees from Banner do
16    not demonstrate a ████████████  shortfall?
17              MR. GILMORE:  Objection, form, foundation.
18              THE WITNESS:  Well, again, I'll go back to
19         what I said a minute ago.  I mean, in hindsight
20         I think it would have been better to label this
21         as year one, year, two, year three, year four,
22         and year five as opposed to 2024 because,
23         again, as we look at and as we discussed in my
24         analysis previously, I think it was Scheduled
25         3A, we're looking at an annual impact of the
```

1       conduct that's been alleged that began in 2024.

2   BY MR. POLLARD:

3       Q.   Okay.  Just based on your chart here, you

4   say that Aspirion has total lost revenue for the

5   year 2024 of ███████.  Do you see where I'm at?

6       A.   I do.

7       Q.   Okay.  And do you maintain that's an

8   accurate figure?

9       A.   I do.

10      Q.   Okay.  And you agree with me that we have

11  10 months of actual numbers in terms of fees for the

12  year 2024?

13      A.   We do.

14      Q.   So at this point we can calculate the

15  revenue Aspirion has made on these clients through

16  the first 10 months of 2024, correct?

17      A.   You can.

18      Q.   And do you agree with me that if we do

19  that even without the final two months of the year,

20  that does not yield ███████ in lost revenue?

21      A.   I don't agree with you.

22      Q.   Why do you disagree?

23      A.   Well, for the reasons we talked about when

24  we talked about 3A.  And as we're talking about now,

25  again, you know, in hindsight I think this table

David M. Duffus
January 17, 2025

1    would have been better labeled year one, year two,

2    year three, year four, and year five of the damage

3    period.  Because I'm calculating annual damage

4    numbers based on a but for that's based on the

5    historical average revenues and a run rate in the

6    business May through October of 2024 to derive my

7    projected actual with that difference being the

8    calculation of the lost revenue.

9           And I think with respect to Banner, if you

10   go back to 3A under the methodology that I just

11   described, it's exactly the number that's presented

12   here as the lost revenue for existing clients.

13        Q.   You agree with me in this column where it

14   says 2024, when you talk about lost revenue you're

15   talking about fee revenue that would have been

16   earned in 2024?

17        A.   It's fee revenue that would have been

18   earned in year one of my damage calculation.

19        Q.   But are we talking about the calendar year

20   2024?

21        A.   We are not.

22        Q.   You're not talking about the calendar year

23   in 2024?

24        A.   That is correct.  Again, what I'm --

25   again, I wish, you know, in hindsight I may have

```
 1    labeled this differently as year one, year two, year
 2    three, year four, and year five in the damage
 3    calculation, but it's based on annual figures using
 4    2024 data obviously, but is not intended to present
 5    an actual 2024 figure.  It is intended to present a
 6    year one damage figure.
 7          Q.   From what -- from what date to what date?
 8          A.   Well, again, let's start with the but for
 9    and we'll take Banner.  That figure above is based
10    on the two year average fee 2022 and 2023.  When we
11    go down to the next section, which is actual revenue
12    for Banner, that's based on the run rate for the
13    period May of 2024 through October of 2024, a
14    six-month period.
15          You can test the number by going back and
16    looking at the subsidiary schedules.  Then the math
17    by taking the average of 2022 and 2023, minus the
18    fee revenue from the run rate May through October
19    gives you lost revenue of ██████████.
20          Q.   You agree with me you have these labeled
21    '24, '25, '26, '27, '28, right?
22          A.   I do.  And as I stated I think in
23    hindsight it would have been better labeled year
24    one, year two, so on and so forth.
25          Q.   But are you talking about a whole year in
```

```
 1    each of these, or are these just parts of years?
 2         A.   They're whole years.  I mean, they're
 3    annualized numbers so the year one number or
 4    numbers, for instance, grows by ███████ into the
 5    next year, into the next year, over the five year
 6    damage period.
 7         Q.   So your annualizing in 2024 -- so you're
 8    annualizing this Banner number?
 9         A.   I'm not annualizing that Banner number.
10    Again, it is based on the run rate for the period
11    May through October of 2024.  That run rate is
12    annualized to a 12 month figure to derive the fee
13    revenue.  We looked at it on 3A.
14              MR. POLLARD:  Deaken, do you have a
15         spreadsheet there with the margin calculation
16         where they get that ██ percent?
17              Okay.  Can we blow this up?
18    BY MR. POLLARD:
19         Q.   Okay.  Have you done any other expert work
20    that arises out of the revenue cycle management
21    space?
22         A.   I have -- I'm familiar with the space.
23    I'm not sure perhaps how to ultimately characterize
24    the work that I've done, but I'm very familiar with
25    it.
```

```
 1        Q.    What is, based on your testimony here,
 2   what is Aspirion's margin?
 3        A.    Well, gross the margin that I calculated
 4   based on 2023 for their large balance denial
 5   business is ███ percent.
 6        Q.    Okay.  Does that strike you as unusually
 7   high?
 8        A.    No.
 9        Q.    Okay.  And do you think you have
10   accurately accounted for or backed out all of the
11   ordinary buckets of overhead in your chart here?
12        A.    I think the only exception is -- I mean,
13   to the extent there are or is a new client and in
14   the case of my calculation with Baptist, I did apply
15   it is the commission rate that is paid in the first
16   two years after that client has been obtained.
17             So, you know, for certain clients the
18   margin would be 5 percent lower than ███ percent.
19        Q.    Did you factor in IT cost?
20        A.    Well, I considered it.  I mean, I
21   considered all of their cost in ultimately deriving
22   what I deducted as the incremental expend.
23        Q.    Okay.  Can you tell me where information
24   technology would go -- would fit into this chart?
25        A.    Well, it would be what we would call below
```

1   the line, below the gross margin line.  It's an

2   overhead expense that in the terminology that I

3   would use is not incremental in terms of generating

4   the lost revenue.

5       Q.   But is it accounted for anywhere in this

6   chart?

7       A.   No.  Because this chart is calculating the

8   incremental expense or the incremental margin that I

9   used in my analysis.  Since it's not incremental,

10  it's not on the chart.

11          MR. POLLARD:  All right.  We're going to

12          take five.  We might be done with our

13          questioning.

14             (A short break was taken.)

15          MR. POLLARD:  Deaken, can you pull up

16          Attachment 4, please, again?

17  BY MR. POLLARD:

18      Q.   All right.  So I apologize for my

19  obtuseness, sir.  But can you please help me

20  understand this, okay.  So for the first column 2024

21  it's like an X axis and a Y axis.  We go over to

22  total loss revenue ████████, okay?

23      A.   That's correct.

24      Q.   Total loss revenue.  Is that the lost

25  revenue that you were projecting for the calendar

David M. Duffus
January 17, 2025

1    year 2024?

2         A.   No.

3         Q.   Okay.  Over what period of time start date

4    to end date is that dollar amount reflective of the

5    claimed lost revenue?

6         A.   It is in the first full annual year of the

7    damage period based on, again, what occurred the

8    actuals from '22 and '23 averaged and the run rate

9    between May and October of 2024.  The difference

10   between those two figure gives you the annualized

11   lost revenue for the first year in my damage log.

12        Q.   But what I'm getting at, what I'm trying

13   to understand is, you're maintaining that Aspirion

14   lost or was projected to lose over four and a half

15   million dollars.  During what period of time?  I'm

16   not asking you about what you're basing it on.  I'm

17   asking you over what period of time does that loss

18   reflect?

19        A.   It's using data from 2024 --

20        Q.   I'm not asking what it's using.  I'm

21   asking you what -- what -- so in terms of damages,

22   right, if you have a business, okay.  If you have a

23   business and your business shuts down for three

24   months and has damages for three months, you can

25   tell me what are the three months the business shut

1    back down.  So ███████████████████████ that

2    is a loss over what specific period of time?  Start

3    date to end date.

4         A.   It is the first, what I would characterize

5    as the first year of the damage period using the

6    historical data from '22 and '23 and comparing it to

7    the run rate starting in May of 2024 through October

8    of 2024, but it is an annual figure.

9         Q.   Sir, I am not -- I want to clarify my

10   question.  I'm not asking you what the projection is

11   based on.  Your client is claiming lost revenue.  I

12   am trying to understand over what period of time is

13   that lost claim for?  Because if we project that out

14   forward, right, you have '24, '25, '26, '27, '28.

15   You're telling me you mislabeled the chart.  I need

16   to understand.  They would have made the 4.5 million

17   during what period of year?

18        A.   So, again, and I think in my report I've

19   indicated that I believe the damage period starts in

20   January of 2024.  That's when everybody had left

21   Aspirion.  I think Mr. Cameron was the last one to

22   leave.  And so using that start date as the start

23   date for my data, I then use that to project forward

24   on an annual basis over a five-year damage period

25   what the expected loss is.

```
1          Q.   Sir, you're not answering my question.
2     You're saying ████████████████████████████ in
3     lost revenue.  You're saying that starts
4     January 2024.  It has to have a discernable date.
5     What is the date upon which it starts?
6          A.   I did not say it started January 2024.  I
7     stated that the impact began in January 2024, and
8     that then can be observed in the data that I used in
9     my analysis.  I used that data to then quantify
10    annual damage figures over a five-year damage period
11    starting with data from 2024.
12         Q.   Okay.  Sir, so that I understand, you've
13    said annual damage period you said start
14    January 2024.  So is this $4.5 million in lost
15    revenue, is that lost revenue, which would be
16    counted or attributable to the year 2024?  Is that
17    lost revenue in the year 2024?
18         A.   It is not lost revenue in 2024.  It's lost
19    revenue in the first year of the damage period using
20    the 2024 data.
21         Q.   It's 2025, correct?
22         A.   I'm sorry?
23         Q.   It's 2025, correct?  The year is currently
24    2025, correct?
25         A.   It is currently 2025, yes.
```

David M. Duffus
January 17, 2025

1        Q.    Okay.  Last year was 2024?

2        A.    That's correct.

3        Q.    So for the year 2024, I'm not talking

4   about your chart.  I am talking about the year.  Do

5   you understand the definition of a year?

6        A.    You're cutting in and out.

7              MR. GILMORE:  You broke up.

8   BY MR. POLLARD:

9        Q.    Can we agree -- sorry.  Can we agree that

10  the calendar year of 2024 is defined as January 1,

11  2024, until December 31, 2024?  Can we agree with

12  that?

13       A.    We can.

14       Q.    Okay.  For the year 2024, what is your

15  opinion of how much revenue Aspirion lost that is

16  attributable to the Ternium defendants?

17       A.    Again, I haven't looked at it that way.

18  I've looked at it on a year one basis.

19  Unfortunately I labeled the columns with years, but,

20  again, it should be year one.  In other words, I've

21  got a five year -- I'm looking at the impact over a

22  five-year damage period.  And I'm saying what's the

23  year one effect, what's the year two effect, what's

24  the year three effect.

25              Now, I'm certainly using data from 2024 to

David M. Duffus
January 17, 2025

1    inform that analysis, but I'm doing it over a

2    five-year period.

3        Q.   You said year one effect.

4        A.   Correct.

5        Q.   When you say year one effect, please

6    define for me your meaning of year one, start date

7    to end date?

8        A.   Well, again, I'm using data in my actual

9    for the period May of 2024 through October of 2024

10   to come up with a run rate that then gives me an

11   annualized revenue figure that I used to be my

12   projected year one revenues.  That then gets

13   compared against a but for that's calculated based

14   on 2022 and 2023 with the difference being my

15   estimated year one loss.

16       Q.   What, without referencing to all of the

17   things you're projecting and everything else you

18   just said over the past two minutes, what is the

19   start date and the end date for your year one?

20   Date, sir.

21       A.   Again, I use data --

22           MR. GILMORE:  Hold on.  Hold on, David.

23       Objection, form, foundation.  And, Counsel,

24       maybe it's been a long week here.  You're

25       literally yelling at the witness on the

David M. Duffus
January 17, 2025

```
 1            deposition.  So --
 2                 MR. POLLARD:  Again, I'm trying to get
 3            dates for the year, year one.  What is year
 4            one?
 5                 MR. GILMORE:  Look, we've all been in
 6            depositions where the lawyer and the witness
 7            may be talking past each other, perhaps that's
 8            happening here.  I don't really care.  I just
 9            ask that you be professional and not yell at my
10            witness.
11                 So why don't you, let's take a step back,
12            deep breath, why don't you reask the question
13            again.
14    BY MR. POLLARD:
15            Q.   I'll ask one more time and see if I can
16    get a straight answer.
17                 Can you please give me the start date and
18    the end date for your year one?
19            A.   Again, it's based on the -- actual is
20    based on the run rate that starts in May of 2024 and
21    goes through October of 2024.  That is then used to
22    project out the year one expected revenue from --
23    from these particular clients.
24                 Hopefully that answers it.  I mean, I'm
25    using data that starts in May of 2024.
```

David M. Duffus
January 17, 2025

```
1              MR. POLLARD:  I have nothing further.

2              MR. GILMORE:  I don't have any questions

3        for the witness.

4              MR. POLLARD:  We're done.  We'll take a

5        copy of it, please.  Expedited.

6              THE COURT REPORTER:  Expedited for when?

7              MR. POLLARD:  Is there any way I could get

8        it Monday?

9              THE COURT REPORTER:  Yes.

10             MR. GILMORE:  Reading.  And, yeah, we'll

11       take it on the same basis as Pollard.

12                   (Witness excused.)

13             (Thereupon, the deposition was concluded

14       at 3:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25
```

David M. Duffus
January 17, 2025

CERTIFICATE OF OATH

STATE OF PENNSYLVANIA

COUNTY OF PHILADELPHIA


        I, Joey Beauregard, Florida Professional

Reporter, Notary Public, State of Florida,

certify that the witness, DAVID M. DUFFUS,

personally appeared remotely before me  on the

17th day of  January, 2025 and was duly sworn.


        WITNESS my hand and official seal

this 20th day of January, 2025.

_____
JOEY B. BEAUREGARD, FPR
Notary Public, State of Florida
My Commission No. HH 053117
My Commission Expires: 02/13/2025

David M. Duffus
January 17, 2025

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF BROWARD

      I, JOEY B. BEAUREGARD, Florida

Professional Reporter, do hereby certify that I

was authorized to and did stenographically report

the foregoing remote deposition of DAVID M.

DUFFUS; that a review of the transcript was

requested; and that the transcript is a true

record of my stenographic notes.

      I FURTHER CERTIFY that I am not a

relative, employee, attorney or counsel of any of

the parties' attorneys or counsel connected with

the action, nor am I financially interested in

the action.

      Dated this 20th day of January, 2025.

_____

JOEY B. BEAUREGARD, FPR
Notary Public - State of Florida
My Commission No. HH 053117
My Commission Expires: 02/13/2025

David M. Duffus
January 17, 2025

WITNESS NOTIFICATION LETTER

DATE:  January 20, 2025
TO:    DAVID M. DUFFUS
ATTN:  ROBERT B. GILMORE, ESQ.
STEIN MITCHELL BEATO & MISSNER, LLP
2000 K Street Northwest.
Suite 600
Washington, DC 20007
IN RE:  MAINSAIL VS. JEWELL
DEPOSITION OF DAVID M. DUFFUS
taken on  January 17, 2025
US Legal Support Job No. 6792910-001

         The transcript of the above proceeding
    is now available for your review.
         Please contact our office at
    561.835.0220 to make arrangements to read and
    sign the deposition transcript.  Our office hours
    are 9:00 a.m. to 5:00 p.m., Monday through
    Friday, at a U.S. Legal Support office located
    nearest you.
         If the transcript is not signed by the
    witness within 30 days after this letter has been
    furnished, we will then process the transcript
    without a signed errata page.  If you wish to
    waive your signature, please sign your name at
    the bottom of this letter and return it to our
    office @ U.S. Legal Support, 16825 Northcase
    Drive, Suite 900, Houston, TX 77060-6004.
         Your prompt attention to this matter is
    appreciated.


Sincerely,


JOEY B. BEAUREGARD


I do hereby waive my signature:


_____


DAVID M. DUFFUS

CC via transcript:
Jonathan Pollard, Esq.
Robert Gilmore, Esq.

David M. Duffus
January 17, 2025

E R R A T A  S H E E T

In Re:  MAINSAIL VS. JEWELL
DAVID M. DUFFUS
January 17, 2025
U.S. Legal Job No. 6792910-001

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

PAGE    LINE          CHANGE                    REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Please forward the original signed errata sheet to this
office so that copies may be distributed to all parties

Under penalties of perjury, I declare that I have read
my deposition and that it is true and correct subject to
any changes in form or substance entered here.

DATE:  _____

SIGNATURE OF DEPONENT:  _____

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025

David M. Duffus
January 17, 2025