# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**MAINSAIL PARENT, LLC d/b/a
ASPIRION; and SPECIALIZED
HEALTHCARE PARTNERS, LLC,
Plaintiffs,**

**v.**

**DAVID JEWELL; MICHAEL
CAMERON; ALISHA MAYS
MEGAN KELLY, and TERNIUM, LLC,
Defendants.**

**Case No. 1:24-cv-22875-CMA**

**Expert Report of
Cheri S. Kane, MSA, FHFMA, FACMPE**

**December 23, 2024**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## TABLE OF CONTENTS

I.   ASSIGNMENT ...................................................................................................1

II.  QUALIFICATIONS AND EXPERIENCE .................................................1

III. SUMMARY OF OPINIONS.......................................................................3

IV.  RELEVANT CASE BACKGROUND .......................................................4

V.   BASIS FOR OPINIONS .............................................................................5

   A.  Relevant Industry Background .........................................................5

   B.  Client Relationships..........................................................................6

      1.  Developing the Client Relationships Necessary to Receive Contracts in the Denials Business is a Long and Arduous Process Requiring Significant Resources. ...................................................................................6

      2.  Defendants Incorrectly Downplay the Role of Relationships and Goodwill in the Denials Sales Process. ..................................................................9

      3.  Aspirion Maintains Active, Ongoing Relationships with Its Denials Clients, Which Defendants Began to Poach while Working for the Company. ...............................................................................12

   C.  Employee Relationships and Specialized Training .........................14

      1.  Aspirion's Extraordinary and Specialized Training Provides Employees Expertise in the Company's Process for Appealing Denials and in Managing its Specific Clients. ...........................................................14

      2.  Defendants Capitalized on Aspirion's Trade Secrets and Confidential Information by Hiring Away Aspirion's Trained Workforce, which are One of the Most Valuable Assets for Any Denials Management Vendor. .................16

   D.  Confidential and Proprietary Information and Trade Secrets...........17

      1.  The RCM Industry Would Classify Aspirion's Confidential Information as Confidential, Proprietary, or Trade Secrets. .......................................17

      2.  Aspirion's Internal, Client-Specific Data Provides the Cornerstone of its Business Strategy and Gives the Company an Edge Over Its Competition........19

      3.  Aspirion Customizes Software with Proprietary Algorithms, Models, and Code to Enhance its Internal Business Processes and Performance. .................22

      4.  Evidence Indicates that Defendants Used Aspirion's Confidential Information for Ternium's Benefit. ....................................................22

   E.  It would have been Impossible for Defendants and Ternium, as a Start-Up Denials Vendor, to Achieve the Same Success Without Aspirion's Client Relationships, Trained Employees, and Confidential Information. ...........................................................23

      1.  Stealing Aspirion's Client Relationships Resulted in Ternium Avoiding the Lengthy Sales Process Required when Acquiring New Clients.........................23

      2.  Stealing Aspirion's Employees Resulted in Ternium Avoiding the Time and Resources Required to Train New Denials Staff, Allowing The Company to Quickly Onboard Aspirion's Clients. .............................................25

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

3.   Stealing Aspirion's Confidential Information Allowed Ternium to Identify Opportunities Amongst Aspirion's Clients and Fast-Track the Negotiation Process by Undercutting Aspirion's Pricing. ....................................................25

VI.  Signature....................................................................................................................26

## I.   ASSIGNMENT

1.   I have been asked by counsel for Plaintiffs[1] to provide an overview and background of the healthcare revenue cycle management (RCM) industry, and, in particular, the market for vendors operating in the claim denials line of business.

2.   Counsel also asked me to evaluate the impact that client relationships have on driving business for vendors in the denials services industry. In conjunction with this assessment, I was asked to opine on whether Aspirion's relationships with its clients are active and ongoing, and whether Ternium gained a competitive advantage by leveraging Aspirion's client relationships.

3.   I have also been asked to evaluate whether Aspirion provides specialized or extraordinary training to its staff, defined as training that goes beyond that typically offered in the denials industry. I was further asked to assess to what extent, if at all, trained denials staff members are valued by denials management vendors, and whether Ternium gained a competitive advantage by hiring Aspirion's staff members.

4.   Finally, I was asked to review internal information that the Individual Defendants[2] had access to and/or misappropriated while working for Aspirion, and to provide an assessment of its confidentiality, Aspirion's business interest in the information, and its competitive value.

5.   In undertaking my analysis, I have considered information from a variety of sources, including industry reports, interviews with Aspirion's employees, and the parties' written discovery. A list of these materials considered is attached to this report as Exhibit A. I have also relied upon my professional judgment and expertise, gathered from 45 years of experience in the field of RCM processes and sales experience. I understand that discovery in this case is ongoing, and as a consequence, I reserve the right to modify and supplement my opinions should additional relevant information be provided.

## II.   QUALIFICATIONS AND EXPERIENCE

6.   I currently serve as the President of Reliant Healthcare Consultants, LLC ("Reliant Healthcare"), a company that performs revenue cycle consulting for the some of the largest hospital organizations in the country. This is my third stint with Reliant Healthcare, as I previously served as President from 2001 to 2003 and 2007 to 2009. I earned a Bachelor of Arts degree with a major in Business Administration from Webster University and a Master of Science Administration (MSA) with a specialty in Healthcare Administration from Central Michigan University. I also earned two fellowships. One fellowship was earned from the Healthcare Financial Management Association (HFMA) with a specialty

---

[1] The "Plaintiffs" in this case are Specialized Healthcare Partners, LLC and Mainsail Parent, LLC d/b/a Aspirion, which I will also collectively refer to as "Aspirion" or "the Company."

[2] The "Individual Defendants" in this case are David Jewell ("Jewell"), Michael Cameron ("Cameron"), Megan Kelly ("Kelly"), and Alisha Mays ("Mays"). The other defendant in this case is Ternium LLC ("Ternium"). I will refer to the Individual Defendants and Ternium collectively as "Defendants."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in revenue cycle management and the other from the American College of Medicare Practice Executives (ACMPE).

7. I possess 45 years of revenue cycle operations and sales experience. During the 25 years before my current position at Reliant Healthcare, I held multiple senior positions for several companies operating in the RCM or RCM-consulting industry, where I was responsible for leading some of the largest health system revenue cycle sales and hospital operational transformations in the country.

8. From 1997 to 2001, I held the position of Director of Provider Relations for UnitedHealthcare's largest regional health plan, where I was responsible for, among other things, oversight of claim and denial processing.

9. From 2002 to 2009, I was a partner at Select Health Management, LLC, which overlapped with my first and second stints at Reliant Healthcare from 2001 to 2003 and 2007 to 2009. In these roles I managed and reformed revenue cycle departments as a vice president at Grady Memorial Hospital and St. Vincent's Catholic Medical Centers. Part of my job for these revenue cycle transformations was writing and issuing requests for proposals (RFPs) and managing vendor outsource selections for insurance follow-up and denials management.

10. From 2009 to 2011, I served as the Insurance Division President for The Outsource Group (TOG), where I managed over 500 employees performing a variety of outsource functions including, but not limited to, denials management and complex claim services for more than a hundred providers. I was a key leader in selling revenue cycle outsourcing services to providers and performing client management services for hospitals once each sale was complete. I led revenue cycle teams by performing sales analysis, training and development, and improving operations for acquisitions and the subsequent integration of companies into TOG.

11. From 2011 to 2016, I served as a managing director at PwC, where my responsibilities included performing revenue cycle sales and leading large revenue cycle consulting projects. During these transformations, I led teams in charge capture, coding, billing, follow-up, and denials management. In addition, I collaborated with teams to develop more than five hospital revenue cycle training programs, including a two-day case study capstone program for newly hired employees. I also served as a senior leader performing other types of consulting services such as providing due diligence assessments of revenue cycle companies for private equity companies.

12. From 2016 to 2022, before rejoining Reliant Healthcare in my current role, I served as the Vice President of Revenue Cycle at Community Health System (CHS), a two hundred hospital system. I managed 2,500 employees performing all aspects of the revenue cycle generating more than a billion dollars in cash a month. More than a hundred of these employees included attorneys, nurses, and staff performing denial appeal functions.

13. I have served as an expert witness in several litigation matters, on subjects including, but not limited to, RCM charge description master pricing and processes, RCM information system installation processes and practices, along with disproportionate share government

funding for hospitals. Additional details on my professional qualifications, a list of my previous testimony experience, and a list of my published articles are included in my curriculum vitae attached as Exhibit B.

14. I am being compensated in this matter at a rate of $700 per hour for my time preparing this report and $950 per hour for deposition and trial testimony. My compensation is not contingent on my findings, testimony rendered, or the outcome of this litigation.

## III. SUMMARY OF OPINIONS

15. Based on my analysis, I have reached the following conclusions:

- The RCM industry, and the claim denials subcategory in particular, is an extraordinarily complex and competitive environment. No two hospital revenue cycle systems or contracted insurance payors operate through the same processes, and denials vendors are consistently fighting for hospital contracts by offering superior performance, lower rates or more favorable contract terms to win clients. Even after initially engaging potential hospital clients, the sales process is long and arduous, typically lasting well over a year.

- Given the nature of the industry, it is critical for denials vendors like Aspirion to develop relationships with clients and prospective clients in order to drive business. Aspirion has active, ongoing relationships with its clients, and Defendants gained a competitive advantage by leveraging Aspirion's client relationships because Ternium was able to bypass the lengthy and expensive effort normally required to recruit new clients.

- Based on my review of Aspirion's training program and my experience in the industry, it is my opinion that Aspirion's training qualifies as specialized and extraordinary, as Aspirion recruits individuals with unique credentials (e.g. juris doctorate (JDs)) trains them on company-specific processes for adjudicating denial appeals, and assigns them to a limited set of client accounts to develop expertise for particular clients. Further, trained denials staff members are one of the most valuable assets for any denials management vendor. For this reason, Aspirion's loss of experienced associates has a significant negative impact on the Company's business and gave Ternium a significant competitive advantage.

- Aspirion has developed confidential, proprietary, and trade secret data, reports, algorithms, and protocols ("Confidential Information"), that both individually and in combination are essential to the company's success. This Confidential Information is not publicly available, and if misappropriated, would undoubtedly give a competitor a significant competitive advantage in the ultra-competitive denials marketplace.

- Finally, without Ternium's dependence on Aspirion's client relationships, employees, and Confidential Information, it would have been impossible for the company, as a new denials vendor, to achieve the level of financial success it has obtained in such a short period of time. Given their training and know-how acquired from Aspirion, Jewell, Cameron, Mays, and Kelly would have known exactly the Aspirion

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Confidential Information to take and use, the client relationships to leverage, and the employees to pursue, for their new RCM company. Thus, instead of proceeding as a start-up in the denials industry, the Defendants were able to essentially market and operate Ternium as Aspirion 2.0, and, accordingly, were able to bypass the extensive timeline and resources needed to form a functioning RCM company and develop client relationships and a trained workforce.

## IV.  RELEVANT CASE BACKGROUND

16. Aspirion is an RCM vendor that provides services to hospitals and healthcare systems by managing and improving their claims processing, payment, collection, and revenue generation functions.[3] Denials Management is Aspirion's core and most profitable line of RCM business, in which the Company specializes in high-balance clinical denials.[4]

17. Jewell, Cameron, Kelly, and Mays are former employees of Aspirion.[5] Jewell, Kelly, and Mays served as Managing Attorneys & Executive Directors of Client Success at Aspirion and were collectively responsible for maintaining relationships with 75% of the Company's customer accounts.[6] As Cameron's title of Senior Vice President of Sales indicates, he served in a senior sales role at Aspirion.[7] While still employed at Aspirion, the Individual Defendants formed another company to provide the same denials services as Aspirion's core business, called Ternium.[8] Jewell resigned from Aspirion on September 27, 2023, Kelly on October 13, 2023, and Mays on October 20, 2023.[9] Cameron resigned from Aspirion on January 31, 2024.[10] The Individual Defendants have since continued to own and operate Ternium in direct competition with Aspirion.

18. On July 29, 2024, Aspirion filed a lawsuit against Defendants alleging that Jewell Cameron, Kelly, and Mays solicited, served, and/or interfered with the Company's clients and prospective clients, solicited, served, and/or interfered with the Company's employees and former employees, and used and/or accessed the Company's Confidential Information, all for the Individual Defendants' own benefit and for the benefit of their new competing company, Ternium.[11]

19. To date, Defendants have solicited and/or contracted with over 40 of Aspirion's hospital clients and have hired seven of Aspirion's former employees (not including themselves).[12] Defendants have also admitted to maintaining possession of Aspirion's Confidential Information.[13]

---

[3] Complaint ¶ 19.
[4] *Id.* ¶ 22.
[5] *Id.* ¶¶ 23, 43 and 57.
[6] *Id.* ¶¶ 23, 42, 43, 57-58, 60.
[7] *Id.* ¶ 43.
[8] *Id.* ¶¶ 13, 82-122.
[9] *Id.* ¶¶ 61-62.
[10] *Id.* ¶ 55.
[11] *See generally id.*
[12] *See* Ternium First Am. Ans. Interrog. Nos. 6, 7, and 10, Exhibit B.
[13] *See* Ternium First Am. Ans. Interrog. No. 21.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## V. BASIS FOR OPINIONS

### A. Relevant Industry Background

20. A hospital's revenue cycle is the process by which the healthcare entity receives consistent revenues. One source of cash flow in the cycle comes from payments from overturned denied claims. While hospitals commonly assign internal teams to resolve clerical or administrative denials, they often outsource adjudication of their complex denials (*e.g.*, payor billing, coding, medical necessity and clinical issues) to vendors like Aspirion.

21. Internal processes for handling denied claims varies by hospital, such that it is necessary for vendors to build customized denial processes and operational workflows specific to a hospital client's business needs to increase appeal recovery rates. This includes learning how the hospital's revenue cycle, information databases, and medical record systems function.

22. Appealing denied claims is further complicated because hospitals are often under contract with many payors and hundreds of plan types.[14] Denial vendors therefore must not only possess unique and specialized knowledge to adapt to particular hospital protocols, but also to appeal claims in a manner designed by the payor, including understanding how to adapt to a payor's specific denials processes, paperwork, timelines, appeals limits, and location for consideration. Venders must also be able to manage and understand payor interpretations of the more than four hundred Claim Adjustment Reason Codes (CARC) and Remittance Adjustment Reason Codes (RARC)[15] payors use to define various payment and denial actions in order to appeal claims and provide direction to the healthcare provider.[16]

23. To be effective, after the signing of a vendor denial agreement, each hospital and vendor must work together to create a "playbook" of the services provided. Once the review of the procedures and codes is complete, the denial appeals specialist must develop an appeal strategy, write a letter of appeal describing why the service should be paid, complete specific payor appeal forms, obtain the medical records documenting the support of the appeal, and compile an appeal packet with other supporting documentation to be sent to the correct location within a specific timeframe to appeal the plan's claim denial. Hospitals also expect denial vendors to collaborate with them to identify denial root causes and

---

[14] In a recent study published in The American Journal of Managed Care, researchers observed "the first – and most basic - fact about contracting is that hospitals have many contracts with many different payors. Hospitals in the sample negotiated a mean of 52 different contracts." In addition, "each of the hospital's included in this study contracts with dozens of plans. Within each hospital, contract structure varies significantly across plans…with multiple payment methodologies." Henderson, Morgan A. and Mouslim, Morgane C., *Facts About Hospital-Insurer Contracting*, *available at* https://www.ajmc.com/view/facts-about-hospital-insurer-contracting.

[15] *See* Claim Adjustment Reason Codes, *available at* https://x12.org/codes/claim-adjustment-reason-codes. Although there are commonalities between healthcare providers and CARC and RARC denial codes, the number of claim denial scenarios are endless. This is due primarily to various hospital services provided, the voluminous different payor, plan, or employer utilization rules, regulations for each procedure, and diagnosis code such as CPTs, ICD-10s, and DRGs.

[16] For example, codes exist to communicate to the provider to adjust the balance to a contractual discount or to document the claim is denied for lack of medical necessity potentially allowing the claim to be appealed. These CARC and RARC codes are returned to the provider on remittance advice in an electronic 835 format.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

advise them how to alter processes and workflows to reduce denials. This is often an iterative process, as frequently multiple appeals need to be submitted and pursued.

24. As a part of their offered services, vendors typically provide hospital assessments and education to hospital employees. Aspirion has provided such training and feedback to its clients' hospital employees. However, it is my experience that vendors generally are careful not to provide their own internal processes for pursuing specific claim denials since vendors consider these processes proprietary to their organization.

25. Healthcare providers depend on the consistent cash flows from overturned denials for their operations. Hospitals have had success in appealing denials, as it is estimated that 75% of the denials are eventually overturned.[17] This, in turn, has increased the competition among vendors operating within the denials market.

## B. Client Relationships

### 1. Developing the Client Relationships Necessary to Receive Contracts in the Denials Business is a Long and Arduous Process Requiring Significant Resources.

26. To succeed in the denials industry, vendors must devote significant resources to sell their services to health systems. It takes extensive time to develop a trusted client relationship that leads to an agreement between a vendor and a healthcare organization. First, vendors must identify the decision-makers, then proceed to engage those leaders in meetings, provide education on their services, and complete purchasing requirements.[18] In my experience, this part of the sales process often takes over a year to complete.[19] That timeframe is consistent with the 20-month average Aspirion experiences between logging a new denials opportunity in its SalesForce database and closing on a contract.[20] According to Aspirion's data, Mike Cameron's average time to close a deal was 193 days in 2020, 275 days in 2021, and 307 days in 2022.[21] (Interestingly, Cameron's average time to close deals more than doubled in 2023, to 667 days; this jump coincided with his working with Ternium while still employed by Aspirion, suggesting that his work with the former interfered with his work for the latter.)

---

[17] *Id.*

[18] According to the American Hospital Association, vendors are experiencing "[m]ore competition. Unprecedented change. Complex buying processes. And senior hospital and health system executives who are navigating the clutter of email, endless rounds of meetings, and constant interruptions. You're not wrong if you think it is getting tougher to break through the noise." *See* "5 Hacks to increase C-suite engagement," American Hospital Ass'n, *available at* https://sponsor.aha.org/resources/5-hacks-increase-hospital-c-suite-engagement (last visited December 22, 2024).

[19] Health systems have a slow and opaque decision process. It is widely acknowledged that, "[w]hen selling to hospitals, everybody will tell you that the sales cycles are very long." *See* Turinas, A., "What's different about selling to healthcare organizations?" Health Launchpad, *available at* https://healthlaunchpad.com/what's-different-about-selling-to-healthcare-organizations (last visited December 22, 2024). The consensus in the sales field is to "expect that selling to healthcare will take 50% to 100% longer, and build this into your business plan." *Id.* This is why the sales cycle with hospitals is referred to as "the never-ending sales cycle." *See* Fullerton, J. "The daunting challenge of selling into health systems – Lesson 1: It's all about process" Gen5, *available at* https://gen-5.com/blog/the-daunting-challenge-of-selling-into-health-systems (last visited December 22, 2024).

[20] Oct. 30, 2024 Interview of Amy Amick.

[21] ASPIRION_0005506.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

27. In both my own experience and Aspirion's, the time period between executing the contract and kickoff varies, ranging from ████████████████████[22] Following this part of the pre-project timeline, in my experience, the period between kickoff and going live on a project usually takes an additional several months, which is also consistent with Aspirion's ████████ average.[23]

**TABLE 1 – Aspirion Pre-Project Timeline**

| Activity | Average Duration (Aspirion 2022-2024) |
|---|---|
| Opportunity → Contract | ██████ |
| Contract → Kickoff | ███████████ |
| Kickoff → Start | ████████ |

28. One of the main reasons for the extensive sales timeline is because healthcare leaders and decision makers are notoriously difficult to identify, contact, and keep engaged.[24] Healthcare organizations are staggeringly complex. "Health system consolidation has led to sprawling entities comprised of multiple hospitals, physician practices, outpatient centers, labs and clinics. Those systems are typically governed by equaling sprawling range of leaders with varying responsibilities at both the health system and the individual hospital level. Layer onto this the dizzying range of governing committee, clinical committee and board committees and you begin to realize that the health system or hospital you are targeting is simply the entry point to a vast and confusing organization."[25] A recent study of 400 healthcare solution vendors revealed that the biggest sales and marketing challenge is "reaching their targeted audience and connecting to busy hospital executives, followed by the difficulty to build relationships."[26] Even if successful in engaging hospitals in negotiations, in healthcare sales "only 18% of their deals that entered an evaluation actually closed."[27]

29. Because decision-makers are the key to opening doors and selling services, having salespeople on your roster who have already identified and cultivated such relationships with these individuals is highly valued in the industry. I certainly agree, based on my 45 years of experience in the industry, that "someone who has a network of relationships that can open doors, pinpoint opportunities and turn them into qualified opportunities, is worth

---

[22] *Id.*

[23] *Id.*

[24] "What's unique about hospitals, however, is the often complex web of decision makers and stakeholders-the challenge is to find the right person (or people) to reach out to…in larger organizations, the decision maker could be an internal manager or group purchasing organization…There are so many people involved in the decision making process…cast your net widely!" Ochoa, Daniela, "6 Key Steps for Selling to Hospitals," Thinkific, *available at* https://www.thinkific.com/blog/how-to-sell-to-hospitals/ (last visited December 22, 2024).

[25] *See* Fullerton, J. "The Daunting challenge of selling into health systems – Lesson 1: It's all about process", *supra* note 19.

[26] *See* "Becoming a Health Care Business Partner of Choice," AMERICAN HOSPITALS ASS'N, *available at* https://sponsor.aha.org/resources/becoming-health-care-business-partner-choice (last visited December 22, 2024).

[27] *Id.*

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

their weight in gold."[28] I also agree that "[w]ord-of-mouth referrals and networking are massively influential in the healthcare industry and cultivating brand trust and long-term relationships…"[29] The high value placed on client relationships is why vendors like Aspirion have dedicated teams of fulltime sales staff to develop relationships with clients and prospective clients.[30] For example, Defendant Cameron's role as Chief Client Officer at SHP and then Senior Vice President of Sales at Aspirion required him to develop and maintain client relationships.[31] Defendant Cameron often used word-of-mouth referrals, stating "I can usually mention a few key prestigious health systems that use us which adds credibility."[32]

30. The high value placed on client relationships is further supported by the fact that vendors often buy relationships through acquisitions or hiring consultants. While working as the division president at The Outsource Group (TOG), we found the quickest way to increase our hospital client base for insurance follow-up and denials was through acquisition of other companies, even when the acquiree was in a different line of business. Through 2023, Aspirion had acquired six companies in 5 years.[33] This included Aspirion's acquisition of Specialized Healthcare Partners, LLC (SHP) in 2019, which is where the Individual Defendants worked before Aspirion.[34] By acquiring SHP, Aspirion bought "over 200 hospital clients nationwide."[35] Aspirion gained additional denials client relationships through its acquisitions of FIRM Revenue Cycle Management Services, Inc. in 2023,[36] and, most recently, Boost Healthcare in December 2024.[37] In addition to acquisitions, the high value placed on client relationships is also supported by the fact that vendors are willing to pay consultants for introductions to healthcare decision-makers. At Reliant Healthcare I have consulted with various start-up vendors to assist them with healthcare sales development. Often, these companies are working diligently to develop

---

[28] *See* Turnias, A., 'Why selling to healthcare organizations takes so long," Health Launchpad, Nov. 7, 2019, *available at* https://healthlaunchpad.com/why-selling-to-healthcare-takes-so-long/ (last visited December 24, 2024).

[29] Clark. J., "6 Effective tactics for marketing to healthcare professionals and organizations," SageFrog Marketing Group, *available at* https://www.sagefrog.com/blog/6-effective-tactics-for-marketing-to-healthcare-professionals/ (last visited December 22, 2024).

[30] Compl. ¶ 2; *see also* Compl. Ex. 7, Decl. A. Amick, at ¶¶ 8, 11-14.

[31] Compl. Ex. 7 at § 11.

[32] ASPIRION_00000986.

[33] *See* "Aspirion Announces Acquisition of FIRM Revenue Cycle Management Services, Inc.," Aspirion, May 19, 2023, *available at* https://www.aspirion.com/aspirion-announces-acquisition-of-firm-revenue-cycle-management-services-inc/ (last visited December 22, 2024).

[34] *See* "Aspirion Health Resources Announces Combination with Specialized Healthcare Partners" Aspirion, Aug. 14, 2019, *available at* https://www.aspirion.com/aspirion-health-resources-announces-combination-with-specialized-healthcare-partners/#:~:text=Aspirion%20Health%20Resources%20(%E2%80%9CAspirion%E2%80%9D,complex%20claims%20for%20healthcare%20providers (last visited December 22, 2024).

[35] *Id.*

[36] "Aspirion Announces Acquisition of FIRM Revenue Cycle Management Services, Inc.," *supra* note 33.

[37] "Aspirion Expands Revenue Cycle Management Capabilities Through Strategic Acquisition of Boost Healthcare," PR NewsWire, Dec. 18, 2024,  *available at* https://www.prnewswire.com/news-releases/aspirion-expands-revenue-cycle-management-capabilities-through-strategic-acquisition-of-boost-healthcare-302334279.html (last visited December 22, 2024).

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

9

hospital relationships in order to sell services and are willing to pay a "fee" for the consultant to schedule an introduction to hospital's healthcare decision-maker(s).[38]

31. Once a trusted client relationship exists between a vendor and the client's decision-maker, maintaining this relationship is key to the vendor's continued business with the client. In healthcare, business is often built on trust and long-term relationships. I agree it is essential that "[s]alespeople should focus on consistent follow-ups, excellent customer service, post-sale support and retention or reactivation to build and maintain these relationships."[39] Aspirion dedicates substantial resources to maintain its client relationships. Defendants Jewell, Mays, and Kelly serve as prime examples. Aspirion enlisted the three of them to serve fulltime on the company's client success team to manage relationships with current clients on a fulltime basis. They were employed to continually assess potential pain points for clients, develop and document historical trends, and provide qualitative feedback for clients.[40] In fact, when asked by prospective clients the reason for Aspirion being able to assure success, Aspirion points to its "Client Success Managers."[41] Through these positions, the three Defendants formed very close relationships with revenue cycle and clinical denials leaders employed by Aspirion's clients.

## 2. Defendants Incorrectly Downplay the Role of Relationships and Goodwill in the Denials Sales Process.

32. I understand that Defendants have taken the position that Aspirion does not have protectable client relationships because "[t]he market is a free-for-all, business is often awarded by bids, and the quality of work and price are most often the reasons business is awarded or maintained and the customers often work with multiple vendors like Plaintiffs and customers are considered competitors themselves through in house teams that do the same type of work."[42] I disagree with Defendants' characterization of the denials market for multiple reasons.

33. Defendants are attempting to remove the human element from the market, which is simply illogical given their own careers. If Defendants' position was true, there would be no need for denials vendors to employ and provide high compensation to sales staff like Defendant Cameron. In fact, Defendant Cameron disclosed that he solicited over two dozen Aspirion healthcare clients on behalf of Ternium, which in itself demonstrates his reliance (and the value he places) on the relationships he developed at Aspirion.[43] Defendant Cameron's disclosed communications with Aspirion's clients were notably conducted through relationship-building tactics, including meetings, lunches, dinners, and direct messages

---

[38] In contrast, other marketing methods such as cold calls and mass email solicitations are largely ineffective for vendors operating in healthcare. My company, Reliant Healthcare, contracts with a marketing firm that sends 100,000 emails to senior hospital leaders each month to identify potential new clients. Typically, I receive eight to ten responses a month. Of these responses, only one resulted in a substantial contract in the last three years.

[39] *See* Thomas, M. "7 Top hospital and operational challenges and how to overcome them," LinkedIn, Apr. 9, 2024, https://www.linkedin.com/pulse/7-top-hospital-sales-operational-challenges-how-overcome-thomas-rntme (last visited December 22, 2024).

[40] Oct. 31, 2024 Interview with J. Podraza, President & General Manager of Aspirion.

[41] UNM Project Proposal, 1.4.10, ASPIRION_00005167 – ASPIRION_00005202.

[42] Cameron First Am. Ans. Interrog. No. 16.

[43] Cameron First Am. Ans. Interrog. Nos. 3, 9.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

through texts and emails.[44] Defendants disclosed that they have contacted or are currently servicing 40 of the healthcare entities.[45] All but three of those entities are prospective or current Aspirion clients, and one or more of the Defendants were assigned as the primary contact for those entities while working for Aspirion.[46] There are thousands of healthcare entities in the United States, and the fact that nearly all of Ternium's clients and prospective clients are Aspirion clients and prospective clients indicates that Defendants are leveraging their relationships developed at Aspirion.

34. The denials market is not the "free-for-all" Defendants describe. As I explain earlier in this report, cash flow generated from overturned denials is a critical part of the revenue cycle for hospitals. As such, picking the correct vendor to perform denied claim appeals is an important decision for hospitals, and is certainly influenced by established relationships between the hospital and vendor. Further, based on my experience, the industry standard is for hospitals to only have one clinical denial vendor due to the hospital's extensive work effort to operationalize an agreement. Hospitals must assure that each vendor's employee is educated on the hospital's RCM operations, payor contracts, internal department communications, credentialed with each payor, compliant with the hospital's information system security requirements, Health Insurance Portability and Accountability Act (HIPAA),[47] and appropriately accesses only those patient medical records to appeal claims.

35. While I do not necessarily disagree with Defendants' assertion that "the quality of work and price are most often the reasons business is awarded or maintained," Defendants are wrong to suggest that those components are distinct from the relationships formed between vendors and clients. Pitching the quality of a vendor's work is typically a central selling point for a vendor to initiate and maintain business. Therefore, it is one of the major factors sales personnel like Cameron rely on to build and fortify relationships. I would note that, consistent with this point, it is my understanding that Cameron told an Aspirion client, Sharp (which Ternium was pursuing) that Aspirion's capabilities were reduced precisely because it has lost a number of key employees that had been involved in the relationship with the client.[48] Pricing, of course, is another major factor for clients, but in my experience, hospitals rarely, if ever, base their decisions on pricing alone. Therefore, developing and maintaining relationships is key for vendors to prevail over their competitors.

36. Defendants have relatedly argued that without exclusive contracts Ternium's business with Aspirion's clients has no negative impact on Aspirion, and hospitals often have a sufficient volume of claims such that hospitals can supply multiple vendors with as much business as they can handle.[49] But Defendants have solicited and are servicing two of Aspirion's largest clients, Banner Health and CHOC, and Aspirion has subsequently "noticed an 83%

---

[44] *Id.*
[45] Ternium First Am. Ans. Interrog. No. 10, Exhibit B.
[46] *Id.*
[47] Aspirion has earned an R2 Hitrust security rating for HIPAA, which sets the company apart from most other vendors in the industry.
[48] *See* Aug. 16, 2024 Prelim. Inj. Hr'g Tr., at 42:3-20.
[49] Def.'s Opp. Mot. Prelim. Inj., ECF No. 35, at 7; *see also* Aug. 13, 2024, Prelim. Inj. Hr'g Tr. at 39:18–40:23.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

reduction in aggregate claims dollar value placed with Aspirion from Banner Health and an 89% reduction in placements from CHOC" as of July 2024.[50] Further, exclusivity clauses are not critical because, as I discuss above, hospitals prefer limiting projects to one vendor because having multiple vendors increases the hospital's work effort, potential legal exposures and adds complexity to hospital operations. For the same reason, even if projects include multiple vendors, the number is intentionally limited. The vendors who make the cut (and are assigned the largest volume of claims) are almost always the companies that have established relationships with the hospital.

37. From the vendor's perspective, additional vendors on the same project means more competition, and unfortunately, often a smaller volume of claims. Therefore, vendors rely on their relationships to expand their share of claims. This is the reason why Aspirion employed Defendants Jewell, Kelly, and Mays in dedicated roles that functioned to maintain these relationships. Pouring resources into "client success" positions is a good indicator that Aspirion intended to grow its business with ongoing clients.

38. Further, while I do not dispute that hospitals occasionally use a bidding process to procure denials vendors, *Aspirion's* relationships with clients are overwhelmingly based on negotiated contracts.[51] Even setting that aside, the bidding process is not a lottery. Hospitals choose their vendors based on a combination of a vendor's ability, reputation, and pricing. Therefore, past relationships between a vendor and hospital directly affect the outcome of the bid process.

39. Finally, Defendants claim "customers are considered competitors themselves through in house teams that do the same type of work."[52] I must disagree. As I mentioned in Section V.A, it is often the vendor's role to *train* hospital staff how to avoid future denials, not treat them as competition. But as a more practical matter, hospitals' in-house teams are typically ineffective for appealing complex claim denials, and, due to the nursing shortage, nurses are better utilized on hospital floors caring for patients. Based on my 45 years of experience in the industry, outsourcing to denial vendors is the typical approach taken by hospitals for managing their complex denials.

40. Each of Defendants' arguments above also omits the impact of goodwill on the vendor selection process. All vendors are not created equal, and from my experience serving as a hospital executive, reputation is a key factor when selecting a vendor. Plaintiffs' counsel has asked me to evaluate Aspirion's goodwill associated with "an ongoing business or professional practice, by way of trade name, trademark, service mark, or 'trade dress'" and "in relation to a specific marketing or trade area", which I understand are elements under the relevant statute at issue for the breach of contract claims against Defendants Jewell and Cameron.[53] Defendant Cameron relied on Aspirion's goodwill when pitching the company. When asked how to approach a new customer in Southern California, Defendant Cameron instructed that the employee should say "As an example, We work with several health systems in Southern California and San Diego areas. Maybe you know

---

[50] Aspirion Ans. to Jewell's Interrog. No. 6, p. 29.
[51] Oct. 30, 2024 Interview of A. Amick.
[52] Cameron Second Am. Ans. Interrog. No. 16, dated December 10, 2024.
[53] § 542.335(1)(b) 4.a, c., Fla. Stat.

some of your peers at Cedars in LA or Sharp Health in San Diego? We have many years of servicing Cedars for denials and Sharp rarely outsources anything to external vendors."[54] In addition to the reputation Aspirion has built through its numerous client relationships discussed herein, Aspirion's current status as Best in KLAS  for Denials Management Services speaks for itself.[55] KLAS is recognized as a leading third-party evaluator in the healthcare industry, and members of the industry, including hospital decision-makers, understand that Aspirion achieving the highest rating level sets them apart from other denials vendors in the market. This is why Aspirion, including Defendant Cameron while leading the UNM RFP proposal, marketed its high KLAS rating in pitches to prospective clients.[56]

### 3. Aspirion Maintains Active, Ongoing Relationships with Its Denials Clients, Which Defendants Began to Poach while Working for the Company.

41. The Court has already held that "Plaintiffs established that they have active, ongoing relationships with several clients and a reasonable expectation of continued business from those clients. They also showed that the development of those relationships required a significant amount of time and resources, including from Jewell and Cameron." ECF 60, Order at 6. Upon my review of the information in this case, I fully agree with the Court's ruling in relation to the handful of clients raised at the preliminary injunction hearing, which include Banner Health, CHOC, BMC Jacksonville, and Evangelical Health. The information additionally supports that Aspirion has spent significant time and resources to develop active, ongoing relationships with all of its denials clients and has a reasonable expectation of continued business from those clients. Aspirion has also spent time and resources pursuing business opportunities with specific prospective clients.

42. Aspirion has contractual relationships with some of the most profitable healthcare providers in the country. Of the top 113 largest healthcare providers in the United States ranked by total net operating review revenue in 2023,[57] Aspirion has strong existing client contracting relationships with more than fourteen of these high revenue producing organizations as follows: Advent Health ($16.8B), Baylor Scott & White ($14.1B), Banner Health ($14.1B), Cedars Sinai ($7.4B), Community Health Systems ($12.5B), Cone Health ($2.9B), Christus Health ($8.4), Geisinger ($7.7B), Kaiser ($100.0B), Orlando Health ($6.4B), Ochsner Health ($7.0B), Parkview Health ($2.0B), Piedmont Health ($7.3B), Sharp ($4.4B), SSM Health ($10.5B), Stanford Health Care ($8.0B), and Texas Health Resources ($6.0B).[58] Aspirion recovers revenues (and earns fees) from each of these clients on a monthly basis.[59]

---

[54] ASPIRION_00000986.
[55] ASPIRION_00005915 - ASPIRION_00005936.
[56] UNM Project Proposal, 1.4.9, ASPIRION_00005167 – ASPIRION_00005202.
[57] Madden, B., "113 Of the Largest Health Systems Ranked By Revenue as of 2023," Hospitalogy, *available at* https://hospitalogy.com/articles/2024-04-11/113/largests-heatlh-systems-by-revenue-in-2023 (last visited December 23, 2024)
[58] *Ibid.*
[59] *See* ASPIRION_0004858.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

43. Moreover, Aspirion maintained a ▮% retention rate during the five years leading up to 2023.[60] Aspirion has current projects with ▮ healthcare providers for denials work.[61] The vast majority of these projects are subject to current agreements. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[62] Therefore, in both scenarios, Aspirion can reasonably expect future business from the healthcare entities. Aspirion has also expended significant resources on developing relationships with prospective clients. I reviewed the history of Aspirion's relationships with some of these hospitals, which is documented in Aspirion's SalesForce database.

44. Defendants' disclosures have revealed that they have targeted many of these same clients and prospective clients, even while employed by Aspirion. The Defendants have relationships with Aspirion clients and are experts at developing and maintaining these relationships with these senior leaders. In 2023 and early 2024, while employed by Aspirion, the Defendants held weekly client calls regarding Ternium, Mays sent CMS updates to clients while Jewell and Cameron sent emails and texts to clients notifying them of their Aspirion terminations along with regular communications on Ternium's development, new contracts executed and other Ternium business topics.[63] In one instance, on August 8, 2023 while employed by Aspirion, Cameron had dinner with Brett Kelsey from Louisiana Children's Medical Center (LCMC) and Centura's Gerrit Ostermick, both new potential Aspirion client leads, and discussed business with Aspirion and future business with Ternium.[64] In another instance, Cameron emailed a Beaumont Health leader from his Ternium email regarding a college football game.[65] And, still another, asking Steve Burr of Christus Health, Aspirion client, to "put in a good word with Anthony C at LCMC" regarding Ternium.[66] All of these actions permanently damaged Aspirion's client relationships and reputation in the market place.

45. Cameron and Jewell developed longstanding trusted relationships with Aspirion's high revenue producing client decision-makers, including Advent Health, Banner Health, Cedars Sinai, Ochsner Health, Orlando Health, Sisters of St. Mary's (SSM), University of New Mexico, Evangelical, to name a few.[67] Cameron and Jewell had direct communication access to these leaders using their personal cell phones and email addresses. Cameron began notifying clients that he was "thinking about leaving" or "was leaving Aspirion" to start his own company early in 2023 while still employed by Aspirion in direct conflict with his employment agreement and Aspirion's policies.[68] Cameron received responses from two of the top 100 health systems in the country. Hank Smithers, Executive Director of Patient Financial Services at Cedars Sinai, stated he was concerned about "all the people leaving Aspirion"[69] and Gerilyn Seveniker, Vice President of Sharp

---

[60] UNM Project Proposal, 1.4.9, ASPIRION_00005167 – ASPIRION_00005202.
[61] Aspirion Am. Ans. Interrog. No. 8.
[62] *See* ASPIRION_00005504.
[63] Cameron Am. Ans. Interrog. pp. 4-13.
[64] *Id.* p. 4
[65] *Id.* p. 8
[66] *Id.* p. 9.
[67] Ternium Am. Ans. Interrog. No. 10.
[68] Cameron Am. Ans. Interrog. pp. 4-13.
[69] *Id.* p. 10.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Healthcare, asked "what is happening at Aspirion with all the turnover."[70] These early and inappropriate contacts by Cameron and Jewell may have permanently damaged to Aspirion's business reputation and resulted in the client loss of some of the highest revenue producing healthcare organizations in the country.

46. Defendants Cameron, Jewell, Kelly and Mays leveraged these trusted Aspirion client relationships and their knowledge of these healthcare organizations to connect with these leaders for meetings, dinners, lunches, golf, and other activities for the immediate purpose to notify them that they were leaving Aspirion and developing a new company.[71] The vast majority of these healthcare decision makers accepted multiple invitations from the Cameron for a variety of purposes including developing the new company, contracts, terms, and discuss personal matters.[72]

47. Because of these deep personal relationships, Ternium has received signed contracts with Aspirion's clients on an expedited basis. This includes a contract with Banner Health prior to the end of 2023, which was signed within *ninety days* from first contact.[73] Subsequently, Jewell registered Ternium on September 28, 2023, the day after the Banner Health agreement was executed.[74]

## C. Employee Relationships and Specialized Training

### 1. Aspirion's Extraordinary and Specialized Training Provides Employees Expertise in the Company's Process for Appealing Denials and in Managing its Specific Clients.

48. Aspirion's JD denial resolution model is one of its key differentiators in the market.[75] Due to the nature of these denials, Aspirion utilizes employees with JDs to triage, appeal and escalate denials with medical insurance companies.[76] As Defendant Cameron stated, "[o]ne of the items I always us [*sic*] to make us different from all the other vendors is our unique approach of using attorney resources to write the appeals supplemented by clinicians to cover various clinical, technical, contractual and legal arguments."[77] The sophistication of the individuals hired by Aspirion allows the Company to provide training that goes beyond that typically offered in the denials industry.

49. But just because individuals have JDs does not mean they are "trained" in appealing denials. Aspirion often hires personnel with little or no denials experience and invests

---

[70] *Id.* p. 6.
[71] *Id.*
[72] Cameron Am. Ans. Interrog. pp. 4-13. When Defendant Cameron texted, emailed, called or met these hospital decision makers and advised him that "he was" or "considering" leaving Aspirion and starting his own company, several clients stated "they wanted to work with Ternium" including Banner Health, Children's Hospital of Orange County (CHOC), Christus Health, Orlando Health, Parkview, Community Medical Centers, Ochsner Health, UT Southwest, University of Miami and University of San Diego. *Id.* One client, Tim Reiner of Advent Health, stated "he may want to invest in Ternium." *Id.*
[73] Ternium Am. Ans. Interrog. No. 13, Exhibit A.
[74] Jewell Am. Ans. Interrog. No. p. 2.
[75] Compl. ¶ 4.
[76] *Id.*
[77] ASPIRION_00000986.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

considerable money and time to teach them the Aspirion way of providing denials services.[78] As Defendant Cameron explained while leading Aspirion's UNM project proposal, "[f]or initial onboarding there is an extensive training program that all new employees go through regardless of industry experience."[79] In addition to providing a general orientation to the Company, Aspirion requires its denials staff to attend and review materials for "The Training Course," which spans anywhere from 40 to 80 hours.[80] During that time, an Aspirion management team teaches specific subject matter training on denials, which includes instruction on drafting appeals and specific issue based resolution.[81] Following the course, Aspirion pairs each of its new hires with a manager for one-on-one mentoring and training typically lasting 90 days.[82]

50. After a complete review of the training materials it is clear Aspirion's training in the areas of coding and utilization review for staff is substantially above industry standards and are specialized training tools used to overturn clinically denied claims. I personally reviewed more than fifty of Aspirion's training programs consisting of more than a thousand pages of documentation. Cameron and Jewell stated they received no specialized or extraordinary training of any kind from the Plaintiffs.[83] I must disagree. These training programs are exceptional and exceed any denial training I have reviewed in my 45 years in the industry.  These training programs provide a very specific approach specifically designed by Aspirion to successfully appeal denied claims  and provide defined steps and methodologies on how to appeal a claim, write appeal letters, use custom appeal workflows,[84] leverage state and federal claim legislation to create appeal strategies, interpret contracts and payment analysis,[85] use customized software (e.g. Compass), engage internal coders and utilization review nurses to review denials and medical records for a variety of specific services (e.g. reconstructive surgery, cancer treatment) and others. Some of these programs are specific using detailed argument examples pre-defined by Aspirion.[86] As stated in the next section, it is not possible to train newly hired Ternium employees in one and a half days unless Ternium is leveraging Aspirion's confidential business information and/or their employees received previous training from Aspirion.

51. Earlier I described how Aspirion must adapt its services on a client-by-client basis since no two hospital revenue cycle systems or contracted payors are built the same way. Accordingly, for appeal processing to be effective, specialized denial management training is required for each hospital client on their revenue cycle processes, payors and plan

---

[78] Oct. 31, 2024 Interview of Jeff Podraza.
[79] UNM Project Proposal, 1.2.7, ASPIRION_00005167 – ASPIRION_00005202.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] Cameron Second Am. Ans. Interrog. 16; Jewell Second Am. Ans. Interrog. No. 16.
[84] *See* Discretionary Denials and Workflow Basics, ASPIRION_00005322.
[85] *See* Contract Interpretation and Payment Analysis, ASPIRION_00005485.
[86] Aspirion Appeal Best Practices and Recommendations ASPIRION_00005477; Advanced Appeals, ASPIRION_00005399.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

requirements, denial processes, information systems, and each of the hospital's payor contracts.[87]

52. Because each client has a separate set of hospital and payor protocols, which require Aspirion employees to work through their in-house systems, Aspirion assigns its denials staff to a limited roster of specific client accounts. Aspirion management trains the staff members on the client's and their payor's specific processes, and after spending time working accounts, the staff members receive months of additional mentoring until they become specialized in each particular client.

53. Training staff on customer specific topics is largely related to utilization of client systems and documentation, workflow, and process steps unique to client.  The way to appeal a specific denial is not usually unique to a client but could vary if the contract between client and the payer/insurance carrier has specific terms changing how and when denials are appealed.

54. The same client-specific expertise was also provided the Individual Defendants at Aspirion. While at Aspirion, they held positions in which they solicited (Cameron) and managed (Jewell, Kelly, and Mays) the company's clients, and accordingly learned the clients' priorities, procedures, systems, processes, and pain points. For example, Mays was the Aspirion Executive Manager assigned to Banner Health, Evangelical, and Advent Health,[88] which are three clients she is now assigned to "manage" at Ternium.[89] Each of the Individual Defendants are now able to adapt the "lessons learned" at Aspirion to the same clients on behalf of Ternium.

## 2. Defendants Capitalized on Aspirion's Trade Secrets and Confidential Information by Hiring Away Aspirion's Trained Workforce, which are One of the Most Valuable Assets for Any Denials Management Vendor.

55. Trained denials staff are a major contributing factor toward a denial vendor's ability to generate revenue and is a leading reason why launching a start-up in the denials industry is particularly difficult. The value associated with trained employees is also the reason why non-solicitation and non-hiring clauses are common in the RCM industry, as it is important to prevent substantial drops in production triggered by the loss of experienced associates who are lured away by departing managers. The restrictions on soliciting and hiring Aspirion's current and former employees in the Jewell's and Cameron's employment agreements were intended to thwart this same problem.

56. Jewell and Cameron claim "Defendant does not believe that Plaintiffs have suffered any damages, let alone those which could be quantified, as a result of the hiring of any individuals who worked for Plaintiffs[.]"[90] Defendant's position suggests there is a lack of

---

[87] Post pandemic, wage inflation and sourcing revenue cycle employees for hospitals and vendors has become a key barrier to success. Denial vendors are often forced to hire inexperienced staff that require months and even years of extensive revenue cycle billing and denial management training for each employee's specific position such as legal, coding, nursing, and utilization review.
[88] Aspirion's Am. Ans. Jewell Interrog. No. 2.
[89] Ternium Am. Ans. Pl.s Interrog. No. 8.
[90] Jewell Second Am. Ans. Interrog. No. 17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

value in employing trained denials staff. In addition to the reasons stated in the previous paragraph, Defendants' assertion is contradicted by the clear pattern of their hiring of Aspirion's employees, who at one point comprised the majority of Ternium's workforce.[91] Ternium saved significant costs by stealing individuals trained by Aspirion. Even more importantly because Ternium is a start-up company, Ternium was able to capitalize on Aspirion's trained employees because it did not have to endure the extended training necessary in the denials business. Ternium was therefore able to immediately implement a team to service clients and collect revenue.

57. The benefits of the expertise that staff members develop in relation to specific clients are further underscored by the fact that Ternium assigned Aspirion's ex-employees to the same accounts they serviced while working on behalf of Aspirion. By transitioning the ex-employees to the same clients, Ternium did not have to provide any training because the training was already provided by Aspirion. For example, Liaran Aleman was assigned to Banner Health on behalf of Ternium within days of resigning from Aspirion.[92] Drolet appeared on a training presentation invitation from the Baptist Medical Center Jacksonville just a month after leaving Aspirion.[93] Ternium clearly capitalized on the training Aspirion provided for these clients. Not only were Defendants able to utilize Aspirion's trained employees to perform RCM services with speed, effectiveness, and success, with the clients, but it also was undoubtedly a selling point for Ternium to be able to tell clients that they would be able to continue working with the same employees whom the clients knew, performing the work in a manner with which the clients were familiar.

58. Finally, Ternium states that "all new hires participate in 1.5 days of on boarding and training."[94] The lack of training shows that Ternium is relying on the training provided by Aspirion for the same employees. Based on my experience in the industry, the only way a new hire would only need less than two days of training is if the individual received training from a former employer for the same client or market.

## D. Confidential and Proprietary Information and Trade Secrets

### 1. The RCM Industry Would Classify Aspirion's Confidential Information as Confidential, Proprietary, or Trade Secrets.

59. Similar to many companies operating in the RCM industry, Aspirion collects and analyzes the information learned through the course of business to improve performance. It did not surprise me at all to learn that Aspirion treats such information as either confidential, proprietary, or as trade secrets. When I was employed by various companies in the RCM industry, including TOG and PwC, my organizations took measures to protect the confidentiality of the same types of information. Defendants accessed and or misappropriated while at Aspirion: existing and prospective employees and client lists, identities of client points-of-contact and decision-makers, client decision processes, contract terms, rates, account placements and dollars, placement age, placement balance,

---

[91] Ternium Am. Ans. Interrog. No. 6.
[92] Compl. ¶¶ 93-95.
[93] Ternium Second Am. Ans. Interrog. Nos. 6, 7, 8; Compl. ¶ 127-128.
[94] Ternium Am. Ans. Interrog. No. 8. This is before "all Ternium new hires are assigned a mentor contact to review initial work product and answer questions," which indicates that the employees immediately begin working claims.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

client recovery rates, vendor and client procedures, processes, and data structures training documents, and specific payor appeal techniques. Any of the above information can be used by competing vendors to gain an unfair advantage. In combination, in the manner that Aspirion used them to achieve significant success in the RCM industry, they would have provided a new company such as Ternium with a powerful leg-up advantage to quickly and effectively compete in the marketplace without needing to have expended the time and resources to build those capabilities and know-how on its own.

60. This is the reason why companies operating in the RCM industry commonly protect their Confidential Information by requiring employees to abide by employee handbooks and authorized use policies. Just like the Individual Defendants at Aspirion, I was also required to abide by employee handbooks to safeguard the organization's confidential business information while working TOG and PwC. The value of the Confidential Information is also the reason why companies often require certain individuals to sign employment agreements containing restrictive covenants. Similar to Defendants Jewell and Cameron, I signed restrictive covenants forbidding me to hire employees or contact clients. But unlike Jewell and Cameron, when I left those organizations, I continued my career at non-competing companies to ensure that I did not violate my covenants.

61. For these reasons, I absolutely disagree with Defendants' characterization "[t]hroughout this industry, the work done and processes utilized by entities like Plaintiffs is relatively uniform, can easily be recreated and/or is publicly available (including through companies like Plaintiffs that share such information with competitors and other third parties who are not subject to any restrictions)."[95] If the RCM business was "relatively uniform" and "easily recreated," companies would not have paid fees in exchange for my consulting expertise in RCM. Also, while I agree that it is common for denial vendors to share information with their clients, as Defendants well know, vendors like Aspirion only share basic information and stop well short of divulging internal marketing and business solutions or strategies.

62. Defendants exaggerate the level of information shared between vendors and clients. During the preliminary injunction, for example, Defendants claimed that Aspirion publicly publishes educational articles on its online "Knowledge Center" that disclose their alleged confidential and proprietary information detailing Aspirion's process for collecting on denied claims.[96] But these types of articles are common in the industry and often used for marketing purposes. Regardless, I personally reviewed all revenue-related articles available on the Knowledge Center website. Two articles discussed a high-level appeal process for denied claims and only went as far as advising clients to define the issue, rule, application, and conclusion when writing an appeal.[97] In stark contrast to the information discussed in sections D.2 and D.3 below, none of the articles I reviewed provided any detailed information providing education on how to overturn an appeal. Regardless, given the complexity of denials and the varying diagnoses and denial reasons by payor, it would be virtually impossible to document in a meaningful way how to process complex claim

---

[95] Cameron Am. Ans. Interrog. No. 16.
[96] *See* August 12, 2024 Prelim. Inj. Hr'g Tr. at 12:13–13:7.
[97] *See* ASPIRION_00002002–ASPIRION_00002103.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

denials through short, online articles. Aspirion's Confidential Information, as discussed below, is distinct and much more detailed.

63. I address various specific aspects of Aspirion's Confidential Information that, individually, are economically valuable and derive such value at least in part from their secrecy. It is my opinion that in combination, Aspirion's various trade secrets and other proprietary and sensitive Confidential Information have played a significant role in making Aspirion a highly successful company in the industry. By accessing and using the range of Aspirion's Confidential Information discussed below, Defendants have been able to, in essence, replicate Aspirion through Ternium. Furthermore, Jewell, Cameron, Mays and Kelly would have been able to draw on their significant training and know-how acquired from Aspirion to identify exactly what Aspirion trade secrets and other information to review, take, and use in standing up their competing enterprise. In my opinion, these two aspects of the case—the overall value of Aspirion's Confidential Information in combination, and the individual Defendants' access to and familiarity with Aspirion's Confidential Information—highlight and accentuate the competitive harm that Defendants have caused Aspirion.

### 2. Aspirion's Internal, Client-Specific Data Provides the Cornerstone of its Business Strategy and Gives the Company an Edge Over Its Competition.

64. Aspirion's use of the intelligence gathered during the course of business is pivotal for the company's claim processing performance and marketing. Aspirion relies on this internal, client-specific data to increase the company's success rates on denials claims, create tailored pitch presentations for existing and prospective clients, and assess the value of denials projects before exhausting resources pursuing them. As senior Aspirion leaders, the Individual Defendants were exposed to the company's Confidential Information through multiple channels, including through the distribution of company-issued reports, access to protected databases, and participation in periodic meetings where confidential and proprietary information was openly discussed. I have had an opportunity to review various examples of this data, which contained contract rates, claim wins and loss data, strategic account plans, specific client PowerPoint slide decks, prospective and existing marketing information, pricing, business development plans, compensation plans, operational processes, marketing and sales techniques, pending sales pricing strategies, along with other vital Aspirion operational information.[98] Based on my experience, I find the data to be the exact type of information that is considered highly valuable to a company operating in the RCM industry and certainly not information typically disclosed outside the company.

65. First, Defendants were the recipients of periodic, company-issued reports containing in-depth internal analysis on Aspirion's clients and prospective clients. These included reports referred to as "Challenging Contract Review," "Win-Loss Deep Dive," and

---

[98] Oct. 30, 2024 Interview of A. Amick; *see also*, *e.g.*, ASPIRION_00005154; ASPIRION_00005203; ASPIRION_00005382; ASPIRION_00005397; ASPIRION_00005401; ASPIRION_00005404; ASPIRION_00005476; ASPIRION_00005482; ASPIRION_00005349, ASPIRION_00005324–ASPIRION_00005332; ASPIRION_00005483; ASPIRION_00005262; and ASPRION_00005403.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"Strategic Account Plans."[99]   These reports not only delved into successful strategies, but also area where lessons were learned. Both categories of information are highly valuable.

66. Second, Defendants had access to multiple protected databases. I reviewed Aspirion's Priority Report, which is a live spreadsheet containing



Therefore, the Priority Report information is a key selling point for Aspirion, provides Aspirion an edge over its competition, and would be highly valuable to a start-up vendor without

In the hands of a competitor, this information would greatly assist it to target and pursue work from Aspirion clients and, once that work is obtained, perform the denials overturning work more effectively.

67. Aspirion uses Compass as a core workflow platform, which is a proprietary account prioritization system developed by Aspirion that stores Aspirion's standardized client data files for data extraction, ingestion, and mapping. Each of the Defendants had access to Compass. When Aspirion acquired SHP, and The Firm, the client data from those companies was incorporated into the Compass platform. In 2022, the information from the denials legacy unit at Aspirion was transitioned to the Compass system.[104] Accordingly, Compass contains a wealth of client-specific data, and Cameron himself has described Compass as a "proprietary claims processing platform" when pitching clients.[105]

68. I also was given a tour of Aspirion's SalesForce database. SalesForce is a customer relationship management (CRM) system, which is often used by companies to store and track key existing and prospective client information. Each of the four Individual Defendants had access to all clients in the SalesForce database. This is noteworthy because only forty of the over 1,400 employees at Aspirion are given access to the SalesForce database.[106]

---

[99] *See*, *e.g.*, ASPIRION_00005349, ASPIRION_00005324–ASPIRION_00005332; ASPIRION_00005483.
[100] Due to the highly confidential nature of the Priority Report, a copy was not provided to me. However, I was given the opportunity to review it at length with individuals from Aspirion.
[101] Oct. 31, 2024 Interview of J. Podraza.
[102] *Id.*
[103] Oct. 31, 2024 Interview of J. Podraza.
[104] Dec. 4, 2024 Interview of Michele Sullivan and Erin Hanson.
[105] UNM Project Proposal at 1.4.9, ASPIRION_00005167 – ASPIRION_00005202.
[106] Dec. 4, 2024 Interview of M. Sullivan and E. Hanson.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

69. At the preliminary injunction hearing, Defendants' counsel attempted to show that the information populated in Aspirion's SalesForce database is sourced from third-party data. It is not under dispute that SalesForce contains public information, as Aspirion subscribes to add-on services from Definitive and ZoomInfo to populate certain portions of the database with corporate information.[107] This is normal and typical in the industry. However, that information is limited to basic facts such as hospital name, names and titles of senior leaders, hospital phone numbers, bed counts, and revenue figures. Aspirion is not contending that this information is confidential, proprietary, or a trade secret.

70. Aspirion uses its SalesForce database both for sales and business development, as well as for strategy, risk assessment, and performance of its work for its existing client base. In contrast, Aspirion creates and uploads information that is a product of conducting business firsthand with specific existing and prospective clients, including the identities of company contacts and decision-makers, client decision processes, and the company's observed keys to contract negotiations and closing the deal. Aspirion's SalesForce database contains a custom screen for each existing and prospective client called "Sales Methodology" that provides deal information, including whether discovery was complete, the client agreed to meet, analysis on the estimated return on investment, budget, contract status, reason(s) for a win or loss, and, if the opportunity was lost, the identity of the competitor incumbent.[108] Aspirion's SalesForce also features a custom screen called "Opportunities" where marketing lead information is housed. Information on the interactions with prospective clients is documented, including completed requests for information, emails that were opened by the prospective client, attendance at online seminar(s), any changes in decision-makers, and other information reflecting the prospective client's interest in a deal.[109] Aspirion promotes these opportunities to the next stage by calculating the probability for contract completion based on an Aspirion-proprietary algorithm incorporating client analysis, negotiation details, proposal status stage, and other information.[110]

71. Aspirion also creates custom algorithms to synthesize its Confidential Information in SalesForce. This includes the criteria used to ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Before this information was stored in SalesForce, Aspirion developed this methodology in an Excel database which the Defendants also accessed while working for Aspirion.[111]

---

[107] *Id.*
[108] Dec. 4, 2024 Interview of M. Sullivan and E. Hanson.
[109] *Id.*; ASPIRION_00005482.
[110] Dec. 4, 2024 Interview of M. Sullivan and E. Hanson.
[111] *Id.*; ASPIRION_00005403.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

72. Aspirion also uses Loopio software to store all of Aspirion's completed answers to client questions in proposals. These completed RFPs are considered confidential by Aspirion and the receiving prospective client. Aspirion has uploaded every RFP question and answer into Loopio for future use. Aspirion also documents RFP successes and failures in the database.

### 3. Aspirion Customizes Software with Proprietary Algorithms, Models, and Code to Enhance its Internal Business Processes and Performance.

73. In addition to the ████████ found in the SalesForce Database, Aspirion has also developed a variety of custom tools, codes, and algorithms to enhance its internal business processes and maximize its financial performance These processes, in turn, improve Aspirion's client relationships and performance on denials projects.

74. Aspirion creates custom models for EasyMorph, which is a database conversion program. Aspirion's models convert client files into standardized data for Aspirion to use while performing denials work. Reports containing the data are imported into and accessed by Aspirion's employees through the Compass platform. Therefore, although the software is commercially available, Aspirion has leveraged it to capture client information and create and maintain data translation models specific to each client. Some of these EasyMorph models were stolen by Devannie Abell, who simultaneously worked for Ternium and Aspirion.[112]

### 4. Evidence Indicates that Defendants Used Aspirion's Confidential Information for Ternium's Benefit.

75. Even though discovery is not complete, Aspirion has uncovered multiple sources of evidence that, in my opinion, show that Defendants must be relying on Aspirion's Confidential Information for Ternium's benefit.

76. First, Defendants have disclosed that they are in possession of Aspirion's business documents.[113] As of the date of this report, it is my understanding that Defendants have not produced the identified documents in discovery. I therefore reserve my right to update my report if I should find these documents relevant following their production. Regardless, the fact that Defendants removed internal documents from Aspirion, and took the additional step of storing the information on Ternium laptops and share file systems, is highly unusual and certainly a forbidden practice throughout the industry.

77. Second, Defendants' disclosure that nearly all of the healthcare providers they have either solicited or serviced are Aspirion's clients is not a coincidence. Instead, it indicates that the Individual Defendants are either using documents or their own knowledge of Aspirion's client list to identify potential clients for Ternium.

78. Third, Defendants hired Aspirion's Senior Business Intelligence Administrator, Devannie Abell, who simultaneously worked at Aspirion and Ternium while managing Aspirion's most sensitive and proprietary Confidential Information in the Company's data

---

[112] *See* ASPIRION_00001443 – 1446.
[113] Ternium Am. Ans. Interrog. No. 17.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

engineering division. Documents reveal that on multiple occasions, from October 2023 to June 2024, Abell sent the EasyMorph algorithms to her personal email account.[114] In my opinion, the timing of this misappropriation indicates that the algorithms were likely used by Ternium to fast-track its internal business processes.

79. Fourth, as discussed Defendants had complete and easy access to the Priority Report while working for Aspirion. This report provides detailed client account information such as



would be able to identify for Ternium ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ for the immediate financial success of Ternium.

80. Finally, as discussed further in the following section below, the fact that Defendants were able to turn Ternium into an effective competitor so quickly after its launch is strong evidence that Defendants were leveraging Aspirion's Confidential Information in that effort.

81. I understand that two of the Defendants, Jewell and Kelly, only recently returned their Aspirion laptops, that Aspirion has an analysis of those laptops underway, and that Aspirion also seeks forensic inspection of Defendants' computers and devices. I reserve the right to supplement my conclusions based on my review of additional information that these further investigations yield.

**E. It would have been Impossible for Defendants and Ternium, as a Start-Up Denials Vendor, to Achieve the Same Success Without Aspirion's Client Relationships, Trained Employees, and Confidential Information.**

82. Because of its complexity and competitive nature, the RCM is particularly difficult industry to launch a start-up company. It is my opinion that without Ternium's dependence on Aspirion's client relationships, employees, and Confidential Information, it would have been impossible for the company, as a new denials vendor, to achieve the level of business it has obtained in such a short period of time.

**1. Stealing Aspirion's Client Relationships Resulted in Ternium Avoiding the Lengthy Sales Process Required when Acquiring New Clients.**

83. By leveraging the relationships developed on behalf of Aspirion, instead of proceeding as a typical start-up in the denial industry, Defendants were able to essentially market Ternium as Aspirion 2.0, and, accordingly, were able to bypass the extensive timeline needed to develop relationships in the industry or incur costs purchasing relationships through acquisition and consulting fees. This is the reason why denials vendors frequently require their employees to agree to restrictive covenants to protect established relationships with identifiable clients with whom the companies either had current projects or ongoing relationships.

84. As I described, it typically takes between twelve and twenty-four months to execute a contract in the industry. The average for Aspirion is ▮▮▮▮▮. But as set forth in the table

---

[114] *See* ASPIRION_00001443 - 1446.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

below, Ternium's initial contact date to contract execution date reveals an average time of seven months for Ternium's first ten contracted clients.

**TABLE 2 – Ternium's Average Contract Period[115]**

| Hospital Name | Initial Contact Date | Contract Date | Total Contract Days |
|---|---|---|---|
| Advent Health | 12/4/2023 | 9/3/2024 | 274 |
| Banner Health | 7/1/2023 | 9/29/2023 | 90 |
| BMC Jacksonville | 3/7/2024 | 5/9/2024 | 63 |
| Children's Medical Center of Orange County | 3/21/2023 | 1/17/2024 | 302 |
| Evangelical | 3/1/2024 | 9/29/2024 | 212 |
| Guidehouse | 7/1/2023 | 10/15/2024 | 472 |
| Legacy Health | 4/25/2024 | 10/3/2024 | 161 |
| Louisiana Children's Medical Center (LCMC) | 7/1/2023 | 9/5/2023 | 66 |
| Ochsner Health | 10/27/2023 | 1/30/2024 | 95 |
| UT Southwest | 3/17/2023 | 3/20/2024 | 369 |
| Total Contract Days | | | 2,104.0 |
| Average Contract Days | | | 210.4 |
| Average Contract Months | | | 7.0 |

85. Personally, in my 45 years of sales and vendor management experience, I have never seen contracting success of this magnitude for a new "start-up" denials vendor. This is even factoring in that three of these clients, Advent Health, Banner Health, and Ochsner Health, are in the top 113 of healthcare providers in the country.

86. Moreover, ten of the twenty-seven clients that Cameron contacted on behalf of Ternium executed agreements, creating a sales conversion rate of 37%. This rate is more than double the conversion rate that some of the best healthcare sales organizations achieve.[116] And Ternium's conversion rate may be understated, as it is likely that Ternium still is pursuing a number of the clients that Cameron and the other defendants have contacted.

87. It is my opinion that Ternium's significantly lower-than-average contract time and significantly higher success rate are a product of the Defendants continuing the client relationships they formed while working for Aspirion and the Aspirion Confidential Information they had access to while at Aspirion. Therefore, Ternium gained an unfair advantage even in comparison to established denials management vendors.

---

[115] Ternium First Am. Ans. Interrog. Nos. 10 and 13, Ex. A and B.
[116] *See* Fullerton, J., "The Daunting challenge of selling into health systems – Lesson 1: It's all about process," *supra* note 19.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**2. Stealing Aspirion's Employees Resulted in Ternium Avoiding the Time and Resources Required to Train New Denials Staff, Allowing The Company to Quickly Onboard Aspirion's Clients.**

88. Defendants' hiring of Aspirion's employees was another key and necessary measure to accomplish their plan of operating Aspirion 2.0.

89. Defendants have admitted that over half of the individuals working at Ternium as of the date of the lawsuit were previously employed by Aspirion.[117] This means that Ternium did not have to endure the extensive time and resources that is normally required to train denials staff. Because Ternium essentially operated by using Aspirion's trained workforce, it was able to carry on Aspirion's business at Ternium without any disruptions. Preventing departing managers from luring other employees to a new company is one of the reasons why denials vendors frequently include no-solicit and no-hire clauses in employment agreements. The intention is to prevent substantial drops in production triggered by the loss of experienced associates while prohibiting competing companies like Ternium from gaining an unfair advantage.

90. It is my opinion that Ternium's immediate success in the denials business was only possible through the hiring of Aspirion's trained employees.

**3. Stealing Aspirion's Confidential Information Allowed Ternium to Identify Opportunities Amongst Aspirion's Clients and Fast-Track the Negotiation Process by Undercutting Aspirion's Pricing.**

91. Defendants' access to and/or misappropriation of Aspirion's Confidential Information gave Ternium a "cheat code" for determining which healthcare entities to target and what terms to market to those companies. In my opinion, Defendants' ability to fast-track numerous contracts with Aspirion's clients is likely a product of their reliance on Aspirion's Confidential Information.

92. Defendants worked closely with, and therefore understood, which healthcare entities were Aspirion's best clients. As members of Aspirion's senior sales and client leadership teams, Defendants had access to information on client account placements, cash recovery rates, and claim volume.[118] Defendants also had access to the SalesForce database containing Aspirion's current opportunities, which, among other things, includes ███████ ██████████████████████████████ This means that the Defendants knew which of Aspirion's best clients presented opportunities based on ████████████ ████████████████████████ Importantly, having access to this information, including ████████████████████████, may have directed the Defendants not to pursue particular clients.[119]

---

[117] Ternium lists 15 employees who began working for the company before the filing of this lawsuit. *See* Ternium First Am. Ans. Interrog. No. 6. When factoring in the four Defendants, Ternium's roster included nine former Aspirion employees versus six non-Aspirion employees.
[118] Oct. 31, 2024 Interview of J. Podraza.
[119] Oct. 30, 2024 Interview of A. Amick.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

26

93. As stated by the Defendants, "the quality of work and *price* are most often reasons business is awarded or maintained."[120] Defendants also had access to Aspirion client contract terms and fee rates.[121] Therefore, Defendants not only knew which of Aspirion's clients presented placement opportunities, but also the contract terms and rates that were accepted by those clients. With this information, Ternium would be able to undercut Aspirion's rates in order to convince Aspirion's clients to sign a contract with Ternium. Further, Defendants also knew on a client-by-client basis Aspirion's minimum balance threshold per claim and the project time limit.[122] Defendants could use this information to pitch a better return on investment for the same client by offering a lower threshold and shorter project time span.

94. Defendants' knowledge of Aspirion's pricing terms also gave them an unfair advantage on RFP bids. Take, for example, Ternium's bid on the University of Mexico Health Request for Proposal in 2023. Through Cameron's knowledge of Aspirion's bid on the project, Ternium would have been able to gain a competitive advantage by undercutting Aspirion's bid pricing or other terms. Furthermore, with access to tools like the Priority Report, Ternium would be able to project modeled cost and labor requirements to understand projected profitability and staffing requirements, again providing Defendants with an unfair competitive advantage in pursuing clients and work leveraging Aspirion's Confidential Information.

95. Finally, Aspirion develops and relies on its EasyMorph algorithms to enhance its internal processes that contribute to its denials operational performance. As discussed above, Defendants employed Aspirion's Devannie Abell while she misappropriated proprietary algorithms Aspirion created for EasyMorph. Similar to the Defendants' theft of Aspirion clients and employees, stealing the EasyMorph algorithms would provide Ternium with a shortcut in developing its own internal data sharing models that is typical for a start-up company.

96. For the foregoing reasons, instead of proceeding as a start-up in the denials industry, the Defendants were able to essentially market and operate Ternium as Aspirion 2.0, and, accordingly, were able to bypass the extensive timeline and resources needed to form client relationships and develop a trained workforce.

## VI. Signature

97. I completed this report on December 23, 2024.

_____
Cheri S. Kane, MSA, FHFMA, FACMPE

---

[120] Cameron Second Am. Interrog. Ans. No. 17 (emphasis added).
[121] Oct. 31, 2024 Interview of J. Podraza.
[122] *Id.*

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT A**

# List of Materials Reviewed

## Court Documents

Complaint for Injunctive Relief and Damages, and attached documents, dated July 29, 2024
Briefing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction
Transcripts and Exhibits from August 2024 Prelinary Injunction Hearing
Briefing on Defendants' Partial Motion to Dismiss

## Written Discovery

Aspirion's Responses And Objections To Ternium, LLC's First Set of Interrogatories, dated November 13, 2024
Aspirion's Responses And Objections To Jewell's First Set of Interrogatories, dated November 13, 2024
Specialized Healthcare Partners, LLC's Responses And Objections to  Jewell's First Set of Interrogatories, dated November 13, 2024
Specialized Healthcare Partners, LLC's Responses And Objections to Ternium's First Set of Interrogatories, dated November 13, 2024
Defendant Alisha May's Amended Responses To Plaintiff's First Set of Interrogatories, dated November 14, 2024
Defendant David Jewell's Amended Responses To Plaintiff's First Set of Interrogatories, dated November 14, 2024
Defendant Megan Kelly's Amended Responses To Plaintiff's First Set of Interrogatories, dated November 14, 2024
Defendant Michael Cameron's Amended Responses To Plaintiff's First Set of Interrogatories, dated November 14, 2024
Defendant Ternium, LLC's Amended Responses To Plaintiff's First Set of Interrogatories, dated November 14, 2024
Defendant Alisha May's Second Amended Responses To Plaintiff's First Set of Interrogatories, dated December 10, 2024
Defendant David Jewell's Second Amended Responses To Plaintiff's First Set of Interrogatories, dated December 10, 2024
Defendant Megan Kelly's Second Amended Responses To Plaintiff's First Set of Interrogatories, dated December 10, 2024
Defendant Michael Cameron's Second Amended Responses To Plaintiff's First Set of Interrogatories, dated December 10, 2024
Defendant Ternium, LLC's Second Amended Responses To Plaintiff's First Set of Interrogatories, dated December 10, 2024
Aspirion's Amended Responses And Objections To Jewell's First Set of Interrogatories, dated December 10, 2024
Aspirion's Amended Responses And Objections To Ternium, LLC's First Set of Interrogatories, dated December 10, 2024
Specialized Healthcare Partners, LLC's Amended Responses And Objections to Jewell's First Set of Interrogatories, dated December 10, 2024
Specialized Healthcare Partners, LLC's Amended Responses And Objections to  Ternium's First Set of Interrogatories, dated December 10, 2024

## Interviews

Interview of Amy Amick, October 30, 2024
Interview of Jeff Podraza, October 31, 2024
Interview of M. Sullivan and E. Hanson, December 4, 2024

## Articles

"Facts About Hospital-Insurer Contracting", Henderson, Morgan A. and Mouslim, Morgane C.,
     https://www.ajmc.com/view/facts-about-hospital-insurer-contracting.

"5 Hacks to increase C-suite engagement", American Hospital Association,
     https://sponsor.aha.org/resources/5-hacks-increase-hospital-c-suite-engagement

"What's different about selling to healthcare organizations?" Turinas, A., Health Launchpad,
     https://healthlaunchpad.com/what's-different-about-selling-to-healthcare-organizations

"The daunting challenge of selling into health systems – Lesson 1: It's all about process" Fullerton, J., Gen5,
     https://gen-5.com/blog/the-daunting-challenge-of-selling-into-health-systems (last visited December 22, 2024).

"Becoming a Health Care Business Partner of Choice," American Hospital Association,
     https://sponsor.aha.org/resources/becoming-health-care-business-partner-choice

"Why selling to healthcare organizations takes so long," Turnias, A., Health Launchpad, Nov. 7, 2019,
     https://healthlaunchpad.com/why-selling-to-healthcare-takes-so-long/

"6 Effective tactics for marketing to healthcare professionals and organizations," SageFrog Marketing Group,
     https://www.sagefrog.com/blog/6-effective-tactics-for-marketing-to-healthcare-professionals/

"Aspirion Announces Acquisition of FIRM Revenue Cycle Management Services, Inc.," Aspirion, May 19, 2023,
     https://www.aspirion.com/aspirion-announces-acquisition-of-firm-revenue-cycle-management-services-inc/

"Aspirion Health Resources Announces Combination with Specialized Healthcare Partners" Aspirion, Aug. 14, 2019,
     https://www.aspirion.com/aspirion-health-resources-announces-combination-with-specialized-healthcare-partners/#:~:text=Aspirion%20Health%20Resources%20(%E2%
     80%9CAspirion%E2%80%9D,complex%20claims%20for%20healthcare%20providers

"Aspirion Expands Revenue Cycle Management Capabilities Through Strategic Acquisition of Boost Healthcare," PR NewsWire, Dec. 18, 2024,
     https://www.prnewswire.com/news-releases/aspirion-expands-revenue-cycle-management-capabilities-through-strategic-acquisition-of-boost-healthcare-302334279.html

"7 Top hospital and operational challenges and how to overcome them," Thomas, M., LinkedIn, Apr. 9, 2024,
     https://www.linkedin.com/pulse/7-top-hospital-sales-operational-challenges-how-overcome-thomas-rntme

"113 Of the Largest Health Systems Ranked By Revenue as of 2023," Madden, B., Hospitalogy,
     https://hospitalogy.com/articles/2024-04-11/113/largests-heatlh-systems-by-revenue-in-2023

## Other

The Priority Report

§ 542.335  Fla. Stat.
     https://www.flsenate.gov/Laws/Statutes/2018/0542.335

Claim Adjustment Reason Codes,
     https://x12.org/codes/claim-adjustment-reason-codes.

**Production Documents**

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|
| ASPIRION_00000013 | – | ASPIRION_00000014 | ASPIRION_00002070 | – | ASPIRION_00002071 |
| ASPIRION_00000986 | | ASPIRION_00000986 | ASPIRION_00002072 | – | ASPIRION_00002073 |
| ASPIRION_00001443 | – | ASPIRION_00001446 | ASPIRION_00002074 | – | ASPIRION_00002075 |
| ASPIRION_00001447 | – | ASPIRION_00001447 | ASPIRION_00002076 | – | ASPIRION_00002077 |
| ASPIRION_00001448 | – | ASPIRION_00001449 | ASPIRION_00002078 | – | ASPIRION_00002079 |
| ASPIRION_00001450 | – | ASPIRION_00001454 | ASPIRION_00002080 | – | ASPIRION_00002081 |
| ASPIRION_00001455 | – | ASPIRION_00001458 | ASPIRION_00002082 | – | ASPIRION_00002086 |
| ASPIRION_00001459 | – | ASPIRION_00001459 | ASPIRION_00002087 | – | ASPIRION_00002090 |
| ASPIRION_00002002 | – | ASPIRION_00002010 | ASPIRION_00002091 | – | ASPIRION_00002093 |
| ASPIRION_00002011 | – | ASPIRION_00002013 | ASPIRION_00002094 | – | ASPIRION_00002094 |
| ASPIRION_00002014 | – | ASPIRION_00002016 | ASPIRION_00002095 | – | ASPIRION_00002095 |
| ASPIRION_00002017 | – | ASPIRION_00002019 | ASPIRION_00002096 | – | ASPIRION_00002096 |
| ASPIRION_00002020 | – | ASPIRION_00002021 | ASPIRION_00002097 | – | ASPIRION_00002098 |
| ASPIRION_00002022 | – | ASPIRION_00002024 | ASPIRION_00002099 | – | ASPIRION_00002099 |
| ASPIRION_00002025 | – | ASPIRION_00002028 | ASPIRION_00002100 | – | ASPIRION_00002100 |
| ASPIRION_00002029 | – | ASPIRION_00002031 | ASPIRION_00002101 | – | ASPIRION_00002101 |
| ASPIRION_00002032 | – | ASPIRION_00002034 | ASPIRION_00002102 | – | ASPIRION_00002103 |
| ASPIRION_00002035 | – | ASPIRION_00002037 | ASPIRION_00002211 | – | ASPIRION_00002224 |
| ASPIRION_00002038 | – | ASPIRION_00002039 | ASPIRION_00002225 | – | ASPIRION_00002225 |
| ASPIRION_00002040 | – | ASPIRION_00002041 | ASPIRION_00002226 | – | ASPIRION_00002239 |
| ASPIRION_00002042 | – | ASPIRION_00002044 | ASPIRION_00002240 | – | ASPIRION_00002241 |
| ASPIRION_00002045 | – | ASPIRION_00002046 | ASPIRION_00002242 | – | ASPIRION_00002246 |
| ASPIRION_00002047 | – | ASPIRION_00002048 | ASPIRION_00002247 | – | ASPIRION_00002253 |
| ASPIRION_00002049 | – | ASPIRION_00002051 | ASPIRION_00002254 | – | ASPIRION_00002259 |
| ASPIRION_00002052 | – | ASPIRION_00002054 | ASPIRION_00002260 | – | ASPIRION_00002270 |
| ASPIRION_00002055 | – | ASPIRION_00002057 | ASPIRION_00002271 | – | ASPIRION_00002279 |
| ASPIRION_00002058 | – | ASPIRION_00002060 | ASPIRION_00002280 | – | ASPIRION_00002291 |
| ASPIRION_00002061 | – | ASPIRION_00002063 | ASPIRION_00002292 | – | ASPIRION_00002296 |
| ASPIRION_00002064 | – | ASPIRION_00002065 | ASPIRION_00002297 | – | ASPIRION_00002297 |
| ASPIRION_00002066 | – | ASPIRION_00002067 | ASPIRION_00002298 | – | ASPIRION_00002310 |
| ASPIRION_00002068 | – | ASPIRION_00002069 | ASPIRION_00002311 | – | ASPIRION_00002312 |

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|
| ASPIRION_00002313 | – | ASPIRION_00002336 | ASPIRION_00002578 | – | ASPIRION_00002578 |
| ASPIRION_00002337 | – | ASPIRION_00002360 | ASPIRION_00002579 | – | ASPIRION_00002581 |
| ASPIRION_00002361 | – | ASPIRION_00002361 | ASPIRION_00002582 | – | ASPIRION_00002584 |
| ASPIRION_00002362 | – | ASPIRION_00002366 | ASPIRION_00002585 | – | ASPIRION_00002585 |
| ASPIRION_00002367 | – | ASPIRION_00002368 | ASPIRION_00002586 | – | ASPIRION_00002586 |
| ASPIRION_00002369 | – | ASPIRION_00002380 | ASPIRION_00002587 | – | ASPIRION_00002588 |
| ASPIRION_00002381 | – | ASPIRION_00002385 | ASPIRION_00002589 | – | ASPIRION_00002589 |
| ASPIRION_00002386 | – | ASPIRION_00002403 | ASPIRION_00002590 | – | ASPIRION_00002592 |
| ASPIRION_00002404 | – | ASPIRION_00002405 | ASPIRION_00002593 | – | ASPIRION_00002597 |
| ASPIRION_00002406 | – | ASPIRION_00002415 | ASPIRION_00002598 | – | ASPIRION_00002603 |
| ASPIRION_00002416 | – | ASPIRION_00002423 | ASPIRION_00002604 | – | ASPIRION_00002619 |
| ASPIRION_00002424 | – | ASPIRION_00002437 | ASPIRION_00002620 | – | ASPIRION_00002628 |
| ASPIRION_00002438 | – | ASPIRION_00002453 | ASPIRION_00002629 | – | ASPIRION_00002631 |
| ASPIRION_00002454 | – | ASPIRION_00002455 | ASPIRION_00002632 | – | ASPIRION_00002633 |
| ASPIRION_00002456 | – | ASPIRION_00002461 | ASPIRION_00002634 | – | ASPIRION_00002635 |
| ASPIRION_00002462 | – | ASPIRION_00002470 | ASPIRION_00002636 | – | ASPIRION_00002637 |
| ASPIRION_00002471 | – | ASPIRION_00002482 | ASPIRION_00002638 | – | ASPIRION_00002639 |
| ASPIRION_00002483 | – | ASPIRION_00002494 | ASPIRION_00002640 | – | ASPIRION_00002641 |
| ASPIRION_00002495 | – | ASPIRION_00002496 | ASPIRION_00002642 | – | ASPIRION_00002651 |
| ASPIRION_00002497 | – | ASPIRION_00002504 | ASPIRION_00002652 | – | ASPIRION_00002672 |
| ASPIRION_00002505 | – | ASPIRION_00002506 | ASPIRION_00002673 | – | ASPIRION_00002681 |
| ASPIRION_00002507 | – | ASPIRION_00002510 | ASPIRION_00002682 | – | ASPIRION_00002682 |
| ASPIRION_00002511 | – | ASPIRION_00002541 | ASPIRION_00002683 | – | ASPIRION_00002688 |
| ASPIRION_00002542 | – | ASPIRION_00002555 | ASPIRION_00002689 | – | ASPIRION_00002695 |
| ASPIRION_00002556 | – | ASPIRION_00002559 | ASPIRION_00002696 | – | ASPIRION_00002698 |
| ASPIRION_00002560 | – | ASPIRION_00002564 | ASPIRION_00002699 | – | ASPIRION_00002709 |
| ASPIRION_00002565 | – | ASPIRION_00002568 | ASPIRION_00002710 | – | ASPIRION_00002711 |
| ASPIRION_00002569 | – | ASPIRION_00002572 | ASPIRION_00002712 | – | ASPIRION_00002713 |
| ASPIRION_00002573 | – | ASPIRION_00002575 | ASPIRION_00002714 | – | ASPIRION_00002715 |
| ASPIRION_00002576 | – | ASPIRION_00002577 | ASPIRION_00002716 | – | ASPIRION_00002719 |

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|
| ASPIRION_00002720 | – | ASPIRION_00002721 | ASPIRION_00002943 | – | ASPIRION_00002944 |
| ASPIRION_00002722 | – | ASPIRION_00002723 | ASPIRION_00002945 | – | ASPIRION_00002945 |
| ASPIRION_00002724 | – | ASPIRION_00002725 | ASPIRION_00002946 | – | ASPIRION_00002947 |
| ASPIRION_00002726 | – | ASPIRION_00002728 | ASPIRION_00002948 | – | ASPIRION_00002954 |
| ASPIRION_00002729 | – | ASPIRION_00002730 | ASPIRION_00002955 | – | ASPIRION_00002966 |
| ASPIRION_00002731 | – | ASPIRION_00002740 | ASPIRION_00002967 | – | ASPIRION_00002968 |
| ASPIRION_00002741 | – | ASPIRION_00002747 | ASPIRION_00002969 | – | ASPIRION_00002969 |
| ASPIRION_00002748 | – | ASPIRION_00002752 | ASPIRION_00002970 | – | ASPIRION_00002971 |
| ASPIRION_00002753 | – | ASPIRION_00002757 | ASPIRION_00002972 | – | ASPIRION_00002992 |
| ASPIRION_00002758 | – | ASPIRION_00002764 | ASPIRION_00002993 | – | ASPIRION_00003000 |
| ASPIRION_00002765 | – | ASPIRION_00002765 | ASPIRION_00003001 | – | ASPIRION_00003008 |
| ASPIRION_00002766 | – | ASPIRION_00002767 | ASPIRION_00003009 | – | ASPIRION_00003010 |
| ASPIRION_00002768 | – | ASPIRION_00002773 | ASPIRION_00003011 | – | ASPIRION_00003018 |
| ASPIRION_00002774 | – | ASPIRION_00002785 | ASPIRION_00003019 | – | ASPIRION_00003020 |
| ASPIRION_00002786 | – | ASPIRION_00002787 | ASPIRION_00003021 | – | ASPIRION_00003024 |
| ASPIRION_00002788 | – | ASPIRION_00002794 | ASPIRION_00003025 | – | ASPIRION_00003029 |
| ASPIRION_00002795 | – | ASPIRION_00002799 | ASPIRION_00003030 | – | ASPIRION_00003031 |
| ASPIRION_00002800 | – | ASPIRION_00002802 | ASPIRION_00003032 | – | ASPIRION_00003037 |
| ASPIRION_00002803 | – | ASPIRION_00002811 | ASPIRION_00003038 | – | ASPIRION_00003045 |
| ASPIRION_00002812 | – | ASPIRION_00002820 | ASPIRION_00003046 | – | ASPIRION_00003047 |
| ASPIRION_00002821 | – | ASPIRION_00002823 | ASPIRION_00003048 | – | ASPIRION_00003058 |
| ASPIRION_00002824 | – | ASPIRION_00002832 | ASPIRION_00003059 | – | ASPIRION_00003068 |
| ASPIRION_00002833 | – | ASPIRION_00002841 | ASPIRION_00003069 | – | ASPIRION_00003069 |
| ASPIRION_00002842 | – | ASPIRION_00002844 | ASPIRION_00003070 | – | ASPIRION_00003077 |
| ASPIRION_00002845 | – | ASPIRION_00002846 | ASPIRION_00003078 | – | ASPIRION_00003087 |
| ASPIRION_00002847 | – | ASPIRION_00002857 | ASPIRION_00003088 | – | ASPIRION_00003090 |
| ASPIRION_00002858 | – | ASPIRION_00002867 | ASPIRION_00003091 | – | ASPIRION_00003095 |
| ASPIRION_00002868 | – | ASPIRION_00002888 | ASPIRION_00003096 | – | ASPIRION_00003097 |
| ASPIRION_00002889 | – | ASPIRION_00002910 | ASPIRION_00003098 | – | ASPIRION_00003103 |
| ASPIRION_00002926 | – | ASPIRION_00002936 | ASPIRION_00003104 | – | ASPIRION_00003105 |
| ASPIRION_00002937 | – | ASPIRION_00002942 | ASPIRION_00003106 | – | ASPIRION_00003113 |

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|
| ASPIRION_00003114 | – | ASPIRION_00003125 | | ASPIRION_00003348 | – | ASPIRION_00003348 |
| ASPIRION_00003126 | – | ASPIRION_00003141 | | ASPIRION_00003349 | – | ASPIRION_00003358 |
| ASPIRION_00003142 | – | ASPIRION_00003145 | | ASPIRION_00003359 | – | ASPIRION_00003360 |
| ASPIRION_00003146 | – | ASPIRION_00003146 | | ASPIRION_00003361 | – | ASPIRION_00003372 |
| ASPIRION_00003147 | – | ASPIRION_00003147 | | ASPIRION_00003373 | – | ASPIRION_00003373 |
| ASPIRION_00003148 | – | ASPIRION_00003170 | | ASPIRION_00003374 | – | ASPIRION_00003379 |
| ASPIRION_00003171 | – | ASPIRION_00003173 | | ASPIRION_00003380 | – | ASPIRION_00003382 |
| ASPIRION_00003174 | – | ASPIRION_00003187 | | ASPIRION_00003383 | – | ASPIRION_00003385 |
| ASPIRION_00003188 | – | ASPIRION_00003192 | | ASPIRION_00003386 | – | ASPIRION_00003392 |
| ASPIRION_00003193 | – | ASPIRION_00003203 | | ASPIRION_00003393 | – | ASPIRION_00003402 |
| ASPIRION_00003204 | – | ASPIRION_00003216 | | ASPIRION_00003403 | – | ASPIRION_00003422 |
| ASPIRION_00003217 | – | ASPIRION_00003226 | | ASPIRION_00003423 | – | ASPIRION_00003430 |
| ASPIRION_00003227 | – | ASPIRION_00003233 | | ASPIRION_00003431 | – | ASPIRION_00003434 |
| ASPIRION_00003234 | – | ASPIRION_00003240 | | ASPIRION_00003435 | – | ASPIRION_00003439 |
| ASPIRION_00003241 | – | ASPIRION_00003247 | | ASPIRION_00003440 | – | ASPIRION_00003448 |
| ASPIRION_00003248 | – | ASPIRION_00003254 | | ASPIRION_00003449 | – | ASPIRION_00003453 |
| ASPIRION_00003255 | – | ASPIRION_00003265 | | ASPIRION_00003454 | – | ASPIRION_00003458 |
| ASPIRION_00003266 | – | ASPIRION_00003270 | | ASPIRION_00003459 | – | ASPIRION_00003464 |
| ASPIRION_00003271 | – | ASPIRION_00003272 | | ASPIRION_00003465 | – | ASPIRION_00003470 |
| ASPIRION_00003273 | – | ASPIRION_00003277 | | ASPIRION_00003471 | – | ASPIRION_00003481 |
| ASPIRION_00003278 | – | ASPIRION_00003285 | | ASPIRION_00003482 | – | ASPIRION_00003489 |
| ASPIRION_00003286 | – | ASPIRION_00003292 | | ASPIRION_00003490 | – | ASPIRION_00003491 |
| ASPIRION_00003293 | – | ASPIRION_00003294 | | ASPIRION_00003492 | – | ASPIRION_00003500 |
| ASPIRION_00003295 | – | ASPIRION_00003302 | | ASPIRION_00003501 | – | ASPIRION_00003515 |
| ASPIRION_00003303 | – | ASPIRION_00003310 | | ASPIRION_00003516 | – | ASPIRION_00003526 |
| ASPIRION_00003311 | – | ASPIRION_00003326 | | ASPIRION_00003527 | – | ASPIRION_00003536 |
| ASPIRION_00003327 | – | ASPIRION_00003327 | | ASPIRION_00003537 | – | ASPIRION_00003538 |
| ASPIRION_00003328 | – | ASPIRION_00003339 | | ASPIRION_00003539 | – | ASPIRION_00003539 |
| ASPIRION_00003340 | – | ASPIRION_00003340 | | ASPIRION_00003540 | – | ASPIRION_00003548 |
| ASPIRION_00003341 | – | ASPIRION_00003344 | | ASPIRION_00003549 | – | ASPIRION_00003562 |
| ASPIRION_00003345 | – | ASPIRION_00003347 | | ASPIRION_00003563 | – | ASPIRION_00003570 |

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|
| ASPIRION_00003571 | – | ASPIRION_00003578 | | ASPIRION_00003787 | – | ASPIRION_00003795 |
| ASPIRION_00003579 | – | ASPIRION_00003581 | | ASPIRION_00003796 | – | ASPIRION_00003811 |
| ASPIRION_00003582 | – | ASPIRION_00003607 | | ASPIRION_00003812 | – | ASPIRION_00003814 |
| ASPIRION_00003608 | – | ASPIRION_00003617 | | ASPIRION_00003815 | – | ASPIRION_00003818 |
| ASPIRION_00003618 | – | ASPIRION_00003622 | | ASPIRION_00003819 | – | ASPIRION_00003819 |
| ASPIRION_00003623 | – | ASPIRION_00003623 | | ASPIRION_00003820 | – | ASPIRION_00003820 |
| ASPIRION_00003624 | – | ASPIRION_00003625 | | ASPIRION_00003821 | – | ASPIRION_00003821 |
| ASPIRION_00003626 | – | ASPIRION_00003626 | | ASPIRION_00003822 | – | ASPIRION_00003832 |
| ASPIRION_00003627 | – | ASPIRION_00003631 | | ASPIRION_00003833 | – | ASPIRION_00003842 |
| ASPIRION_00003632 | – | ASPIRION_00003638 | | ASPIRION_00003843 | – | ASPIRION_00003861 |
| ASPIRION_00003639 | – | ASPIRION_00003639 | | ASPIRION_00003862 | – | ASPIRION_00003873 |
| ASPIRION_00003640 | – | ASPIRION_00003642 | | ASPIRION_00003874 | – | ASPIRION_00003878 |
| ASPIRION_00003643 | – | ASPIRION_00003648 | | ASPIRION_00003879 | – | ASPIRION_00003924 |
| ASPIRION_00003649 | – | ASPIRION_00003654 | | ASPIRION_00003925 | – | ASPIRION_00003926 |
| ASPIRION_00003655 | – | ASPIRION_00003658 | | ASPIRION_00003927 | – | ASPIRION_00003932 |
| ASPIRION_00003659 | – | ASPIRION_00003672 | | ASPIRION_00003933 | – | ASPIRION_00003936 |
| ASPIRION_00003673 | – | ASPIRION_00003686 | | ASPIRION_00003937 | – | ASPIRION_00003945 |
| ASPIRION_00003687 | – | ASPIRION_00003688 | | ASPIRION_00003946 | – | ASPIRION_00003956 |
| ASPIRION_00003689 | – | ASPIRION_00003695 | | ASPIRION_00003957 | – | ASPIRION_00003968 |
| ASPIRION_00003696 | – | ASPIRION_00003711 | | ASPIRION_00003969 | – | ASPIRION_00003981 |
| ASPIRION_00003712 | – | ASPIRION_00003721 | | ASPIRION_00003982 | – | ASPIRION_00003988 |
| ASPIRION_00003722 | – | ASPIRION_00003724 | | ASPIRION_00003989 | – | ASPIRION_00004023 |
| ASPIRION_00003725 | – | ASPIRION_00003727 | | ASPIRION_00004024 | – | ASPIRION_00004029 |
| ASPIRION_00003728 | – | ASPIRION_00003733 | | ASPIRION_00004030 | – | ASPIRION_00004042 |
| ASPIRION_00003734 | – | ASPIRION_00003739 | | ASPIRION_00004043 | – | ASPIRION_00004043 |
| ASPIRION_00003740 | – | ASPIRION_00003749 | | ASPIRION_00004044 | – | ASPIRION_00004054 |
| ASPIRION_00003750 | – | ASPIRION_00003756 | | ASPIRION_00004055 | – | ASPIRION_00004056 |
| ASPIRION_00003757 | – | ASPIRION_00003758 | | ASPIRION_00004057 | – | ASPIRION_00004063 |
| ASPIRION_00003759 | – | ASPIRION_00003762 | | ASPIRION_00004064 | – | ASPIRION_00004075 |
| ASPIRION_00003763 | – | ASPIRION_00003769 | | ASPIRION_00004076 | – | ASPIRION_00004079 |
| ASPIRION_00003770 | – | ASPIRION_00003786 | | ASPIRION_00004080 | – | ASPIRION_00004084 |

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|
| ASPIRION_00004085 | – | ASPIRION_00004107 | | ASPIRION_00004687 | – | ASPIRION_00004696 |
| ASPIRION_00004108 | – | ASPIRION_00004118 | | ASPIRION_00004697 | – | ASPIRION_00004772 |
| ASPIRION_00004119 | – | ASPIRION_00004124 | | ASPIRION_00004773 | – | ASPIRION_00004774 |
| ASPIRION_00004125 | – | ASPIRION_00004128 | | ASPIRION_00004775 | – | ASPIRION_00004786 |
| ASPIRION_00004129 | – | ASPIRION_00004132 | | ASPIRION_00004787 | – | ASPIRION_00004792 |
| ASPIRION_00004133 | – | ASPIRION_00004136 | | ASPIRION_00004793 | – | ASPIRION_00004801 |
| ASPIRION_00004137 | – | ASPIRION_00004145 | | ASPIRION_00004802 | – | ASPIRION_00004806 |
| ASPIRION_00004146 | – | ASPIRION_00004155 | | ASPIRION_00004807 | – | ASPIRION_00004809 |
| ASPIRION_00004156 | – | ASPIRION_00004166 | | ASPIRION_00004810 | – | ASPIRION_00004839 |
| ASPIRION_00004167 | – | ASPIRION_00004186 | | ASPIRION_00004840 | – | ASPIRION_00004843 |
| ASPIRION_00004187 | – | ASPIRION_00004193 | | ASPIRION_00004844 | – | ASPIRION_00004845 |
| ASPIRION_00004194 | – | ASPIRION_00004227 | | ASPIRION_00004846 | – | ASPIRION_00004846 |
| ASPIRION_00004228 | – | ASPIRION_00004244 | | ASPIRION_00004847 | – | ASPIRION_00004847 |
| ASPIRION_00004245 | – | ASPIRION_00004291 | | ASPIRION_00004848 | – | ASPIRION_00004857 |
| ASPIRION_00004292 | – | ASPIRION_00004294 | | ASPIRION_00004858 | – | ASPIRION_00004858 |
| ASPIRION_00004295 | – | ASPIRION_00004316 | | ASPIRION_00005154 | – | ASPIRION_00005154 |
| ASPIRION_00004317 | – | ASPIRION_00004326 | | ASPIRION_00005155 | – | ASPIRION_00005155 |
| ASPIRION_00004327 | – | ASPIRION_00004328 | | ASPIRION_00005156 | – | ASPIRION_00005156 |
| ASPIRION_00004329 | – | ASPIRION_00004330 | | ASPIRION_00005157 | – | ASPIRION_00005157 |
| ASPIRION_00004331 | – | ASPIRION_00004331 | | ASPIRION_00005158 | – | ASPIRION_00005158 |
| ASPIRION_00004332 | – | ASPIRION_00004337 | | ASPIRION_00005159 | – | ASPIRION_00005159 |
| ASPIRION_00004338 | – | ASPIRION_00004345 | | ASPIRION_00005160 | – | ASPIRION_00005165 |
| ASPIRION_00004346 | – | ASPIRION_00004354 | | ASPIRION_00005166 | – | ASPIRION_00005166 |
| ASPIRION_00004646 | – | ASPIRION_00004651 | | ASPIRION_00005167 | – | ASPIRION_00005202 |
| ASPIRION_00004652 | – | ASPIRION_00004653 | | ASPIRION_00005203 | – | ASPIRION_00005203 |
| ASPIRION_00004654 | – | ASPIRION_00004654 | | ASPIRION_00005204 | – | ASPIRION_00005204 |
| ASPIRION_00004655 | – | ASPIRION_00004655 | | ASPIRION_00005205 | – | ASPIRION_00005205 |
| ASPIRION_00004658 | – | ASPIRION_00004665 | | ASPIRION_00005206 | – | ASPIRION_00005210 |
| ASPIRION_00004666 | – | ASPIRION_00004668 | | ASPIRION_00005211 | – | ASPIRION_00005211 |
| ASPIRION_00004669 | – | ASPIRION_00004682 | | ASPIRION_00005212 | – | ASPIRION_00005212 |
| ASPIRION_00004683 | – | ASPIRION_00004686 | | ASPIRION_00005213 | – | ASPIRION_00005213 |

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|
| ASPIRION_00005214 | – | ASPIRION_00005214 | ASPIRION_00005264 | – | ASPIRION_00005264 |
| ASPIRION_00005215 | – | ASPIRION_00005215 | ASPIRION_00005265 | – | ASPIRION_00005265 |
| ASPIRION_00005216 | – | ASPIRION_00005227 | ASPIRION_00005266 | – | ASPIRION_00005266 |
| ASPIRION_00005228 | – | ASPIRION_00005228 | ASPIRION_00005267 | – | ASPIRION_00005267 |
| ASPIRION_00005229 | – | ASPIRION_00005229 | ASPIRION_00005268 | – | ASPIRION_00005268 |
| ASPIRION_00005230 | – | ASPIRION_00005233 | ASPIRION_00005269 | – | ASPIRION_00005279 |
| ASPIRION_00005234 | – | ASPIRION_00005234 | ASPIRION_00005280 | – | ASPIRION_00005280 |
| ASPIRION_00005235 | – | ASPIRION_00005235 | ASPIRION_00005281 | – | ASPIRION_00005281 |
| ASPIRION_00005236 | – | ASPIRION_00005236 | ASPIRION_00005282 | – | ASPIRION_00005282 |
| ASPIRION_00005237 | – | ASPIRION_00005237 | ASPIRION_00005283 | – | ASPIRION_00005286 |
| ASPIRION_00005238 | – | ASPIRION_00005238 | ASPIRION_00005287 | – | ASPIRION_00005287 |
| ASPIRION_00005239 | – | ASPIRION_00005239 | ASPIRION_00005288 | – | ASPIRION_00005291 |
| ASPIRION_00005240 | – | ASPIRION_00005240 | ASPIRION_00005292 | – | ASPIRION_00005300 |
| ASPIRION_00005241 | – | ASPIRION_00005241 | ASPIRION_00005301 | – | ASPIRION_00005301 |
| ASPIRION_00005242 | – | ASPIRION_00005242 | ASPIRION_00005302 | – | ASPIRION_00005305 |
| ASPIRION_00005243 | – | ASPIRION_00005243 | ASPIRION_00005306 | – | ASPIRION_00005306 |
| ASPIRION_00005244 | – | ASPIRION_00005244 | ASPIRION_00005307 | – | ASPIRION_00005310 |
| ASPIRION_00005245 | – | ASPIRION_00005245 | ASPIRION_00005311 | – | ASPIRION_00005311 |
| ASPIRION_00005246 | – | ASPIRION_00005246 | ASPIRION_00005312 | – | ASPIRION_00005312 |
| ASPIRION_00005247 | – | ASPIRION_00005247 | ASPIRION_00005313 | – | ASPIRION_00005313 |
| ASPIRION_00005248 | – | ASPIRION_00005248 | ASPIRION_00005314 | – | ASPIRION_00005314 |
| ASPIRION_00005249 | – | ASPIRION_00005249 | ASPIRION_00005315 | – | ASPIRION_00005315 |
| ASPIRION_00005250 | – | ASPIRION_00005250 | ASPIRION_00005316 | – | ASPIRION_00005318 |
| ASPIRION_00005251 | – | ASPIRION_00005254 | ASPIRION_00005319 | – | ASPIRION_00005319 |
| ASPIRION_00005255 | – | ASPIRION_00005255 | ASPIRION_00005320 | – | ASPIRION_00005321 |
| ASPIRION_00005256 | – | ASPIRION_00005256 | ASPIRION_00005322 | – | ASPIRION_00005322 |
| ASPIRION_00005257 | – | ASPIRION_00005257 | ASPIRION_00005323 | – | ASPIRION_00005323 |
| ASPIRION_00005258 | – | ASPIRION_00005260 | ASPIRION_00005324 | – | ASPIRION_00005332 |
| ASPIRION_00005261 | – | ASPIRION_00005261 | ASPIRION_00005333 | – | ASPIRION_00005333 |
| ASPIRION_00005262 | – | ASPIRION_00005262 | ASPIRION_00005334 | – | ASPIRION_00005334 |
| ASPIRION_00005263 | – | ASPIRION_00005263 | ASPIRION_00005335 | – | ASPIRION_00005335 |

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|
| ASPIRION_00005336 | – | ASPIRION_00005336 | | ASPIRION_00005395 | – | ASPIRION_00005395 |
| ASPIRION_00005337 | – | ASPIRION_00005337 | | ASPIRION_00005396 | – | ASPIRION_00005396 |
| ASPIRION_00005338 | – | ASPIRION_00005338 | | ASPIRION_00005397 | – | ASPIRION_00005397 |
| ASPIRION_00005339 | – | ASPIRION_00005339 | | ASPIRION_00005398 | – | ASPIRION_00005398 |
| ASPIRION_00005340 | – | ASPIRION_00005343 | | ASPIRION_00005399 | – | ASPIRION_00005399 |
| ASPIRION_00005344 | – | ASPIRION_00005344 | | ASPIRION_00005400 | – | ASPIRION_00005400 |
| ASPIRION_00005345 | – | ASPIRION_00005345 | | ASPIRION_00005401 | – | ASPIRION_00005401 |
| ASPIRION_00005346 | – | ASPIRION_00005346 | | ASPIRION_00005402 | – | ASPIRION_00005402 |
| ASPIRION_00005347 | – | ASPIRION_00005347 | | ASPIRION_00005403 | – | ASPIRION_00005403 |
| ASPIRION_00005348 | – | ASPIRION_00005348 | | ASPIRION_00005404 | – | ASPIRION_00005404 |
| ASPIRION_00005349 | – | ASPIRION_00005349 | | ASPIRION_00005405 | – | ASPIRION_00005405 |
| ASPIRION_00005350 | – | ASPIRION_00005350 | | ASPIRION_00005406 | – | ASPIRION_00005406 |
| ASPIRION_00005351 | – | ASPIRION_00005351 | | ASPIRION_00005407 | – | ASPIRION_00005410 |
| ASPIRION_00005352 | – | ASPIRION_00005352 | | ASPIRION_00005411 | – | ASPIRION_00005419 |
| ASPIRION_00005353 | – | ASPIRION_00005353 | | ASPIRION_00005420 | – | ASPIRION_00005420 |
| ASPIRION_00005354 | – | ASPIRION_00005357 | | ASPIRION_00005421 | – | ASPIRION_00005425 |
| ASPIRION_00005358 | – | ASPIRION_00005358 | | ASPIRION_00005426 | – | ASPIRION_00005429 |
| ASPIRION_00005359 | – | ASPIRION_00005359 | | ASPIRION_00005430 | – | ASPIRION_00005430 |
| ASPIRION_00005360 | – | ASPIRION_00005360 | | ASPIRION_00005431 | – | ASPIRION_00005431 |
| ASPIRION_00005361 | – | ASPIRION_00005361 | | ASPIRION_00005432 | – | ASPIRION_00005432 |
| ASPIRION_00005362 | – | ASPIRION_00005362 | | ASPIRION_00005433 | – | ASPIRION_00005436 |
| ASPIRION_00005363 | – | ASPIRION_00005380 | | ASPIRION_00005437 | – | ASPIRION_00005440 |
| ASPIRION_00005381 | – | ASPIRION_00005381 | | ASPIRION_00005441 | – | ASPIRION_00005441 |
| ASPIRION_00005382 | – | ASPIRION_00005382 | | ASPIRION_00005442 | – | ASPIRION_00005442 |
| ASPIRION_00005383 | – | ASPIRION_00005383 | | ASPIRION_00005443 | – | ASPIRION_00005443 |
| ASPIRION_00005384 | – | ASPIRION_00005384 | | ASPIRION_00005444 | – | ASPIRION_00005444 |
| ASPIRION_00005385 | – | ASPIRION_00005385 | | ASPIRION_00005445 | – | ASPIRION_00005445 |
| ASPIRION_00005386 | – | ASPIRION_00005386 | | ASPIRION_00005446 | – | ASPIRION_00005446 |
| ASPIRION_00005387 | – | ASPIRION_00005387 | | ASPIRION_00005447 | – | ASPIRION_00005447 |
| ASPIRION_00005388 | – | ASPIRION_00005388 | | ASPIRION_00005448 | – | ASPIRION_00005448 |
| ASPIRION_00005389 | – | ASPIRION_00005394 | | ASPIRION_00005449 | – | ASPIRION_00005463 |

| Beginning Bates | | Ending Bates | | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|
| ASPIRION_00005464 | – | ASPIRION_00005464 | | ASPIRION_00005857 | - | ASPIRION_00005861 |
| ASPIRION_00005465 | – | ASPIRION_00005465 | | ASPIRION_00005862 | - | ASPIRION_00005866 |
| ASPIRION_00005466 | – | ASPIRION_00005466 | | ASPIRION_00005867 | - | ASPIRION_00005871 |
| ASPIRION_00005467 | – | ASPIRION_00005467 | | ASPIRION_00005872 | - | ASPIRION_00005876 |
| ASPIRION_00005468 | – | ASPIRION_00005468 | | ASPIRION_00005877 | - | ASPIRION_00005881 |
| ASPIRION_00005469 | – | ASPIRION_00005469 | | ASPIRION_00005882 | - | ASPIRION_00005885 |
| ASPIRION_00005470 | – | ASPIRION_00005470 | | ASPIRION_00005886 | - | ASPIRION_00005889 |
| ASPIRION_00005471 | – | ASPIRION_00005471 | | ASPIRION_00005890 | - | ASPIRION_00005894 |
| ASPIRION_00005472 | – | ASPIRION_00005472 | | ASPIRION_00005895 | - | ASPIRION_00005899 |
| ASPIRION_00005473 | – | ASPIRION_00005474 | | ASPIRION_00005900 | - | ASPIRION_00005904 |
| ASPIRION_00005475 | – | ASPIRION_00005475 | | ASPIRION_00005905 | - | ASPIRION_00005909 |
| ASPIRION_00005476 | – | ASPIRION_00005476 | | ASPIRION_00005910 | - | ASPIRION_00005914 |
| ASPIRION_00005477 | – | ASPIRION_00005477 | | ASPIRION_00005915 | - | ASPIRION_00005936 |
| ASPIRION_00005478 | – | ASPIRION_00005478 | | | | |
| ASPIRION_00005479 | – | ASPIRION_00005479 | | | | |
| ASPIRION_00005480 | – | ASPIRION_00005480 | | | | |
| ASPIRION_00005481 | – | ASPIRION_00005481 | | | | |
| ASPIRION_00005482 | – | ASPIRION_00005482 | | | | |
| ASPIRION_00005483 | – | ASPIRION_00005483 | | | | |
| ASPIRION_00005484 | – | ASPIRION_00005484 | | | | |
| ASPIRION_00005485 | – | ASPIRION_00005485 | | | | |
| ASPIRION_00005486 | – | ASPIRION_00005488 | | | | |
| ASPIRION_00005489 | – | ASPIRION_00005489 | | | | |
| ASPIRION_00005490 | – | ASPIRION_00005490 | | | | |
| ASPIRION_00005491 | – | ASPIRION_00005491 | | | | |
| ASPIRION_00005492 | – | ASPIRION_00005492 | | | | |
| ASPIRION_00005504 | – | ASPIRION_00005504 | | | | |
| ASPIRION_00005506 | – | ASPIRION_00005506 | | | | |
| ASPIRION_00005845 | – | ASPIRION_00005848 | | | | |
| ASPIRION_00005849 | – | ASPIRION_00005852 | | | | |
| ASPIRION_00005853 | – | ASPIRION_00005856 | | | | |

**EXHIBIT B**

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

<u>**Executive Summary**</u>

Results oriented revenue cycle executive with a demonstrated capacity to achieve under adverse business conditions. Cheri possesses 40+ years of healthcare leadership experience with increasing responsibility in a variety of government, large profit, not-for-profit, academic hospital and physician environments. She has managed all aspects of the revenue cycle process including patient financial service conversions, patient access, Medicaid eligibility, health information management, and billing, under payment recovery, collections, managed care contracting and CDM/charge capture processes.

<u>**Professional Experience**</u>

**Reliant Healthcare Consultants, LLC, Portsmouth, NH**                **July, 2022 - Present**
**President**

- Key leader in selling and performing revenue cycle transformation for some of the largest hospital organizations in the country.

- Performing revenue cycle assessments and developing action plans for improvement in areas such as acceleration, accounts receivable reduction, management development, operational transformation, transferring knowledge to hospital leaders for long term management, etc.

- Providing support to private equity firms in identifying and evaluating companies for potential investment/acquisition.

**Community Health Systems, Nashville, TN**                **December, 2016 – July, 2022**
**Vice President of Revenue Cycle**

- Managed more than 2,500 employees in six national service centers performing pre-registration, registration, billing, follow-up, denials / appeals, under payment recovery, Medicaid eligibility, divestitures, and revenue integrity functions for up to two hundred hospitals equalling more than $12B in cash collections annually.

- Led more than fifteen hospital conversions to MedHost and Cerner's electronic medical record and Millennium. Facilitated many improvements including the hiring and training of CCL report writers, electronic claim statusing and electronic insurance coverage discovery identifying more than $2.7M of cash recoveries in a three-month period.

- Exceeded cash goals over projections by $286M yearend 2020 and met cash goals for 2021 during the COVID-19 pandemic while reducing cost to collect to the lowest level in recent history. Average revenue cycle monthly collections equalled a billion dollars a month.

- Reduced vendor contract costs over the last two years by more than $10M dollars in the areas of patient access ($2M) collection agency ($2M), Medicaid eligibility ($750K), billing $2M, replacement software ($2M) along with other vendors.

- Reduced corporate FTEs saving more than $4M+ salary costs annually between 2018 and 2021.

- Recovered $3.5M in DRG transfer opportunity while reducing vendor fees from 30% to 10%.

- Resolved more than 400k credit balance accounts with automation while eliminating 100 full time employee equivalents (FTEs) bringing the organization over all <1% of accounts receivable.

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

- Implemented a structure nationally to support Patient Access by providing operations assessments, utilizing and implementing new registration tools, training, communication, etc.

- Implemented a variety of pilot revenue integrity programs and along with a new department to identify revenue integrity and charge capture improvements.

- Coordinated and implemented a national monthly CEO/CFO Revenue Cycle call to highlight areas of opportunity and company best practices.

- Changed the organization's culture from decisions being a "corporate mandate" to revenue cycle being a "support and training" department for the hospitals to help drive additional revenue cycle improvements.

**PricewaterhouseCoopers, Atlanta, GA                    May, 2011 – December, 2016**

**Managing Director**

- Promoted to managing director in July 2013, responsible for selling and managing $4M in healthcare services annually.

- Revenue cycle leader on many of PwC's mergers and engagements with private equity companies to evaluate operations of potential revenue cycle companies. Wrote reports, identified operational gaps and issues along with potential solutions post-acquisition to address.

- Expert witness for Cerner in matter concerning a failed revenue cycle implementation generating over a million dollars in revenue for PwC.

- Revenue cycle point person at PwC to perform due diligence assessments on companies identified by private equity firms for potential acquisition.

- Led large revenue cycle transformation projects for PwC with many workstreams including Patient Access, Health Information Management, Revenue Integrity, Billing, Follow-up, etc.

- Led the project for ProMedica was an eight-hospital system with $3.5M in net revenue for PwC with more than twelve work streams.

- Interim Vice President of Revenue Cycle (November 2014 – March 2015) leading 500+ employees for Sisters of Charity Health System. Responsible for Patient Access pre-processing Center, billing, Collections, Denials Management, etc. in a post Epic optimization project for an 8-hospital system with more than five hundred employed physicians.

- Led a revenue cycle transformation for Phoebe Putney (October 2011 - August, 2012) Central Business Office in Georgia with six hospitals. Areas of operational improvement included Patient Access, Billing, Insurance Follow-up, and Denials.

- Project leader for Integris Health System's CBO (July 2012 – November 2013) responsible for billing nine hospitals in Oklahoma for work streams including Charge Capture Improvement, Point of Service Collections, Billing Optimization and Denial Management Reduction.

- Project lead for large ICD-10 and revenue cycle assessment engagements performing revenue cycle improvement, cash acceleration, risk assessment and valuation along with managed care contracting at Geisinger Medical Center, PA and. St. Joseph's Candler, GA.

- Performed managed care contracting strategy development paired with contract review and evaluation for mid-size hospital facilities in complex managed care environments. Completed

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

client service quality and payer analysis, managed care product evaluations, and competitor reviews for Akron Medical Center, OH along with others.

- Innovative thought leader creating points of view for the firm to use externally with clients on various topics such as Customer Centric Care, Price Transparency, Rate Navigation and Value Based Reimbursement to name a few.

- Developed five PwC Revenue Cycle training programs for directors, managers, and sr. associates with a two-day off-site case study program.

**The Outsource Group, St. Louis, MO**              **July, 2009 - April, 2011**

**President, Insurance Division**

- Key revenue cycle leader in selling outsource services to hospitals for outsourcing such as insurance follow-up, denials management, workers' compensation, Medicaid applications, etc. and managing client outcomes once the sale was complete.

- Revenue cycle lead during the acquisition process with more than thirteen potential private equity companies over a six-month period providing operational analysis, insights, solutions, and long-term development plans and responsible for integration of acquired companies.

- Managed more than 500+ employees with revenues of $50M annually at regional locations in Massachusetts, Louisiana, Alabama, and New York City performing the functions of Medicaid eligibility, billing, insurance follow-up, denials, workers' compensation and third-party liability.

- Led the optimization of workflow processes in insurance follow-up and denials management by implementing an electronic workflow process to automate the claim statusing of insurance claims increasing staff productivity from fifty accounts a day to up to 250 a day.

- Facilitated the electronic compilation of workers' compensation and third-party liability claims increasing staff productivity by up to 300% and increasing revenues by $500k a month.

**Reliant Healthcare Consultants, LLC, Dayton, OH**          **October, 2001 – May, 2003**

                                                              **August, 2007 - June, 2009**

**President**

- Solely responsible for all revenue cycle hospital and vendor sales for healthcare transformation services for a variety of hospital systems including, but not limited to Proven Health System and Prince William Medical Center

- Interim Vice President of Revenue Cycle for Grady Memorial Hospital leading all aspects of the revenue cycle for hospital and physician billing and collections. Managed more than 500+ employees performing Patient Access, Health Information Management, Billing, Insurance Follow-up, Collections, CDM/Charge Capture and Managed Care Contracting.

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

- Facilitated the collection of more than $113M dollars, as documented by PwC, by implementing revenue cycle initiatives that included the reduction of discharged not final billed, updating the charge description master, the implementation of charge capture improvements, and improving registration quality over a two year period as reported to the hospital's board.

- Implemented quality, productivity and staff training programs and testing in all major areas including Patient Access and Health Information Management.

- Reduced FTEs by more than 20% over a two year period.

- Reduced accounts receivable from more than 100+ to 65 A/R days in an eighteen-month period.

- Successfully implemented a comprehensive Pre-Access Call Center for Scheduling, Pre-Registration, Insurance Verification, Authorization, etc. for Emory and Moorehouse Medical Schools.


**Select Health Management, LLC, Dayton, OH**                    **January 2002 –May, 2009**
**Partner**
- Jointly responsible for healthcare sales to hospitals for transformational services.

- Interim Vice President of Revenue Cycle for St. Vincent's Catholic Medical Center an eight-hospital system throughout the greater New York City area. Led all aspects of the revenue cycle for hospital and physician billing and collections. Managed more than 500+ employees performing Patient Access, Billing, Insurance Follow-up, Collections, CDM/Charge Capture and Managed Care Contracting over a two year period.

- Implemented a consolidated CDM for the system by evaluating medical services and assuring appropriate CPTs were applied consistently. Standardized pricing throughout the health system.

- Performed a charge capture improvement process equalling more than $50M in net revenue for the system.

- Led a Patient Access optimization improvement process to reduce denials and improve billing quality. Developed a staff quality review process with training for improvement in the areas of registration as well as point of service collections.

**United Healthcare, Inc, Dayton, OH**
**Director of Provider Relations**                    **November, 1997 – December, 2001**

- Promoted from Manager of Capitated Networks in 1999 to Director of Provider Relations for the number one most profitable UHC health plan in the country.
- Managed up to thirty employees performing managed care contracting, provider negotiations, network development and physician utilization profiling for more than 3,500 physicians.
- Identified and recovered more than half a million dollars in an 18-month period from providers due to claim processing and payment errors.

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

- Developed financial models and methods to evaluate each managed care contract and assure it was financially beneficial for the provider to execute the agreement. Statistically analyzed utilization data to determine the most cost-effective pricing methods for the health care services provided.

**Miami Valley Hospital, Dayton, OH**

**Regional Director, Physician Practices**                    **August, 1992 - November, 1997**

- Promoted from Marketing Manager to Regional Director of Practice Operations.

**Education**

Webster University , BA, Business Administration emphasis in Management, 1990

Central Michigan University, Master of Science Administration (MSA) with an emphasis in Healthcare Administration, 2001

**Professional Organizations / Fellowships / Certifications**

Fellow, Healthcare Financial Managers Association (FHFMA) 2002 – 2024

Fellow, American College of Medical Practice Executives (FACMPE) 1999 – 2024

Certified Project Manager (PMP) 2014 – 2017

**Prior Litigation Engagements**

**Trinity Medical Center v. Cerner Corp.** (Arbitration) (2013)

**US v. Huron Consulting Group, Inc.,** United States District Court, S.D. New York (09 Civ. 1800)

**Founding Partners Stable Fund v. Ernst and Young** (Arbitration) (2023)

**Cynthia Flournoy v. Grady Hospital** (Arbitration) (2006)

**List of Publications**

Brief Encounter, Fall 2000 "Using Internal and External Resources to Negotiate Contracts"

Healthcare Financial Management Association (HFMA's) Revenue Cycle Strategist, September 2007, "Selecting a Charge Description Master Vendor"

Healthcare Financial Management Association (HFMA's) HFM, September 2009, "Improving Patient Access in an Indigent Care Setting"

Gale Academic On File, Cheri Kane and Jeff Drake 2009, "Transforming revenue cycle processes in an indigent care setting: manual processes, lack of accountability for errors, and a low emphasis on front-end collections all contributed to severe revenue shortfalls at Atlanta's Grady Health System. Learn how the health system enhanced skill levels of staff, decreased error rates--and improved revenue"

Healthcare Financial Management Association (HFMA), HFMA, Newsletter / Presentation, "Transforming Revenue Cycle in an Indigent Care Setting"

**Cheri S. Kane, MSA, FHFMA, FACMPE**
35 Summit Avenue
Portsmouth, NH 03801
(937) 367-6590 cell

Healthcare Financial Management Association (HFMA), HFM, April 2014, "Demystifying patient price estimates: How price transparency can create a business advantage"

Healthcare Financial Management Association (HFMA), HFMA VT / CT Newsletter 2014, "Who qualifies? How financial scoring can identify patients in need"

Healthcare Financial Management Associations (HFMA), HFMA VT / CT Newsletter 2014, "Patients pre-processing keeps patients happy by streamlining the registration process"

Healthcare Financial Management Associations (HFMA), HFMA VT / CT Newsletter Feb/Mar 2015, "How can healthcare providers confirm collection agencies are complying with the Consumer Financial Protection Bureau?

Healthcare Financial Management Association (HFMA), HFM, March, 2017, "Improving Point of Service Collections"