```
                UNITED STATES DISTRICT COURT.
               SOUTHERN DISTRICT OF FLORIDA
                      MIAMI DIVISION

                CASE NO. 1:24-cv-22875-CMA


MAINSAIL PARENT, LLC
d/b/a ASPIRION; and
SPECIALIZED HEALTHCARE
PARTNERS, LLC,

               Plaintiffs,

vs.

DAVID JEWELL; MICHAEL
CAMERON; ALISHA MAYS;
MEGAN KELLY; and TERNIUM, LLC,

               Defendants.

_____/




                DEPOSITION OF CHERI KANE
           {Via Remote Video/Audio Conference}




                   January 13, 2025
                  2:15 p.m. - 3:30 p.m.




              Stenographically Reported By:
               RICHARD GREENSPAN, CM, FAPR
          U.S. Legal Support Job No. 6787777-001
```

Cheri Kane
January 13, 2025

```
 1                    REMOTE APPEARANCES

 2

 3      On Behalf of the Plaintiffs:

 4           STEIN MITCHELL BEATO & MISSNER, LLC

 5           2000 K Street NW, Suite 600

 6           Washington, D.C. 20006

 7           (202) 661-0907

 8           BY:   KEVIN ATTRIDGE, ESQ.

 9                 kattridge@steinmitchell.com

10

11      On Behalf of the Defendants:

12           POLLARD PLLC

13           401 East Las Olas Boulevard, Suite 1400

14           Fort Lauderdale, Florida 33301

15           (954) 332-2380

16           BY:   JONATHAN POLLARD, ESQ.

17                 jpollard@pollardllc.com

18                 CHRISTOPHER PRATER, ESQ.

19                 cprater@pollardllc.com

20

21

22

23

24

25
```

Cheri Kane
January 13, 2025

```
 1                         -  -  -

 2                        INDEX

 3                         -  -  -

 4

 5   WITNESS:                DIRECT CROSS REDIRECT RECROSS

 6

 7   CHERI KANE

 8

 9      By Jonathan Pollard  4

10      By Kevin Attridge          45

11

12

13

14

15

16   EXHIBITS:               DESCRIPTION:        IDENT:

17   (None marked)

18

19

20

21

22

23

24

25
```

Cheri Kane
January 13, 2025

```
 1                 P R O C E E D I N G S

 2                        - - -

 3          THE COURT REPORTER:  Ms. Kane, is it

 4     agreeable that I swear you in over this Zoom

 5     connection?

 6          THE WITNESS:  Yes.

 7          THE COURT REPORTER:  Please raise your right

 8     hand.  Do you solemnly swear to tell the truth,

 9     the whole truth and nothing but the truth in these

10     proceedings?

11          THE WITNESS:  I do.

12 Thereupon,

13                    CHERI KANE,

14     having been first duly sworn via remote

15     video/audio conference, was examined and

16     testified as follows:

17                 DIRECT EXAMINATION

18 BY MR. POLLARD:

19     Q.   Good afternoon, Ms. Kane.  How are you

20 today?

21     A.   I am doing well.  Thank you.

22     Q.   So if I refer to the plaintiff in this case

23 as Aspirion and the defendants collectively as the

24 Ternium defendants, is that okay with you?

25     A.   That is fine.
```

Cheri Kane
January 13, 2025

```
 1      Q.   Can you tell me, Ms. Kane, are you familiar

 2  with the litigation that is currently pending in the

 3  United States District Court for the Southern

 4  District of Florida between the plaintiff Aspirion

 5  and the Ternium defendants?

 6      A.   Yes, I have read the complaint and many of

 7  the interrogatories and documents associated with

 8  this case.

 9      Q.   How did you come to be involved in this

10  matter?

11      A.   Counsel contracted with me to be an expert

12  witness in this case.  Actually, this was via another

13  company, IPEG Experts.

14      Q.   You say to be an expert witness in this

15  case, correct?

16      A.   Yes.

17      Q.   What is the nature of the expertise that you

18  intend to offer you have?

19      A.   My expertise is regarding revenue cycle

20  management and specifically the denials, vendor

21  management, in that area of expertise.

22      Q.   Are you a damages expert?

23      A.   I am not.

24      Q.   Have you ever testified as an expert witness

25  before in other court proceedings?
```

Cheri Kane
January 13, 2025

1       A.   Yes, I have.

2       Q.   In how many other proceedings?

3       A.   In three, I believe three other proceedings.

4       Q.   And in those proceedings were you deposed?

5       A.   Yes.

6       Q.   In those other proceedings, do you know if

7  you were ever subject to what is called a Daubert

8  challenge?

9       A.   I was not.

10      Q.   You were not subject to a Daubert challenge?

11      A.   No.

12      Q.   You said you testified as an expert in three

13 proceedings, correct?

14      A.   Yes.  I have testified and been deposed in

15 three different proceedings, yes.

16      Q.   Okay, testified and been deposed in three

17 different proceedings.  Walk me through each one of

18 these different proceedings.  Did those proceedings

19 resolve before the case went to trial?

20      A.   Two of them were arbitrations as I recall,

21 and one I testified in court.

22      Q.   Let's put the two arbitrations to the side.

23 So you have only been deposed in one court

24 proceeding, correct?

25      A.   Yes.

Cheri Kane
January 13, 2025

1    Q.   What court was that in?

2    A.   I do not recall exactly.  It was the United

3  States Court, I believe, in New York.

4    Q.   So it was a federal court?

5    A.   Yes.

6    Q.   What was the nature of your testimony in

7  that case?

8    A.   The nature of my testimony had to do with

9  how hospitals charge for services and how those

10  charges were derived.

11    Q.   What was the name of that case?  Just give

12  me the name of one of the parties involved so I can

13  use it as a shorthand.

14    A.   Huron Healthcare Consulting.

15    Q.   So would you agree with me that in the Huron

16  case, your testimony was about how certain rates are

17  set, correct?

18    A.   How certain hospital rates are set.

19    Q.   Yes.  Yes, we are talking about hospitals

20  and revenue cycle management.  So we are talking

21  about rates in the hospital context, correct?

22    A.   Yes.

23    Q.   So your testimony was about how certain

24  hospital rates were set, correct?

25    A.   That is correct.

Cheri Kane
January 13, 2025

1    Q.   You agree with me that what you have

2   presented in your expert report here in this case is

3   fundamentally different than testifying about how

4   hospitals set certain rates?

5         MR. ATTRIDGE:  Objection.  Form.  You can

6      answer.

7    A.   It is fundamentally different; however,

8   revenue cycle management is a very broad topic.

9    Q.   I didn't ask you for anything further than

10   whether or not it was different.  You agree with me

11   your testimony in this case that you are proposing to

12   offer is significantly and materially different than

13   opining on how hospitals set certain rates?

14   A.   Yes.

15   Q.   If I reference your expert report, you

16   understand that to be the expert report that you have

17   submitted in connection with this case, correct?

18   A.   Yes.

19   Q.   I don't know why you came -- I'm sorry, I

20   have got a ping in my stream.  So let me ask you some

21   questions, and I don't want to necessarily pull up

22   your expert report and have you read it back to me,

23   because I know what it says in there, I just want to

24   have a conversation with you about this, okay?

25         MR. ATTRIDGE:  And just for clarity,

Cheri Kane
January 13, 2025

1        counsel, I let Ms. Kane know that she can have a

2        copy of her expert report, so I believe she has

3        one in front of her in case she needs to refresh

4        her memory throughout the course of this

5        deposition.  I just want to be transparent there.

6            MR. POLLARD:  Certainly.  Thank you, Kevin,

7        I appreciate that.

8        Q.   So I understand that, and if you need to

9    refer to it, I understand that, but generally if you

10   can, can we please just try to have a conversation

11   about this so I can understand what your perspective

12   is here, okay?

13       A.   Yes.

14       Q.   So if you can tell me, top level summary,

15   elevator pitch, what is the expert opinion that you

16   are offering here?  Boil it down for me to a couple

17   of sentences.  What's your expert opinion here?

18       A.   My expert opinion is that relationships,

19   training, training employees, along with confidential

20   information, have a direct impact on vendors and can

21   specifically create a competitive advantage if used,

22   misappropriated in an incorrect manner.

23       Q.   What is the purpose of that expert

24   testimony?

25           MR. ATTRIDGE:  Objection.  Form.

Cheri Kane
January 13, 2025

1    Q.    What's the purpose?  What's the utility?

2    A.    You need to be more specific about what your

3  question is.

4    Q.    You understand that expert testimony is

5  intended to assist a jury, correct?

6    A.    Yes.

7    Q.    And what you just told me about how

8  confidential information, training, et cetera, can

9  create a competitive advantage, how does what you

10  just explained to me assist a jury in resolving this

11  dispute?

12         MR. ATTRIDGE:  Objection.  Form.  Calls for

13     a legal conclusion.

14    Q.    You can answer, Ms. Kane.

15    A.    Yes.  So it helps -- it's going to help the

16  jury, the court, understand, you know, the revenue

17  cycle, the unique aspects of revenue cycle

18  management, what the market looks for, how the market

19  makes decisions, how the hospitals make decisions

20  when they are selecting vendors, and whether or not

21  the vendor in this case, Aspirion, had their

22  information misappropriated and potentially used to

23  better independents.

24    Q.    Is this scientific in nature?

25         MR. ATTRIDGE:  Objection, to the extent it

Cheri Kane
January 13, 2025

1      calls for a legal conclusion.

2           MR. POLLARD:  No, it doesn't.  Kevin, could

3      you please slow the speaking objections, you can

4      just do form.  Scientific is not a legal term of

5      art.

6      Q.   Ms. Kane, is this scientific testimony?

7      A.   I think some of it is mathematical.

8      Q.   What is mathematical?

9      A.   Algorithms are mathematical, the number of

10     months for sales to be complete is mathematical, and

11     of the other information that has been compiled in my

12     report is mathematical.

13          Healthcare -- the sales in healthcare I

14     wouldn't say is scientific.  What I know from my 45

15     years of experience is how it's accomplished, what's

16     accomplished, when it's accomplished, and how sales

17     occur.

18     Q.   In your report, you have repeatedly talked

19     about trade secrets, so I am going to ask you, please

20     tell me, describe for me what is the trade secret at

21     issue?

22     A.   There is multiple trade secrets at issue.

23     Some of those trade secrets have to do with

24     information in Sales Force, custom screens.

25     Information was entered by Aspirion and accessed

1   potentially by the defendants.  So rates, sales

2   methodology, those opportunities that were identified

3   and documented, contacts, e-mails, all of that

4   information is trade secret or may be used by another

5   vendor.

6          Then you have EasyMorph, EasyMorph code that

7   was entered and utilized by Aspirion to communicate

8   information, load information into Compass, Compass,

9   which is a proprietary database, even as confirmed by

10  Cameron.  He claimed in the University of New Mexico

11  RFP that that was a proprietary database that helped

12  prioritize.

13         So there is a lot of confidential trade

14  secret information, none less than Priority Report.

15  The Priority Report, which the defendants all had

16  access to, ████████████████████████████████

    ██████████████████████████████████████████████

    ████████████████████████████████████████████████████

    █████████████████████████████████████████████████████

    ████████████████████

21         The Loopio database contain RFPs.  That

22  information is also confidential and not public.

23  None of these documents or none of these databases

24  are public information.  So all of this information

25  is confidential information.

Cheri Kane
January 13, 2025

1    Q.   Okay.  Well, let's go back to the sales

2   methods.  What sales methods are trade secrets here?

3    A.   How you contact -- for example, sales

4   methodology, information on documents that you have

5   drafted and prepared for sales, information that is

6   communicated, did they, did they complete a training

7   class, did they send an e-mail, what are the services

8   they are interested in, all of that information, wins

9   and losses also were documented there, and if there

10   was an incumbent, who that incumbent was.

11        So all of that information would be valuable

12   information to a competitor.  They would know who

13   to -- what that client was interested in buying, the

14   rates, and that information, so they would have the

15   ability to access that.

16    Q.   Let me ask you to please do me a favor.

17   When I ask you a question about a specific branch of

18   the supposed trade secrets, could we try to stay

19   within that, because my prior question was about

20   sales methodology and you got kind of far afield.  So

21   next time could you try and stick within the

22   framework of the particular trade secrets?

23    A.   Excuse me, I believe that when we talked

24   about sales methodology screens and Sales Force, that

25   was exactly what was entailed.  I don't think I left

Cheri Kane
January 13, 2025

1  that topic.  Maybe you were referring to sales

2  methodology in general and I was referring to sales

3  methodology, the custom screen and Sales Force.

4      Q.   Okay.  Okay.  You said contacts are a trade

5  secret.  In what sense are contacts a trade secret?

6      A.   So hospitals are very complex organizations,

7  multiple layers, multiple -- many of them have been

8  superconsolidated to date.

9          So just because someone is considered a CFO

10 in a major hospital organization such as Banner, they

11 may not be the decision-maker.  It may be someone

12 else.  It may be the medical director in that

13 organization.

14         So these organizations are very complex and

15 very layered.  Contacts are not always based on

16 title, they are based on who the actual

17 decision-makers are in that organization, what

18 committees.  So contacts can be very important.

19     Q.   Okay.  So you just testified contacts can be

20 very important, but does contacts being very

21 important equate to contacts being a trade secret?

22         MR. ATTRIDGE:  Objection.  Misstates prior

23     testimony.  She certainly said a lot more than

24     contacts are --

25         MR. POLLARD:  Kevin, please do not engage in

Cheri Kane
January 13, 2025

```
 1       speaking objections.  It is inappropriate.  Form

 2       is sufficient.

 3       Q.   Ms. Kane, you testified ultimately that

 4  contacts are very important.  I am asking you does

 5  contacts being important translate into them being a

 6  trade secret?

 7            MR. ATTRIDGE:  The same objections.

 8       A.   Potentially, yes.  Yes, I think contacts

 9  definitely could be trade secrets and are valued.

10  When I worked at PriceWaterhouseCoopers -- and the

11  Outsource Group is a revenue cycle vendor.  They

12  believed and treated contacts as trade secrets.

13       Q.   Okay.  So you are throwing around the term

14  trade secrets an awful lot here.  Are you an

15  attorney?

16       A.   I am not.

17       Q.   Do you have a law degree?

18       A.   I do not.

19       Q.   Have you ever been admitted by any court in

20  the world to opine on what is or what is not a trade

21  secret?

22       A.   I have not.

23       Q.   In terms of your usage of the term trade

24  secret, are you utilizing the definition found in the

25  Uniform Trade Secrets Act?
```

Cheri Kane
January 13, 2025

1     A.    I have read it.  I believe I have read that

2   statute.  No, I am saying that in the respect to

3   hospital and healthcare revenue cycle management,

4   it's trade secret confidential information that's key

5   information for vendors.

6     Q.    So I would not -- I am going to ask you

7   about trade secrets, because you admit that you

8   utilized the term trade secrets repeatedly throughout

9   your report, correct?

10    A.    Yes.

11    Q.    So by utilizing a legal term of art, it

12   follows that you have some definition of the term

13   trade secrets, correct?

14    A.    I have read the information and the

15   definition regarding trade secrets.

16    Q.    Okay, that's fantastic.  Now I ask you:  Are

17   you using the definition from the Uniform Trade

18   Secrets Act?

19    A.    I don't know.  I can't respond to that.

20    Q.    Are you using the information from the

21   Federal Defend Trade Secrets Act?

22    A.    I can not respond to that.

23    Q.    Are you utilizing the information from the

24   Florida Trade Secrets Act?

25    A.    I have read the Florida Trade Secrets Act.

Cheri Kane
January 13, 2025

1    Q.   I am not asking if you read it, I am asking

2    which definition you are using.

3    A.   Trade secrets, confidential information

4    regarding revenue cycle, these are all very -- I

5    mean, it's very important confidential information to

6    these businesses.

7    Q.   So Ms. Kane, so that I understand, when you

8    say trade secrets, you agree with me this is a trade

9    secrets case, correct?

10   A.   Yes.

11   Q.   Okay.  And in your report you have

12   repeatedly said these are trade secrets, correct?

13   A.   Yes.

14   Q.   So in a trade secrets case, if you are an

15   expert witness who repeatedly says something is a

16   trade secret, doesn't it follow that you are

17   utilizing a legal term of art pertaining to the

18   claims at issue?

19        MR. ATTRIDGE:  Objection.  Form.

20   A.   In the Florida Statute that talks about

21   algorithms, protocols, processes or trade secrets,

22   along with other information.

23   Q.   Do you want to talk about the Florida

24   Statutes?

25   A.   No, I'm telling you I read it and I'm

Cheri Kane
January 13, 2025

1   telling you what the definition said.

2       Q.   So when you used the term trade secrets, it

3   seems to me like you are using trade secrets to refer

4   to important information.

5           MR. ATTRIDGE:  Objection.  Form.

6       Q.   Is that accurate?

7       A.   No.  What I'm referring to is confidential

8   information for businesses that can be used and

9   leveraged by other vendors.

10      Q.   So when you say trade secret, do you mean

11  not available to the public at large or do you mean

12  not available to other competitors in the industry?

13          MR. ATTRIDGE:  Objection.  Form.

14      A.   It's not available to other vendors and it's

15  not available to the general public.

16      Q.   Okay.  In terms of the particular industry,

17  I'm going to define this particular industry as RCM

18  denials; is that fair?

19      A.   Yes.

20      Q.   Okay.  So within that particular industry,

21  who are the biggest players in the market?

22      A.   Aspirion --

23          MR. ATTRIDGE:  Objection to form.

24      A.   -- is number one in class and perceived as

25  an industry leader in that market.

Cheri Kane
January 13, 2025

1    Q.   No, who are the other major competitors in

2  the RCM denials market?

3    A.   I think there is a variety I think.  There

4  is Enthrive.  There is a lot of vendors that are in

5  the denials market.  However, they are not doing what

6  Aspirion is doing.

7    Q.   Okay.

8    A.   As far as I know, they are not using

9  attorneys to appeal claims.

10   Q.   Could you name ten competitors in the market

11 for me?

12       MR. ATTRIDGE:  Objection.  Form.

13   A.   I probably cannot name ten.  I can probably

14 name a few.

15   Q.   Well, go ahead, name who you can.

16   A.   EnThrive, Elevate, Certa are a few of the

17 major companies.

18   Q.   That's it?  You named three companies.

19 That's all you can think of?

20       MR. ATTRIDGE:  Objection.  Form.

21   A.   This information is not in my report.  Can

22 you -- is there some requirement --

23   Q.   Ma'am, I'm allowed to ask you about anything

24 that's pertinent here, okay, and what I am trying to

25 get a handle on is the scope of the relevant market,

Cheri Kane
January 13, 2025

1   okay?  So you just referred to Aspirion as number one

2   first class.  Is it your testimony that Aspirion is

3   the largest RCM denials vendor in the country?

4          MR. ATTRIDGE:  Objection.  Form.

5      A.   I don't know who the largest is.  What I

6   said was KLAS rated Aspirion as number 1 in denials

7   management.  KLAS rating.  KLAS is a specific revenue

8   cycle evaluation company.

9      Q.   Okay.  So you have testified via your report

10  that Aspirion has this mix of information that

11  constitutes a trade secret, correct?

12     A.   Confidential information and trade secret,

13  yes.

14     Q.   Okay.  And so in reaching this conclusion,

15  how many other companies in the RCM denials space did

16  you use as comparators?

17         MR. ATTRIDGE:  Objection.

18     A.   I'm not sure I understand your question.

19     Q.   Okay.  If you were going to testify that

20  what Aspirion does and what Aspirion has is unique in

21  this marketplace, that uniqueness necessarily entails

22  that Aspirion's key competitors don't have access to

23  the same general mix of information, correct?

24         MR. ATTRIDGE:  Objection.  Form.

25     A.   Excuse me, I'm sorry, what I am testifying

1   is that the information that they have, that they

2   have created is confidential information that is not

3   available publicly and not available to other

4   vendors.

5       Q.    Isn't it fair to say that many other vendors

6   in this space have a similar mix of information?

7       A.    No, I don't believe so, because they have,

8   for example, the Priority Report, where they, ██████

    ████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████████████   So they have a unique pool of

12  information specifically and unique to Aspirion as

13  one example.

14      Q.    Okay.  Did you, as part of preparing this

15  report, did you evaluate what Optum does in the RCM

16  denial space?

17      A.    I did not.  I have worked with Optum in the

18  past, as recently as six months ago.

19      Q.    Well, I am not asking about the past, I am

20  asking about in connection with this report.  Did you

21  study what Optum currently does in the RCM denial

22  space?

23          MR. ATTRIDGE:  Objection.  Form.

24      Q.    Did you study what Conifer does in the RCM

25  denial space?

Cheri Kane
January 13, 2025

```
 1      A.    I did not.

 2      Q.    Did you study what Ensemble does in the RCM

 3  denial space?

 4      A.    I did not.

 5      Q.    Did you study what R1 does in the RCM denial

 6  space?

 7      A.    I did not.

 8      Q.    Did you study what Notion does in the RCM

 9  denial space?

10      A.    I did not.  I am not sure that any of these

11  vendors would even share it with me what they would

12  do given the competitive nature and the confidential

13  information that they have.

14      Q.    Okay, let's just talk about -- let's talk

15  about Banner, okay?  So with respect to Banner, do

16  you agree with me that Aspirion has experienced a

17  significant decrease in its revenue from Banner over

18  the past year or so?

19          MR. ATTRIDGE:  Objection.  Form.

20      A.    I believe it's stated in my report that

21  Banner had a decrease.  I have to look for those

22  specific numbers.  It had an 89 -- let's see.  They

23  had an 83 percent reduction in aggregate claims

24  dollar value placed with Aspirion.

25      Q.    Are you opining that the defendants caused
```

Cheri Kane
January 13, 2025

1  that decrease?

2      A.    Yes, I believe that there was a substantial

3  impact by the defendants upon this decrease in

4  placements.

5      Q.    Okay.  So your testimony, what you have been

6  brought in to opine on, you are saying that you are

7  testifying as an expert that the defendants' conduct

8  led to the decrease in the Banner Healthcare

9  business?

10     A.    What I'm saying is, as stated in my report,

11 they substantially noticed an 83 percent reduction in

12 aggregate claims dollars placed with Aspirion from

13 Banner.

14     Q.    You are not a damages expert, are you?

15     A.    I am not a damages expert.

16     Q.    Okay.  In terms of the decrease in Banner

17 revenue, can you quantify how much of Banner's

18 business Banner brought inhouse?

19     A.    I don't think that's what I stated.  I

20 didn't say there was a decrease in revenue.  What I

21 said, there was a decrease in aggregate claims

22 dollars placed.  I am not sure they know the outcome

23 at this time.

24     Q.    Ms. Kane, if Banner brought a significant

25 percentage of its claims denials work inhouse,

Cheri Kane
January 13, 2025

1  wouldn't that affect the volume of claims placed with

2  Aspirion?

3          MR. ATTRIDGE:  Objection.  Form.

4      Foundation.

5      A.   I sourced -- excuse me.  I sourced the

6  interrogatories along with other documents on this

7  information.  I have not evaluated the revenue.  I

8  can't answer that question.

9      Q.   I am not asking you about the revenue, I am

10  asking you about the claims placed.  If Banner moved

11  a significant volume of its claims denials business

12  inhouse, wouldn't that affect the volume of claims

13  available to be placed with external vendors like

14  Aspirion?

15          MR. ATTRIDGE:  The same objections.

16     A.   Yes.  That could affect that, yes.

17     Q.   Did you take that into account?

18     A.   That's always the -- I guess that's always a

19  potential issue with clients and change in vendor

20  placements.

21     Q.   So if Aspirion has had this 80-something

22  percent reduction in claims placed from Banner, don't

23  the numbers just speak for themselves; the causal

24  chain there is not something you are capable of

25  opining on; is that correct?

Cheri Kane
January 13, 2025

```
 1            MR. ATTRIDGE:  Objection.  Form.
 2       A.   Sir, what I know is that Banner is not a
 3  contract with Ternium.  That's a fact I know.
 4       Q.   But you are not qualified to opine on why
 5  the number of claims placed by Banner with Aspirion
 6  has decreased, you are not qualified to opine on
 7  that, are you?
 8            MR. ATTRIDGE:  Objection.
 9       A.   I do not have visibility into that specific
10  answer.
11       Q.   Then why is your report talking about an
12  80-something percent decrease?
13       A.   Because it is discussed in general cause and
14  effect and an outcome and a reason why potentially
15  there were decreases given that contracts were signed
16  between Ternium and Banner, and talk.
17       Q.   So you agree with me that by saying
18  discussing cause and effect in an outcome, you are
19  talking about causation, correct?
20            MR. ATTRIDGE:  Objection.  Form.
21       A.   As I understand it, there is additional
22  documents that are still pending, so I have the
23  ability to update my opinion as those documents are
24  provided.
25       Q.   That's not what I am asking you.  I am not
```

Cheri Kane
January 13, 2025

1   asking if you have the ability to update your report

2   or look at other documents.  I am asking you by

3   saying -- and we can have the court reporter read it

4   back if we need to.  You just said cause and affect

5   in the outcome.  You agree with me that by saying

6   cause and affect in the outcome you are talking about

7   causation, correct?

8          MR. ATTRIDGE:  Objection.  Form.

9      A.   Yes, I'm saying that is a potential reason

10  why there has been a change with Aspirion in

11  placements.

12     Q.   You are talking about causation of damages,

13  correct?

14     A.   I'm quoting the interrogatories and looked

15  at that as a potential reason why there was an

16  affect, an outcome, a change in outcome in Aspirion.

17     Q.   Do you have an accounting background?

18     A.   No, I have a revenue cycle management

19  background.  It's not accounting.  There is nothing

20  logical about revenue cycle management.

21     Q.   So a core part of your testimony here, as

22  you have described it, is the importance of

23  relationships, correct?

24          MR. ATTRIDGE:  Objection.  Form.

25     Q.   I didn't hear your answer.

Cheri Kane
January 13, 2025

```
 1        A.    Yes.

 2        Q.    So basically that relationships between a

 3  vendor like Aspirion and clients like Banner are

 4  valuable, correct?

 5        A.    Yes, those relationships are important.

 6        Q.    Isn't that something that an eight grader

 7  can understand without the benefit of your testimony?

 8              MR. ATTRIDGE:  Objection.  Form.

 9        A.    No, I don't believe so.  Healthcare is quite

10  unique.  It's very human-based.  Decisions are

11  human-based.  The defendants themselves worked hard

12  to maintain those relationships via e-mails, phone

13  calls, meetings.  They obviously felt like that that

14  was key.  Aspirion spent a lot of time and money,

15  resources to develop those relationships, and the

16  defendants continued those relationships.  So they

17  obviously thought those relationships were important

18  too.

19        Q.    Okay.  And again, to go back to the purpose

20  of expert testimony, you understand that the purpose

21  of expert testimony is to help explain scientific,

22  technical or otherwise information that is so complex

23  that the average juror could not understand it.  Do

24  you understand that?

25              MR. ATTRIDGE:  Objection.  Form.
```

Cheri Kane
January 13, 2025

```
 1     A.   Yes, and I believe my 45 years of revenue
 2   cycle management experience support that.
 3     Q.   Okay.  In terms of relationships, let's
 4   stick on the particular tangent of relationships,
 5   okay?  What about maintaining these relationships and
 6   the importance of these relationships is so complex
 7   that a reasonable juror could not understand it
 8   without the benefit of your testimony?
 9          MR. ATTRIDGE:  Objection.  Form.
10     Foundation.
11     A.   Trust in relationships in the healthcare
12   environment are why hospitals buy services.  That's
13   unique from the perspective, that key could be
14   issued, and quality, price may not be the deciding
15   factor, it may be a relationship because someone
16   knows that they can trust a vendor to collect the
17   dollars on their denials.
18          These are long-standing difficult tasks.
19   The CFO has to depend that those dollars can be
20   collected for his budget, for his next budget year.
21   He may create strategic plans based on that.  So
22   trust in relationships are very key.  They are
23   developing a partnership with these vendors.
24     Q.   Do you drive a car, Ms. Kane?
25     A.   I'm sorry?
```

Cheri Kane
January 13, 2025

```
1       Q.   Do you drive a car?

2       A.   I have hearing aids.  I did not hear your

3   question.

4       Q.   Do you drive an automobile?

5       A.   Yes, sir.

6       Q.   Okay, have you ever taken your car to a

7   mechanic?

8       A.   Yes, I have.

9       Q.   Have you ever, throughout your life, had a

10  mechanic who was your regular mechanic?

11      A.   No, I haven't.

12      Q.   Where do you take your car?

13      A.   Actually, my husband takes my car.

14      Q.   Do you know where he takes the car?

15      A.   To the Mercedes dealer.

16      Q.   The Mercedes dealer, okay.  Why does he take

17  the car to the Mercedes dealer?

18      A.   Because it's a Mercedes.

19      Q.   Well, beyond that, has he taken it to the

20  Mercedes dealer multiple times?

21      A.   I guess I question how this is relevant to

22  my expert witness case.

23      Q.   It's not your deposition, it's mine.  Has he

24  taken it to the Mercedes dealership multiple times?

25      A.   Actually, no.
```

Cheri Kane
January 13, 2025

1      Q.    Is it a new car?

2      A.    It's 12 years old.

3      Q.    Hasn't it needed oil changes and spark plug

4   changes, you know, periodic maintenance?

5      A.    Again, I don't take my car, my husband takes

6   care of my car.

7      Q.    You agree with me that when people or

8   customers use a particular vendor, that as an

9   ordinary premise they are going to consider a variety

10  of different factors in terms of who they hire for

11  any service, correct?

12          MR. ATTRIDGE:  Objection.  Form.

13     Foundation.

14     A.    Yes, that is correct, there are a variety of

15  different factors.

16     Q.    And so in terms of hiring a vendor for

17  anything of significant dollars, one would ordinarily

18  consider factors such as -- and please don't cut me

19  off, I am going to go through these one at a time and

20  just let me know whether or not you agree that these

21  are the factors people would consider, okay, whether

22  or not you trust the person, correct?

23          MR. ATTRIDGE:  I'm going to object.  Form,

24     foundation, calls for speculation, and it is even

25     a vague question here.

```
 1          MR. POLLARD:  Kevin, you can just say form,
 2     okay?  We don't need to do all the speaking
 3     objections.
 4     Q.   Do you agree with me, Ms. Kane, that in
 5  terms of hiring any vendor, we can even focus in this
 6  space:  Customers are going to hire based on a number
 7  of different criteria, correct?
 8          MR. ATTRIDGE:  The same objections.
 9     A.   Yes, every revenue cycle management vendor,
10  the clients are going to have multiple different
11  factors they are going to look at.  As I stated in my
12  report, price, quality are some of them, along with
13  relationships.
14     Q.   Is that concept that clients are going to
15  consider, price, quality, relationships, is that
16  concept so complex and technical that it requires
17  your testimony for a jury to understand it?
18          MR. ATTRIDGE:  Objection.  Form.
19     A.   I think the revenue cycle industry is so
20  complex, and that is discussed in my report, the
21  quality, the price, the relationship.
22          Revenue cycles are totally different than
23  anything.  That's why I am not an accountant and why
24  it's not accounting, it's revenue cycle.  So
25  specifically how denials are worked, how all -- these
```

Cheri Kane
January 13, 2025

1  aspects are very complex.  So yes, those things do

2  require someone with an internal perspective.

3     Q.   You said how denials work.  Are you telling

4  me that your expert testimony is necessary to explain

5  to the jury how denials work?

6     A.   I think it's one of the aspects, yes.

7     Q.   Okay, what about that is so complex that it

8  requires your testimony?

9     A.   No two hospitals have the same internal

10  process, which you need to understand in order to do

11  denial work.  Every hospital has multiple payors.

12  Those contracts are all different.

13        So in order to complete the denial process,

14  you have to understand the contracts, you have got to

15  understand the hospital and all of the layers and

16  services that are provided, CARC and Remark codes,

17  diagnosis codes, there are 400 codes, why a claim

18  could be denied, along with all of the services,

19  cancer, psychology, mental health, all of those, so

20  it is very complex.

21        And then you have got the appeal itself,

22  which has multiple layers.  You have got to identify

23  the issue with the medical records, determine how to

24  appeal, it, does it meet the timelines.  So yes, it

25  is very layered and very complex.

Cheri Kane
January 13, 2025

1    Q.    How does that, what you just said, interplay

2   with your testimony about supposed confidential

3   information or trade secrets, is it your testimony

4   that those things, that information is a trade

5   secret?

6         MR. ATTRIDGE:  Objection.  Form.

7    A.    The contracts between the payors and the

8   hospitals are definitely confidential information,

9   perceived not only by the hospital but by the payors.

10  So that information is confidential, along with, you

11  know, the hospitals, how the hospital charges, that

12  is confidential information.  The hospital perceives

13  that as confidential information.

14        So -- and then on the vendor side, how those

15  appeals function, how you appeal, what that process

16  looks like.  Aspirion has specialized and

17  extraordinary training programs that talk

18  specifically about services, cancer and other

19  services, and how to appeal claims.

20        All of that information is nonpublic.  It is

21  not readily available.  It's not public information,

22  and that is confidential information.

23   Q.    So you used the term specialized or

24  extraordinary training.  Is there a specific reason

25  why you are using that exact language?

Cheri Kane
January 13, 2025

1    A.   Because it's very different training than

2  what hospitals have for denials, so that is very,

3  very unique, how Aspirion trained their attorneys to

4  perform those denials.

5    Q.   Do you understand that the term specialized

6  or extraordinary appears in Florida Statutes 542.335?

7  It is a subchapter of the Florida Antitrust Act.  Are

8  you aware of that?

9    A.   I believe -- I don't have -- I only have my

10 expert report here, but I believe that I read that

11 statute, yes.

12   Q.   Okay.  So that's what I was getting at,

13 right?  So you are using the term extraordinary or

14 specialized training which you appeared to have

15 derived from Florida Statutes 542.335, correct?

16   A.   Again, I don't have that statute in front of

17 me.  I don't think it is referenced in my report, but

18 I did read that document.

19   Q.   Okay.  So when you say extraordinary or

20 specialized training, you mean as compared to what?

21   A.   I'm sorry, sir, I did not hear you.

22        (A portion of the record was read by the

23    reporter)

24   A.   As compared to the hospital training that I

25 have seen as compared to the trainings that I had

Cheri Kane
January 13, 2025

```
 1   developed at The Outsource Group, as compared to
 2   trainings that I have developed for some of my
 3   clients.
 4       Q.   Okay.  Are you familiar with the training
 5   that Optum provides its employees who work in RCM
 6   denials?
 7       A.   I don't have privy to that information.  I
 8   haven't seen that.
 9       Q.   Okay.  The same question with respect to
10   Conifer, are you familiar with the training Conifer
11   provides?
12       A.   I am not.
13       Q.   Are you familiar with the training Ensemble
14   provides?
15       A.   I am not.
16       Q.   Are you familiar with the training R1
17   provides?
18       A.   I am not.
19       Q.   Are you familiar with the training Notion
20   provides?
21       A.   I'm not even familiar with that company.
22   No, I'm not.
23       Q.   Did Aspirion replace the Ternium defendants
24   on key accounts with new personnel?
25       A.   I cannot respond to that question.  I do not
```

Cheri Kane
January 13, 2025

1  know.

2      Q.   Okay.  Did Aspirion replace the Ternium

3  defendants with new employees who also have JDs?

4      A.   I cannot respond to that.  It's not part of

5  my report.

6      Q.   Well, Ms. Kane, you agree that your report

7  talks about damages to Aspirion and the cause and

8  effect of the Ternium defendants leaving and damage

9  being done to Aspirion.  So you agree with that.

10  Your report talks about the Ternium defendants

11  leaving and then the damages being done to Aspirion,

12  correct?

13          MR. ATTRIDGE:  Objection.  Form.

14      A.   Again, I'm not a damages expert.  What I am

15  relating is information that was in the

16  interrogatories.

17      Q.   Okay.  Can you look at your report, please?

18  I would like you to go to Paragraph 44 of your

19  report.  It's on page 13.

20      A.   Yes.

21      Q.   The last line of Paragraph 43 -- you can

22  read the whole thing, but if you look at the last

23  line:  All of these actions permanently damaged

24  Aspirion's client relationships and reputation in the

25  marketplace.

Cheri Kane
January 13, 2025

```
1       A.   Yes.

2       Q.   So you are not a damage expert, but you have

3  big sweeping conclusions in here about actions that

4  have permanently damaged Aspirion's client

5  relationships and reputation, correct?

6            MR. ATTRIDGE:  Objection.  Form.

7       A.   Yes.  And I'm speaking based on my

8  experience.  If I was a hospital client and someone

9  had told me early in 2023 that they were leaving, the

10 defendant was leaving Aspirion and was going to start

11 his new business, and two of Aspirion's clients even

12 asked what's happening in Aspirion, because all the

13 people are leaving.  So that was Cedar Sinai and

14 Sharp are wondering what is happening at Aspirion

15 because people are leaving.

16           So from my perspective, if I was a client

17 and was placing an account, I would be concerned

18 about the collection of my accounts and what was

19 happening and why are people leaving.  So that is

20 what I am basing that statement on, my personal

21 experience, how I would feel.

22      Q.   But see, I'm trying to get a handle on what

23 the scope of your supposed expert testimony is here,

24 and when you have a line like this, all of these

25 actions permanently damages Aspirion's client
```

Cheri Kane
January 13, 2025

```
 1  relationships and reputation in the marketplace, how

 2  does that fall within the scope of your proffered

 3  expert testimony if you are not a damages expert?

 4          MR. ATTRIDGE:  Objection.  Form.

 5      A.   Again, sir, the statement is referring to

 6  how I would perceive it as a client, if I were a

 7  client at Aspirion, and from these statements that

 8  some of the clients stated, that they are concerned

 9  about the people leaving from Aspirion.

10      Q.   How is how you would perceive something if

11  you were a client a proper subject for expert

12  testimony?

13          MR. ATTRIDGE:  Objection.  Form.

14      A.   I believe it's absolutely pertinent.  I have

15  45 years of healthcare experience, working and

16  leading some of the largest healthcare organizations

17  in the country, working for PriceWaterhouseCoopers, I

18  worked Community Health Systems with 200 hospitals,

19  and I don't believe I am different than any of these

20  leaders at these large organizations.

21      Q.   So basically you are providing us with an

22  insight into how these clients and the sophisticated

23  decision-makers would view this ordeal?

24          MR. ATTRIDGE:  Objection.  Form.

25      A.   Based on my experience, I am stating what I
```

Cheri Kane
January 13, 2025

1  believe these clients, and actually Sharp, along with

2  Cedar Sinai, both stated what is happening at

3  Aspirion with all the people leaving.  That Mays,

4  Kelly and Jewell managed 75 percent of the success or

5  client success executive directors.  So they managed

6  75 percent of the clients.  So those clients are

7  definitely concerned that those leaders collectively

8  left.

9          And the fact that Cameron continued to talk

10 about Ternium early in 2023 and the defendants

11 continued to send e-mails and tell them the status of

12 Ternium, you know, what new contracts they had, what

13 communication.

14         So I think all of that had an effect and

15 would to me if I was one of these leaders contracting

16 with Aspirion.

17     Q.   Did the folks who replaced the Ternium

18 defendants have JDs?

19         MR. ATTRIDGE:  Objection.  Form.

20     A.   I believe I have already answered the

21 question.  I said I don't know the answer to that.

22     Q.   Let's go to your report, Page 3.  This is

23 the summary of your opinions, okay?

24     A.   Yes.

25     Q.   Alright, the first bullet:  The RCM industry

Cheri Kane
January 13, 2025

1    and the claim denial subcategory in particular is an

2    extraordinary complex and competitive environment.

3    Is that the general thrust of that specific opinion?

4              MR. ATTRIDGE:  Objection.  Form.

5         A.    I think to outline it more specifically,

6    yes, it's very competitive.  Lower rates, more

7    favorable contract terms can definitely win clients.

8         Q.    And that's why your expertise is necessary

9    for us to understand?

10        A.    I think that, yes.

11        Q.    Okay, the second one:  Given the nature of

12   the industry, it is critical for denials vendors,

13   like Aspirion, to develop relationships with clients

14   and prospective clients in order to drive business.

15   Aspirion has active on-going relationships with its

16   clients and defendants have gained a competitive

17   advantage by leveraging Aspirion's client

18   relationships because Ternium was able to bypass the

19   lengthy and expensive effort normally required to

20   recruit new clients.

21              So the thrust of this is that client

22   relationships are important?

23              MR. ATTRIDGE:  Objection.  Form.

24        A.    Active on-going client relationships are key

25   to maintaining business, and Aspirion had those,

Cheri Kane
January 13, 2025

 1  those on-going relationships, until they were

 2  potentially disrupted, misappropriated by the

 3  defendants.

 4      Q.   Let's go to the next one.  We have already

 5  covered whose training you have used as a comparator.

 6  Let me ask you, are there other companies in the RCM

 7  denial space who also use JDs?

 8      A.   Not that I'm aware of.  Not in the level

 9  that Aspirion does.

10      Q.   Well, how many other companies did you

11  survey in order to arrive at that conclusion?

12      A.   The companies that I have worked with in the

13  past.

14      Q.   Okay.  So this is an aspect of your

15  testimony which can be reduced to a methodology.  So

16  I would like to ask you in terms of you opining that

17  Aspirion's training is specialized or extraordinary

18  vis-a-vis competitors in the market, could you please

19  explain to me briefly your research design framework?

20          MR. ATTRIDGE:  I object.

21      A.   Again, I worked for The Oursource Group in

22  the denials management space.  I also worked for

23  PriceWaterhouseCoopers.  I think anyone would say

24  that PriceWaterhouseCoopers in the revenue management

25  space was an exceptional vendor, and we had denials

Cheri Kane
January 13, 2025

 1   management.  We had nothing to the level of the

 2   training that Aspirion had.

 3       Q.   Okay, but you didn't perform an actual

 4   survey or study of any sort to reach this conclusion?

 5       A.   I did not do a study of any sort to come up

 6   with that.  I'm not sure that -- I believe that these

 7   vendors would consider their information confidential

 8   and I doubt if they would share their information, to

 9   be frank.

10       Q.   I don't understand what you were talking

11   about in terms of sharing their information.  I'm

12   asking you about whether or not you did a survey of

13   the training utilized by competitors in the RCM

14   denial space and your testimony is no, you didn't do

15   a survey?

16       A.   I did not do a survey; however, I have

17   extensive experience with PriceWaterhouseCoopers and

18   The Outsource Group.

19       Q.   When you talk about PWC, you keep mentioning

20   PWC, what is the significance of your repeated

21   references to PWC?

22       A.   I worked for PWC for six and a half years as

23   a Managing Director.  PWC had their own outsource

24   company that performed denials work, which I worked

25   with, and they were highly successful and were doing

Cheri Kane
January 13, 2025

1  outsource work for a variety of vendors, along with

2  The Outsource Group that was purchased by R1.

3      Q.   Let's go to your next conclusion.  This is

4  about confidential and proprietary and trade secret

5  data.  We have already covered that.  I am just

6  trying to wrap this up.

7          MR. ATTRIDGE:  Counsel, you mentioned you

8      are about to wrap up or trying to wrap up.  About

9      how much longer?  I know we have been going for

10     about an hour, and I'll leave it up to Ms. Kane

11     whether she wants to break now or not, but if you

12     are going to wrap up in 15 minutes, maybe she will

13     want to go --

14         MR. POLLARD:  I will be done in 15 minutes.

15         MR. ATTRIDGE:  Ms. Kane, would you like to

16     continue on or do you need a break?

17         THE WITNESS:  Let's continue on.  If it goes

18     much longer, though, than 15 minutes, I would like

19     a break.

20     Q.   Certainly.  So let me ask you, because your

21  testimony gets into things like 542, it doesn't

22  mention 542, but you use terms of art from 542 here

23  and there.

24         MR. ATTRIDGE:  Objection.

25     Q.   Of the four Ternium defendants, are you

Cheri Kane
January 13, 2025

1  aware who had restrictive covenants and who didn't?

2      A.   Yes.  Julian Cameron as I understand it.

3      Q.   So with respect to the other Ternium

4  defendants, what was to stop the other Ternium

5  defendants from lawfully setting up a competitive

6  business and competing for the same clients?

7          MR. ATTRIDGE:  Objection.  Form.

8      Foundation.

9      A.   They signed the employee handbook, which

10  protects confidential information for the company,

11  and has other requirements which they agreed to.

12      Q.   Okay, but nothing in any contract agreement

13  or handbook would have prevented Mays and Kelly from

14  establishing a competing business, correct?

15          MR. ATTRIDGE:  Objection.  Form.

16      Foundation.

17      A.   I'm not sure I can speak to that.  I'm not

18  an attorney.

19      Q.   Isn't it true to say that you have spoken to

20  a lot of things that involve law and legal terms of art?

21          MR. ATTRIDGE:  Objection.  Form.

22      A.   I don't believe I have.  I talked about -- I

23  said I read a statute.  I don't believe I have.

24      Q.   Well, in your report you talk about the

25  defendants stealing employees, correct?

Cheri Kane
January 13, 2025

1    A.   Yes.  Yes, Ternium was hiring Aspirion's

2  employees.

3    Q.   Okay.  Do you agree with me that if not

4  prevented by any particular restrictive covenant, a

5  competitor has every right to hire the employees of a

6  rival?

7         MR. ATTRIDGE:  Objection.  Form.

8    A.   Again, I am not an attorney, but I believe

9  the restricted covenants for Jewell and Cameron

10 stated there was restrictions on hiring employees.

11   Q.   But Mays and Kelly would have been able to

12 start their own competing venture and hire whoever

13 they wanted from Ternium, correct?

14         MR. ATTRIDGE:  Objection.  Form.

15   A.   Again, I am not an attorney.  I can't speak

16 to what kind of restrictions they have.

17   Q.   I don't have anything further.  I'm done.

18 We will order.  Can we get it expedited?

19         MR. ATTRIDGE:  I do have some follow-up of

20    direct.

21         MR. POLLARD:  No problem.

22         MR. ATTRIDGE:  Thank you.

23                  CROSS-EXAMINATION

24 BY MR. ATTRIDGE:

25   Q.   Ms. Kane, how long have you worked in the

Cheri Kane
January 13, 2025

1    RCM industry?

2        A.    Actually 45 years.

3        Q.    And have you worked on denials projects?

4        A.    Yes, I have led extensive denial projects

5    for large organizations, such as Integris, Community

6    Health.  I had more than 100, 250 employees doing

7    performing denials at Community Health.  Along with

8    The Outsource Group, I had more than 100 employees

9    performing denials at The Outsource Group.

10       Q.    Please explain, are those companies vendors,

11   are they consulting firms, can you give us the nature

12   of those companies?

13       A.    Sure.  PriceWaterhouseCoopers is consulting

14   and they were also a vendor performing revenue cycle

15   work through the North Carolina office.

16             The Outsource Group is a vendor.

17   Specifically we did not do consulting, we

18   specifically did all sorts of end-to-end revenue

19   cycle for hospitals.  I was Division President of the

20   Insurance Division.  I had more than 500 employees

21   there.  That organization was subsequently purchased

22   by R1.

23       Q.    Have you done denials work while working for

24   hospitals?

25       A.    Absolutely.  Most recently I was at Stamford

Cheri Kane
January 13, 2025

1  Hospital as the Interim Vice President -- Interim

2  Executive Director of Revenue Cycle for that facility

3  from January through June of 2023, and led their

4  Internal Denials Management Group.

5      Q.   Did you gain intelligence about the denials

6  industry by working in these positions that you just

7  went through?

8      A.   Yes.  We had a variety of -- a team

9  internally.  We had approximately six people and a

10  couple of nurses doing denials, and then we

11  outsourced our work to Elevate to do complex denials.

12      Q.   You otherwise would not gain that knowledge

13  about the denials industry if you did not work in

14  these positions?

15      A.   Correct.  I mean, these are very detail

16  in-depth organizations.  Obviously Community Health

17  Systems, I said I had 200 employees, approximately,

18  doing denials.  We were, one, generating a billion

19  dollars in cash every month for the hospitals, so

20  yes.

21      Q.   Earlier in your deposition you talked about

22  training, employee training.  Do you have experience

23  in denials training?

24      A.   Yes, I do.  Not only have I developed

25  programs for The Outsource Group, but I have assisted

Cheri Kane
January 13, 2025

1    and led teams, such as at Stamford developed denials

2    training, and then at PriceWaterhouseCoopers I was

3    responsible for the whole suite of training for

4    PriceWaterhouseCoopers, and part of that was on the

5    denials topic.

6        Q.   And so when you conclude that Aspirion

7    training is specialized in your report, you are

8    basing that on those past experiences?

9        A.   Yes.  Aspirion's training is much different

10   from the perspective that it's based on diagnosis.

11   The work flows are very specific.  Some of them are

12   cancer-related.  They had a whole variety of very

13   specialized training that talked about how to

14   overturn specific denials.

15       Q.   If you could turn to page 1 of your report.

16   Do you have it there in front of you?

17       A.   Yes.

18       Q.   Beginning at Paragraph 3, it says:  I have

19   also been asked to evaluate whether Aspirion provides

20   specialized or extraordinary training to its staff.

21   So does that mean that you were asked to evaluate

22   whether the training program at Aspirion was

23   specialized or extraordinary?

24       A.   Yes.  Yes.

25       Q.   Those weren't terms that you came up with

Cheri Kane
January 13, 2025

1  yourself, right, that was the task?

2      A.   Yes, that is correct.

3      Q.   In your 45 years in the RCM industry, you

4  have seen similar information that you described as

5  confidential information in your report, correct?

6      A.   Yes, I have.

7      Q.   The same categories of information, is that

8  correct, business informations?

9      A.   Yes, that is correct.

10      Q.   And based upon your experience with that

11  type of information, that's what led you to conclude

12  that that type of business information is not

13  confidential information?

14      A.   I'm sorry, can you repeat the question?

15      Q.   Sure.  Sure.  Bear with me one moment.  You

16  have seen the same type of information that you

17  discuss in your report when it comes to confidential

18  information during your time in the denials industry;

19  is that correct?

20      A.   Absolutely.  At PriceWaterhouseCoopers, The

21  Outsource Group, along with a variety of other

22  organizations that I have worked with.

23      Q.   And was that type of information ever

24  publicized outside the company?

25      A.   No, it was heavily protected by those

Cheri Kane
January 13, 2025

 1  organizations.  Training materials, all those

 2  documents were heavily protected by those

 3  organizations and not shared outside with the clients

 4  or with the vendors.

 5      Q.   Does that include business intelligence?

 6      A.   Yes, absolutely.  Account history, account

 7  placements, account recoveries, wins and losses,

 8  absolutely, that is highly guarded by those

 9  organizations.

10      Q.   And Sales Force in particular, have you ever

11  come across Sales Force before in your experience?

12      A.   Yes, several organizations that I have

13  worked with use Sales Force, including PWC.

14      Q.   And for denials in particular, did those

15  companies store the same type of information?

16      A.   Yes, in a customer relationship database,

17  CRN database of some sort, whether it was a Sales

18  Force or another, but that information was stored and

19  only allowed to be seen by a few senior leaders.

20      Q.   And was that information, was it specific to

21  their clients?

22      A.   Yes, it was typically specific to the

23  clients that they had.

24      Q.   So from your review of Aspirion's Sales

25  Force database, you saw the same type of information,

Cheri Kane
January 13, 2025

```
 1   but it was different because it was client-specific?
 2       A.    That's correct, and also obviously Aspirion
 3   had a variety of customized fields and things that
 4   were unique to Aspirion, whether it's the health
 5   score or any of those that are unique.
 6       Q.    I have no further questions.
 7            MR. POLLARD:  We will take the transcript.
 8            THE COURT REPORTER:  Read, waive?
 9            MR. ATTRIDGE:  Read, please.
10            THE COURT REPORTER:  Kevin, are you ordering
11       the transcript too?
12            MR. ATTRIDGE:  We are.  We are, yes.  I will
13       contact you.  I need to talk to folks at the shop
14       whether we are expediting or not.
15            (The witness was excused.)
16            (At 3:30 p.m. the deposition was concluded.)
17
18
19
20
21
22
23
24
25
```

Cheri Kane
January 13, 2025

1          C E R T I F I C A T E   O F   O A T H

2                              - - -

3    STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6          I, RICHARD GREENSPAN, CM, FAPR, Notary

7    Public, State of Florida, certify that CHERI KANE

8    appeared before me on remote video/audio conference

9    on January 13, 2025 and was duly sworn.

10         Signed January 15, 2025.

11

12

13    _____

14              RICHARD GREENSPAN, CM, FAPR

15            NOTARY PUBLIC - STATE OF FLORIDA

16              My Commission #HH 209771

17              Expires:  March 12, 2026

18

19

20

21

22

23

24

25

Cheri Kane
January 13, 2025

1                C E R T I F I C A T E

2                      - - -

3   STATE OF FLORIDA

4   COUNTY OF PALM BEACH

5

6      I, RICHARD GREENSPAN, CM, FAPR, certify that I

7   was authorized to and did stenographically report the

8   remote video deposition of CHERI KANE, pages 1

9   through 51; that a review of the transcript was

10  requested; and that the transcript is a true record

11  of my stenographic notes.

12

13     I further certify that I am not a relative,

14  employee, attorney, or counsel of any of the parties,

15  nor am I a relative or employee of any of the

16  parties' attorneys or counsel connected with the

17  action, nor am I financially interested in the

18  action.

19     Dated January 15, 2025.

20

21

22  _____

23            RICHARD GREENSPAN, CM, FAPR

24

25

Cheri Kane
January 13, 2025

1                        ERRATA SHEET

2    DO NOT WRITE ON THE TRANSCRIPT, ENTER CHANGES ON THIS PAGE
In Re:  Mainsail Parent, LLC, et al. v. David Jewell, et al.
                         Cheri Kane
4                    January 13, 2025

5    PAGE   LINE   CHANGE                              REASON

6    _____  _____  _____    _____

7    _____  _____  _____    _____

8    _____  _____  _____    _____

9    _____  _____  _____    _____

10   _____  _____  _____    _____

11   _____  _____  _____    _____

12   _____  _____  _____    _____

13   _____  _____  _____    _____

14   _____  _____  _____    _____

15   _____  _____  _____    _____

16   _____  _____  _____    _____

17   _____  _____  _____    _____

18   _____  _____  _____    _____

19   _____  _____  _____    _____

20   _____  _____  _____    _____

21   _____  _____  _____    _____

22   Under penalties of perjury, I declare that I have
     read my deposition transcript, and it is true and
23   correct subject to any changes in form or substance
     entered here.

24

     _____                  _____
25   DATE                     CHERI KANE

U.S. Legal Support | www.uslegalsupport.com

Cheri Kane
January 13, 2025

1   January 17, 2025

2   Cheri Kane
    c/o Kevin Attridge, Esq. (kattridge@steinmitchell.com)
3   Stein Mitchell Beato & Missner, LLC
    2000 K Street NW, Suite 600
4   Washington, D.C. 20006

5   In Re:    Mainsail Parent, LLC, et al v. David Jewell, et al
              Deposition taken on 01/13/2025
6             U.S. Legal Support Job No. 6787777-001

7   The transcript of the above-referenced proceeding has
    been prepared and is being provided to your office
8   for review by the witness.

9   We respectfully request that the witness complete their
    review within a reasonable amount of time and return
10  the errata sheet to our office at the below address
    or email to:  southeastproduction@uslegalsupport.com.

11
    Sincerely,
12

13

14
    _____
15  Richard Greenspan, CM, FAPR
    U.S. Legal Support, Inc.
16  Attn:  Transcript Production
    16825 Northchase Drive, Suite 900
17  Houston, Texas 77060
    (713) 653-7100
18
    CC via transcript:
19
    Christopher Prater, Esq.
20
    Kevin Attridge, Esq.
21

22

23

24

25

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025

Cheri Kane
January 13, 2025