UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MAINSAIL PARENT, LLC
d/b/a ASPIRION; and
SPECIALIZED HEALTHCARE
PARTNERS, LLC,

   *Plaintiffs*,

v.

DAVID JEWELL; MICHAEL
CAMERON; ALISHA MAYS;
MEGAN KELLY; TERNIUM LLC; &
DEVANNIE ABELL,

   *Defendants*.
_____/

CASE No. 1:24-cv-22875-CMA

## DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Jewell, Cameron, Kelly, Mays, Abell, and Ternium LLC, pursuant to F.R.C.P. 56 and Local Rule 56.1, submit this Statement of Material Facts in Connection with their forthcoming Motion for Partial Summary Judgment.

1. Plaintiff Specialized Healthcare Partners, LLC is wholly owned by Plaintiff Mainsail Parent, LLC d/b/a Aspirion Health Resources (Plaintiffs are collectively "Aspirion"). Aspirion is a revenue cycle management company ("**RCM**"). Aspirion works in multiple segments of the RCM industry, but the relevant segment is healthcare denials (a/k/a appealing denied health insurance claims on behalf of healthcare facilities and systems). D.E. 60 at ¶ 1; Injunction Hearing Tr., Vol. 1 at 43:6-9, attached hereto as Exhibit "A".

2. The RCM industry segment at issue involves appealing the denial of payments by healthcare insurance companies to healthcare organizations. This segment is commonly referred to as "denials." D.E. 60 at ¶ 2; Ex. A at 42:22-43:16.

3. Although Aspirion previously tried to differentiate itself in the market by using personnel with juris doctor degrees to work on the denials appeals, Aspirion has been transitioning to an Artificial Intelligence and Machine Learning based entity utilizing that technology to draft appeals. Ex. A at 9:17-20, 124:21-23.

4. The Individual Defendants previously worked for Aspirion. Jewell stopped working there in September 2023, Mays and Kelley stopped working there in October 2023, and Cameron stopped working there in January 2024. Ex. A at 113:1-3, 145:5-7. Jewell and Cameron signed employment agreements with 12-month restrictive covenants. D.E. 60 at ¶¶ 5, 7.

5. In 2022 Jewell registered Ternium. Ternium sat dormant until late 2023 when Jewell, Cameron, Mays, and Kelly collectively decided to operate a business together under the already registered Ternium name. Ex. B, at 21:14-15, attached hereto as Exhibit B; Ex. C at 44:4-12, attached hereto as Exhibit C; Ternium's Second Amended Interrogatory Responses, at Amended Response to Number 1, attached hereto as Exhibit "D". Jewell, Cameron, Mays, and Kelly, signed the Ternium operating agreement in August 2023. D.E. 60 at ¶ 8; Ex. C at 44:4-12; Ex. D at Amended Response 1.

6. Customers needs in the RCM denials industry can change from day to day and fluctuate frequently due the discretionary nature of the relationships. Ex. A at 122:14-21; Ex. B at 55:14-56:25; Ex. C at 32:11-18.

7. No services or other account work were provided by Ternium until November 2023, which was after Jewell, Mays, and Kelly stopped working for Aspirion. Ex. B, at 21:1-6; Ex. E at 14:5-7, attached hereto as Exhibit "E"; Ex. C at 45:5-10.

8. Aspirion claims some clients reduced business with it, and attribute that to Defendants, but introduced no evidence of that beyond conclusory testimony and a speculative expert report. *See* Duffus Expert Report, filed as D.E. 114-1; see also Duffus Dep. Tr. filed as D.E. 114-3; Ex. A at 159:9-14, 160:13-23; Ex. E at 43:25-2. There is no evidence that Defendants were the cause of that allegedly lost business. Defendants disputed that the reduction was because of their competition. *See, e.g.,* Ex. E at 10:19-14:4. Plaintiffs admitted they did not discuss the reduction with the at the issues clients and Defendants testified that at least a couple clients at issue reduced their denials work that is outsources to companies like Plaintiffs and Ternium following and because of a data breach at a prominent clearing house in February 2024. Ex. E at 10:19-14:4; Ex. A at 160:13-17.

9.

10. Plaintiffs admitted multiple times that the harm they attribute to Defendants is lost business with customers. *See, e.g.,* Ex. F.

11. The overwhelming majority of information at issue is publicly available and/or is shared by Plaintiffs with its competitors that it works with, including their clients consider to be *their biggest competitors due to the in-house RCM work they do*). Ex. A at 192:1-25. Sharing of this information occurs through Plaintiffs' work with those entities, through Plaintiffs' publications on the Knowledge Center page of its website, through trainings Aspirion provides to competitors and customers, and through Aspirion's presentations at industry events and conferences. Ex. A at 192:1-25; Ex. B at 10:9-14:4 (regarding Aspirion's sharing of information at issue in this case at industry events attended by healthcare facilities and other competitors).

12. The nature of the RCM denials industry is such that the process and methods utilized are not secret. Ex. B at 15:6-7.

13. Aspirion shared its template contract with prospective clients and it was typically edited from there by actual and prospective clients. Ex. B at 15:12-25.

14. The contract wish list PowerPoint slide that Cameron emailed himself before leaving Aspirion, i.e., they only Aspirion document he took, is not confidential and versions of it have been repeatedly shared with clients and at industry events and conferences by Aspirion. Ex. B at 49:8-19.

15. Defendants' access to Plaintiffs' systems was cut off when their employment ended. Ex. A at 197:21-198:7.

16. Mays and Kelly had access to the same or substantially similar mix of information as Jewell and Cameron despite not having restrictive covenants. Ex. A at 137: 24 – 139:2.

17. Through at least the end of Jewell's employment, Aspirion utilized documents and information taken from another RCM company. Ex. C at 35:6-26:13.

18. Plaintiffs did not identify any exclusive or near exclusive relationships with customers. Ex. B, at 25:11-13. To the contrary, it is clear that customers work with multiple RCM denials vendors at the same time. Ex. B, at 25:11-13; Ex. C at 32:11-18, 39:18-40:23. These customers are not required to send any work to Plaintiffs (even when agreements are in place) and there is no reasonable expectation that business will continue in the future. See, e.g., Ex. A at 159:18-23.

19. Business with customers in this industry is frequently awarded through requests for proposals and competitive bids and pitch meeting processes. Ex. A at 176:23-177:12. The key factors considered by customers when awarding business is price and performance. Ex. B, at 31:11-14; Ex. C at 40:24-41:2.

20. Although Aspirion and Ternium submitted bids to University of New Mexico during Jewell's employment, Jewell (who was solely responsible for that bid for Ternium) has no recollection of Aspirion's participation in that bid from prior to his submission for Ternium and did not review the Aspirion bid prior to submitting the bid for Ternium. Ex. C at 61:4-13, 15:15-20, 44:21-24. Both Aspirion and Ternium lost the bid and the word was awarded to a competitor. Ex. A at 118:8-21. Aspirion has never done business with University of New Mexico. Ex. A at 197:14-16.

21. In another instance where Aspirion and Ternium submitted a bid to the same entity (Baptist Medical Center of Jacksonville), which occurred after Jewell, Cameron, Kelly, and Mays all stopped working for Aspirion, both Aspirion and Ternium were awarded the business along with two other competitors. Ex. A at 164:15-22; Ex. D at 17. In other words, four RCM companies were awarded denials work from the same client.

22. Kelly decided to leave Aspirion after she noticed, over the course of several years, that Aspirion's denials performance was declining and internal process issues and customer complaints that she repeatedly brought to the attention of her superiors were not being appropriately addressed. Ex. B, at 7:14-8:1. Cameron decided to leave Aspirion because, among other reasons, Aspirion was going to change his compensation plan to drastically reduce his compensation and his sales territory was going to be shrunk. Ex. B, at 50:6-9.

23. Plaintiffs frequently rejected business from existing customers including at least some at issue here. Ex. A at 197:11-16; Ex. B at 24:9-25:10, 55:14-56:25. Some of that business was declined because Plaintiffs had capacity issues (i.e., could not handle the extra work) or because the work did not meet certain thresholds Plaintiffs required (i.e., was too old or not worth enough money). *Id*.; Ex. A at 158:3-6.

24. Plaintiffs also admitted that they generally target potential customers that exceed certain amounts in annual patient revenue, and said there is no problem with Defendants going after customers who do less than certain annual patient revenue amounts. Ex. A at 196:1-7, 196:12-15.

25. To the contrary, much of Plaintiffs' grievances come from the fact that Cameron and Jewell let entities know that they were leaving Aspirion and, when asked, described telling such customers that they intended to stay in the business with Ternium. Ex. B at 57:1-15.

26. Potential customers in the RCM denials industry are easily identifiable through a variety of means. Ex. A at 109:12-14. There are hundreds of competitors in the market and hundreds, if

not thousands, of potential clients. Ex. B, at 9:9-17. Lists of health systems and hospitals and the names of people in roles at those entities are not trade secrets. Ex. A at 134:10-17

27. The amount of work, if any, sent to Aspirion by the at issues customers is discretionary, meaning clients were not required to send any work to Aspirion and when the did send work the amounts often fluctuated substantially. Ex. B, at 24:9-25:10.

28. Former Aspirion employee Aleman offered Aspirion the opportunity to match her compensation offer from Ternium, but Aspirion declined to do so and Aleman resigned. Ex. A at 145:21-146:4.

29. Aspirion took screenshots of HIPAA protected information from Banner Healthcare's system without permission from Banner and filed that HIPAA protected information in the public docket. Ex. A at 161:17-163:9.

30. Plaintiffs have not demonstrated that damages cannot be calculated, and even admitted they could be. *See, e.g.,* Ex. A at 121:1-14, 193:22-194:3 Both changed their story later during a series of rapid-fire leading questions by Plaintiffs' counsel about generic categories of so-called harm. That is not enough. Nor is Duffus's pure speculation that a relationship may have been harmed by Defendant's placing a phone call to a client or because a client learned of this litigation and wants nothing to do with Aspirion as a result. *See, e.g.,* DE 114-3 at 33:24-34:14.

31. Cameron had no involvement with Banner, including he did not participate in any calls and attended no meetings with this entity. Ex. C at 7:10-22.

32. Defendants encouraged clients who worked with Aspirion to continue doing so and they are not aware of any customer that cancelled or ended its business with Aspirion because of Ternium's competition. Ex. C at 31:11-18, 32:11-18.

33. Ternium has no contract with Christus or Parkview and has not earned any revenue from Legacy or Advent. Ex. D at Number 10.

34. There are several factors, other than Defendants' competition, that could have and in many instances did in fact reduce the business clients sent to Aspirion. These include, without limitation, the clients keeping the denials work in house and handling it with their own teams, clients brining on other vendors, and market events and conditions including, for example, the Change Healthcare data breach that occurred in February 2024, which was one of the largest healthcare data breaches in history. Following that breach, many healthcare systems (including Banner Healthcare) stopped

sending denials out to RCM vendors altogether, substantially reduced the work they sent out, and some are still being impacted by it today. Ex. B, at 42:6-43:15; Ex. E at 12:22-13:7.

35. Cameron has worked in the RCM industry since approximately 1994. Ex. B, at 47:6-21. This includes working at Convergent (a competitor of Aspirion), where several of Plaintiffs' current and former agents worked before SHP and Aspirion, including David Jewell who worked for Convergent and its predecessor AHC for years. *Id*.; *see also* Ex. B, at 50:22-21 .

36. Aspirion uses artificial intelligence in its denials work, and there is no allegation that Defendants have Aspirion's methodology for the AI algorithm Aspirion uses. Ex. A at 124:21-23, 137:18-138:5.

37. Plaintiffs only ever identified a single vendor as being at issue in this case, Change Healthcare, which is a claims processing company utilized across the industry. Ex. A at 134:13-25.

38. Jewell, Mays, and Kelly were top performers for Aspirion in 2022-2023

39. Cameron closed millions of dollars worth of deals for Plaintiffs during his last year and even last few months of employment with them. Ex. B at 50:20-51:17. Cameron closed

40. Plaintiffs limited damages to those explained by their expert in their objections to discovery. See Objections to Corporate Representative Deposition Topics, attached Exhibit "F".

41. Plaintiffs served initial disclosures on 8/29/24 and have not amended those disclosures during this litigation. *See* Plaintiffs' Initial Disclosures, attached hereto as Exhibit "G".

42. Evangelical taking all business in house.

43. Plaintiffs served interrogatory responses describing the alleged relationships and goodwill and damages at issue in this case. Aspirion's and SHP's Amended Responses to Interrogatories from Jewell, attached hereto as Exhibit "H"; Aspirion's and SHP's Amended Responses to Interrogatories from Ternium attached hereto as Exhibit "I"; Aspirion's and SHP's Responses to Interrogatories from Jewell, attached hereto as Exhibit "J".

Dated: January 21, 2025.	Respectfully submitted,

By: /s/ *Christopher S. Prater*
**Christopher S. Prater**
Florida bar No.: 105488
cprater@pollardllc.com

**Jonathan E. Pollard**
Florida Bar No.: 83613

jpollard@pollardllc.com

**Pollard PLLC**
401 E. Las Olas Blvd. Ste. 1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 21, 2025, the forgoing document was electronically served via email to all counsel of record.

By: */s/ Christopher S. Prater*
Christopher S. Prater