**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

MAINSAIL PARENT, LLC, et al., **CASE No. 1:24-cv-22875-CMA**

*Plaintiffs*,

v.

DAVID JEWELL, et al.,

*Defendants*.
_______________________________________/

**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND EXPERT REPORTS OF DAVID DUFFUS AND CHERI KANE**

Defendants David Jewell, Michael Cameron, Alisha Mays, Megan Kelly, Devannie Abell, and Ternium LLC file this Motion to Exclude the Testimony and Expert Reports of David Duffus and Cheri Kane and state as follows:[1]

## INTRODUCTION

Plaintiffs disclosed David Duffus as their damages expert. In his expert report, Mr. Duffus opines that Plaintiffs have suffered and will suffer at least $20 million in damages. The Court should exclude the testimony and report of Mr. Duffus for three central reasons. First, Aspirion's *actual* 2024 earnings data shows that Aspirion did not suffer the multi-million dollar losses that Mr. Duffus has projected. Second, Mr. Duffus' testimony at his deposition was confusing and would not assist a jury. Third, any claim of lost profits is highly speculative given the volatile nature of this business and a multitude of other variables that Mr. Duffus did not control for.

Plaintiffs also disclosed Cheri Kane as an expert. Ms. Kane describes herself as an expert on the healthcare revenue cycle management industry. But that description is illusory. The real purpose of Ms. Kane's expert report is obvious: Ms. Kane is Plaintiffs' "legitimate business interest" expert. In other words, Ms. Kane has taken key concepts from Florida non-compete and trade secret law and fashioned an expert report around those concepts. Ms. Kane's so-called expert testimony does lots of work for the Plaintiffs and blankets the waterfront. She attests to the importance of client relationships, the existence of trade secrets, and the extraordinary nature of

[1] This consolidated and unredacted motion and exhibits are being re-filed in accordance with the Court's Order (D.E. 119).

Plaintiffs' employee training. Ms. Kane's proffered expert testimony is both unnecessary and improper.

# I. MEMORANDUM OF LAW

## A. STANDARD

Expert testimony is only admissible when: (1) the expert is qualified to testify regarding the subject matter; (2) the expert's methodology is sufficiently reliable and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a fact at issue. *See Chapman v. Procter & Gamble*, 766 F.3d 1296, 1304 (11th Cir. 2014). Courts have a critical gatekeeping function when it comes to expert testimony. *See, e.g., United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1310 (11th Cir. 1999). They must ensure "that speculative and unreliable opinions do not reach the jury." *McClain v. Metabolife*, 401 F.3d 1233, 1237 (11th Cir. 2005).

## B. THE TESTIMONY AND REPORT OF DAVID DUFFUS SHOULD BE EXCLUDED

### 1. Plaintiff's Actual Earnings Disprove the Damages Theory

Mr. Duffus calculated damages based on the 9 clients who are centrally at issue in this dispute. These clients are healthcare providers. When insurance companies deny their claims, these healthcare providers sometimes outsource the collection of those denied claims to companies like Aspirion. For 2022 and 2023, Mr. Duffus looked at the claims-placed, collection rate, and resulting fees paid to Aspirion. He then took the average of these two years and used that average to project what Aspirion would have earned in fees in 2024. He calls this the "but for" projection. In other words, but for the Defendants' alleged wrongdoing, Mr. Duffus contends that Aspirion would have earned that revenue. The Duffus Report breaks this down on a customer-by-customer basis. *See* Exhibit A - Duffus Expert Report at p. 40, Attachment 3A.

Mr. Duffus then projects Aspirion's actual 2024 earnings. For 2024, Mr. Duffus projects that Aspirion would suffer a massive shortfall in revenue. For example, take the client Banner. Mr. Duffus presents "but for" revenue of $4,421,671 vs. only $1,541,629 projected actual revenue. He attributes this $2,880,042 shortfall to the Defendant's misconduct. *Id*.

But here's the issue: The Duffus Report contains data on Aspirion's actual 2024 earnings through October. *See id*. at p.42, Attachment 3B ("Fees" column). So whereas Mr. Duffus theorizes about Aspirion's lost revenue, we can do simple math and see if Aspirion *actually* lost

any revenue in 2024. Let's take Banner again. For the first 10 months of 2024, Aspirion actually earned $3,859,295 in fees from Banner. *Id*. In other words, the massive losses that Mr. Duffus attributes to the Defendants don't exist. Through October, Aspirion was on pace in terms of fee revenue from Banner. And if we use the 2024 monthly average based on Aspirion's actual revenue ($385,930/month) to fill in the gap for November and December, that brings us to $4,631,154. That's even better than Mr. Duffus' "but for" number for Banner.

Defendants have created two charts. *See* Exhibit B – Aspirion 2024 Revenue. The first chart shows Aspirion's actual 2024 revenue for 8 of the 9 customers at issue through October. *Id*. The second chart shows the same thing but with a projection for November and December based on the average of the trailing 10 months. *Id*. For 2024, Mr. Duffus' total "but for" fee revenue number was $11,130,774. Ex. A at p. 40, 3A. Through October, Aspirion did $8,903,474 in fees. Ex. B. Aspirion appears on pace to do $10,684,169 for the year. *Id*. That is a shortfall of less than $500,000. But Mr. Duffus is claiming that Aspirion had more than $4.5 million in lost fee revenue for 2024. *See* Ex. A at p. 47, Attachment 4. That is clearly and demonstrably false. To make things worse, Mr. Duffus has projected these losses forward through 2028.

It would be wholly improper to let Mr. Duffus present his theory of Aspirion's lost revenue to a jury when Aspirion's *actual earnings* completely discredit that theory. On this basis alone, Mr. Duffus should not be permitted to testify at trial and his report should be excluded.

**2. <u>Mr. Duffus' Testimony Would Be Confusing and Unhelpful</u>**

At Mr. Duffus' deposition, there was an exact moment when he realized that he was in trouble. In other words, the moment when Mr. Duffus realized that he had failed to consider what Aspirion *actually* earned for the first 10 months of 2024 before opining that Aspirion had lost millions of dollars for 2024.

But Mr. Duffus could not simply admit his error. He began to scramble. First, Mr. Duffus argued that we did not understand. That his model was a projection. That it was based on May through October 2024. And that he stood by his assertion that Aspirion had lost millions of dollars in fees. Let's stick with Banner as an example. At one point, Mr. Duffus admitted that there was "mathematically" no shortfall but insisted that we were making a false comparison. *See* Ex. C –

Duffus Dep. Volume 2 at 18:25-20:10.[2] He stated, "Your comparison is false. I mean, there's so many falsities in what you put forward that I just think it's inappropriate to run the calculation in the way that you have." *Id.*

But then, things got strange. Realizing that his big problem was Aspirion's *actual 2024 earnings*, Mr. Duffus fashioned a workaround: He would claim that what appeared in the Duffus Report as lost revenue for 2024 was not actually for the year 2024. To be clear: Mr. Duffus' report states unequivocally that Plaintiff had suffered more than $4.5 million in damages for the year 2024. The charts in the report all contain years. 2024. 2025. 2026. 2027. 2028. The charts in the report present a specific amount of lost revenue for each one of those years. But, per Mr. Duffus, that was in error. Mr. Duffus testified that those years should not have been calendar years. Instead, Mr. Duffus explained that those years should have been labeled as Year 1, Year 2, Year 3, Year 4, and Year 5 of his damages model. This exchange lasts for a few pages of the deposition transcript and is worth reviewing in full. *Id*. at 55:18 - 61:25.

Defendants' counsel pressed Mr. Duffus to specifically delineate the timeframe that equates to Year 1 of his damages model. Mr. Duffus scrambled and evaded but ultimately let slip that Year 1 of his damage model started in January 2024. *Id*. at 57:18-20; *see also* Ex. A at ¶ 37 (p. 12 of the report) (stating "The lost profits analysis I performed is premised on a damage period that starts January 1, 2024."). When subsequently asked to confirm the January 2024 start date and provide the end date for his Year 1, Mr. Duffus was unable to do so. Mr. Duffus continued to talk in circles about his projection, a "run rate" based on May through October 2024, and a 5-year damages model. But he was never able to explain for what timeframe Aspirion was claiming the more than $4.5 million in lost revenue that was listed in his report as lost revenue for 2024. Ultimately, Mr. Duffus refused to explain for what specific period of time those losses were claimed (other than to say in Year 1 of his damages model). *Id.*

So, not only is Mr. Duffus' damages model a house of cards, but his evasive explanations would confuse a jury rather than help them. This is another reason why the Court should exclude Mr. Duffus' report and testimony.

### 3. Mr. Duffus' Report and Testimony Are Too Speculative

[2] For completeness, volume one of Duffus' deposition is attached hereto as Exhibit D. No specific language is cited from this volume. Multiple volumes of this deposition exist because of technical issues suffered by the court reporter.

Reasons A and B above present the clearest and strongest grounds for excluding Mr. Duffus and his report. But there is one more point worth noting. On a fundamental level, Plaintiffs' claim of lost revenue and lost profits is wholly speculative. If we look at the data contained in the Duffus Report, we see tremendous volatility. That volatility is everywhere. There is no consistency in terms of claims placed, collection rate, fees generated, etc. Ex. A at pp. 40, 42-45, Attachments 3A and 3B.

Beyond this, Mr. Duffus does not account for numerous factors such as major market events (i.e., Change Healthcare data breach), clients taking business in-house, client dissatisfaction, competition from vendors other than Ternium, and more. *See* Exhibit C – Duffus Dep. Vol. 2 at 22:14 to 34:14. In one particularly telling exchange, Mr. Duffus was asked how he accounted for clients bringing the relevant business in-house. In other words, a client formerly outsourced a large volume of business to Aspirion but now handles some of that business internally. Mr. Duffus testified that this could be attributable to clients simply throwing up their hands and saying they were done with both Aspirion and Ternium. But that theory is belied by the fact that many of the clients at issue still have large volumes of claims with Aspirion.

Any claim of lost revenue and lost profits in this case is highly speculative and must account for a litany of variables. Mr. Duffus did not account for any of those variables. Instead, he simply assumed that Aspirion would earn for 2024 the exact average of the prior two years (2023 and 2022). And then he assumed (in spite of clear evidence to the contrary) that the Defendants had caused Aspirion many millions of dollars' worth of damages. *See* Ex. A at p.22, ¶ 60. Mr. Duffus' report and testimony consist of unreliable assumptions and wild speculation. His testimony is not reliable enough to go to the jury.

**C. THE TESTIMONY AND REPORT OF CHERI KANE SHOULD BE EXCLUDED**

Ms. Kane's expert opinions can be summarized as follows:

- The industry is complex and competitive.
- Relationships are important and drive business.
- The Defendants gained a competitive advantage from working at Aspirion.
- Aspirion hires JD's and this is a unique model.
- Aspirion has trade secrets that are essential to its success.

- Without relying on Aspirion's relationships, employees, and confidential information, and training it would have been impossible for Ternium to establish a successful competing venture in short order.

*See* Exhibit E - Kane Expert Report. Ms. Kane's proffered expert testimony is highly problematic for several reasons. First, nothing here is so complex as to render expert testimony necessary or useful. When asked to summarize her expert opinion, Ms. Kane stated the following:

> My expert opinion is that relationships, training, training employees, along with confidential information, have a direct impact on vendors and can specifically create a competitive advantage if used, misappropriated in an incorrect manner.

*See* Exhibit F – Kane Dep. at 9:18 – 9:22. When asked to explain how this testimony would help the jury, Ms. Kane explained:

> Yes. So it helps -- it's going to help the jury, the court, understand, you know, the revenue cycle, the unique aspects of revenue cycle management, what the market looks for, how the market makes decisions, how the hospitals make decisions when they are selecting vendors, and whether or not the vendor in this case, Aspirion, had their information misappropriated and potentially used to better [the Defendants].

*Id*. at 10:15 to 10:23. Ms. Kane went on to state that the purpose of her testimony is to explain "how sales occur." *Id*. at 11:16-17. Expert testimony is neither necessary nor useful for any of this. And Ms. Kane's brief deposition makes it clear that she should not be permitted to testify to the jury because her testimony adds nothing meaningful.

Second, Ms. Kane and her expert report should be excluded because of Ms. Kane's repeated reliance on legal conclusions. Throughout her report and her testimony, Ms. Kane repeatedly invoked the concept of trade secrets. For one thing, Ms. Kane is not a lawyer. Ms. Kane is not an expert on trade secrets. Ms. Kane has never been permitted by a court to testify about what is or is not a trade secret. But here, Ms. Kane proposes to testify about the law, about what constitutes a trade secret, and about the misappropriation of trade secrets. In so doing, she strays far beyond the scope of any expertise she may have and infringes on the Court's role in instructing the jury on the law. Likewise, Ms. Kane basically proposes to tell the jury that Defendants are the bad guys, stole trade secrets, and caused all Plaintiffs' problems. This is not appropriate for expert testimony. *See, e.g., Montgomery v. Aetna*, 898 F.2d 1537, 1541 (11th Cir. 1990) (expert may not merely tell the jury what result to reach and offer opinions on the law or legal implications of conduct).

Third, Ms. Kane proposes to testify about how Aspirion is so unique and singular within the market but struggled to identify Aspirion's key competitors and never conducted any research into the type of information those competitors possess. *See* Exhibit F at 19:1-22:13. When pressed, Ms. Kane was only able to name 3 of Aspirion's competitors. *Id*. Likewise, Ms. Kane admitted that she had no knowledge of what mix of information or data any of Aspirion's competitors had access to. Likewise, Ms. Kane had no knowledge of what sorts of training leading companies in the industry provided. *Id*. at 34:19 to 35:22.

Fourth, Ms. Kane at times strayed into offering testimony about damages and causation. *Id*. at 22:14-26:16. At one point, Ms. Kane testified that the Defendants caused an 83% reduction in claims placed with Aspirion by the client Banner. Likewise, Ms. Kane opined in her report that Defendants making informal and casual contact with clients and potential clients (e.g., an email about a college football game) "permanently damaged Aspirion's client relationships and reputation in the marketplace." Exhibit E – Kane Report at p.13, ¶44. Opinions of this nature are wildly speculative and far outside of Ms. Kane's purview.

**CONCLUSION**

For all the foregoing reasons, the Court should exclude the testimony and reports of David Duffus and Cheri Kane.

Dated: January 24, 2025

Respectfully submitted,

By: /s/ *Christopher S. Prater*

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

Michael A. Boehringer
Florida Bar No.: 1018486
mboehringer@pollardllc.com

**Pollard PLLC**
401 E. Las Olas Blvd., #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Defendants*

## CERTIFICATE OF CONFERRAL

**I HEREBY CERTIFY** that on January 21, 2025, I conferred with counsel for Plaintiffs regarding the relief requested herein over the phone and was advised that Plaintiffs oppose this motion.

By: */s/ Christopher S. Prater*
Christopher S. Prater

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 21, 2025, the forgoing document was electronically served via email to all counsel of record.

By: */s/ Christopher S. Prater*
Christopher S. Prater